# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE NORTHERN DYNASTY MINERALS LTD. SECURITIES LITIGATION | Case No. 1:20-cv-05917-ENV-RLM<br><br>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Lawrence Kelemen ("Lead Plaintiff") and Named Plaintiff Charles Hymowitz ("Named Plaintiff"), collectively referred to as "Plaintiffs," individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of public filings by Northern Dynasty Minerals Ltd. ("Northern Dynasty" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"), as well as media and analyst reports about the Company and the Company's press releases. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired Northern Dynasty securities from December 21, 2017 through November 24, 2020, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC.

2.     Throughout the Class Period, Defendants repeatedly issued false and misleading statements about the Pebble Project, Northern Dynasty's plan to develop what Defendants deemed "one of the world's most important mineral resources." Northern Dynasty had been planning a mine size between 2.0 and 6.5 billion tons, with an initial mine life of 25 years and mine extensions to 78 years and beyond. Because the initially proposed Pebble Project was ill-received by the Environmental Protection Agency and stakeholders due to its disastrous impact on the unparalleled Bristol Bay watershed of Alaska, Defendants concocted a plan to devise a significantly smaller mine of shorter duration in an effort to extract a federal construction permit. To that end, Defendants repeatedly represented to the market, including in multiple filings with the SEC and in testimony to the U.S. Congress that the "Pebble mine will operate for a period of 20 years" with a "development footprint less than half the size previously envisaged" that is "designed for closure" after 20 years. Advancing this fictitious proposal, Defendant Collier emphasized that the Pebble Project "is likely to get a permit, but not because the [political] fix is in – rather, because our smaller, environmentally enhanced mine plan meets the high environmental standards and permitting requirement enforced in the US and Alaska, and should receive a permit."

3.     In truth, however, Defendants had no intention of limiting the mine to the size, scope, or duration of the Pebble Project. Undercover videotapes obtained by investigators with

the Environmental Investigation Agency ("the Pebble Tapes") revealed Defendants' scheme to purposefully submit a significantly smaller mine to maximize their chances of extracting a federal permit. In truth, Defendants schemed to build one of the largest mining facilities in the world: as Defendant Thiessen exclaimed, "[s]ee this project ultimately will look a lot like the Mongolian project Oyu Tolgoi," one of the world's largest copper-gold mines. In truth, Defendants intended that "during that 20 years [of the mine they claimed was designed for closure], you're gonna make the application to continue for another 20" because expansion of the mine "is the plan." Defendant Collier characterized the likelihood of expansion as almost 100%.

4. The Pebble Tapes reveal a different version of Defendants' plan, a project with at least a 180–200-year mine life, with expected increases in daily production rates to between 220,000 and 320,000 tons. Thiessen agreed that "there will be more—but the first one lasts 180 years." Thiessen also planned to develop additional mines in the area, saying "[n]ow Pebble itself has . . . 425 square miles of mineral claims, and so there could be more mines on the Pebble lands over time . . . We have other sites that we've drilled into and we have ore-grade mineralization in other areas in that 425 square miles but we don't talk about it too much because right now we want people to focus on only Pebble …." Defendants can also be heard confirming their interest in using the Pebble Project infrastructure to activate the Donlin mine, another project 175 miles north of Pebble: "if you flip the Pebble switch on, it's likely that you may be also flipping on the Donlin switch."

5. The Pebble Tapes also expose Defendants Thiessen and Collier brazenly bragging about their powers of political manipulation and their coziness with some individuals at the Army Corps of Engineers, the entity tasked with issuing the federal permit.

6.    When the truth emerged through a series of corrective disclosures and materializations of risks that the Pebble Project would not receive a permit, Northern Dynasty's stock went into a tailspin, wiping out hundreds of millions of dollars in market capitalization and injuring hundreds of thousands of investors.

7.    Collier resigned from his position as CEO of the Pebble Partnership on September 23, 2020, two days after the Pebble Tapes became public.  The United States Attorney's Office for the District of Alaska commenced a grand jury investigation into the matter.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.  Pursuant to Northern Dynasty's annual report on Form 40-F, as of the close of December 31, 2019, there were 422,942,680 shares of the Company's common shares outstanding.  Northern Dynasty's common shares trade on the New York Stock Exchange ("NYSE").  Accordingly, there are presumably hundreds, if not thousands, of investors in Northern Dynasty's common shares located within the United States, some of whom undoubtedly reside in this judicial district.

11.   In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Lead Plaintiff Lawrence Kelemen, as set forth in his Certification previously filed in *Darish v. Northern Dynasty Minerals Ltd.*, *et al.*, No. 20 Civ. 5917 (ENV) (RLM) (Dec. 4, 2020), Dkt. No. 17-4 at *2–*4 and attached herein as Exhibit purchased or otherwise acquired Northern Dynasty's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Named Plaintiff Charles Hymowitz, as set forth in his Certification previously filed with the Court (*see* Dkt. No. 1 at *23–*24), purchased or otherwise acquired Northern Dynasty's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Northern Dynasty Minerals Ltd. is incorporated in British Columbia, Canada, with its principal executive offices located on the 15th Floor, 1040 West Georgia Street, Vancouver, British Columbia, Canada V6E 4H1. The Company's securities trade in an efficient market on the NYSE, under the ticker symbol "NAK."

15.     Defendant Ronald William Thiessen ("Thiessen") has been Northern Dynasty's Chief Executive Officer ("CEO") and President from November 2001 to present. Thiessen is also the Director of the Pebble Limited Partnership ("Pebble Partnership"), a wholly owned subsidiary of Northern Dynasty. The Pebble Partnership was established in 2007 to design, permit, construct and operate the Pebble Project. Thiessen also leads Northern Dynasty's corporate development and financial activities.

16. Defendant Tom Collier ("Collier") served as CEO of the Pebble Partnership from February 4, 2014[1] until September 23, 2020. Collier is a veteran D.C. lobbyist who was hired at an annual salary of around $1.5 million, but with an additional substantial bonus of $12.5 million conditioned on his ability to secure a permit for the Pebble Project.[2]

17. Defendants Thiessen and Collier are sometimes referred to herein as the "Individual Defendants."

18. Defendants Northern Dynasty and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Defendants' Prior Attempts to Advance the Pebble Project

19. Northern Dynasty engages in the exploration of mineral properties in the United States. Its principal mineral property is the Pebble copper-gold-molybdenum project comprising 2,402 mineral claims that covers an area of approximately 417 square miles located in southwest Alaska (the "Pebble Project"). Northern Dynasty acquired rights to the Pebble deposit in 2001. Northern Dynasty owns 100% of the Pebble Partnership, which was established in mid-2007 to engineer, permit, construct and operate a mine at the Pebble Project.[3]

20. Since 2011, Northern Dynasty has tried to secure a federal permit for the Pebble Project in the Bristol Bay area of Alaska. The initial mine proposal included an open pit mine, a tailings facility, a power generating station, a deepwater port, and substantial transportation

---

[1] Northern Dynasty's Form 6-K filed with SEC on February 5, 2014.

[2] Northern Dynasty's Form 6-K filed with SEC on May 16, 2018.

[3] Northern Dynasty Minerals Ltd., About Us, A World-Class Resource, https://www.northerndynastyminerals.com/about-us/a-world-class-resource/ (last visited June 13, 2021); Northern Dynasty's Form 6-K dated November 16, 2011.

infrastructure, and was slated to operate for over 20 years. The originally proposed mine was expected to be one of the largest open pit mines in the world.

21.     The remote location of the Pebble deposit, and its proximity to the largest wild salmon sockeye run in the world, has made the Pebble Project a controversial lightning rod and the environmental fight of the century for Alaska. The Bristol Bay watershed is considered to be a delicate ecosystem, providing spawning grounds for all five species of Alaska salmon and habitat for over 40 species of mammals and 190 species of birds. The Bristol Bay region generates approximately $1.5 billion annually and provides a vital food source for thousands of Alaska's native residents, supporting subsistence activities for 25 communities of Alaska Natives. The Native village of Newhalen, for example, averages a 700-pound per capita harvest each year.

22.     In February 2011, Northern Dynasty formally submitted information to the SEC, presenting plans for the development of the Pebble Project. The plan outlined several stages of mine development, the smallest being a 2.0-billion-ton mine and the largest being a 6.5-billion-ton mine. Each of these proposals was larger than 90% of the known ore deposits of this type in the world.

23.     Although the Pebble Project would have been located on state land, it was still subject to federal permitting requirements. Because the mine construction would require a significant amount of dredging, Northern Dynasty needed to obtain a permit under §404 of the Clean Water Act. Such permits are issued by the U.S. Army Corps of Engineers ("Army Corps"). Under § 404(c), however, the Environmental Protection Agency ("EPA") may prohibit or restrict fill activities if it determines that a project would have an "unacceptable adverse effect" on the fishery habitats and their spawning and breeding areas.

24.     For several years, the EPA gathered information about the impact such a project would have on the Bristol Bay watershed.  The EPA conducted an ecological risk assessment and after three years of study, two rounds of public comment, and independent, external peer review, in January 2014, the EPA released its Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska (the "Bristol Bay Assessment").

25.     The Bristol Bay Assessment evaluated the environmental impacts using three mine scenarios that represent different stages of mining at the Pebble deposit, based on the amount of ore processed: (i) Pebble 0.25 stage mine (approximately 0.25 billion tons of ore over 20 years); (ii) Pebble 2.0 stage mine (approximately 2.0 billion tons of ore over 25 years); and (iii) Pebble 6.5 stage mine (approximately 6.5 billion tons of ore over 78 years).

26.     In assessing the impacts of the smaller 0.25 stage mine, the EPA found that, although this smaller size is dwarfed by the mine sizes that Northern Dynasty presented to the SEC, its impacts would still be significant.

27.     The Bristol Bay Assessment found that the extraction, storage, treatment, and transportation activities associated with building, operating, and maintaining one of the largest mines ever built would pose significant risks to the unparalleled ecosystem that is one of the greatest wild salmon fisheries left in the world.  The Bristol Bay Assessment concluded that the infrastructure necessary to mine the Pebble deposit jeopardizes the long-term health and sustainability of the Bristol Bay ecosystem.

28.     Then, in July 2014, the EPA's Region 10, which services the Pacific Northwest area, published its "Proposed Determination" report under Section 404.  That section permits the EPA to restrict or prohibit certain mining activities if it determines a project would have unacceptable adverse effects on fishery areas.  The EPA's Proposed Determination came down

hard on the Pebble Project, detailing the many risks involved even with a smaller footprint mine, including the major loss of fish habitat, the high probability of a damaging pipeline break, the catastrophic consequences of tailings dam failures, and the never-ending threat of acid-mine drainage.

29.     In the Proposed Determination, the EPA underscored that, based on the information Northern Dynasty provided to the SEC, mining the Pebble deposit was likely to involve excavation of the largest open pit ever constructed in North America, covering up to 6.9 square miles (17.8 km2) and reaching a depth of as much as 0.77 mile (1.24 km). For reference, the EPA explained, the maximum depth of the Grand Canyon is approximately 1 mile. Disposal of resulting waste material would require construction of up to three mine tailings impoundments covering an additional 18.8 square miles (48.6 km2) and waste rock piles covering up to 8.7 square miles (22.6 km2) in an area that contains highly productive streams and wetlands.

30.     The Proposed Determination explained that the total mineral resources at the Pebble deposit are believed to be approximately 12 billion tons of ore. Accordingly, the development of a mine at the Pebble deposit would ultimately be much larger than the 0.25 stage mine that the EPA considered in its Bristol Bay Assessment, and could even exceed the 6.5 stage mine. The Proposed Determination highlighted Northern Dynasty's statement that "the Pebble deposit supports open pit mining utilizing conventional drill, blast and truck-haul methods, with an initial mine life of 25 years and potential for mine extensions to 78 years and beyond." Based on that statement, the EPA inferred that Northern Dynasty was actively considering a mine size between 2.0 and 6.5 billion tons.

31.     The EPA explained that the volume of mine tailings and waste rock produced from the smallest mine proposed by Northern Dynasty to the SEC (the 2 billion-ton mine scenario)

would be enough to fill a professional football stadium more than 880 times, whereas the largest mine would do so more than 3,900 times.  In total, these three mine components (mine pit, tailings impoundments, and waste rock piles) would cover an area larger than Manhattan.  The EPA also underscored that mine construction and operation would also require the construction of support facilities, including a major transportation corridor, pipelines, a power generating station, wastewater treatment plants, housing and support services for workers, administrative offices, and other infrastructure.  Such facilities, the EPA found, would greatly expand the "footprint" of the mine and affect additional aquatic resources beyond the scope of the Proposed Determination.  Any mining of this deposit would, by necessity, require similar mine components, support facilities, and operational features.

32.     In its Proposed Determination, the EPA concluded that given the proposals made by Northern Dynasty to develop 2.0- and 6.5-billion-ton mines at the Pebble deposit and the EPA's evaluation of even a smaller 0.25-billion-ton mine, it had reason to believe that mining of the Pebble deposit at any of these sizes, even the smallest, could result in significant and unacceptable adverse effects on ecologically important streams, wetlands, lakes, and ponds and the fishery areas they support.  Accordingly, the EPA proposed strict restrictions on the discharge of dredged or fill material into area waterways to protect the unparalleled ecological value of the Bristol Bay watershed.

33.     Northern Dynasty sued the EPA over the regulatory actions that prevented the Pebble Project from advancing to a permit application with the Army Corps.  The EPA and Northern Dynasty eventually settled the lawsuit, and on December 21, 2017, Northern Dynasty announced its intention to apply for a Clean Water Act permit with the Army Corps using a significantly smaller footprint and a closure plan after 20 years.

**<u>Defendants' Renewed Attempts to Advance a Purportedly "Smaller,<br>More Responsive Project Design"</u>**

34.     Given the contentious history with the EPA, Defendants deliberately crafted a ***much smaller, limited, 20-year mining proposal*** and offered a ***mine closure plan*** to obfuscate their actual plans for future expansions.  Defendants designed this scheme in hopes of securing a permit from the Army Corps.

35.     In the December 22, 2017 permit application submitted to the Army Corps, it was represented that the entire production phase of the mine is planned to last ***only 20 years***, with active open pit mining lasting 14 years ***and a daily process rate of 160,000 tons***.  More specifically, the application stated that the "[p]roject operating life [is] 20 years," "[t]he Project will mine approximately 1.1 billion tons of mineralized material . . . over the 20-year mine life," "[c]onstruction will last for approximately four years, followed by a commissioning period and 20 years of mineral processing," "open pit mining [is] 14 years," "[t]he mine operation will commence during the last year of the Reproduction Phase and extend for 14 years during the Production Phase," "[t]he Production Phase is planned to last for 20 years. Mineralized material will be mined for 14 years," "[t]otal TSF [Tailings Storage Facility] capacity will be sufficient to store the 20-year mine life tailings volume", "[d]aily process rate" of the Pebble Project is "160,000 tons."  The application represented that "[t]he Project plan has been limited to mining the near-surface portion of the Pebble Deposit" in order to "significantly reduce[] the footprint of the open pit, TSF, and mine facilities."

36.     What's more, Defendants even outlined a ***closure plan*** for the mine: "[t]he overall project footprint will be minimized to facilitate physical closure and post-closure water management" and "[a]ctive mining in the open pit will stop after 14 years, pit dewatering will stop,

and the pit will begin to flood."[4]  Specifically, Pebble Project's closure plan called for tailings to be placed in the open pit, precluding mining at the mine site and committing Northern Dynasty to a 20-year mining plan.

37.     On August 31, 2018, the Army Corps issued a scoping report for the Pebble Project. The scoping process provides an opportunity for people potentially affected by the project to express their views and concerns and to contribute to the completeness of the Environmental Impact Statement ("EIS").[5]  The scoping report described the proposed Pebble Project as having a total footprint of approximately 5.9 square miles.[6]  The scoping report also included a presentation by the Pebble Partnership titled "The Pebble Project, Project Description and Summary Information." The presentation stated that the "Project operating life [is] 20 years."[7]     The presentation included a slide titled "Closure & Reclamation."  The slide showed a timeline for a reclamation of the Pebble mine under the heading "Pebble: Designed for Closure." The reclamation block stated that "[m]ost buildings [would be] removed," "[t]errain resculpted," and "[n]ative plants resown," after 5 years. After 20 years, "[v]egetation well-established in reclaimed areas," "[p]it continues to fill with water." After 30 years, "[p]it lake has formed," "[w]ater is pumped from pit for treatment and discharge."[8]

38.     On October 23, 2019, Defendant Collier testified before the United States House of Representatives on the Pebble Project's process and its potential impacts.  Collier stated that

---

[4] Pebble Project, Department of the Army Application Permit, December 2017, Attachment D–Project Description, Section 6.

[5] U.S. Army Corps of Engineers, Pebble Project EIS, Scoping Report, August 31, 2018.

[6] *Id.* (Appendix A – Notice of Intent).

[7] *Id.* at 287.

[8] *Id.*

Northern Dynasty "ha[s] taken several steps to de-risk [its] mining plans."[9] Specifically, Collier represented that Northern Dynasty "*has planned a smaller, smarter mine*," of "*just 5.2 square miles*" and has "reduced the mine size" to alleviate concerns about environmental impacts. Collier emphasized that Northern Dynasty's mine closure plan is a "*significant factor*" in reducing impacts from the mine because it eliminates waste rock storage by filling the open pit.

39.     In response to concerns about the possibility of expanded mining of the Pebble deposit, Collier categorically rejected those concerns as nothing more than the "desperation" of those opposed to the mine. In no uncertain terms, Collier unequivocally represented that Pebble **"*has no current plans, in this application or in any other way, for expansion*"**:

> I would like to talk about what the Pebble Partnership has done to improve its plans and dispel some of the myths associated with the Corps' work to date. Pebble has planned a smaller, smarter mine. *In response to concerns voiced by various stakeholders, we have reduced the mine size to a footprint that even EPA's rigid Proposed Determination would nearly have allowed to proceed through the NEPA permitting process* . . .

> One of my fellow panelists today, former EPA Regional Administrator Dennis McLerran, has called Pebble's permit application the "camel's nose under the tent," which I suppose means that he believes that Pebble plans on shoehorning in a larger project despite the fact that we have scaled back the footprint in the mine currently before the Corps of Engineers. I have several responses:

> First, I believe it shows the level of desperation that the Pebble opposition has reached. Think about it: to oppose this permit application, they are forced to argue that it must in fact be far different than what is actually proposed. In other words, they are struggling to find problems with what is currently pending before the Corps.

> *Pebble has no current plans, in this application or in any other way, for expansion*.[10]

---

[9] Testimony of Tom Collier, CEO of the Pebble Partnership, Before the Subcommittee on Water Resources and the Environment, Committee on Transportation and Infrastructure, United States House of Representatives, October 23, 2019, "The Pebble Mine Project: Process and Potential Impacts."

[10] *Id.*

40.     On July 24, 2020, the Army Corps released a positive Final Environmental Impact Statement (FEIS) for the Pebble Project, noting that the Pebble Project would have no measurable impact on Bristol Bay's fisheries.  The FEIS is not a permit decision and does not authorize operation of the mine.  The FEIS contained an analysis of Pebble's preferred alternative along with alternatives to that project.  The analysis in the FEIS was to be used, along with other factors, to determine if Pebble's preferred alternative was permissible under §404 of the Clean Water Act.

41.     Collier hailed the FEIS as a significant milestone for the Pebble Project, claiming that the Alaskan residents had been deceived by a "misinformation campaign" that the fishing industry would be harmed in any way:

> Alaskans, especially the residents of Bristol Bay, have never received the real Pebble story and after a lengthy misinformation campaign many were led to believe a mine at Pebble would harm the fishery. Today's report from the USACE turns that lie on its head – returning salmon won't be harmed, subsistence fishing won't be harmed, and the commercial fishing industry won't be harmed. The final EIS for Pebble unequivocally shows it can be developed without harming salmon populations. It clearly states that no long term measurable impacts to returning salmon are to be expected and there will be no long term changes to the health of the Bristol Bay commercial fishery.

42.     Collier defended the "process the [Army Corps] followed to get to th[at] point" as "sound and defensible."[11]

43.     Eventually, as described herein, in November 2020, the Army Corps denied the permit, finding that the plan "does not comply with Clean Water Act guidelines" and concluding that "the proposed project is contrary to the public interest."[12]

---

[11] Press Release, Pebble Partnership, Final Federal Environmental Review Shows Pebble Can Be Developed Responsibly, PLP CEO Calls EIS a Significant Project Milestone (July 24, 2020), https://pebblepartnership.com/press-releases/2020/7/24/final-federal-environmental-review-shows-pebble-can-be-developed-responsibly.
[12] Record of Decision for Application Submitted by Pebble Limited Partnership to: the United States Army Corps of Engineers, November 20, 2020.

## In Truth, Defendants Planned a Massive and Long-Lasting Project

44.     Contrary to their public representations, including in filings with the SEC (*see infra*) and before Congress, Defendants had other plans for the Pebble Project.  In truth, Defendants schemed to secure a permit for the Pebble Project by pretending to have significantly downsized the project and its duration.   But unbeknownst to the market, Defendants planned all along to develop one of the largest mines in the world.

45.     On September 21, 2020, the Environmental Investigation Agency ("EIA"), a Washington DC-based non-profit, released a series of conversations recorded between August and September 2020 that took place among undercover EIA investigators expressing an interest in investment opportunities related to the Pebble Project, and Defendants Thiessen and Collier.  The recordings, dubbed "The Pebble Tapes,"[13] revealed Northern Dynasty's actual plans to build a much larger and long-lived mine than described in Northern Dynasty's permit application with the Army Corps, in public SEC filings, and in Congressional testimony.  The Pebble Tapes contain repeated statements by Thiessen and Collier that confirm Defendants' true plans for the Pebble project.

46.     In these tapes, Thiessen repeatedly stressed that the 20-year project described publicly will, in fact, be merely ***the first stage*** in Northern Dynasty's planned, expansive development of the Pebble deposit.[14]  Thiessen is heard saying that once it secures the permit for Pebble, Northern Dynasty is "gonna make the application to continue for another 20" years:

> [Thiessen]: The original footprint was about 16 to 18 square miles.  How do we bring that down and make people comfortable? . . .

---

[13]  Press Release, Environmental Investigation Agency, the Pebble Tapes (Sept. 21, 2020), https://eia-global.org/reports/20200921-the-pebble-tapes.  Exhibit B to the Complaint contains the transcripts of the Pebble Tapes.

[14]  Pebble Tape 1.

[W]e said 'Ok, let's see if we can reduce the size of the project overall and still have a reasonable economic. [sic]
So we reduced the size of the processing plant to 160,000 metric tons per day. And then we said 'Let's just have a 20-year mine life . . . So we said 'Let's only have a 20-year mine life' and so that's how we kept the footprint down to five-and-a-half square miles. Is slightly smaller throughput and a 20-year mine life. **But during that 20 years, you're gonna make the application to continue for another 20. So we do have all the studies that go through all of this**, and to increase the size of the mill from 160,000 metric tons per day we can go to 220, we can go to 320.

47.     Accordingly, Thiessen made clear that the Pebble project's processing capacity had been designed to expand far past the milling rates disclosed publicly: "we can go to 320." Thiessen unequivocally agreed that "*all the key elements of the expansion are already contained in the current project*." Thiessen emphasized that *expansion of the mine "is the plan*." Thiessen also added: "*See this project ultimately will look a lot like the Mongolian project Oyu Tolgoi*," an open pit and underground mine that is one of the largest in the world.

48.     When asked by the investigators if growth of the mine past the scale currently applied for would be "unstoppable," Thiessen offered a categorical "Yes." Thiessen explained further: "Well who's gonna stop a mine that has 180– at a 160,000 metric tons per day, the first deposit that we've discovered at Pebble *– and there will be more – but the first one lasts 180 years*." Thiessen added: "Once you have something like this in production why would you want to stop? And even, at the end of the day its footprint is so tiny. If we mined the whole valley it's 25 square miles."

49.     In response to a question from the investigators about the mine's expansion after the first 20 years, Collier said that Northern Dynasty plans for "*constant expansions*" after the issuance of the first permit. When asked whether "the likelihood [of expansion] is pretty much 100 percent almost," Collier responded with a resounding "Yes." Thiessen added that "[w]ell I'm just saying that based on a 180,000 short tons a day of processing capacity, and we have 10 billion tons, that's 180-year mine life. And we know that there's more ore there *so it's probably gonna*

16

*be more than 200 years*." When asked how locked Northern Dynasty was "into thinking or planning to go beyond 20 years, 180 years or so?," Thiessen responded "Well it's absolutely because the ore is there. We've drilled it. We've engineered it.  All the work's been done for it."[15] In a separate conversation with the investigators, Thiessen emphasized: "***remember this mine is not gonna be finished for 180, 200 years***."[16]  When asked "***and it's important to not make [the extension plan] public now I understand,***" Thiessen simply said: ***"Yes."***[17]

50.     Collier added his own admissions on tape, noting that when he "came in [his] assignment from Ron was to kind of reconsider the project and  design something we thought could get through the permitting process without as much controversy as the original project had engendered.  So we did lots of things to the project.  We made it smaller . . . ."[18]  Collier further explained how the "northern corridor route" facilitates the mine's planned expansion: "And so now we are going to be building a northern corridor.  We'll have a slurry pipeline as part of it so the concentrate will go down to the coast by pipeline.  And it makes a lot of things easier for us. *It makes expansion much easier*." In response to the investigators' question "when you say it is easier for the expansion you mean post–20 years or ….?," Collier responded: "***Yes post–20 years***."[19] Thiessen also enthusiastically embraced the northern infrastructure corridor because it would facilitate expansion of the mine: "The northern corridor infrastructure part will handle the expansion":

> [Thiessen]: The northern corridor infrastructure part will handle the expansion.
> When that expansion comes on, you know because the PEA talks about effectively

---

[15] *Id.*

[16] Pebble Tape 9.

[17] Pebble Tape 12.

[18] Pebble Tape 5.

[19] *Id.*

a 220,000 ton per day concentrator and **what we're building in the first stage is a 180,000 ton per day concentrator**.

[Investigator]: So all is already contained, all the expansion, all the key elements of the expansion are already contained in the current project.

[Thiessen]: **Yes.**

[Investigator]: And that's the plan?  That's really the objective?

[Thiessen]: **That is the plan** . . .[20]

51.    Thiessen emphasized Northern Dynasty's interest in developing additional mines in the Pebble Valley, saying "Pebble itself has . . . 425 square miles of mineral claims, and so there could be more mines on the Pebble lands over time. We have other sites that we've drilled into and we have ore-grade mineralization in other areas in that 425 square miles but **we don't talk about it too much because right now we want people to focus on only Pebble** . . ."[21]

52.    Thiessen also disclosed to the investigators Northern Dynasty's plan of using the infrastructure that will be put in place as part of the Pebble Project to facilitate activation of another nearby mine.  According to Thiessen, the nearby Donlin mine was economically unviable unless it could use the roads and pipelines that will be built by Pebble to export its ore.  Thiessen explained: "there is another project that's 175 miles north of Pebble. It's called the Donlin Project . . . there is a lot of logic to us joining forces to make a single corridor."[22]  Collier also weighed in, stating, "**if you flip the Pebble switch on, it's likely that you may be also flipping on the Donlin switch**."[23]

53.    Thiessen described Defendants' plan to have multiple mines in that region for centuries to come, underscoring that it was important to keep the plan hidden from the market:

---

[20] Pebble Tape 1.

[21] Pebble Tape 12.

[22] Pebble Tape 2.

[23] *Id.*

[Thiessen]: Well you know there, *so I mean listen the first mine is 180 years long*, Pebble. There's no rush for the other ones but I think ultimately, it's like you can say like Escondida, like Los [unclear], like Chuquicamata, you could see, you know, three to four mines in the area. But that might be over a century.

[Investigator]: Yea, that's exactly what I was about to say. So that would be, say, three, four – *in reality what's at stake here is three, four mines for a century in the region?*

[Thiessen]: *Yes*

[Investigator]: Have you shared your plan or what the plan is about of having several other mines in pebble with the Army Corps? What have they said about that?

[Thiessen]: So… Yes, we have. More about the extension of the original mine to subsequent years. They took a look at downstream, the kinds of things that would need to be considered and they did take some of that into account but because we are only applying for a 20-year mine life most of this will be addressed sometime in the next 20 years.

[Investigator]: Mhmm. And it's important to not make it public now I understand.

[Thiessen]: *Yes.* So we've, with respect to other mines, typically we share that information under the NDA with the other potential partners, the mining operating partners. *[Y]ou can see it, there's a picture in our presentation and it's induced polarization. It's a picture of the 425 square miles and it's got a bunch of dots on it. Each one of those little dots represents potentially another mine site.*

[Investigator]: And so the army corp when they made their decision, they took into account that. *Its not Public* but

[Thiessen]: **Yes**

[Investigator]: -- ah. I understand. So they are already thinking along your side guys on the big development expansion and are planning in this way?

[Thiessen]: Yes. Yes. We've told them that there are two ways we would expand. The most obvious one is to extend the mine life, the mining license by 20 to 40 years, once we know the next methodology, block caving, open pit, or a combination of the two. And then the other expansion potential is to expand the mill from 180,000 tons a day to say 320,000 tons a day.[24]

---

[24] Pebble Tape 12.

54.     Far from the "substantially smaller" 5.9 square miles mine of 20-year duration touted to the market, the Pebble Tapes revealed Northern Dynasty's true intent to develop a mine as large as 25 square miles,[25] that is "not gonna be finished for 180, 200 years."[26] At bottom, the market was told that the Pebble mine is a 20-year project, while the Pebble Tapes reveal that the mining operations will be expanded for centuries.  While the market was told that the mine is "just 5.2 square miles,"[27] the Pebble Tapes revealed that the mining operations could spread over the entire Pebble Valley and pave the way for other mines, hundreds of miles away.  While the market was told that only 160,000 – 180,000 tons per day will be mined, the Pebble Tapes revealed that the planned mining rate was at least 220,000 - 320,000 tons per day.

55.     Defendants' trickery—to commit to a significantly smaller mining operation only until a permit was secured—had been in the works for some time, and at least as early as the beginning of the Class Period.  On or around September 26, 2017, Thiessen gave a presentation to gold companies boasting about the long-term nature of the mine, but underscoring that the "Pathway to Permitting – A Fresh Start" was by "advancing a project into permitting that *is smaller and more responsive to stakeholder concerns.*"[28]   Thiessen described the "*reality*" as "*represent[ing] development for many years, perhaps centuries into the future, and when you build the infrastructure in there and you've got a concentrator you can feed it forever.*"

---

[25] Pebble Tape 1.

[26] Pebble Tape 9.

[27] Testimony of Tom Collier, CEO of the Pebble Partnership, Before the Subcommittee on Water Resources and the Environment, Committee on Transportation and Infrastructure, United States House of Representatives, October 23, 2019, "The Pebble Mine Project: Process and Potential Impacts."

[28] Northern Dynasty Minerals Ltd., the Pebble Partnership, The Pebble Project, The Future of U.S. Mining & Metals, A Pathway to Permitting, September 2017.

56. One of the September 26, 2017 presentation slides used by Thiessen showed a timeline for the Pebble mine, including blocks of time for permitting, construction, and production. The block for permitting showed "3-4 years," the block for construction showed "4 years," and the block for production said: "*A Very Long Time*." Thiessen made specific references to the production block, declaring "***Probably my most interesting block on this is the production period, which is a very long period of time.*" "*The size and scale of Pebble leads to a long-life mine*," Thiessen continued, "***representing development for perhaps centuries into the future, with other nearby mining opportunities too*." The presentation included a slide titled "Pebble May Host Other Major Deposits." It underscored that "The extent of mineralization at Pebble is comparable to: Oyu Tolgoi, Chuquicamata, Los Bronces/Andina" (some of the biggest mines in the world) and that "exploration potential at deposit and within region is noteworthy." It also boasted that the Pebble Project will increase U.S. copper production "by 20% *over decades of production*."

57. Thus, from the very beginning of the Class Period, Defendants had hatched a plan to scheme and mislead until a permit was secured. To that end, during the Class Period, Defendants repeatedly vouched that the Pebble Project was limited to 20 years of mining operations with a limited footprint and even a closure plan that precluded further mining. It is crystal clear that Defendants lied to the market about the fundamentals of their permit application. Defendants falsely designed the project to maximize its chances of obtaining a critical permit despite having no intention of limiting the mine to the size, scope, or duration presented to the market.

**Materially False and Misleading Statements Issued During the Class Period**

58. During the Class Period, Defendants repeatedly made materially false and misleading statements concerning the size, scope, and duration of the Pebble Project.

**A. The 2017 Statements**

59.     On December 21, 2017, Northern Dynasty and Thiessen issued a press release, which was also filed with the SEC as Form 6-K.

60.     The December 21, 2017 6-K included a quote from Thiessen, who represented that the Pebble Project:

> design we're taking into permitting includes a substantially reduced development footprint and meaningful new environmental safeguards that respond directly to the priorities and concerns we've heard from stakeholders in Alaska. Not only are we confident that Pebble as currently envisaged will secure development permits from federal, state and local regulatory agencies, we are confident it will co-exist with the world class fisheries of Bristol Bay and earn the support of the people of the region and the state.

61.     The December 21, 2017 6-K also included "Development Highlights," underscoring that:

> Under the development scenario the Pebble Partnership would submit for federal and state permitting on December 22, 2017:
>
> > The footprint of Pebble's major mine facilities (pit, tailings storage facility) will be substantially smaller than previous planning iterations, at approximately 5.9 square miles;
> >
> > There will be no primary mine operations in the Upper Talarik watershed, minimizing the project's environmental footprint and addressing stakeholder concerns related to potential impacts on local salmon productivity[.]

62.     The statements in the two preceding paragraphs describing the scope of the Pebble project and its environmental footprint were materially false and misleading when made because Defendants were planning a massive, expanded development of the Pebble deposit and future explorations of additional mines.  The planned mine would have been environmentally disastrous. Defendants purposefully advanced a smaller mine in hopes of securing a permit, but their actual plan was for constant expansion. While the market was told that the mine's footprint would be "approximately 5.9 square miles," Northern Dynasty planned to drill at a minimum 425 square

miles and to activate the Donlin mine, another project 175 miles north of Pebble.

63.     On December 21, 2017, Collier made the following statements concerning the size and the scope of the Pebble mine:

> We have listened to our stakeholders, supporters and skeptics, and are presenting a much smaller mine with enhanced environmental safeguards. Since I have been with the project, my main focus has been to initiate the permitting process so that Pebble can be fairly and objectively evaluated by the independent experts hired by the Corp of Engineers.[29]

64.     The statements in the preceding paragraph describing "a much smaller mine with enhanced environmental safeguards" were materially false and misleading when made because Defendants were planning a massive, expanded development of the Pebble deposit.  Defendants also planned to explore additional mines: to drill at a minimum 425 square miles and to activate the Donlin mine, another project 175 miles north of Pebble.  This massive expansion would have endangered the environment.

65.     On or around December 24 and 26, 2017, Northern Dynasty published on its official website the following statements concerning the size and the scope of the Pebble mine: "Northern Dynasty is focused on designing, permitting, building and operating the Pebble Project. The Company initiated permitting by the end of 2017, with a project that is smaller than previously contemplated."

66.     The statements in the preceding paragraph describing "a project that is smaller than previously contemplated" were materially false and misleading when made because Defendants were planning a massive, expanded development of the Pebble deposit.  Defendants also planned to explore additional mines: to drill at a minimum 425 square miles and to activate the Donlin

---

[29] Elwood Brehmer, *Pebble Partnership to Finally File Permit Application*, TCA Regional News (Dec. 21, 2017).

mine, another project 175 miles north of Pebble. Defendants purposefully advanced a smaller

mine in hopes of securing a permit, but their actual plan was for constant expansion.

**B. The 2018 Statements**

67. On January 5, 2018, Northern Dynasty and Thiessen issued a press release, which

was also filed with the SEC as Form 6-K on January 9, 2018.

68. The January 5, 2018 6-K provided the following description of the proposed Pebble

Mine:

> Following four years of construction activity, the proposed Pebble mine will
> operate for a period of 20 years. This includes 14 years of mining using
> conventional drill-blast-shovel operations, followed by six years of milling material
> from a low-grade ore ("LGO") stockpile. The mining rate will average 90 million
> tons per year, with 58 million tons of mineralized material going through the mill
> each year (160,000 tons per day), for an extremely low life-of-mine waste to ore
> ratio of 0.1:1.
>
> *       *       *
>
> The development proposed in Pebble's Project Description is substantially smaller
> than previous iterations, and presents significant new environmental safeguards,
> including:
>
> ● a development footprint less than half the size previously envisaged;
>
> ● the consolidation of most major site infrastructure in a single drainage (the
>    North Fork Koktuli), and the absence of any primary mine operations in the
>    Upper Talarik drainage[.]

69. The statements in the two preceding paragraphs describing the Pebble mine

operating only for a period of 20 years, with a mining rate of 160,000 tons per day were materially

false and misleading when made because Defendants failed to disclose that they were planning to

extend the mining operations at least for 180–200 years for the first mine alone and to increase its

daily production rates to between 220,000 and 320,000 tons per day. The representations that the

Pebble Project "is substantially smaller" than previous iterations and "presents significant new

environmental safeguards" such as a "development footprint less than half the size previously

24

envisaged," "a single drainage" and limited mining operations were false and misleading when made because they failed to disclose Defendants' plan to drill at a minimum 425 square miles and to activate the Donlin mine, another project 175 miles north of Pebble. In truth, Defendants planned to develop one of the largest mines in the world and to use it for centuries.

70. The January 5, 2018 6-K also included the following description of the proposed mine site facilities and operations:

> The open pit will be developed in stages with final dimensions of ~6,500 feet in length, ~5,500 feet in width and depths between 1,330 and 1,750 feet. A total of 1.2 billion tons of material will be mined, including 1.1 billion tons to be processed through the mill and 100 million tons of waste rock.

> \*　　　\*　　　\*

> On average, the process plant will produce ~600,000 tons of copper-gold concentrate each year, containing ~287 million lb copper, ~321,000 oz gold and 1.6 million oz silver, and ~15,000 tons of molybdenum concentrate each year, containing ~13 million lb molybdenum.

> A single TSF located in the North Fork Koktuli drainage will store 1.1 billion tons of tailings generated over 20 years of mine operations.

71. The statements in the preceding paragraph describing in numerical terms the mine's operations and the 20-year life span were materially false and misleading when made because Defendants intended to extend the mining operations at least for 180–200 years for the first mine alone and planned a mine size between 2.0 and 6.5 billion tons. Thus, the stated 20-year duration and the numbers related to the length, width, depth, and amounts of production and generated tailings were hopelessly inaccurate and significantly understated.

72. The January 5, 2018 6-K also included the following representations concerning the closure of the Pebble mine:

*Reclamation and Closure*

- The Pebble Project has been 'designed for closure', in order that facilities can be removed and land reclaimed in such a way that it can be returned to a stable and productive state.

- Reclamation and closure activities will include: removal of mill and other facilities not required in the post-closure period; hauling of PAG waste rock into the open pit for sub-aqueous storage; recontouring of disturbed areas and placement of overburden for revegetation; installation of water management features to provide for long-term water quality monitoring and treatment.

73.     The statements in the preceding paragraph that the 20-year Pebble Project has been "designed for closure," which detailed such purported closure, were materially false and misleading when made because Defendants never intended to close the mine after its first 20 years of operation.  In reality, Defendants planned all along to operate an "unstoppable" mine for "a very long time," up to at 200 years or more for the first mine alone.

74.     On January 26, February 27–28, April 2, May 16, May 28, June 20, July 28, September 15, October 18, and December 29, 2018, Northern Dynasty published on its official website the following statements concerning the size and the scope of the Pebble mine: "Northern Dynasty is focused on designing, permitting, building and operating the Pebble Project . . . with a project that is smaller than previously contemplated."

75.     The statements in the preceding paragraph were materially false and misleading when made because Defendants failed to disclose that, in reality, they were planning a massive, expanded development of the Pebble deposit.  Defendants also planned to explore additional mines: to drill at a minimum 425 square miles and to activate the Donlin mine, another project 175 miles north of Pebble.  Defendants purposefully advanced a smaller mine in hopes of securing a permit, but their actual plan was for constant expansion.

76.     In February 2018, Collier made the following statement concerning the size and the scope of the Pebble mine: "We will soon initiate the permitting and review process with a much smaller and more environmentally sensitive plan for a mine at Pebble."[30]

77.     The statements in the preceding paragraph were materially false and misleading when made because Defendants failed to disclose that, in reality, they were planning a massive, expanded development of the Pebble deposit.  Defendants also planned to explore additional mines: to drill at a minimum 425 square miles and to activate the Donlin mine, another project 175 miles north of Pebble. The actual plan would have been environmentally disastrous.  Defendants purposefully advanced a smaller mine in hopes of securing a permit, but their actual plan was for constant expansion.

78.     On March 29, 2018, Northern Dynasty filed with the SEC an annual report on Form 40-F for the year ended December 31, 2017 (the "2017 40-F").  The 2017 40-F contained Sarbanes Oxley certifications by Defendant Thiessen.

79.     The 2017 40-F included the following representations concerning the size, the scope, and the duration of the Pebble mine:

> Following four years of construction activity, the proposed Pebble mine will operate for a period of 20 years. This includes 14 years of mining using conventional drillblast-shovel operations, followed by six years of milling material from a low-grade ore stockpile. The mining rate will average 90 million tons per year, with 58 million tons of mineralized material going through the mill each year (160,000 tons per day), for a life-of-mine waste to mineralized material ratio of 0.1:1.

> The development proposed in Pebble's Project Description is substantially smaller than previous iterations, and presents significant new environmental safeguards, including:

> • a development footprint less than half the size previously envisaged;

---

[30] Tasha Anderson, *Inside Alaska Business*, Alaska Business Monthly, Anchorage, Volume 34, Issue 2 (Feb. 2018).

• the consolidation of most major site infrastructure in a single drainage (the North Fork Koktuli), and the absence of any primary mine operations in the Upper Talarik drainage[.]

80. The statements in the preceding paragraph describing the Pebble mine operating only for a period of 20 years, with a mining rate of 160,000 tons per day were materially false and misleading when made because Defendants failed to disclose that they were planning to extend the mining operations at least for 180–200 years for the first mine and to increase its daily production rates to between 220,000 and 320,000 tons per day. The representations that the Pebble Project "is substantially smaller" than previous iterations and "presents significant new environmental safeguards" such as a "development footprint less than half the size previously envisaged," "a single drainage" and limited mining operations were false and misleading when made because they failed to disclose Defendants' plan to drill at a minimum 425 square miles and to activate the Donlin mine, another project 175 miles north of Pebble. In truth, Defendants planned to develop one of the largest mines in the world and to use it for centuries.

81. On May 16, 2018, Northern Dynasty filed a Form 6-K with the SEC, which was signed by Thiessen.

82. The May 16, 2018 6-K included the following representations concerning the size and the scope of the Pebble mine:

In the latter part of 2017, a project design based on a smaller mine concept was developed for the Pebble Project, as described in the Project Description which is part of the application for a US Clean Water Act 404 ("CWA 404") permit . . . The Project Description in the permit application envisages the project developed as a 160,000-ton per day open pit mine and processing facility with supporting infrastructure. The proposed Pebble mine would have a development footprint less than half the size previously envisaged . . .

83. The statements in the preceding paragraph that the Pebble Project had a "smaller mine" designed for extraction of only 160,000-tons per day with a "development footprint less than half the size previously envisaged" were false and misleading when made because Defendants

failed to disclose that they were planning to increase its daily production rates to between 220,000 and 320,000 tons per day. Defendants purposefully advanced a smaller mine in hopes of securing a permit, but their actual plan was for constant expansion.

## C. The 2019 Statements

84. On January 15, 2019, Northern Dynasty filed with the SEC Form F-10, a registration statement under the securities act of 1933 (the "2019 F-10"). The 2019 F-10 was signed by Thiessen.

85. The 2019 F-10 included the following representations concerning the size, the scope, and the duration of the Pebble mine:

> On December 22, 2017, the Pebble Partnership filed its 404 wetlands permit application. . . . The permit application include[s] a project description (the "Project Description") for the Pebble Project that was based on a smaller mine concept developed for the Pebble Project in the latter part of 2017. The Project Description . . . involves a development plan with a significantly smaller development footprint than previously envisaged . . ..

> In response to stakeholder concerns, the footprint of the proposed development in the updated Project Description is substantially smaller than previously envisaged. Following four years of construction activity, the proposed Pebble mine would operate for a period of 20 years as a conventional drill-blast-shovel operation.

86. The statements in the preceding paragraph were repeated in Northern Dynasty's January 25, 2019 Amendment No. 1 to Form F-10, filed with the SEC and signed by Thiessen. Those statements were also repeated in Northern Dynasty's February 19, March 12–13, June 19, August 8–9, December 12–13, 2019 prospectus supplements to the short form base shelf prospectus dated January 25, 2019 and filed with the SEC.

87. The statements described in the two preceding paragraphs were materially false and misleading when made because the Pebble Project was not "a smaller mine concept," was not "a significantly smaller development footprint than previously envisaged," was not "substantially smaller," and was not intended to operate for only 20 years. In reality, Defendants were planning

to extend the mining operations at least for 180–200 years for the first mine alone. Additionally, Defendants planned to explore additional mines: to drill at a minimum 425 square miles and to activate the Donlin mine, another project 175 miles north of Pebble. Defendants purposefully advanced a smaller mine in hopes of securing a permit, but their actual plan was for constant expansion.

88.     On April 1, 2019, Northern Dynasty filed an annual report on Form 40-F for the year ended December 31, 2018 (the "2018 40-F"), which contained Sarbanes Oxley certifications by Defendant Thiessen. The 2018 40-F included the following representations concerning the size, the scope, and the duration of the Pebble mine:

> Following four years of construction activity, the proposed Pebble mine will operate for a period of 20 years as a conventional drill-blast-shovel operation. The mining rate will average 70 million tons per year, with 66 million tons of mineralized material going through the mill each year (180,000 tons per day), for a low life-of-mine waste to ore ratio of 0.12:1.

> In response to stakeholder concerns, the footprint of the proposed development in the updated Project Description is substantially smaller than previously envisaged.

89.     The statements in the preceding paragraph describing the Pebble mine operating only for a period of 20 years, with a mining rate of 180,000 tons per day were materially false and misleading when made because Defendants failed to disclose that they were planning to extend the mining operations at least for 180–200 years for the first mine and to increase its daily production rates to between 220,000 and 320,000 tons per day. The representation that the Pebble Project's development footprint "[was] substantially smaller than previously envisaged" was false and misleading when made because Defendants were planning to drill at a minimum 425 square miles and to activate the Donlin mine, another project 175 miles north of Pebble. In truth, Defendants planned to develop one of the largest mines in the world and to use it for centuries.

90. On or around May 7, September 10–11, October 20, 2019, Northern Dynasty published on its official website the following statements concerning the size and the scope of the Pebble mine: "Northern Dynasty is focused on designing, permitting, building and operating the Pebble Project. The Company initiated permitting by the end of 2017, with a project that is smaller than previously contemplated."

91. The statement in the preceding paragraph describing the Pebble Project as "smaller than previously contemplated" was false and misleading when made because Defendants were planning a massive, expanded development of the Pebble deposit. Defendants were also planning to explore additional mines: to drill at a minimum 425 square miles and to activate the Donlin mine, another project 175 miles north of Pebble. In truth, Defendants planned to develop one of the largest mines in the world and to use it for centuries. Defendants purposefully advanced a smaller mine in hopes of securing a permit, but their actual plan was for constant expansion.

92. On May 21, 2019, Northern Dynasty filed a Form 6-K with the SEC, which was signed by Thiessen.

93. The May 21, 2019 6-K included the following representations concerning the size, the scope, and the duration of the Pebble mine:

> In the latter part of 2017, a project design based on a smaller mine concept was developed for the Pebble Project, as described in the Project Description which is part of the application for a CWA 404 permit. The CWA 404 permit application was submitted to the USACE . . . USACE released the Draft EIS . . .The Draft EIS envisages the project developed as an open pit mine and processing facility with . . . a significantly smaller development footprint than previously envisaged . . .

> The Project Description proposes that the Pebble deposit would be developed as a 180,000-ton per day open pit mine with associated on and off-site infrastructure. Following four years of construction activity, the proposed Pebble mine will operate for a period of 20 years as a conventional drill-blast-shovel operation. In response to stakeholder concerns, the footprint of the proposed development in the updated Project Description is substantially smaller than previously envisaged.

94. The statements in the preceding paragraph were also repeated in Northern Dynasty's August 19 and November 22, 2019 6-K Forms, filed with the SEC and signed by Thiessen. Instead of the last sentence in paragraph 99, the November 22, 2019 6-K Form represented: "In response to stakeholder concerns, the current mine plan proposal has a smaller footprint, consolidating most major site infrastructure in a single drainage."

95. The statements described in the two preceding paragraphs about the scope and duration of the Pebble Project were materially false and misleading when made because Defendants were planning to extend the mining operations at least for 180–200 years for the first mine alone, to increase its daily production rates to between 220,000 and 320,000 tons per day, to drill at a minimum 425 square miles, and to activate the Donlin mine, another project 175 miles north of Pebble. In truth, Defendants planned to develop one of the largest mines in the world and to use it for centuries. Defendants purposefully advanced a smaller mine in hopes of securing a permit, but their actual plan was for constant expansion.

96. On July 30, 2019, Collier made the following statements concerning the approval of the Pebble Project based on the smaller size of the mine: "[Opponents] are right when they say Pebble believes it is likely to get a permit, but not because the [political] fix is in – rather, because our smaller, environmentally enhanced mine plan meets the high environmental standards and permitting requirement enforced in the US and Alaska, and should receive a permit."[31]

97. The statements in the preceding paragraph were materially false and misleading when made because they failed to disclose that Defendants purposefully advanced a smaller mine in hopes of securing a permit, but their actual plan was for constant expansion.

---

[31] PR Newswire, *Northern Dynasty: US Environmental Protection Agency Withdraws Proposed Determination*, New York (July 30, 2019).

98.     On October 23, 2019, Collier testified before the Subcommittee on Water Resources and the Environment, Committee on Transportation and Infrastructure, United States House of Representatives. In his testimony "The Pebble Mine Project: Process and Potential Impacts," Collier represented that:

> Pebble has planned a smaller, smarter mine. In response to concerns voiced by various stakeholders, we have reduced the mine size to a footprint that even EPA's rigid Proposed Determination would nearly have allowed to proceed through the NEPA permitting process. The Proposed Determination was based on three hypothetical mining plans of differing sizes and stated that EPA would not object to an application being considered for permitting a mine smaller than the smallest hypothetical EPA mine. Pebble's new mine, at an equivalent footprint of just 5.2 square miles, is 75% smaller than the largest mine in the Proposed Determination, 48% smaller than the medium mine, and slightly larger than the smallest mine evaluated.

> A significant factor in reducing Pebble's footprint is the elimination of permanent waste rock storage on the surface, which further substantially reduces post-closure water management requirements.

99.     The statements in the preceding paragraph were materially false and misleading when made because Defendants were planning a massive, expanded development of the Pebble deposit. Defendants also planned to explore additional mines: to drill at a minimum 425 square miles and to activate the Donlin mine, another project 175 miles north of Pebble. In truth, Defendants planned to develop one of the largest mines in the world and to use it for centuries.

100.    Collier also represented that:

> Pebble has no current plans, in this application or in any other way, for expansion.
> . . .

101.    The statement in the preceding paragraph was materially false and misleading when made because Defendants were planning all along to expand and build a much larger mine with a lifespan of at least 180–200 years for the first mine alone.

102.    During his congressional testimony, Collier also made the following representations concerning the closure of the Pebble mine:

A significant factor in reducing Pebble's footprint is the elimination of permanent waste rock storage on the surface, which further substantially reduces post-closure water management requirements. But Pebble has heard the community's concerns and has completely eliminated spill and post-closure cyanide risks. Upon closure, PAG tailings and waste rock will be transferred to the former open pit, and this permanent subaqueous storage further prevents oxidation. Reclamation: PLP [Pebble Limited Partnership] has provided for the Corps a draft Reclamation and Closure Plan that meets State of Alaska formatting requirements in support of the FEIS [Final Environmental Impact Statement].

103.     The statements in the preceding paragraph were materially false and misleading when made because Defendants never intended to close the mine after its first 20 years of operation. In reality, Defendants planned all along to operate the "unstoppable" mine for "a very long time," up to at least 200 years for the first mine alone, exponentially increasing spill and cyanide risks, as well as other risks to the environment.

**D. The 2020 Statements**

104.     On March 31, 2020, Northern Dynasty filed with the SEC an annual report on Form 40-F for the year ended December 31, 2019 (the "2019 40-F"). The 2019 40-F contained Sarbanes Oxley certifications by Defendant Thiessen.

105.     The 2019 40-F included the following representations concerning the size, the scope, and the duration of the Pebble mine:

In the latter part of 2017, a project design based on a smaller mine concept was developed for the Pebble Project, as described in the Project Description which is part of the application for a CWA 404 permit. . . .

The Draft EIS envisages the project developed as an open pit mine and processing facility with supporting infrastructure, a significantly smaller development footprint than previously envisaged, and other additional environmental safeguards as described in the Project Description.

The current Project Description proposes that the Pebble deposit would be developed as a 180,000-ton per day open pit mine[.]

Following four years of construction activity, the proposed Pebble mine will operate for a period of 20 years as a conventional drill-blast-shovel operation.

In response to stakeholder concerns, the current mine plan proposal has a smaller footprint, consolidating major site infrastructure in a single drainage.

106. The statements in the preceding paragraph about the scope and duration of the Pebble Project were materially false and misleading when made because Defendants were planning to extend the mining operations at least for 180–200 years for the first mine, to increase its daily production rates to between 220,000 and 320,000 tons per day, to drill at a minimum 425 square miles, and to activate the Donlin mine, another project 175 miles north of Pebble. In truth, far from addressing the stakeholder's concerns, Defendants planned to develop one of the largest mines in the world and to use it for centuries.

107. On or around April 11, July 16, July 27, August 9, October 20, December 5–6, 2020, Northern Dynasty published on its official website the following statements concerning the size and the scope of the Pebble mine: "Northern Dynasty is focused on designing, permitting, building and operating the Pebble Project. The Company initiated permitting by the end of 2017, with a project that is smaller than previously contemplated."

108. The statement describing the Pebble Project as "smaller than previously contemplated" was false and misleading when made because Defendants were planning a massive, expanded development of the Pebble deposit. Defendants also planned to explore additional mines: to drill at a minimum 425 square miles and to activate the Donlin mine, another project 175 miles north of Pebble. In truth, Defendants planned to develop one of the largest mines in the world and to use it for centuries. Defendants purposefully advanced a smaller mine in hopes of securing a permit, but their actual plan was for constant expansion.

109. On May 20, 2020, Northern Dynasty filed a Form 6-K with the SEC, which was signed by Thiessen. The May 20, 2020 6-K included the following representations concerning the size, the scope, and the duration of the Pebble mine:

In the latter part of 2017, a project design based on a smaller mine concept was developed for the Pebble Project, as described in the Project Description which is part of the application for a CWA 404 permit . . . . The Draft EIS envisages the project developed as an open pit mine and processing facility with . . . a significantly smaller development footprint than previously envisaged . . . . The current Project Description proposes that the Pebble deposit would be developed as a 180,000-ton per day open pit mine[.] Following four years of construction activity, the proposed Pebble mine will operate for a period of 20 years as a conventional drill-blast-shovel operation. In response to stakeholder concerns, the current mine plan proposal has a smaller footprint, consolidating major site infrastructure in a single drainage.

110.    Representations similar to the statements made in the preceding paragraph were also repeated in Northern Dynasty's August 18 and November 19, 2020 6-K Forms filed with the SEC and signed by Thiessen.  Representations similar to the statements in the preceding paragraph were also repeated in Northern Dynasty's April 28–29, May 8, June 3, July 2, 2020 Forms F-10, filed with the SEC and signed by Thiessen.

111.    The statements described in the two preceding paragraphs were materially false and misleading when made because Defendants were planning to extend the mining operations at least for 180–200 years for the first mine, to increase its daily production rates to between 220,000 and 320,000 tons per day, to drill at a minimum 425 square miles, and to activate the Donlin mine, another project 175 miles north of Pebble.  In truth, far from addressing the stakeholders' concerns, Defendants planned to develop one of the largest mines in the world and to use it for centuries. Defendants purposefully advanced a smaller mine in hopes of securing a permit, but their actual plan was for constant expansion.

## LOSS CAUSATION/ECONOMIC LOSS

112.    During the Class Period, as detailed above, Northern Dynasty and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Northern Dynasty's securities and operated as a fraud or deceit on Class Period purchasers of Northern Dynasty securities, by

misrepresenting the size, scope, and duration of the Pebble Project. When the truth about the size, scope, and/or the duration of Defendants' mining plans emerged and/or the risk that the Pebble Project will not receive a permit from the Army Corps materialized, the price of Northern Dynasty's securities declined as the prior artificial inflation came out of the price over time. As a result of their purchases of Northern Dynasty securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

113.     On August 24, 2020, the Army Corps released a statement concerning the Pebble Project, stating that it would result in "significant degradation of the environment and would likely result in significant adverse effects on the aquatic system or human environment." The Army Corps further found that "the project, as currently proposed, cannot be permitted under section 404 of the Clean Water Act." The Army Corps requested that the Company submit a mitigation plan in response to this finding.

114.     On this news, Northern Dynasty's common share price fell $0.55 per share, or 37.9%, to close at $0.9 per share on August 24, 2020, damaging investors.

115.     On August 25, 2020, *POLITICO* published an article "Pebble Problems Stack Up." *POLITICO* reported that "[t]he mitigation projects required may be difficult for the mine developers to meet given that the pristine wilderness near the Bristol Bay project has few areas in need of restoration. The process could also push any final decision on the mine beyond the end of Trump's first term, potentially leaving it up to his challenger, Joe Biden, who opposes the project."

116.     On this news, Northern Dynasty's common share price fell $0.29 per share, or 32.22%, to close at $0.61 per share on August 25, 2020, damaging investors.

117.     On September 21, 2020, the Environmental Investigation Agency released the Pebble Tapes. The EIA's press release stated, in relevant part:

**Washington DC** — Today the Washington DC-based non-profit the Environmental Investigation Agency (EIA) released recordings of conversations between EIA investigators and executives of Pebble Limited Partnership and Northern Dynasty Minerals (Pebble), the companies behind the contested Pebble Mine project in Alaska. The recordings, which EIA has dubbed "The Pebble Tapes," reveal Pebble's plans to build a large and long-lived mine at the headwaters of Bristol Bay in western Alaska.

The tapes also reveal Pebble's apparent plans to use the infrastructure included in its mine plan to open up other expansive swathes of western Alaska to mining, including through the activation of the Donlin Mine, a project that already has federal permits and could become economically viable overnight if the Pebble project is approved.

Tom Collier, the CEO of Pebble Limited Partnership, and Ronald Thiessen, the president and CEO of Northern Dynasty, of which Pebble is a wholly-owned subsidiary, spoke with EIA investigators during August and September after the investigators expressed interest in investment opportunities related to the Pebble project. *Their conversations, which were recorded, contain multiple statements by Collier and Thiessen that contradict, or in some instances color, previous public statements by company executives as well as assertions in official company materials that Pebble is intended to be only a small 20-year mine, as described in the Clean Water Act permit application for the project.*

*     *     *

The Pebble Tapes cover discussions between EIA investigators and Pebble on a number of other topics including: the Alaska Governor, the Army Corps of Engineers, the Northern Corridor, Alaska senators, Alaska politics, corporate structure, water treatment, Trump Administration and EPA veto.

118.     On September 22, 2020, the *Washington Post* published an article "In Secret Tapes, Mine Executives Detail their Sway over Leaders from Juneau to White House." The *Washington Post* reported that Northern Dynasty "had deliberately downplayed the project's impact." On the same day, the *New York Times* published an article "Tape Casts Doubt on Alaska Mine Plan." The *New York Times* reported that "in private" Thiessen and Collier explained that "their plans for massive expansion will be unstoppable" and that "the operation could run nine times longer than outlined in their permit filings."

119.     On this news, Northern Dynasty's common share price fell $0.10 per share, or 9.01%, to close at $1.01 per share on September 23, 2020, damaging investors.

120.     On October 28, 2020, the *Outside* published an article "What the Hell Is Going on with the Pebble Mine?" The *Outside* article reported, in relevant part:

> The [Pebble] tapes were damning. "I've been at this 40 years, and I've never seen this happen to the blatant extent that the tapes reveal," says the NRDC's [Joel Reynolds, western director and senior attorney for the Natural Resources Defense Council (NRDC).] ***"It's a testament to the flaws in our permitting system that it takes a videotape to force people to come to terms with that basic fraud."*** For those dedicated to fighting the mine, what the tapes revealed seemed less "embellished" than unvarnished, the true Pebble finally come to light. "Collier is one symptom of the much greater problem of this company terrorizing Bristol Bay for almost 20 years now," says [Alannah Hurley, the executive director of United Tribes of Bristol Bay.] "Getting rid of him does absolutely nothing to rectify the entrenched issues." To her, the flawed permitting process and alleged political influence taint the process beyond repair. "***At this point, a permit denial is clearly needed***," she says.

121.     On this news, Northern Dynasty's common share price fell $0.08 per share, or 8.16%, to close at $0.9 per share on October 28, 2020, damaging investors.

122.     On October 29, 2020, the EIA released additional tapes and emails revealing the extent to which Northern Dynasty CEO Thiessen, who is still running the company, played a hands-on role in every aspect of Pebble Project's development, and made statements to EIA's investigators that were as offensive as those made by Collier. The new tapes included Thiessen discussing his influence over Alaska's senators and pro-Pebble governor, and an assertion that Thiessen believes that the state of Alaska would contribute roughly $1.5 billion of taxpayer money to assist in building infrastructure for the mine. The EIA's press release stated that "[t]he recordings underscore both Thiessen's importance as a driving force behind the Pebble project and the financial windfall that he anticipates Pebble to deliver to his companies located in British Columbia, including an estimated $1.5 billion subsidy from Alaskans."

123.     On this news, Northern Dynasty's common share price fell $0.06 per share, or 6.32%, to close at $0.89 per share on October 30, 2020, damaging investors.

124.     On November 18, 2020, the office of Alaska Senator Lisa Murkowski issued the following text of her remarks at the Resource Development Council 2020 Alaska Resources Conference.  During the conference, Senator Murkowski said:

> . . . ***this is not the place that I planned to wind up, but given everything that has come to light during this considerable review process [of the Pebble Project], I have reached the same conclusion that Ted Stevens did many years ago: that this is the wrong mine in the wrong place.*** And this is the only project--I will remind folks--this the only project that I have opposed in Alaska during my time here in the Senate. Where I have come down is that Pebble cannot be permitted, according to now multiple administrations. ***And I think that the Army Corps should deny its permit application*** within the scope of its normal process, rather than setting the stage for an EPA veto that would set a dangerous precedent for the state . . . I want to make sure that we have proper process but I have come down in a different position with Pebble, and I respect the process that has gone before us. I have encouraged it every step of the way, and have said, it needs to follow through. ***But I have to tell you. I'll just be very honest with you. What we saw, what we all saw play out in those awful Pebble tapes was something that none of us should feel good or comfortable about. If you have those who are attempting to sell a project through I believe not only fabrications and truly a dishonest appraisal of their own project, I think we all should be concerned. I don't think that does anybody else's development project in the state any help at all.***[32]

125.     On this news, Northern Dynasty's common share price fell $0.05 per share, or 5.62%, to close at $0.84 per share on November 18, 2020, damaging investors.

126.     On November 25, 2020, it was announced that the Army Corps has denied the permit for the Pebble Project.  The Corps said in a statement that it has determined that the plan

---

[32] Targeted News Service, *Senator Murkowski: Remarks at RDC's 2020 Alaska Resources Conference* (Nov. 18, 2020). In the Pebble Tapes, both Thiessen and Collier discussed their alleged political dealings with Senator Murkowski. For example, Thiessen said to the EIA investigators concerning Senator Murkowski: "Well she can't make a negative decision. Senator Murkowski, she's very political. She in her heart wants the project to go ahead. She will say things that appeal to sometimes people's emotions but that won't do any damage to the project overall. So Senator Murkowski we feel good about." Collier added: "It's an age-old practice where when you have constituents, you have important people who support you on two sides of an issue, alright, you try to find a way to satisfy them both. You don't choose one or choose the other. You try to satisfy them both. The way that Senator Murkowski has done that is that when she's asked a question she says things that don't sound supportive of [P]ebble – but when it comes to vote, when it comes time to vote, when it comes time to do something, she never does anything to hurt Pebble, Ok?" Pebble Tape 6.

"does not comply with Clean Water Act guidelines" and it has concluded that "the proposed project is contrary to the public interest."

127.     On this news, Northern Dynasty's common share price fell $0.40 per share, or 50%, to close at $0.40 per share on November 25, 2020, damaging investors.

128.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

129.     Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) Northern Dynasty's stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Northern Dynasty's stock; and

(e) Plaintiffs and other members of the Class purchased Northern Dynasty's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

130.     At all relevant times, the markets for Northern Dynasty's securities were efficient for the following reasons, among others:

(a) as a regulated issuer, Northern Dynasty filed periodic public reports with the SEC;

(b) Northern Dynasty regularly communicated with public investors via established market communication mechanisms;

(c) Northern Dynasty was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d) Northern Dynasty's common stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "NAK."

131.    As a result of the foregoing, the market for Northern Dynasty securities promptly digested current information regarding Northern Dynasty from publicly available sources and reflected such information in the prices of Northern Dynasty's securities.   Under these circumstances, all purchasers of Northern Dynasty securities during the Class Period suffered similar injury through their purchase of Northern Dynasty securities at artificially inflated prices and the presumption of reliance applies.

132.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to Northern Dynasty, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## **NO SAFE HARBOR**

133.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was signed, authorized or approved by the executive officers or top management of the Company, who knew that the statements were false when made.

## CLASS ACTION ALLEGATIONS

134.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Northern Dynasty securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Individual Defendants, the officers and directors of Northern Dynasty, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assignees and any entity in which Individual Defendants have or had a controlling interest.

135.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Northern Dynasty securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Northern Dynasty or its transfer agent and

may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

136.     Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws that are complained of herein.

137.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

138.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the Pebble Project and business of Northern Dynasty;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Individual Defendants caused Northern Dynasty to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Northern Dynasty securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

139.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

140. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in securities class action litigation. Plaintiffs have no interests that conflict with those of the Class.

141. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

142. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

143. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC.

144. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Northern

Dynasty securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Northern Dynasty securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

145.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Northern Dynasty securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Northern Dynasty's plans that the Pebble Project would be larger in size, scope, and duration than conveyed to the public.

146.     As evidenced by the Pebble Tapes, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts of Northern Dynasty, their control over, and/or receipt and/or modification of Northern Dynasty's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Northern Dynasty, participated in the fraudulent scheme alleged herein.

147.     The Individual Defendants had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or Northern Dynasty to members of the investing public, including Plaintiffs and the Class.

148.     As a result of the foregoing, the market price of Northern Dynasty securities was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Northern Dynasty securities during the Class Period in purchasing Northern Dynasty securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

149.     Had Plaintiffs and the other members of the Class been aware that the market price of Northern Dynasty securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Northern Dynasty securities at the artificially inflated prices that they did, or at all.

150.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

151.     By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Northern Dynasty securities during the Class Period.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

152.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

153.     During the Class Period, the Individual Defendants participated in the operation and management of Northern Dynasty, and conducted and participated, directly and indirectly, in the conduct of Northern Dynasty's business affairs.  Because of their senior positions, they knew the adverse non-public information about Northern Dynasty's misstatements and omissions.

154.     The Individual Defendants had a duty to disseminate accurate and truthful information with respect to Northern Dynasty's plans that the Pebble Project would be larger in size, scope, and duration than conveyed to the public.

155.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Northern Dynasty disseminated in the marketplace during the Class Period concerning Northern Dynasty's Pebble Project.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Northern Dynasty to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Northern Dynasty within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Northern Dynasty securities.

156.     Each of the Individual Defendants exercised control over the Pebble Project and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other members of the Class complain.

157.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Northern Dynasty.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of Plaintiffs and the Class, demand judgment and relief against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated:  June 15, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ Emma Gilmore*
Jeremy A. Lieberman
Emma Gilmore
Dolgora Dorzhieva
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
egilmore@pomlaw.com
ddorzhieva@pomlaw.com

*Counsel for Plaintiffs and for the Proposed Class*

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Named Plaintiff and for the Proposed Class*