**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

IN RE NORTHERN DYNASTY
MINERALS LTD. SECURITIES
LITIGATION

Case No. 1:20-cv-05917-ENV-RLM

Date of Service: September 15, 2021

**Oral Argument Requested**

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND................................................................................... 4

STANDARD OF REVIEW ................................................................................. 14

ARGUMENT ..................................................................................................... 15

I.      PLAINTIFFS FAIL TO STATE A SECTION 10(b) CLAIM ......................... 15

      A.     Plaintiffs Fail to Adequately Plead A Misstatement or Omission ....................... 15

            1.     The Alleged Omissions Regarding Future Expansion Did Not Render The Challenged Statements False or Misleading..................................... 16

            2.     The Possibility of Future Expansion Was Publicly Disclosed................. 23

            3.     In Any Event, Plaintiffs Have Not Adequately Alleged a Duty to Disclose the Possibility of Future Expansion ......................................... 29

      B.     The Alleged Omissions Are Immaterial as a Matter of Law under the Truth-on-the-Market Doctrine ............................................................... 32

      C.     Plaintiffs Fail to Adequately Plead Loss Causation............................... 33

      D.     Plaintiffs Fail to Adequately Plead Particularized Facts Giving Rise to a Strong Inference of Scienter.............................................................. 37

II.     PLAINTIFFS FAIL TO STATE A SECTION 20(a) CLAIM......................... 39

CONCLUSION................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
No. 19-cv-0067, 2020 WL 4734989 (S.D.N.Y. Aug. 14, 2020)............................4, 27, 28, 29

*Altimeo Asset Mgmt. v. WuXi PharmaTech (Cayman) Inc.*,
No. 19-cv-1654, 2020 WL 6063539 (S.D.N.Y. Oct. 14, 2020)..................................27, 28, 29

*In re Andrx Corp., Inc.*,
296 F. Supp. 2d 1356 (S.D. Fla. 2003) ..................................................................................32

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................................14

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)..........................................................................................14, 15, 39

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..............................................................................................................29

*In re Bell Atl. Corp. Sec. Litig.*,
No. 91-cv-0514, 1997 WL 205709 (E.D. Pa. Apr. 17, 1997), *aff'd*, 142 F.3d
427 (3d Cir. 1998)................................................................................................................32

*Bratusov v. Comscore, Inc.*,
No. 19-cv-3210, 2020 WL 3447989 (S.D.N.Y. June 24, 2020) .............................................30

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002)..................................................................................................29

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)..................................................................................................15

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l. Inc.*,
967 F. Supp. 2d 771 (S.D.N.Y. 2013)....................................................................................39

*Collier v. Aksys Ltd.*,
No. 04-cv-1232, 2005 WL 1949868 (D. Conn. Aug. 15, 2005), *aff'd*, 179 Fed.
App'x 770 (2d Cir. 2006) .....................................................................................................37

*In re Cosi, Inc. Sec. Litig.*,
379 F. Supp. 2d 580 (S.D.N.Y. 2005)....................................................................................30

*Das v. Rio Tinto PLC*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018)..................................................................................38

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)...............................................................................................................33

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..............................................................................15, 37, 38

*Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*,
412 F.3d 103 (2d Cir. 2005)...............................................................................................32

*In re Francesca's Holdings Corp. Sec. Litig.*,
No. 13-cv-6882, 2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015)............................35

*Janbay v. Canadian Solar, Inc.*,
No. 10-cv-4430, 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012)............................34

*Jones v. New Penn Fin., LLC*,
No. 19-cv-1493, 2021 WL 405888 (E.D.N.Y. Nov. 15, 2021) ................................4

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)........................................................................................37, 38

*In re Keyspan Corp. Sec. Litig.*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) ......................................................................26, 27

*Kleinman v. Elan Corp., plc*,
706 F.3d 145, 152 (2d Cir. 2013) (quoting *Dura Pharm., Inc. v. Broudo*, 544
U.S. 336, 341-42 (2005)) .............................................................................................14, 30

*Kuriakose v. Federal Home Loan Mortg. Corp.*,
897 F. Supp. 2d 168 (S.D.N.Y. 2012)..............................................................3, 37, 39

*Lau v. Opera Ltd.*,
No. 20-cv-674, 2021 WL 964642 (S.D.N.Y. Mar. 13, 2021)............................30, 34

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)...............................................................................................33

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
No. 11-cv-398, 2013 WL 4405538 (S.D.N.Y. Aug. 5, 2013), *aff'd sub nom.*
783 F.3d 383 (2d Cir. 2015)...............................................................................................33

*Lipow v. Net1 UEPS Techs., Inc.*,
131 F. Supp. 3d 144 (S.D.N.Y. 2015)..................................................................................4

*Lovallo v. Pacira Pharms., Inc.*,
  No. 14-cv-06172, 2015 WL 7300492 (D.N.J. Nov. 18, 2015) ...............................33

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ......................................................................................30

*ODS Cap. LLC v. JA Solar Holdings Co.*,
  No. 18-cv-12083, 2020 WL 7028639 (S.D.N.Y. Nov. 30, 2020) ....................27, 29

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ..............................................................................34

*In re OSI Pharm., Inc. Securities Litig.*,
  No. 04-cv-5505, 2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007) ..............................39

*Pehlivanian v. China Gerui Adv. Materials Grp., Ltd.*,
  153 F. Supp. 3d 628 (S.D.N.Y. 2015) .................................................................17

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  437 F. Supp. 3d 329 (S.D.N.Y. 2020) .................................................................29

*Resnik v. Swartz*,
  303 F.3d 147 (2d Cir. 2002) ...............................................................................29

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ...............................................................................16

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
  75 F.3d 801 (2d Cir. 1996) ............................................................................30, 31

*Shemian v. Research In Motion Ltd.*,
  No. 1:11-cv-4068, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F.
  App'x 32 (2d Cir. 2014) ................................................................................27, 30

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015) ...............................................................................38

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
  No. 05-cv-1898, 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d
  196 (2d Cir. 2008) ...........................................................................................32

*Tellabs v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .............................................................................. *passim*

*In re Time Warner*,
  9 F.3d at 267–68 ...............................................................................................30

iv

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ........................................................................30

*White v. H&R Block, Inc.*,
    No. 02-cv-8965, 2004 WL 1698628 (S.D.N.Y. July 28, 2004)................................32

*Wilamowsky v. Take-Two Interactive Software, Inc.*,
    818 F. Supp. 2d 744 (S.D.N.Y. 2011)......................................................36

**Statutes and Rules**

Fed. R. Civ. P. 8(a) ........................................................................................35

Fed. R. Civ. P. 9(b) ...................................................................................1, 4

Fed. R. Civ. P. 12(b)(6) .............................................................................1, 4

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4....................3, 15, 33, 38

Securities Exchange Act of 1934 § 10(b) ............................................... *passim*

Securities Exchange Act of 1934 § 20(a) ............................................... *passim*

SEC Rule 10b–5.................................................................................14, 29

# PRELIMINARY STATEMENT

Defendants Northern Dynasty Minerals Ltd. ("NDM" or the "Company"), Ronald W. Thiessen ("Thiessen"), and Tom Collier ("Collier") respectfully move to dismiss Plaintiffs' Consolidated Amended Class Action Complaint ("Complaint"). On September 21, 2020, the Environmental Investigation Agency ("EIA"), an environmental organization, released several highly-edited and manipulated recordings of a series of confidential conversations involving Thiessen, NDM's CEO; Collier, then the CEO of Pebble Limited Partnership ("PLP"); and EIA investigators posing as potential investing partners ("the fake investors"). These conversations, which EIA secretly recorded with audio and video, took place in August and September 2020 ("the Pebble Tapes").[1] *See* Compl. ¶¶ 45, 117. Based on statements contained on the Pebble Tapes, Plaintiffs allege that Defendants misled investors, in violation of federal securities laws, about the size, scope, and duration of a mining project in Alaska for which NDM and PLP sought an environmental permit from the U.S. Army Corps of Engineers (the "Pebble Project").

The Complaint fails to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b), and should be dismissed with prejudice for the following independent reasons.

*First*, and most glaringly, the Complaint fails to identify any materially false or misleading statement because, contrary to Plaintiffs' allegations, *NDM repeatedly disclosed the possibility of future mine expansion*. In each of its annual and quarterly reports, throughout the putative class period, NDM disclosed that the Pebble Project covered by the permit application would mine only a portion of the estimated mineral resources in the entire Pebble deposit, and that "development of additional resources in other phases of the project" was possible "in the future." Tellingly, many of these disclosures are in the very same documents—sometimes just

---

[1] EIA released two additional "tapes" on October 29, 2020. Compl. ¶ 122.

1

sentences later—that Plaintiffs cite in the Complaint as supposed evidence of Defendants' purported fraud. The Court may consider these statements because they are contained in documents incorporated by reference in the Complaint.

*Second*, even if the potential for expansion had not been fully disclosed (it was), the Complaint fails to demonstrate a duty to disclose the information. No matter how motivated Defendants were to expand the Pebble Project beyond what was in the permit application, they could not do so without additional rounds of permitting—rendering their alleged "plan" little more than a possibility for which disclosure is not required.

*Third*, the Complaint fails to adequately allege materiality because the possibility that NDM would apply for a permit to expand the mining project was disclosed. Plaintiffs expressly rely upon the fraud-on-the-market presumption of reliance, under which publicly available information is promptly reflected in a publicly-traded company's securities prices. That also means, however, that if allegedly omitted information was disclosed, the market price of the stock already incorporated the information, and thus any variation of the allegedly omitted facts is immaterial as a matter of law. This was the case here.

*Fourth*, Plaintiffs fail to plead loss causation. Although NDM's share price declined significantly, the vast majority of those declines occurred following news regarding or related to the denial of a permit under Section 404 of the Clean Water Act for environmental reasons. Yet there are no allegations that Defendants made any false or misleading statements about (i) the Pebble Project's environmental impact or (ii) the likelihood that a permit would be granted. As for the more modest price declines allegedly correlated with the disclosure of the Pebble Tapes, Plaintiffs' theory of loss is simply illogical. Plaintiffs fail to explain how *expanding* the mine to increase its profitability—information purportedly first revealed in the tapes—would somehow

*decrease* NDM's share price. Nor have Plaintiffs sufficiently pled loss causation to the extent they rely on stock price declines entirely attributable to negative media portrayals of the Company, third-party press releases, or the ultimate permit denial, which were not the result of any false or misleading statement on the part of Defendants.

*Fifth*, Plaintiffs fail to plead particularized facts giving rise to an inference of fraudulent intent or scienter, much less the "strong inference" required by Rule 9(b) and the PSLRA. Plaintiffs' conclusory allegations that Defendants "acted with scienter in that they knew that the public documents . . . were materially false and misleading," Compl. ¶ 146, are insufficient as a matter of law. *See Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (inference of scienter must be at least as strong as competing inference of nonfraudulent intent). Plaintiffs have not and cannot adequately plead knowledge or recklessness with respect to (i) a false or misleading statement, (ii) an actual, concrete plan to expand, or (iii) materiality. Plaintiffs also literally ignore "the bevy of truthful disclosures that [Defendants] made throughout the Class Period[.]" *Kuriakose v. Federal Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012) ("It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures.").

*Finally*, Plaintiffs' Section 20(a) claim must be dismissed because, among other reasons, Plaintiffs have failed to allege a primary violation of Section 10(b).

# FACTUAL BACKGROUND[2]

*The Pebble Project*.  NDM engages in the exploration of mineral properties in the United States, and its principal mineral property is the Pebble Project, a copper-gold-molybdenum mining project in southwest Alaska.  Compl. ¶ 19.  The Pebble Project consists of 2,402 mineral claims and covers an area of approximately 417 square miles.  *Id.*  NDM owns 100% of PLP, which was established in 2007 to engineer, permit, construct, and operate the Pebble Project.  *Id.* ¶ 15.

In February 2011, NDM filed a Form 6-K in which it disclosed a technical report on a preliminary economic assessment of the Pebble Project ("the 2011 PEA").  The 2011 PEA outlined three possible development cases, *see id.* ¶ 22, stating "[p]hases of mine development beyond 25 years would require separate permitting and development decisions to be made in the future, based on prevailing conditions at the time and the accumulated experience *gained from developing and operating the initial phase of the Pebble Project*."[3]

---

[2] Exhibit references ("Ex.") refer to exhibits to the Declaration of Ashwin J. Ram filed with this Motion. This background is drawn from documents that may be considered on this Motion, including (1) the Complaint and documents referenced therein, and (2) NDM's SEC filings.  *See Tellabs*, 551 U.S. at 322 (court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference"); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 157 (S.D.N.Y. 2015) (court may "consider documents that are referenced in the complaint" and may "take judicial notice of public disclosure documents that must be filed with the [SEC]"); *Jones v. New Penn Fin., LLC*, No. 19-cv-1493, 2021 WL 405888, at *2 n.2 (E.D.N.Y. Nov. 15, 2021) (adopting recommendation of Magistrate Judge Kuo that documents attached to the Complaint may be considered when evaluating a motion to dismiss); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, No. 19-cv-0067, 2020 WL 4734989, at *1 n.2 (S.D.N.Y. Aug. 14, 2020) (courts may consider on a motion to dismiss any documents incorporated by reference to the Complaint and matters of public record, such as SEC filings).

[3] Ex. 1, NDM Form 6-K, Ex. 99.1 Investor Presentation (filed Feb. 24, 2011), at 3 (emphasis added). A table identifying NDM's filings with the SEC is attached as Appendix A ("App'x A").  For consistency and to help access the online filings, all citations to NDM's SEC filings used herein reference the filing date as reported in the SEC's EDGAR database and not the date that appears on the document being filed, which the Complaint references for some of the citations and which may be different.

On September 26, 2017, Thiessen gave an industry presentation in which he discussed the smaller mine project that the Company was preparing to submit for permitting and the long-term nature of the mine.[4]  Compl. ¶ 55.

***Pebble Permit Application and Disclosure***.  On December 22, 2017, PLP submitted a permit application to the Army Corps for a mine with a "project operating life of 20 years" with a total of 1.1 billion tons of mineralized material mined over the "life of the project."[5]  Compl. ¶ 35.

On March 30, 2018, NDM filed its 2017 annual report on Form 40-F with the SEC. Compl. ¶ 78.  Management's Discussion & Analysis ("MD&A") within the 2017 annual report included the following section, entitled "Project Description":

> The Project Description in the permit application envisages the Pebble deposit being developed as an open pit mine, with associated on and off-site infrastructure . . . .
>
> Following four years of construction activity, the proposed Pebble mine will operate for a period of 20 years.  This includes 14 years of mining using conventional drill-blast-shovel operations, followed by six years of milling material from a low-grade ore stockpile. The mining rate will average 90 million tons per year, with 58 million tons of mineralized material going through the mill each year (160,000 tons per day), for a life-of-mine waste to mineralized material ratio of 0.1:1.
>
> The development proposed in Pebble's Project Description is substantially smaller than previous iterations, and presents significant new environmental safeguards, including:
>
> - a development footprint less than half the size previously envisaged[.]

---

[4] *See* Ex. 31, Northern Dynasty Minerals Ltd., the Pebble Partnership, *The Pebble Project, The Future of U.S. Mining & Metals, A Pathway to Permitting* (Sept. 2017).

[5] *See* Ex. 32, The Pebble Project, Dep't of Army Application for Permit (POA-2017-271), *Attachment D— Project Description* (Dec. 2017), at 1, 14, 28, 30, 34.

The NEPA EIS process requires a comprehensive 'alternatives assessment' be undertaken to consider a broad range of development alternatives and, as such, the final project design and operating parameters for the Pebble Project and associated infrastructure may vary significantly from the proposed project described in the Project Description.

The EIS process will consider alternative scenarios with respect to a number of aspects of the proposed project. The Company will need to assess and study all of the proposed alternatives that the USACE will be considering as part of the scoping process conducted during the initial phase of the EIS so that an economic analysis can be completed after examination of all the alternatives.

The project proposed as envisaged in the Project Description uses a portion of the currently estimated Pebble mineral resources. This *does not preclude development of additional resources in other phases of the project in the future. Any future phases of development are expected to require comprehensive review by federal, state and local regulatory agencies, including a discrete EIS permitting process under NEPA.* [6]

The MD&A also warned investors that "[t]he securities of Northern Dynasty are highly speculative and subject to a number of risks," including that "[t]he Company may ultimately be unable to secure the necessary permits under United States Federal and Alaskan State laws to build and operate a mine at the Pebble Project."[7]

*Other NDM Periodic SEC Filings*.  In addition to the 2017 annual report, NDM discussed in each of its periodic annual and quarterly reports filed with the SEC the size, scope, and duration of the project as described in the Project Description to PLP's permit application and/or draft Environmental Impact Statement ("EIS") that was being prepared by the Army Corps, Compl. ¶¶ 81-82, 88, 92-94, 104-105, 109-110, and stated that the project proposed in PLP's permit application only used a portion of the estimated mineral deposit and did not

---

[6] Ex. 2, NDM Form 40-F, Ex. 99.6 MD&A to 2017 Annual Report (filed Mar. 30, 2018), at 10-11 (emphasis added); App'x A.

[7] *Id.* at 33.

preclude future expansion.[8]  On March 31, 2020, for example, NDM filed an annual report on

Form 40-F for the year ended December 31, 2019, *id.* ¶ 104, and included the following

statements in the MD&A:

> The Draft EIS envisages the project developed as an open pit mine
> and processing facility with supporting infrastructure, a significantly
> smaller development footprint than previously envisaged, and other
> additional environmental safeguards as described in the Project
> Description.  It assesses the access route described in the Project
> Description as well as other alternatives.
>
> The current Project Description proposes that the Pebble deposit
> would be developed as a 180,000-ton per day open pit mine with
> associated on and off-site infrastructure. . . .
>
> Following four years of construction activity, the proposed Pebble
> mine will operate for a period of 20 years as a conventional drill-
> blast-shovel operation.
>
> …
>
> *The proposed project uses a portion of the currently estimated*
> *Pebble mineral resources.  This does not preclude development of*
> *additional resources in other phases of the project in the future*,
> although any subsequent phases of development would require
> extensive regulatory and permitting review by federal, state and
> local regulatory agencies, including a comprehensive EIS review
> process under NEPA.[9]

**NDM's Stock Registration and Prospectus Filings**.  NDM filed SEC Form F-10 and F-

10/A registration statements under the Securities Act of 1933 on January 15 and 28, 2019, and

again on April 28 and 30, May 11, June 3, and July 6, 2020.  Compl. ¶¶ 84, 110.  In each of these

filings, NDM stated that the project proposed in PLP's permit application only used a portion of

---

[8] *See* Exs. 3 – 14; App'x A.

[9] Ex. 10, NDM Form 40-F, Ex. 99.6 MD&A to 2019 Annual Report (filed Mar. 31, 2020), at 9, 10
(emphasis added); App'x A.

the Pebble Project and did not preclude future expansion.[10]  For example, the January 15, 2019

F-10 included the following statements:

> The USACE is conducting a comprehensive alternatives assessment
> to consider a broad range of alternatives as part of its preparation of
> the EIS.  As a result, the Company cautions that the plan described
> above may not be the final development plan. A final development
> design has not yet been selected.  *The proposed project uses a
> portion of the currently estimated Pebble mineral resources. This
> does not preclude development of additional resources in other
> phases of the project in the future, although any subsequent phases
> of development would require extensive regulatory and permitting
> review* by federal, state and local regulatory agencies, including a
> comprehensive EIS review process under NEPA.[11]

On February 20, March 12 and 14, June 19 and 20, August 9 and 12, and December 12

and 13, 2019, NDM also filed prospectus supplements to the short form prospectus dated January

25, 2019.[12]  Compl. ¶ 86.  In each of the prospectus supplements, NDM stated that the project

proposed in PLP's permit application would only mine a portion of the estimated mineral

resources and did not preclude future expansion.  For example, the prospectus supplement filed

on December 12, 2019 included the following statements, which are nearly identical to those in

the January 15, 2019 F-10:

> The USACE is conducting a comprehensive alternatives assessment
> to consider a broad range of alternatives as part of its preparation of
> the EIS.  As a result, we caution that the plan described above may
> not be the final development plan.  A final development design has
> not yet been selected.  *The proposed project uses a portion of the
> currently estimated Pebble mineral resources.  This does not
> preclude development of additional resources in other phases of the
> project in the future*, although any subsequent phases of
> development would require extensive regulatory and permitting

---

[10] *See* Exs. 16 – 21; App'x A.

[11] Ex. 15, NDM Form F-10 (Jan. 15, 2019), at 12 (emphasis added); App'x A.

[12] The dates reflect the date the prospectus supplements were filed, whereas the Complaint uses the date of
the document. *See* Exs. 22 – 30; App'x A.

review by federal, state and local regulatory agencies, including a comprehensive EIS review process under NEPA.[13]

*Collier's Congressional Testimony.* On October 23, 2019, Collier testified before a United States House of Representatives subcommittee on the Pebble Project's process and potential impacts. *Id.* ¶ 38. In his written testimony, Collier stated:

> Pebble has no current plans, in this application or in any other way, for expansion. If expansion did become feasible, new permits would be required. The permit applicant would have to go through the same rigorous procedure that Pebble is now going through. Any concerns with scope or environmental risk can be addressed in that new permitting process. If the Corps grants Pebble's current permit application, nothing in that permit suggests a carte blanche to expand. Any future mining projects in the area would therefore be evaluated on their own merits based on then-existing conditions when and if future applications are submitted to the relevant permitting agencies.[14]

*Final Environmental Impact Statement.* On July 24, 2020, the Army Corps released a favorable Final Environmental Impact Statement ("FEIS") for the Pebble Project, noting that the project proposed in PLP's permit application would have no measurable impact on Bristol Bay's fisheries.[15] Compl. ¶ 40. In preparing the FEIS, the Army Corps considered both the expansion of the Pebble Project beyond the 20 years of the proposed project operations and NDM's continued exploration of other mines within its area of mineral claims to be "Reasonably Foreseeable Future Actions" ("RFFA's").[16] Based on the 2011 PEA and Pebble's response to

---

[13] Ex. 29, NDM Prospectus Supplement (Dec. 12, 2019), at 13 (emphasis added); App'x A.

[14] Ex. 33, *The Pebble Mine Project: Process and Potential Impacts*, Hearing Before Subcomm. on Water Resources and the Environment, Comm. on Transportation and Infrastructure, 116 Cong. 39 (Oct. 23, 2019) (Testimony of Tom Collier, CEO of Pebble Partnership), at 20.

[15] The Army Corps posted the FEIS and all related material on a website it created specifically for the Pebble Project, "pebbleprojecteis," which was shut down at the end of December 2020. However, these documents can be found at https://pebblewatch.com/resources/u-s-army-corps-pebble-permitting/.

[16] Ex. 34, U.S. Army Corps of Engineers, Pebble Project, Final Environmental Impact Statement, Chapter 4: Environmental Consequences (July 2020), at 4.1-9.

Army Corps Request for Information ("RFI") 062,[17] the Army Corps concluded that expansion of the proposed Pebble Project was a RFFA and assumed that the foreseeable future expansion would, among other things, increase the mine life of the Pebble Project from the 20 years proposed in the permit application to 118 years and, starting after year 20, increase throughput from 180,000 tons per day to 250,000 tons per day.[18]

The Army Corps also considered NDM's further exploration of additional mines (other than the mine proposed in the permit application) within its mineral claim area to be a RFFA.[19]

*The Pebble Tapes*.  During August and September 2020, Thiessen and Collier participated in multiple Zoom and phone calls with the fake investors, who were in reality EIA environmental activists posing as representatives of a Hong Kong-based investment firm purportedly interested in partnering with NDM on the Pebble Project.  EIA secretly recorded the conversations and, on September 21, 2020, released 12 Pebble Tapes, which are compilations of highly-edited, cut off, and spliced excerpts of the conversations between Thiessen, Collier, and the fake investors.[20]  Most of the excerpts on the Pebble Tapes are standalone, rearranged snippets of statements made by Thiessen and Collier.  The actual questions and the real voices of the fake investors have been omitted from the recordings.  In their place, EIA has dubbed in the audio of an actor to recite the purported questions posed to Thiessen and Collier.  Moreover, many of Thiessen's and Collier's statements have been cut off or spliced together as if they are

---

[17] *Id*. at 4.1-7.  In response to RFI 062, Pebble provided the "conceptual layout for an expanded life development beyond the currently-proposed project" that the Army Corps requested and explained that "[t]he concept is merely one of several expanded development scenarios that could potentially be proposed and permitted in the future."  *See* Ex. 35, the Pebble Partnership, Response to RFI 062 (Sept. 5, 2018), at 4.

[18] Ex. 34, FEIS at 4.1-22.

[19] *Id.* at 4.1-9-10.

[20] *See* https://eia-global.org/reports/20200921-the-pebble-tapes (last visited September 10, 2021).

continuous statements, when the video backgrounds and clothing worn by the participants reveal that the excerpts were recorded on different days.

Despite this deceptive editing, the portions of the conversations that EIA released in the Pebble Tapes are consistent with the Company's prior statements. For example, Thiessen made the following statements about possible expansion of the Pebble Project in the future:

- We then said 'Ok, let's see if we can reduce the size of the project overall and still have a reasonable economic. So we reduced the size of the processing plant to 160,000 metric tons per day. And then we said 'Let's just have a 20-year mine life. And one of the reasons was, I mean this entire deposit, 10 billion tons, it can be mined by open pit, but it might at some point be more reasonable to do what's called a high-volume large-scale underground mining block caving, or panel caving, but for sure the first 20 years is gonna be open pit, and *during that 20 years you'll make a decision on how you will go forward*. Will it be open pit only? Block cave only? Or a combination of the two? It'll be a combination of the two, I'm pretty sure. So we said 'Let's only have a 20-year mine life' and so that's how we kept the footprint down to five-and-a-half square miles. Is slightly smaller throughput and a 20-year mine life. *But during that 20 years, you're gonna make the application to continue for another 20*. So we do have all the studies that go through all of this, and to increase the size of the mill from 160,000 metric tons per day we can go to 220, we can go to 320. Again, some of these things you'll have to go through permitting again….[21]

- Now we could start Pebble at say 35,000 tons and grow over a 30-40 year period. No, we're gonna start it at 160,000 tons per day. *And maybe it grows to either 260 or 320 over the next 20-30 years.*[22]

- The northern corridor infrastructure part will handle the expansion. When that expansion comes on, you know because the PEA talks about effectively a 220,000 ton per day concentrator and what we're building in the first stage is a 180,000 ton per day concentrator. *In all likelihood the expansion mainly involves just increasing the crushing and grinding capacity*, probably one secondary, one additional line of secondary mills – not sure that we would even

---

[21] Compl., Ex. B at 3 (emphasis added).

[22] *Id.* at 4 (emphasis added).

need a new line of SAG mills, probably just increase motor size on existing SAG mills, but the northern corridor will handle the expansion of Pebble.[23]

- The only thing that we have to do additionally is determine will there be more open pit exclusively or will we also do some underground mining like bulk underground mining, block-caving, in which case we need to sink a shaft and do some underground work. *That itself will probably be two to three hundred million dollars, but that will be carried out through that 20-year period and then we'll make application for another 20 or maybe 40 years of mine life.* And it's not unusual that mines, you know in fact you're better off asking for a permit for 20 years than asking for a permit for 60 years because *we don't know what kind of mine operation we will have after 20 years. We don't know that yet. So when they ask us what the environmental footprint is of that expansion, we can't tell them today. We'll only be able to tell them in say year 12 or year 15.* See this project ultimately will look a lot like the Mongolian project Oyu Tolgoi. You know where there's an open pit and there's underground.[24]

- You can see [the other potential mine sites], there's a picture in our presentation and it's induced polarization. It's a picture of the 425 square miles and it's got a bunch of dots on it. Each one of those little dots represents potentially another mine site.[25]

- We've told [the Army Corps] that there are two ways we would expand. *The most obvious one is the extend the mine life*, the mining license by 20 to 40 years, once we know the next methodology, block caving, open pit, or a combination of the two. *And then the other expansion potential is to expand the mill from 180,000 tons a day to say 320,000 tons a day.*[26]

Likewise, Collier stated:

- This is a well-worn path that we're following to build something that allows us to show the community and the state that we can do it, we can do it well, that it's not dangerous and *then we'll come in at some point in the future and request an extension of the time and*

---

[23] *Id.* at 6 (emphasis added).

[24] *Id.* at 6-7 (emphasis added).

[25] *Id.* at 29.

[26] *Id.* at 29 (emphasis added).

*probably an expansion of how much we are producing on a daily basis.*[27]

The Pebble Tapes also include statements that Thiessen and Collier made about the Donlin mine project, an unrelated venture that Plaintiffs mysteriously cite throughout the Complaint as a basis for claiming Defendants made false and misleading statements,[28] even though Defendants neither own nor control it. For example, Thiessen stated the following about the Donlin project on the Pebble Tapes:

> I mean there is, I'm not telling you any big secrets, there is another project that's 175 miles north of Pebble. It's called the Donlin Project. *It's owned 50% by Barrick and 50% by NovaGold.* While currently the infrastructure for the mines are completely separate and independent, use different directions and corridors, there is a lot of logic to us joining forces to make a single corridor. And the infrastructure *on their mine* is 1.5 billion, the infrastructure on *our mine* is 1.5 billion. If you put them together it's not a total savings, but it's probably saving 50 to 75% of one of them.[29]

And Collier stated the following about the Donlin project:

> One of the things that I'm sure Ron mentioned to you is that we think it's possible that we can combine some infrastructure which has the beauty of reducing [Donlin's] need for capital investment, and we think significantly, which means that this is another reason that the state's interested in Pebble. Because if you flip the Pebble switch on it's likely that you may be also flipping on the Donlin switch. And we think that's a real benefit that the project has.[30]

***The Army Corps Denies the Permit***. On November 25, 2020, the Army Corps effectively denied the federal permit for the proposed Pebble Project. Compl. ¶ 126.[31] The

---

[27] *Id.* at 4 (emphasis added).

[28] *See* Compl. ¶¶ 62, 64, 66, 69, 75, 77, 80, 87, 89, 91, 95, 99, 106, 108, and 111.

[29] Compl., Ex. B at 9 (emphasis added).

[30] *Id.* (emphasis added).

[31] *See* Ex. 36, Record of Decision for Application Submitted by Pebble Limited Partnership to: The U.S. Army Corps of Engineers (Dep't of Army Permit # POA-2017-00271) (Nov. 20, 2020), at 2-1, 7-1.

Corps stated that it determined that the proposed project "does not comply with Clean Water Act guidelines" and is "contrary to the public interest." *Id.*

*Plaintiffs' Allegations*. Plaintiffs bring two claims, one for securities fraud under Section 10(b) of the Exchange Act and the other for control person liability under Section 20(a) of the Exchange Act. Plaintiffs allege that Defendants "hatched a plan to scheme and mislead until a permit was secured"; "repeatedly vouched that the Pebble Project was limited to 20 years of mining operations with a limited footprint and even a closure plan that precluded further mining"; "lied to the market about the fundamentals of their permit application"; and "falsely designed the project to maximize its chances of obtaining a critical permit despite having no intention of limiting the mine to the size, scope, or duration presented to the market." *Id.* ¶ 57.

## STANDARD OF REVIEW

"To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plausibly allege: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation[.]" *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)). To state a claim under Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable

participant in the controlled person's fraud." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted). If a plaintiff has not adequately alleged a primary violation, such as under Section 10(b), then the Section 20(a) claim must be dismissed. *See id.*

Plaintiffs must also satisfy the heightened standards under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *ATSI*, 493 F.3d at 99; *Tellabs*, 551 U.S. at 314. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). "Under the PSLRA, the complaint must 'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading,' and 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ECA*, 553 F.3d at 196 (quoting 15 U.S.C. § 78u-4(b)(1), (2)).

## ARGUMENT

## I. PLAINTIFFS FAIL TO STATE A SECTION 10(b) CLAIM

### A. Plaintiffs Fail to Adequately Plead A Misstatement or Omission

The gravamen of Plaintiffs' Complaint is that Defendants allegedly harbored a secret, undisclosed plan for future expansion that rendered their prior statements about the more limited project proposed in the permit application—and repeatedly described in public filings— materially false and misleading. To survive a motion to dismiss a securities fraud complaint, however, plaintiffs alleging fraud "must state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), and "[a]llegations that are conclusory or unsupported by factual assertions are insufficient," *ATSI*, 493 F.3d at 99. Moreover, Plaintiffs "must do more than say that the statements. . . were false and misleading; they must demonstrate with specificity

why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). Plaintiffs' claim

fails for at least three reasons. First, Plaintiffs fail to explain why Defendants' statements

expressing a general desire to potentially expand the project in the future, and the reasonable

foreseeability thereof, are inconsistent with the proposed plan to first obtain a permit to build and

operate a smaller mine. As such, Defendants' statements about the size, scope, and duration of

the specific project proposed in the permit application were neither false nor misleading, let

alone fraudulent. Second, Defendants repeatedly explained—in the very same public filings

cited in the Complaint—that the specific project proposed in the permit application used only a

portion of the Pebble mineral resource and did not preclude additional development of the

resource in other phases of the project in the future. And, third, even assuming Defendants'

future desires and the potential for future expansion had not been fully disclosed prior to the

release of the Pebble Tapes (they were), Plaintiffs fail to show that Defendants had any duty to

disclose them.

### 1. The Alleged Omissions Regarding Future Expansion Did Not Render The Challenged Statements False or Misleading

Plaintiffs allege throughout the Complaint that the Pebble Tapes revealed that

"Defendants repeatedly made materially false and misleading statements concerning the size,

scope, and duration of the Pebble Project." Compl. ¶ 58. They contend:

> Thus, from the very beginning of the Class Period, Defendants had
> hatched a plan to scheme and mislead until a permit was secured.
> To that end, during the Class Period, Defendants *repeatedly vouched
> that the Pebble Project was limited to 20 years of mining operations
> with a limited footprint and even a closure plan that precluded
> further mining*. It is crystal clear that Defendants lied to the market
> about the fundamentals of their permit application. Defendants
> falsely designed the project to maximize its chances of obtaining a
> critical permit despite having no intention of limiting the mine to the
> size, scope, or duration presented to the market.

*Id.* ¶ 57 (emphasis added).

According to Plaintiffs' theory, because Defendants discussed on the Pebble Tapes options for expansion of the Pebble Project in the future (with individuals purporting to be potential investment partners in the Project), it meant that "Northern Dynasty's actual plans [were] to build a much larger and long-lived mine than described in Northern Dynasty's permit application with the Army Corps, in public SEC filings, and in Congressional testimony." *Id.* ¶ 45. In other words, Plaintiffs' entire theory is predicated upon the misguided assumption—undermined by the very documents Plaintiffs cite—that the Pebble Project proposed in NDM's permit application was inconsistent with later expansion of the project.

First, Plaintiffs provide no support for their sweeping allegations that "Defendants falsely designed the project to maximize its chances of obtaining a critical permit despite having no intention of limiting the mine to the size, scope, or duration presented to the market." *Id.* ¶ 57. "[A] company's statement discussing one strategy [is not] 'false [simply] because the company had already made the decision, or was actively considering adopting a plan' to implement a different strategy." *Pehlivanian v. China Gerui Adv. Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 646 (S.D.N.Y. 2015) (quoting *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812 (2d Cir. 1996)). This is particularly true where, as here, a defendant "did not make 'any statements or predictions foreclosing the possibility of adopting alternative' strategies." *Id.* (quoting *Philip Morris*, 75 F.3d at 812). Defendants' statements about the *potential* to seek further permits to expand the mine are plainly consistent with their statements about the initial smaller mine for which a permit was sought.

Second, the Plaintiffs' claim that cherry-picked statements from NDM's public filings are false and misleading because they were inconsistent with Defendants' statements on the Pebble Tapes fails as a matter of law, because Plaintiffs ignore language in those very same filings

entirely consistent with the Pebble Tapes statements. Plaintiffs repeatedly quote passages from NDM's periodic filings that describe the size, scope, and duration of the Pebble Project proposed in the Company's permit application and attempt to juxtapose them with discussions contained on the Pebble Tapes concerning possible future expansion. *See* Compl. ¶¶ 59-111. However, for each of the periodic filings cited in the Complaint, Plaintiffs quote from the parts of the Project Description that describe the 20-year mining project contained in the permit application, but omit the parts of the same Project Description in which the Company states that the "project proposed as envisaged in the Project Description uses a portion of the currently estimated Pebble mineral resources" and "does not preclude development of additional resources in other phases of the project in the future."[32]

Likewise, Plaintiffs allege that statements in the Company's public filings about the scope and duration of the Pebble Project in the EIS prepared by the Army Corps were false and misleading. This was so, according to Plaintiffs, because Defendants discussed future expansion of the project on the Pebble Tapes, but allegedly did not publicly disclose this possibility. *See* Compl. ¶¶ 92-95, 104-107, 109-111. Plaintiffs' own evidence flatly contradicts this allegation. The SEC filings that Plaintiffs cite not only describe the scope and duration of the EIS project description, but they also disclose the potential for future phases of development:

> The USACE is conducting a comprehensive alternatives assessment to consider a broad range of alternatives as part of its preparation of the EIS. As a result, the Company cautions that the plan described above may not be the final development plan. A final development design has not yet been selected. *The proposed project uses a portion of the currently estimated Pebble mineral resources. This does not preclude development of additional resources in other phases of the project in the future, although any subsequent phases of development would require extensive regulatory and permitting*

---

[32] *See* Exs. 2 – 14; App'x A.

> *review by federal, state and local regulatory agencies, including a comprehensive EIS review process under NEPA.*[33]

In fact, in the Final EIS cited in the Complaint, *id.* ¶ 40, the Army Corps concluded that it was *reasonably foreseeable* that the Company would seek to expand the Pebble Project after obtaining the initial 20-year permit, based on Defendants' own disclosures.[34]  Accordingly, Plaintiffs' own evidence again demonstrates that Defendants' statements were not inconsistent.

In addition, the Pebble Tapes themselves contradict Plaintiffs' allegations that discussions about future expansion on the tapes were inconsistent with prior statements in the Pebble Project's permit application.  According to Plaintiffs, "[i]t is crystal clear that Defendants lied to the market about the fundamentals of their permit application."  Compl. ¶ 57.  But Plaintiffs fail to allege *any* statement by Thiessen or Collier on the Pebble Tapes even remotely inconsistent with "the fundamentals of [the] permit application."  Neither Thiessen nor Collier said that the Company would somehow ignore the parameters of the permit for the Pebble Project, if it was approved, and build some other project that the government neither reviewed nor approved.  Instead, both Thiessen and Collier said the Company would begin developing the Pebble Project proposed in the permit application *and then* potentially seek to expand the project in the future after, among other things, the Company developed an expansion plan, found an appropriate operating partner, and obtained a separate government permit for its expansion plans.

Even a cursory review of the statements made on the Pebble Tapes makes this clear.  For example, Thiessen repeatedly said on the Pebble Tapes that the first 20 years of the project

---

[33] *E.g.*, Ex. 15, NDM Form F-10 (Jan. 15, 2019), at 12 (emphasis added); App'x A.

[34] *See, e.g.*, Ex. 34, FEIS at 4.1-7 ("As presented in the response to RFI 062 [], if Pebble Project expansion occurs, it is assumed to begin in year 20 of the proposed project operation.").

would be open pit mining, as described in the permit application, and during that period the

Company would decide how the mine may expand *after* the first 20 years of mining:

- We then said '*Ok, let's see if we can reduce the size of the project overall and still have a reasonable economic*. So we reduced the size of the processing plant to 160,000 metric tons per day. And then we said 'Let's just have a 20-year mine life. And one of the reasons was, I mean this entire deposit, 10 billion tons, it can be mined by open pit, but it might at some point be more reasonable to do what's called a high-volume large scale underground mining block caving, or panel caving, *but for sure the first 20 years is gonna be open pit*, and *during that 20 years you'll make a decision on how you will go forward*. Will it be open pit only? Block cave only? Or a combination of the two? It'll be a combination of the two, I'm pretty sure. So we said 'Let's only have a 20-year mine life' and so that's how we kept the footprint down to five-and-a-half square miles. Is slightly smaller throughput and a 20-year mine life. *But during that 20 years, you're gonna make the application to continue for another 20. So we do have all the studies that go through all of this, and to increase the size of the mill from 160,000 metric tons per day we can go to 220, we can go to 320. Again, some of these things you'll have to go through permitting again….*[35]

- The only thing that we have to do additionally is determine will there be more open pit exclusively or will we also do some underground mining like bulk underground mining, block-caving, in which case we need to sink a shaft and do some underground work. That itself will probably be two to three hundred million dollars, *but that will be carried out through that 20-year period and then we'll make application for another 20 or maybe 40 years of mine life*. And it's not unusual that mines, you know in fact you're better off asking for a permit for 20 years than asking for a permit for 60 years because *we don't know what kind of mine operation we will have after 20 years*. We don't know that yet. So when they ask us what the environmental footprint is of that expansion, we can't tell them today. We'll only be able to tell them in say year 12 or year 15.[36]

---

[35] Compl., Ex. B at 3 (emphasis added).

[36] *Id.* at 6-7 (emphasis added).

Likewise, Collier explicitly stated on the Pebble Tapes that the Company pursued the 20-year permit to prove to local and state stakeholders that it could build and operate the mine safely before seeking later expansion:

- This is a well-worn path that we're following to build something that allows us to show the community and the state that we can do it, we can do it well, that it's not dangerous *and then we'll come in at some point in the future and request an extension of the time and probably an expansion of how much we are producing on a daily basis.*[37]

Thus, contrary to Plaintiffs' conclusory, unsupported allegations, Defendants' statements about the scope and duration of the Pebble Project described in the permit application and about future expansion were entirely consistent with the publicly disclosed information about the Pebble Project.

Next, Plaintiffs claim that Defendants' statements about the scope and duration of the project proposed in the permit application were false and misleading, because the Pebble Tapes revealed that "Northern Dynasty planned to . . . activate the Donlin mine, another project 175 miles north of Pebble." *E.g.*, Compl. ¶ 4. Plaintiffs not only fail to allege any actual inconsistent statements, but their own evidence refutes this claim. For example, Thiessen and Collier made the following statements about the Donlin mine on the Pebble Tapes, respectively:

[Thiessen]: I mean there is, you know, I'm not telling you any big secrets, there is another project that's 175 miles north of Pebble. It's called the Donlin Project. *It's owned 50% by Barrick and 50% by NovaGold*. While currently the infrastructure for the mines are completely separate and independent, use different directions and corridors, there is a lot of logic to us joining forces to make a single corridor. And the infrastructure *on their mine* is 1.5 billion, the infrastructure on *our mine* is 1.5 billion. If you put them together

---

[37] *Id.* at 4 (emphasis added).

it's not a total savings, but it's probably saving 50 to 75% of one of them.[38]

> [Collier]:  One of the things that I'm sure Ron mentioned to you is that we think it's possible that we can combine some infrastructure which has the beauty of reducing [Donlin's] need for capital investment, and we think significantly, which means that this is another reason that the state's interested in Pebble.  Because if you flip the Pebble switch on it's likely that you may be also flipping on the Donlin switch.  And we think that's a real benefit that the project has.[39]

It is readily apparent from these statements that NDM does *not* own the Donlin mine and, therefore, could not control it or otherwise have it secretly "activated."  It is equally apparent from the Pebble Tapes that Thiessen and Collier were explaining the potential for the Pebble and Donlin mines to share infrastructure along a single corridor, which could significantly reduce infrastructure costs for both projects and attract political support from state officials.  But even if NDM somehow had future plans to activate a mine that it does not own or control, such plans would not be inconsistent with the prior statements about the scope and duration of the project proposed in the permit application.

Plaintiffs have failed to demonstrate how Defendants' alleged statements were false and misleading.  The Complaint instead tries to juxtapose snippets from the highly-edited and manipulated Pebble Tapes with excerpts cherry-picked from NDM's public filings.  But, as demonstrated above, other statements in NDM's public filings (but omitted from the Complaint) reveal that, when placed in their proper context, the alleged statements are not inconsistent with the statements in the Pebble Tapes, let alone false or misleading.  As such, the Section 10(b) claim should be dismissed.

---

[38] Compl., Ex. B at 9 (emphasis added).

[39] *Id.*

## 2.     The Possibility of Future Expansion Was Publicly Disclosed

Plaintiffs allege that Defendants' statements about the size, scope, and duration of the project plan described in the permit application during the putative class period, from December 21, 2017 through November 24, 2020, were false and misleading because of allegedly undisclosed statements Defendants made between August and September 2020 (in the Pebble Tapes) about wanting to expand the mine in the future.  *See* Compl. ¶¶ 1, 44-111.  Plaintiffs' claim fails because NDM publicly disclosed the possibility of future expansion repeatedly throughout the class period.  It was, in fact, one of the assumptions that the Army Corps considered in reviewing the permit application for the Pebble Project.

Indeed, well before NDM filed the permit application on December 22, 2017, the Company disclosed to the investing public the full scope of the Pebble property, including the 2,402 mineral claims that covers an area of approximately 417 square miles located in southwest Alaska."  Compl. ¶ 19 (citing NDM Form 6-K, filed Nov. 16, 2011).  And Plaintiffs admit that on September 26, 2017, Thiessen gave a public industry presentation that discussed both the smaller project that the Company was seeking to permit *and* the generational opportunity provided by the full extent of the entire Pebble property.  *See id.* ¶ 55 ("On or around September 26, 2017, Thiessen gave a presentation . . . about the long-term nature of the mine" and "described the '***reality'*** as '***represent[ing] development for many years, perhaps centuries into the future***") (citing Northern Dynasty Minerals Ltd., the Pebble Partnership, *The Pebble Project, the Future of U.S. Mining & Metals, A Pathway to Permitting*, September 2017).[40]

---

[40] *See* Ex. 31 at 7 (showing "Exploration Potential is High" with dots depicting additional mine sites), 9 (comparing Pebble's mineralization to Oyu Tolgoi, one of the largest open pit, underground mines in the world), 21 (describing Pebble as "A Generational Opportunity").

Similarly, on March 30, 2018, NDM filed with the SEC its annual report on Form 40-F for the year ended December 31, 2017 (the "2017 annual report"). Plaintiffs quote language from the 2017 annual report, which they describe as "representations concerning the size, the scope, and the duration of the Pebble mine" and claim that these statements "describing the Pebble mine operating only for a period of 20 years, with a mining rate of 160,000 tons per day were materially false and misleading when made . . . ." Compl. ¶¶ 78-80. However, Plaintiffs omit key statements from the very same section of the 2017 annual report that contradict their assertions.

What Plaintiffs describe as "representations concerning the size, the scope, and the duration of the Pebble mine" are, in fact, statements taken from the MD&A to the 2017 annual report entitled, "Project Description."[41] The Project Description describes the size, scope, and duration of the specific project that was submitted in the permit application. The Complaint omits the portion of this section of the Project Description that begins, "The Project Description *in the permit application* envisages the Pebble deposit being developed as an open pit mine . . . ."[42] Plaintiffs also omit the paragraph from the same section that disclosed that the project proposed in the permit application—which would operate for a period of 20 years and have a mining rate of 160,000 tons per day—used only a portion of the Pebble deposit and did not preclude future development in other phases of the project:

> *The project proposed as envisaged in the Project Description uses a portion of the currently estimated Pebble mineral resources. This does not preclude development of additional resources in other phases of the project in the futur*e. Any future phases of development are expected to require comprehensive review by

---

[41] Ex. 2, NDM Form 40-F, Ex. 99.6 MD&A to 2017 Annual Report (filed Mar. 30, 2018), at 10; App'x A.

[42] *Id.* (emphasis added).

24

federal, state and local regulatory agencies, including a discrete EIS permitting process under NEPA. [43]

Plaintiffs repeat the same allegations with respect to each of NDM's quarterly and annual reports, as well as NDM's prospectus filings from the purported class period. *See* Compl. ¶¶ 59-111. And in each case they omit the key disclosures from those same documents explicitly stating that the information about the size, scope, and duration of the mining operation relates only to the project proposed in the permit application, which mines only a portion of the resources contained within the entire mineral deposit and, thus, does not preclude future development.[44]

Likewise, on July 24, 2020, the Army Corps released an FEIS, which was to be used, along with other factors, to determine if the project in the permit application was permissible under Section 404 of the Clean Water Act. Compl. ¶ 40. Plaintiffs cite the FEIS in the Complaint, but similarly ignore that the FEIS identified both the future expansion of the Pebble mine and further exploration of additional mines within Pebble's mineral claims as "Reasonably Foreseeable Future Actions."[45] As explained in Chapter Four of the FEIS, the basic expansion project that the Army Corps considered to be reasonably foreseeable would last up to 118 years and include the following assumptions:

Year and Activity Description:

Year 0 to 20: This time period refers to the proposed project operations for a 20-year period.

Year 20 to 78: This time period refers to expansion mining for a 58-year period.

---

[43] *Id.* at 11 (emphasis added).

[44] *See* Exs. 2 – 30; App'x A.

[45] Ex. 34, FEIS at 4.1-9.

Year 78 to 98 or 118: This time period refers to expansion milling for a 20- to 40-year period.

Assumptions:

• The current proposed project proceeds as outlined by EIS alternative for the first 20 years.

• After 20 years, mining continues for 58 years and mill throughput is expanded from 180,000 tons per day to 250,000 tons per day. This represents a 39% expansion in throughput compared to the proposed action.

• After mining stops (year 78), milling continues for an additional 20 to 40 years to process low grade ore and PAG waste that is not backhauled to the pit. Bulk and pyritic tailings would be deposited directly into the pit.[46]

Moreover, the Army Corps determined that future expansion of the Pebble Project proposed in the permit application was based,[47] in part, on a publicly available Pebble memorandum which explained that the possible expansion of mine duration from 20 to 118 years was "merely one of several expanded development scenarios that could potentially be proposed and permitted in the future."[48]

These disclosures are fatal to Plaintiffs' claims. "Where allegedly undisclosed material information is in fact readily accessible in the public domain, the Second Circuit has found that a defendant may not be held liable for failing to disclose this information." *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) (citing *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978); *Rodman v. Grant Found.*, 608 F.2d 64, 70 (2d Cir. 1979)). "[A]t the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure

---

[46] *Id*. at 4.1-22.

[47] *See id*. at 4.1-9 (describing the "[e]xpansion of the Pebble Project to develop 55% of its reserves over an additional 58 years of mining, and 20 to 40 years of post-mining processing . . . , as outlined in response to RFI 062 PLP 2018-RFI 062").

[48] Ex. 35, Pebble Response to RFI 062.

of information that was actually disclosed." *Id.*; *see Shemian v. Research In Motion Ltd.*, No. 1:11-cv-4068, 2013 WL 1285779, at *20 (S.D.N.Y. Mar. 29, 2013) (dismissing claims based on alleged omissions that were disclosed), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).

The Southern District of New York recently dismissed Section 10(b) and 20(a) claims in another matter for similar reasons. In *Altimeo Asset Mgmt. v. Qihoo 360 Technology Co. Ltd.*, No. 19-cv-10067, 2020 WL 4734989 (S.D.N.Y. Aug. 14, 2020), investors alleged that, in connection with a take-private deal, Qihoo withheld its plans to relist on a Chinese stock exchange. The court found, however, that "to the extent the [complaint] asserts a failure to alert shareholders to the *possibility* of a future relisting," this very information had been disclosed in the defendants' proxy materials. *Id.* at *9. "Plaintiffs are therefore left with the theory that defendants, at the time of the [take-private deal], had already adopted—but did not disclose to the public—an actual, concrete plan to relist in China." *Id.* Because the factual allegations were insufficient to support the existence of such a concrete plan, the court dismissed the claims with prejudice. *Id.* at *9-17. Two other courts in the Southern District have applied *Qihoo* to dismiss similar claims. *See Altimeo Asset Mgmt. v. WuXi PharmaTech (Cayman) Inc.*, No. 19-cv-1654, 2020 WL 6063539, at *6 (S.D.N.Y. Oct. 14, 2020) (finding no concrete plan to relist); *ODS Cap. LLC v. JA Solar Holdings Co.*, No. 18-cv-12083, 2020 WL 7028639, at *9 (S.D.N.Y. Nov. 30, 2020) (same).

The same result is warranted here. As in *Qihoo*, *WuXi*, and *ODS Capital*, Defendants disclosed the possibility of future expansion of the mine in each of NDM's annual and quarterly reports and prospectus filings during the putative class period. Plaintiffs must therefore adequately allege the existence of a "specific and definite plan" to expand the mine. *See Qihoo*, 2020 WL 4734989, at *9 ("[T]he minimum factual allegation necessary for the [complaint] here

to survive[] [is] the existence . . . of a specific and definite plan for Qihoo to relist.").  The

Complaint here comes nowhere close to meeting that standard.  Defendants' "plans" that

Plaintiffs claim were revealed by the Pebble Tapes were even less concrete than those in *Qihoo*,

*WuXi*, and *ODS Capital*.  Not only was no actual plan to expand discussed on the Pebble Tapes,

Thiessen also made clear that the Company *had no ability* to formulate a concrete plan because

the future was too uncertain:

> The only thing that we have to do additionally is determine will there be more open pit exclusively or will we also do some underground mining like bulk underground mining, block-caving, in which case we need to sink a shaft and do some underground work.  *That itself will probably be two to three hundred million dollars, but that will be carried out through that 20-year period and then we'll make application for another 20 or maybe 40 years of mine life.*  And it's not unusual that mines, you know in fact you're better off asking for a permit for 20 years than asking for a permit for 60 years because *we don't know what kind of mine operation we will have after 20 years.  We don't know that yet.  So when they ask us what the environmental footprint is of that expansion, we can't tell them today.  We'll only be able to tell them in say year 12 or year 15.*[49]

Collier was even more vague when discussing possible expansion plans:

> This is a well-worn path that we're following to build something that allows us to show the community and the state that we can do it, we can do it well, that it's not dangerous and *then we'll come in at some point in the future and request an extension of the time and probably an expansion of how much we are producing on a daily basis.*[50]

Moreover, as both Thiessen and Collier explained, and consistent with the Company's

repeated statements in public filings, any future expansion plans would need to be submitted in a

---

[49] Compl., Ex. B at 6-7 (emphasis added).

[50] *Id*. at 4.  The transcript that EIA posted online and attached as Exhibit B to the Complaint does not identify Collier as the speaker.  However, EIA's Tape 1 of the Pebble Tapes shows Collier making the statement. *See* Pebble Tape 1, EIA (Sept. 21, 2020) at 3:52, https://eia-global.org/reports/20200921-the-pebble-tapes.

separate permit application and undergo regulatory review.[51]  In other words, expanding the

Pebble Project was not possible without securing another permit, which could only occur after (i)

the Company developed an *actual* plan that does not currently exist, (ii) submitted this future

plan in a permit application that has yet to be written (which would then have to undergo an EIS

review process that the Army Corps has not commenced), and (iii) the Company produced a plan

to provide for the requisite compensatory mitigation to offset the adverse impacts resulting from

an actual project that does not currently exist.  Plaintiffs have not, and cannot, point to *any*

evidence that such a plan exists, let only evidence that Defendants have even determined where

future expansion would occur, the minerals that would be extracted, or the type of mining that

would be used. Thus, as in *Qihoo*, *WuXi*, and *ODS Capital*, Plaintiffs' claims should be

dismissed.  *See id.*; *WuXi*, 2020 WL 6063539, at *6; *ODS Capital*, 2020 WL 7028639, at *9.

### 3.    In Any Event, Plaintiffs Have Not Adequately Alleged a Duty to Disclose the Possibility of Future Expansion

"Silence, absent a duty to disclose, is not misleading under Rule 10b–5."  *Basic Inc. v.

Levinson*, 485 U.S. 224, 239 n.17 (1988).  "[A] complete failure to make a statement -- in other

words, a 'pure omission,' -- is actionable under the securities laws only when the corporation is

subject to a duty to disclose the omitted facts."  *In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F.

Supp. 3d 329, 349 (S.D.N.Y. 2020) (citation omitted); *Resnik v. Swartz*, 303 F.3d 147, 454 (2d

Cir. 2002).  Though a party has "a duty to be both accurate and complete," *Caiola v. Citibank,

N.A.*, 295 F.3d 312, 331 (2d Cir. 2002), disclosure is required "only when necessary to make

statements made, in the light of the circumstances under which they were made, not misleading,"

---

[51] *See* Exs. 2 – 13, 15 – 30-; App'x A.

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (ellipsis and internal quotation marks omitted).

"Disclosure of an item of information is not required simply because it may be relevant or of interest to a reasonable investor." *Kleinman*, 706 F.3d at 152-53 (citation omitted). "[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993); *Shemian*, 2013 WL 1285779, at *20. Disclosure is only required when the information is material—when "there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available.'" *In re Time Warner*, 9 F.3d at 267–68 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "When the omitted information concerns a contingent or speculative event, 'the materiality of those events depends on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" *Lau v. Opera Ltd.*, No. 20-cv-674, 2021 WL 964642, at *8 (S.D.N.Y. Mar. 13, 2021) (quoting *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001)). Future plans need not be disclosed unless they "are under active and serious consideration." *See id.* (quoting *In re Time Warner*, 9 F.3d at 268); *Philip Morris*, 75 F.3d at 810-11; *Bratusov v. Comscore, Inc.*, No. 19-cv-3210, 2020 WL 3447989, at *10-11 (S.D.N.Y. June 24, 2020); *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 587 (S.D.N.Y. 2005)).

Plaintiffs do not meet this standard. *Philip Morris* evaluated the duty to disclose under analogous circumstances. 75 F.3d at 809. There, plaintiffs argued that Philip Morris had stated that it would continue its historic strategy of raising prices to sustain profits, but had already test

marketed its product at reduced prices, and was thus obligated to disclose its consideration of an

alternative, opposite strategy focused on increasing market share through a price cut.  *Id.*  The

Second Circuit, however, declined to find a duty to disclose, even though the marketing plan was

important enough to require board approval, was a "sharp break" from historic practice, and

could reduce the company's profits by $2 billion and lead to a significant stock price decline.  *Id.*

at 809-10.  The court held that the mere possibility of a reduced pricing strategy was too

speculative to give rise to a duty to disclose.  *See id.* at 810.

　　　As detailed above, Plaintiffs do not adequately allege a concrete plan to expand.  Nor do

they adequately allege that such a plan was "under active and serious consideration."  *Id.* at 809

(quoting *In re Time Warner*, 9 F.3d at 268).  There is no discussion of an actual or concrete plan

to expand on the Pebble Tapes.  To the contrary, Thiessen stated that no such plan was possible

because the future was uncertain,[52] and Collier's statements about the possibility of expansion

were far too vague.[53]  *See id.* at 811 ("Such puffery cannot have misled a reasonable investor to

believe that the company had irrevocably committed itself to one particular strategy, and cannot

constitute actionable statements under the securities laws.").  Moreover, any expansion plan

would have required another permit—no small hurdle given the denial of even the more limited

project.  Therefore, even if Defendants had not disclosed the possibility of future expansion

(which they repeatedly and ubiquitously did), as in *Philip Morris*, Plaintiffs' claims would *still*

warrant dismissal.

---

[52] Compl., Ex. B at 6-7 (emphasis added).

[53] *Id*. at 4.  The transcript that EIA posted online and attached as Exhibit B to the Complaint does not identify Collier as the speaker.  However, EIA's Tape 1 of the Pebble Tapes shows Collier making the statement. *See* Pebble Tape 1, EIA (Sept. 21, 2020) at 3:52, https://eia-global.org/reports/20200921-the-pebble-tapes at 3:52.

**B.** **The Alleged Omissions Are Immaterial as a Matter of Law under the Truth-on-the-Market Doctrine**

Plaintiffs expressly rely upon the fraud-on-the-market presumption of reliance, Compl. ¶¶ 129-132, alleging that NDM's "securities promptly digested current information regarding [NDM] from publicly available sources and reflected such information in the prices of [NDM's] securities," *id.* ¶ 131. The "essential corollary"[54] to the fraud-on-the-market presumption is that if the "truth" concerning the allegedly omitted fact was disclosed to the market, then the alleged omission is immaterial because the market price of the stock has already incorporated the truth of the allegedly omitted information. *See White v. H&R Block, Inc.*, No. 02-cv-8965, 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004) (where the facts show that the truth "was publicly available . . . the law renders defendants' purported misstatements immaterial" because accurate information is already reflected in the price of the security); *In re Andrx Corp., Inc.*, 296 F. Supp. 2d 1356, 1366 (S.D. Fla. 2003) ("a defendant can escape liability for a false statement—or one that reveals less than the full truth—by showing that the market was not affected by the misrepresentation because the truth of the matter was known already and had been factored into market prices" at the time of the alleged corrective disclosure forming the basis of the plaintiff's claims (quoting *Provenz v. Miller*, 102 F.3d 1478, 1492 n.4 (9th Cir. 1996))); *In re Bell Atl. Corp.*, 1997 WL 205709, at *26. That is because, by definition, an efficient market is one in which the price of a security reflects all publicly available information. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05-cv-1898, 2006 WL 2161887, at *6 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008).

---

[54] *In re Bell Atl. Corp. Sec. Litig.*, No. 91-cv-0514, 1997 WL 205709, at *24 (E.D. Pa. Apr. 17, 1997), *aff'd*, 142 F.3d 427 (3d Cir. 1998).

The question "is not whether the market truly knew any specific piece of information, but whether the information was reasonably available." *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 110 (2d Cir. 2005); *see Lovallo v. Pacira Pharms., Inc.*, No. 14-cv-06172, 2015 WL 7300492, at *9 (D.N.J. Nov. 18, 2015) (holding that "any misstatements or omissions about [a drug's] FDA approval status were immaterial because investors were provided with the full terms of the FDA's approval" in other documents).

As described above, the possibility that Defendants would apply for a permit to expand the mining project was publicly available information. Defendants repeatedly disclosed this information in the very documents Plaintiffs cite in their Complaint. The possibility of future expansion was therefore reflected in NDM's stock price during the relevant time period. This too warrants dismissal of Plaintiffs' claims.

### C.     Plaintiffs Fail to Adequately Plead Loss Causation

Under the PSLRA, Plaintiffs "have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Plaintiffs must plead that the stock price was inflated due to the alleged fraud and that disclosure of the alleged fraud "caused" the Company's stock price to fall by a material amount. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). "The Second [C]ircuit has outlined two possible methods of pleading loss causation, the 'corrective disclosure' theory, and the 'materialization of concealed risk' theory which both require Plaintiffs to establish a post-transaction depreciation of the stock price caused by, respectively, either the issuance of a corrective disclosure or the materialization of a previously concealed risk." *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, No. 11-cv-398, 2013 WL

4405538, at \*9 (S.D.N.Y. Aug. 5, 2013) (collecting cases), *aff'd sub nom.* 783 F.3d 383 (2d Cir. 2015); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005).

The Complaint relies almost exclusively on the corrective disclosure theory. "To show loss causation, a corrective disclosure must 'purport[ ] to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint.'" *Lau*, 2021 WL 964642, at \*12 (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). "Already-public information cannot constitute a corrective disclosure for purposes of alleging loss causation." *Id.* Here, as detailed above, the Pebble Tapes are not corrective in nature because the possibility of future expansion was already public.[55] The Pebble Tapes are also not corrective because, contrary to Plaintiffs' conclusory statements,[56] neither Thiessen nor Collier made any statements contradicting the Company's prior statements about the project proposed in the permit application. In reality, both Thiessen and Collier stated that the Company intended to build and operate the project proposed in the permit application for the first 20 years.[57] Indeed, NDM is *still* seeking a permit for the same project.[58] Therefore, Plaintiffs' corrective disclosure theory fails.

---

[55] Nor are Defendants responsible for the price declines associated with bad press from the Pebble Tapes. A statement does not qualify as a "corrective disclosure" simply because it announces bad news and is followed by a drop in stock price; it must actually reveal a prior statement's false or fraudulent nature. *See In re Omnicom*, 597 F.3d at 511-12 (finding an article inspiring general concern over a company's accounting strategy does not constitute a corrective disclosure if it does not expose a misrepresentation alleged in the complaint); *Janbay v. Canadian Solar, Inc.*, No. 10-cv-4430, 2012 WL 1080306, at \*14 (S.D.N.Y. Mar. 30, 2012) ("An alleged corrective disclosure that does not reveal the falsity of Defendants' challenged public statements cannot establish loss causation.").

[56] Each of Plaintiffs' loss causation claims tied to the Pebble Tapes is based on the prejudicial statements made by Pebble opposition groups, including the environmental group that surreptitiously recorded the Pebble Tapes under false pretenses that were published in press releases or in news articles. *See* Compl. ¶¶ 117-123.

[57] *See* Section I.A.1-2.

[58] *See* Ex. 14, NDM Form 6-K, MD&A to Q2 2021 Report (filed Aug. 17, 2021), at 3-4, 7, 9-11; App'x A.

As for the two references in the Complaint to the "materialization of risk" theory, both relate to "the risk that the Pebble Project [would] not receive a permit from the Army Corps[.]" Compl. ¶¶ 112, 6. But this obvious risk was repeatedly disclosed in each of NDM's public filings. In the MD&A section of the 2017 annual report, for instance, NDM stated: "Some of the risks we face and the uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements include: [] *an inability to ultimately obtain permitting for a mine at the Pebble Project . . . .*"[59] This risk was then elaborated upon.[60] NDM included the same or similar disclosures in each of its annual and quarterly reports during the putative class period.[61]

Plaintiffs also claim losses related to an August 24, 2020 Army Corps press release and August 25, 2020 Politico article regarding environmental mitigation, Compl. ¶¶ 113-116, a November 18, 2020 press release from the office of Senator Lisa Murkowski, *id.* ¶¶ 124-125, and the Army Corps' November 25, 2020 announcement that the Pebble permit was being denied, *id.* ¶¶ 126-127. However, the Complaint does not allege that Defendants made materially false or misleading statements about mitigation, the likelihood of the permit being denied, or other environmental factors. And there are no allegations plausibly linking the disclosure of the Pebble Tapes with the denial of the permit. In fact, Plaintiffs allege that the Army Corps denied the Pebble permit for reasons wholly unrelated to any of the alleged misstatements. Compl. ¶ 126 ("The Corps said in a statement that it has determined that the plan 'does not comply with Clean Water Act guidelines' and it has concluded that 'the proposed project is contrary to the

---

[59] Ex. 2, NDM Form 40-F, Ex. 99.6 MD&A to 2017 Annual Report (filed Mar. 30, 2018), at 4 (emphasis added); App'x A.

[60] *Id.* at 33.

[61] *See* Exs. 2-13; App'x A.

public interest.'").  Plaintiffs therefore do not meet the Rule 8 standard, and certainly fail the Rule 9(b) standard, for pleading loss causation.  *See In re Francesca's Holdings Corp. Sec. Litig.*, No. 13-cv-6882, 2015 WL 1600464, at *18 n.9 (S.D.N.Y. Mar. 31, 2015) ("It is an open question in this Circuit whether the heightened pleading standard of Rule 9(b) applies to loss causation." (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 74 n.2 (2d Cir.2013))).

The fact that Plaintiffs do not allege that Defendants made false or misleading statements about the likelihood of the permit being granted dooms their claims for yet another reason.  According to Exhibit A to the Complaint, the Lead Plaintiff sold all of his shares in NDM on August 24, 2020 (*see* Ex. A at 3), one month *before* the Pebble Tapes were released.  Compl. ¶ 45.  The only alleged corrective disclosure that Lead Plaintiff could potentially use to establish loss causation is therefore the Army Corps' statement, on August 24, 2020, that "the project, as currently proposed, cannot be permitted under section 404 of the Clean Water Act" and its request that the Company submit a mitigation plan in response to this finding.  *Id.* ¶ 113.  But, again, Plaintiffs do not allege that Defendants made false or misleading statements about the environmental factors that formed the basis of the Army Corps' decision.

Finally, Plaintiffs fail to adequately plead loss causation because their allegations contradict their theory of loss.  Plaintiffs claim that Defendants artificially inflated NDM's stock price by not disclosing their plans to build a larger, more profitable mine.  But withholding such information could have only *depressed* the stock price, if at all.  *See Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 753 (S.D.N.Y. 2011) (withholding favorable information artificially depresses stock price).  Had NDM disclosed the so-called "secret expansion plan" (assuming, *arguendo*, that it was not already public)—*i.e.*, that the Pebble

Project was going to be bigger, last longer, and recover more minerals than stated in the permit application—all things equal, the Company's stock price would have *increased*, not decreased. Thus, the price declines associated with the disclosure of the Pebble Tapes, which are the vast majority of the price declines alleged in the Complaint, do not represent the dissipation of a fraudulently inflated stock price. *See Collier v. Aksys Ltd.*, No. 04-cv-1232, 2005 WL 1949868, at *12 (D. Conn. Aug. 15, 2005) (dismissing complaint where stock price moved in wrong direction upon disclosure event), *aff'd*, 179 Fed. App'x 770 (2d Cir. 2006) (unpublished).

### D.     Plaintiffs Fail to Adequately Plead Particularized Facts Giving Rise to a Strong Inference of Scienter

Plaintiffs must allege with particularity either an intent to deceive or, at a minimum, facts supporting a "strong inference" that Defendants acted with scienter. *See ECA*, 553 F.3d at 198; 15 U.S.C. § 78u-4(b)(2). A strong inference of scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. The inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inferences of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. The court will consider the totality of the allegations and the record available on a motion to dismiss. *Id.* at 325; *see also Kuriakose*, 897 F. Supp. 2d at 168 ("[T]he bevy of truthful disclosures that [defendant] made throughout the Class Period . . . negates an inference of scienter. It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures.").

Plaintiffs do not allege motive, nor could they. Under a theory of motive, a plaintiff must plead with particularity a "concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Motives such as the

"desire for the corporation to appear profitable" or "the desire to keep stock prices high to increase officer compensation" are insufficient. *Id.* Here, Plaintiffs do not even show that much. Their theory is that Defendants intended to inflate NDM's stock price by telling the market that they were going to build a smaller mine than they allegedly planned to build. This allegedly withheld information, however, could only have depressed NDM's stock price—the opposite of what Plaintiffs allege.

Plaintiffs thus attempt to plead actual knowledge or recklessness. *See, e.g.*, Compl. ¶¶ 146 ("Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated were materially false and misleading . . . ."), 147 ("The Individual Defendants had actual knowledge of the material omissions and/or the falsity of the material statements . . . and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth . . . ."). Without compelling motive allegations, however, "the strength of [Plaintiffs'] circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142. Under the PSLRA, "[r]ecklessness is defined as 'at the least, . . . an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *ECA*, 553 F.3d at 198. A plaintiff must show that "specific contradictory information was available to the defendants at the same time they made the misleading statements." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 813 (S.D.N.Y. 2018). Moreover, "plaintiffs must plead facts showing that defendants knew an omission was *material*." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106-07 (2d Cir. 2015) (emphasis added); *see ECA*, 553 F.3d at 202 ("Given that they failed to plead materiality of the [allegedly fraudulent] transactions, Plaintiffs certainly did not plead that defendants had knowledge of the transactions' materiality.").

38

The Complaint fails to plead recklessness for many reasons. It fails to show a false or misleading statement. It does not show an actual, concrete plan to expand. It does not demonstrate materiality. And it ignores "the bevy of truthful disclosures that [Defendants] made throughout the Class Period . . . ." *Kuriakose*, 897 F. Supp. 2d at 185 ("It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures."). The conclusory allegations that Defendants "acted with scienter in that they knew that the public documents . . . were materially false and misleading," Compl. ¶ 146, are woefully insufficient. *See Tellabs*, 551 U.S. at 314 (inference of scienter must be at least as strong as competing inference of nonfraudulent intent).

## II.   PLAINTIFFS FAIL TO STATE A SECTION 20(a) CLAIM

Plaintiffs' claim for control person liability under Section 20(a) should also be dismissed. "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108. "[A] primary violation is simply a § 10(b) violation . . . ." *In re OSI Pharm., Inc. Securities Litig.*, No. 04-cv-5505, 2007 WL 9672541, at *14 (E.D.N.Y. Mar. 31, 2007). Because Plaintiffs fail to plead a Section 10(b) claim, they also fail to show a primary violation. *ATSI*, 493 F.3d at 108; *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l. Inc.*, 967 F. Supp. 2d 771, 800 (S.D.N.Y. 2013).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint in its entirety with prejudice.

Dated: September 15, 2021    Respectfully Submitted,

/s/ Ashwin J. Ram
Ashwin J. Ram
Steptoe & Johnson LLP
633 W. 5th Street, Ste. 1900
Los Angeles, CA 90071
Telephone: 213-439-9443
aram@steptoe.com

David Matthew Fragale
Steptoe & Johnson LLP
1330 Connecticut Ave NW
Washington, DC 20036
Telephone: 202-429-8195
dfragale@steptoe.com

Khristoph A. Becker
Steptoe & Johnson LLP
1114 Avenue of the Americas
New York, NY 10036
Telephone: 212-378-7516
kbecker@steptoe.com

*Counsel for Defendants Northern Dynasty Minerals, Ltd., Ronald W. Thiessen, and Tom Collier*