UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE NORTHERN DYNASTY
MINERALS LTD. SECURITIES
LITIGATION

Case No. 1:20-cv-05917-ENV-RLM

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ................................................................................. 1

II. STATEMENT OF FACTS ................................................................... 3

    A. Defendants' Prior Attempts to Advance the Pebble Project .................................. 3

    B. Defendants' Deceptive Scheme to Advance a Purportedly "Smaller, More Responsive Project Design" With a Closure and Reclamation Plan ...................... 7

    C. In Truth, Defendants Planned a Massive and Long-Lasting Project ................... 10

    D. Throughout the Class Period, Defendants Repeatedly Made False and Misleading Statements About the Size, Scope and Duration of the Pebble Project ................................................................................................................. 16

    E. When the Truth Was Eventually Revealed Through a Series of Materializations of Risks and Corrective Disclosures, the Price of Northern Dynasty's Securities Went Into a Tailspin ................................................................................ 17

III. ARGUMENT ................................................................................... 20

    A. Defendants Made Materially False and Misleading Statements About the Pebble Project ................................................................................................ 20

    B. Defendants' Safe-Harbor Defense Fails ............................................................. 26

    C. Defendants' Truth-on-the-Market Defense Fails ................................................ 31

    D. Defendants' Fraud Caused Plaintiffs' Losses ..................................................... 36

    E. The Scienter Allegations Are Compelling ........................................................... 46

    F. The Complaint Adequately Alleges Section 20(a) Claims ................................. 49

IV. CONCLUSION ................................................................................. 49

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
    554 F.3d 342 (3d Cir. 2009) ................................................................................. 36

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) .................................................................................. 49

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................. 20

*AUSA Life Ins. Co. v. Ernst & Young*,
    206 F.3d 202 (2d Cir. 2000) ................................................................................ 38

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. 2002) ................................................................................ 21

*Christine Asia Co. v. Ma*,
    718 F. App'x 20 (2d Cir. 2017) ........................................................................... 43

*Collier v. Aksys Ltd.*,
    2005 WL 1949868 (D. Conn. Aug. 15, 2005) ..................................................... 45

*Darquea v. Jarden Corp.*,
    2007 WL 1610146 (S.D.N.Y. May 31, 2007) *adhered to on reconsideration*,
    2007 WL 2584744 (S.D.N.Y. Sept. 5, 2007) ...................................................... 48

*Dolphin & Bradbury, Inc. v. S.E.C.*,
    512 F.3d 634 (D.C. Cir. 2008) ............................................................................ 28

*DoubleLine Cap. LP v. Odebrecht Fin.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018) ................................................................ 38

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ....................................................................................... 36, 37

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JPMorgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ................................................................................ 48

*Elstein v. Net1 UEPS Techs. Inc.*,
    2014 WL 3687277 (S.D.N.Y. July 23, 2014) ..................................................... 45

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003) ..................................................................... 37, 38, 41

*EP Medsystems, Inc. v. EchoCath, Inc.*,
    235 F.3d 865 (3rd Cir. 2000) ...............................................................29, 32

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ...........................................................................46

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...................................................27, 39, 42

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ......................................................................32, 34

*Glazer v. Formica Corp.*,
    964 F.2d 149 (2d Cir. 1992) .............................................................................21

*Glob. Network Commc'ns, Inc. v. City of New York*,
    458 F.3d 150 (2d Cir. 2006) .............................................................................20

*Gordon v. Vanda Pharms. Inc.*,
    2021 WL 911755 (E.D.N.Y. Mar. 10, 2021) ....................................................49

*Halperin v. eBanker USA.COM, Inc.*,
    295 F.3d 352 (2d Cir. 2002) .............................................................................21

*Hedick v. Kraft Heinz Co.*,
    2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ...................................................40

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004) ...............................................................................45

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005) ..............................................................21

*In re Am. Int'l. Grp., Inc. 2008 Sec. Litig.*,
    741 F. Supp. 2d 511 (S.D.N.Y. 2010) ..............................................................37

*In re Barrick Gold Sec. Litig.*,
    2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) ...........................................38, 39, 41

*In re Bear Stearns Companies, Inc. Sec., Deriv., and ERISA Litig.*,
    763 F. Supp. 2d 423, 505 (S.D.N.Y. 2011), *on reconsideration*, 2011 WL
    4072027 (S.D.N.Y. Sept. 13, 2011), *and on reconsideration*, 2011 WL
    4357166 (S.D.N.Y. Sept. 13, 2011) ..................................................................38

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008) ..............................................................37

*In re Cabletron Sys. Inc.*,
311 F.3d 11 (1st Cir. 2002) ...........................................................................48

*In re Complete Mgmt. Inc. Sec. Litig.*,
153 F.Supp.2d 314 (S.D.N.Y. 2001) ...............................................................29

*In re Comverse Tech., Inc. Sec. Litig.*,
543 F.Supp.2d 134 (E.D.N.Y. 2008) ..........................................................34, 46

*In re Daou Systems, Inc.*,
411 F.3d 1006 (9th Cir. 2005) .........................................................................41

*In re eSpeed, Inc. Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006) .........................................................33, 34

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..............................................................47

*In re Hi-Crush Partners L.P. Sec. Litig.*,
2013WL 6233561 (S.D.N.Y. Dec. 2, 2013) ....................................................47

*In re Indep. Energy Holdings PLC Sec. Litig.*,
154 F. Supp. 2d 741 (S.D.N.Y. 2001) *abrogated on other grounds by In re
Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ...............26

*In re Initial Pub. Offering Sec. Litig. ("In re IPO")*,
544 F. Supp. 2d 277 (S.D.N.Y. 2008) ..............................................................42

*In re MBIA, Inc., Sec. Litig.*,
700 F.Supp.2d 566 (S.D.N.Y. 2010) ...........................................................36, 43

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013) ..............................................................27

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) ............................................................................42

*In re Oxford Health Plans Inc.*,
187 F.R.D. 133 (S.D.N.Y. 1999) ......................................................................26

*In re Par Pharms, Inc. Sec. Litig.*,
733 F. Supp. 668 (S.D.N.Y. 1990) ...................................................................21

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) .....................................................................29

*In re Salix Pharms., Inc.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ...................................................47

*In re Scot. Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)................................................44

*In re SLM Corp. Sec. Litig.*,
    740 F. Supp. 2d 542 (S.D.N.Y. 2010)................................................48

*In re Third Ave. Mgmt. LLC Sec. Litig.*,
    2016 WL 2986235 (S.D.N.Y. May 13, 2016) ...............................44

*In re Time Warner Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993)................................................23, 24

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (S.D.N.Y. Sept. 27, 2016)................................37

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F.Supp.2d 158 (S.D.N.Y. 2003)................................36

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003)................................49

*Janbay v. Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ................................43

*Klein v. Altria Grp., Inc.*,
    525 F. Supp. 3d 638 (E.D. Va. 2021) ................................33

*Kleinman v. Elan Corp.*,
    706 F.3d 145 (2d Cir. 2013)................................20

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991)................................35

*Kronfeld v. Transworld Airlines, Inc.*,
    832 F.2d 726 (2d Cir. 1987)................................23, 24, 34

*Lapin v. Goldman Sachs Group*,
    Inc., 506 F. Supp. 2d 221 (S.D.N.Y. 2006) ................................32, 33, 36

*Lau v. Opera Ltd.*,
    527 F. Supp. 3d 537 (S.D.N.Y. 2021)................................42

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)................................37

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)................................31

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)...............................................................................27

*Nathel v. Siegal*,
    592 F.Supp.2d 452 (S.D.N.Y. 2008).................................................................37

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012)...............................................................................44

*New Jersey Carpenters Health Fund v. The Royal Bank of Scotland Grp., Plc*,
    709 F.3d 109 (2d Cir. 2013)...............................................................................34

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).........................................................................29, 46

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)...............................................................................36

*P. Stolz Family P'ship L.P v. Daum*,
    355 F. 3d 92 (2d Cir. 2004)..........................................................................26, 30

*Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)...............................................................33

*Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ...................................................................36, 47

*Ret. Syst. v. MF Glob., Ltd.*,
    620 F.3d 137 (2d Cir. 2010)...............................................................................29

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009).................................................................................49

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
    75 F.3d 801 (2d Cir. 1996)...........................................................................24, 25

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015)..................................................................27

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996).........................................................................26, 29

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010)...............................................................................29

*Sonesta Int'l Hotels Corp. v. Wellington Assocs.*,
    483 F.2d 247 (2d Cir. 1973)...............................................................................20

*State of New Jersey & its Div. of Inv. v. Sprint Corp.*,
　2004 WL 1960130 (D. Kan. Sept. 3, 2004) ...................................................24

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*,
　250 F.3d 87 (2d Cir. 2001)...............................................................37, 39

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
　551 U.S. 308 (2007)........................................................................46, 47

*Thorpe v. Walter Inv. Mgmt., Corp.*,
　2016 WL 4006661 (S.D. Fla. Mar. 16, 2016) ........................................45

*United States v. Bilzerian*,
　926 F.2d 1285 (2d Cir. 1991)................................................................36

*Van Dongen v. CNinsure Inc.*,
　951 F. Supp. 2d 457 (S.D.N.Y. 2013)...................................................42

*Wilamowsky v. Take-Two Interactive Software, Inc.*,
　818 F. Supp. 2d 744 (S.D.N.Y. 2011)...................................................45

**Statutes**

Clean Water Act.......................................................................... *passim*

**Rules**

Fed. R. Civ. P. 8 ....................................................................................37

Fed. R. Civ. P. 12(b)(6).........................................................20, 35, 38

**Other Authorities**

17 C.F.R. §240.10b-5(b) .................................................................20, 21

Clean Water Act.......................................................................................4

Environmental Investigation Agency, The Pebble Tapes, https://eia-
　global.org/reports/20200921-the-pebble-tapes (last visited November 11,
　2021) .....................................................................................................2

## I.    INTRODUCTION

The Complaint ("Compl.," ECF No. 37) charges Defendants Northern Dynasty Minerals Ltd. ("Northern Dynasty" or the "Company"), Ronald Thiessen ("Thiessen"), the Company's CEO, and Tom Collier ("Collier"), the CEO of the Pebble Partnership (collectively, "Defendants") with violations of the Securities Exchange Act of 1934 and the rules promulgated thereunder. Compl. ¶¶ 1, 142–157.  These provisions aim to safeguard the integrity of the financial markets by ensuring that investors are provided with accurate and truthful information when deciding to purchase or sell securities.

In violation of these provisions, throughout the Class Period, Defendants repeatedly issued false and misleading statements about the Pebble Project, Northern Dynasty's plan to develop what Defendants deemed "one of the world's most important mineral resources." *Id*. ¶ 2.  Northern Dynasty had been planning a mine size between 2.0 and 6.5 billion tons, with an initial mine life of 25 years and mine extensions to 78 years and beyond. *Id.*  Because the initially proposed Pebble Project was ill-received by the Environmental Protection Agency and stakeholders due to its disastrous impact on the unparalleled Bristol Bay watershed of Alaska, Defendants concocted a plan to devise a significantly smaller mine of shorter duration in an effort to extract a federal construction permit. *Id.* ¶¶ 32, 33. To that end, Defendants repeatedly represented to the market, including in multiple filings with the Securities and Exchange Commission and in testimony to the U.S. Congress that the "Pebble mine will operate for a period of 20 years" with a "development footprint less than half the size previously envisaged" that is "designed for closure" after 20 years. *Id.* ¶¶ 2, 68.  Advancing this fictitious proposal, Defendant Collier emphasized that the Pebble Project "is likely to get a permit, but not because the [political] fix is in – rather, because our smaller, environmentally enhanced mine plan meets the high environmental standards and permitting requirement enforced in the US and Alaska, and should receive a permit." *Id.* ¶ 96.

1

In truth, however, Defendants had no intention of limiting the Pebble Project. Undercover videotapes obtained by investigators with the Environmental Investigation Agency ("the Pebble Tapes") revealed Defendants' scheme to purposefully submit a significantly smaller mine to maximize their chances of extracting a federal permit.[1] In truth, Defendants schemed to build one of the largest mining facilities in the world: as Defendant Thiessen exclaimed, "[s]ee this project ultimately will look a lot like the Mongolian project Oyu Tolgoi," one of the world's largest copper-gold mines. Compl. ¶ 47, Ex. B, Pebble Tape 1. In truth, Defendants intended that "during that 20 years [of the mine they claimed was designed for closure], you're gonna make the application to continue for another 20" because expansion of the mine "is the plan." Compl. ¶ 3. Defendant Collier characterized the likelihood of expansion as almost 100%. *Id.* Thiessen agreed that "there will be more—but the first one lasts 180 years." *Id.* ¶ 4. Defendants can also be heard confirming their interest in using the Pebble Project infrastructure to activate the Donlin mine, another project 175 miles north of Pebble. *Id.*

The Pebble Tapes also expose Defendants Thiessen and Collier brazenly bragging about their powers of political manipulation and their coziness with some individuals at the Army Corps of Engineers, the entity tasked with issuing the federal permit. *Id.* ¶ 5.

When the truth emerged through a series of corrective disclosures and materializations of risks that the Pebble Project would not receive a permit, Northern Dynasty's stock went into a tailspin, wiping out hundreds of millions of dollars in market capitalization and injuring hundreds of thousands of investors. *Id.* ¶ 6.

---

[1] Transcripts of the relevant Pebble Tapes are attached to the Complaint. *See* ECF No. 37. The recorded conversations are also available at Environmental Investigation Agency, The Pebble Tapes, https://eia-global.org/reports/20200921-the-pebble-tapes (last visited November 11, 2021).

Collier resigned from his position as CEO of the Pebble Partnership on September 23, 2020, two days after the Pebble Tapes became public. *Id.* ¶ 7. The United States Attorney's Office for the District of Alaska commenced a grand jury investigation into the matter. *Id.*

## II.  STATEMENT OF FACTS

### A.  Defendants' Prior Attempts to Advance the Pebble Project

Northern Dynasty engages in the exploration of mineral properties in the United States. Compl. ¶ 19. Its principal mineral property is the Pebble copper-gold-molybdenum project comprising 2,402 mineral claims that covers an area of approximately 417 square miles located in southwest Alaska (the "Pebble Project"). *Id.* Northern Dynasty acquired rights to the Pebble deposit in 2001. *Id.* The Company owns 100% of the Pebble Partnership, which was established in mid-2007 to engineer, permit, construct and operate a mine at the Pebble Project. *Id.*

The remote location of the Pebble deposit, and its proximity to the largest wild salmon sockeye run in the world, has made the Pebble Project a controversial lightning rod and the environmental fight of the century for Alaska. *Id.* ¶ 21. The Bristol Bay watershed is considered to be a delicate ecosystem, providing spawning grounds for all five species of Alaska salmon and habitat for over 40 species of mammals and 190 species of birds. *Id.* The Bristol Bay region generates approximately $1.5 billion annually and provides a vital food source  for thousands of Alaska's native residents, supporting subsistence activities for 25 communities of Alaska Natives. *Id.* The  Native village of Newhalen, for example, averages a 700-pound per capita harvest each year. *Id.*

Since 2011, Northern Dynasty has tried unsuccessfully to secure a federal permit for the Pebble Project in the Bristol Bay area of Alaska. *Id.* ¶¶ 20–33.  The originally proposed mine was expected to be one of the largest open pit mines in the world. *Id.* ¶ 20. It included an open pit mine, a tailings facility, a power generating station, a deepwater port and substantial transportation

infrastructure, and it was slated to operate for over 20 years. *Id.* In February 2011, Northern Dynasty formally submitted information to the Securities and Exchange Commission ("SEC"), presenting plans for the development of the Pebble Project. *Id.* ¶ 22. The plan outlined several stages of mine development, the smallest being a 2.0-billion-ton mine and the largest being a 6.5-billion-ton mine. *Id.* Each of these proposals was larger than 90% of the known ore deposits of this type in the world. *Id.*

Although the Pebble Project would have been located on state land, it was still subject to federal permitting requirements. *Id.* ¶ 23. Because the mine construction would require a significant amount of dredging, Northern Dynasty needed to obtain a permit under section 404 of the Clean Water Act. *Id.* Such permits are issued by the U.S. Army Corps of Engineers ("Army Corps"). *Id.* Under section 404(c), however, the Environmental Protection Agency ("EPA") may prohibit or restrict fill activities if it determines that a project would have an "unacceptable adverse effect" on the fishery habitats and their spawning and breeding areas. *Id.*

For several years, the EPA gathered information about the impact such a project would have on the Bristol Bay watershed. *Id.* ¶ 24. The EPA conducted an ecological risk assessment and after three years of study, two rounds of public comment, and independent, external peer review, in January 2014, the EPA released its Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska (the "Bristol Bay Assessment"). *Id.*

The Bristol Bay Assessment evaluated the environmental impacts using its own three mine scenarios that represented different stages of mining at the Pebble deposit, based on the amount of ore processed: (i) Pebble 0.25 stage mine (approximately 0.25 billion tons of ore over 20 years); (ii) Pebble 2.0 stage mine (approximately 2.0 billion tons of ore over 25 years); and (iii) Pebble 6.5 stage mine (approximately 6.5 billion tons of ore over 78 years). *Id.* ¶ 25. In assessing the

impacts of the smallest 0.25 stage mine, the EPA found that, although this smaller size was dwarfed by the mine sizes that Northern Dynasty presented to the SEC, its impacts were still going to be significant. *Id.* ¶ 26.

The Bristol Bay Assessment found that the extraction, storage, treatment, and transportation activities associated with building, operating, and maintaining one of the largest mines ever built would pose significant risks to the unparalleled ecosystem that is one of the greatest wild salmon fisheries left in the world. *Id.* ¶ 27. The Bristol Bay Assessment concluded that the infrastructure necessary to mine the Pebble deposit would jeopardize the long-term health and sustainability of the Bristol Bay ecosystem. *Id.*

Then, in July 2014, the EPA's Region 10, which services the Pacific Northwest area, published its "Proposed Determination" report under Section 404. *Id.* ¶ 28. The EPA's Proposed Determination came down hard on the Pebble Project, detailing the many risks involved even with a smaller footprint mine, including the major loss of fish habitat, the high probability of a damaging pipeline break, the catastrophic consequences of tailings dam failures, and the never-ending threat of acid-mine drainage. *Id.*

In the Proposed Determination, the EPA underscored that, based on the information Northern Dynasty provided to the SEC, mining the Pebble deposit was likely to involve excavation of the largest open pit ever constructed in North America, covering up to 6.9 square miles (17.8 km2) and reaching a depth of as much as 0.77 miles (1.24 km). *Id.* ¶ 29. For reference, the EPA explained, the maximum depth of the Grand Canyon is approximately 1 mile. *Id.* Disposal of resulting waste material would require construction of up to three mine tailings impoundments covering an additional 18.8 square miles (48.6 km2) and waste rock piles covering up to 8.7 square miles (22.6 km2) in an area that contains highly productive streams and wetlands. *Id.*

The EPA explained that the total mineral resources at the Pebble deposit are believed to be approximately 12 billion tons of ore. *Id.* ¶ 30. Accordingly, the development of a mine at the Pebble deposit would ultimately be much larger than the 0.25 stage mine that the EPA considered in its Bristol Bay Assessment, and could even exceed the 6.5 stage mine. *Id.* The EPA considered Northern Dynasty's statement that "the Pebble deposit supports open pit mining utilizing conventional drill, blast and truck-haul methods, with an initial mine life of 25 years and potential for mine extensions to 78 years and beyond." *Id.* Based on that statement, the EPA inferred that Northern Dynasty was actively considering a mine size between 2.0 and 6.5 billion tons. *Id.*

The EPA observed that the volume of mine tailings and waste rock produced from even the smallest mine proposed by Northern Dynasty to the SEC (the 2.0 billion-ton mine scenario) would be enough to fill a professional football stadium more than 880 times, whereas the largest mine would do so more than 3,900 times. *Id.* ¶ 31. In total, these three mine components (mine pit, tailings impoundments, and waste rock piles) would cover an area larger than Manhattan. *Id*. The EPA also explained that mine construction and operation would, in turn, require the construction of support facilities, including a major transportation corridor, pipelines, a power generating station, wastewater treatment plants, housing and support services for workers, administrative offices, and other infrastructure. *Id.* Such facilities, the EPA found, would greatly expand the "footprint" of the mine and affect additional aquatic resources beyond the scope of the Proposed Determination. *Id*. Any mining of this deposit would, by necessity, require similar mine components, support facilities, and operational features. *Id.*

The EPA concluded that given the proposals made by Northern Dynasty to develop 2.0- and 6.5-billion-ton mines at the Pebble deposit and the EPA's own evaluation of even a smaller 0.25-billion-ton mine, mining of the Pebble deposit at any of these sizes, even the smallest, would

result in significant and unacceptable adverse effects on ecologically important streams, wetlands, lakes and ponds, and the fishery areas they support. *Id.* ¶ 32. Accordingly, the EPA imposed barriers on the Pebble Project. *Id.*

Northern Dynasty sued the EPA over the regulatory actions that prevented the Pebble Project from advancing to a permit application with the Army Corps. *Id.* ¶ 33. The EPA and Northern Dynasty eventually settled the lawsuit, and on December 21, 2017, Northern Dynasty announced its intention to apply for a Clean Water Act permit with the Army Corps using a significantly smaller footprint with a closure and reclamation plan after 20 years. *Id.*

### B. Defendants' Deceptive Scheme to Advance a Purportedly "Smaller, More Responsive Project Design" With a Closure and Reclamation Plan

Given this contentious history with the EPA, Defendants deliberately crafted a ***much smaller, limited, 20-year mining proposal*** with a ***mine closure and reclamation plan*** to obfuscate their actual plans for future expansions. Compl. ¶ 34. Defendants designed this scheme in hopes of securing a permit, but their actual plan was to use the first mine alone for at least 180 years. *Id* ¶¶ 34, 48.

The December 22, 2017 permit application submitted to the Army Corps represented that the entire production phase of the mine will last ***only 20 years***, with active open pit mining lasting 14 years ***and a daily process rate of 160,000 tons***. *Id.* ¶ 35. More specifically, the application stated that the "[p]roject operating life [is] 20 years," "[t]he Project will mine approximately 1.1 billion tons of mineralized material . . . over the 20-year mine life," "[c]onstruction will last for approximately four years, followed by a commissioning period and 20 years of mineral processing," and "open pit mining [is] 14 years." *Id.* The application stated that "[t]otal TSF [Tailings Storage Facility] capacity will be sufficient to store the 20-year mine life tailings volume." *Id.* The application represented that "[t]he Project plan has been limited to mining the

near-surface portion of the Pebble Deposit" in order to "significantly reduce[] the footprint of the open pit, TSF, and mine facilities." *Id.*

Defendants went so far as to include a ***closure and reclamation plan*** for the mine in order to demonstrate their commitment to leave after 20 years. *Id.* ¶ 36. To that end, Defendants underscored that "[t]he overall project footprint will be minimized to facilitate physical closure and post-closure water management" and "[a]ctive mining in the open pit will stop after 14 years, pit dewatering will stop, and the pit will begin to flood." *Id.* Specifically, Pebble Project's closure plan called for tailings to be placed in the open pit, precluding mining at the mine site and committing Northern Dynasty to a 20-year mining plan. *Id.*

On August 31, 2018, the Army Corps issued a scoping report for the Pebble Project. *Id.* ¶ 37. The scoping process provides an opportunity for people potentially affected by the project to express their views and concerns and to contribute to the completeness of an Environmental Impact Statement ("EIS"). *Id.* The scoping report described the proposed Pebble Project as having a total footprint of approximately 5.9 square miles. *Id*. The scoping report also included a presentation by the Pebble Partnership titled "The Pebble Project, Project Description and Summary Information." *Id.* The presentation stated that the "Project operating life [is] 20 years." *Id*. The presentation included a slide titled "Closure & Reclamation." *Id.* The slide showed a timeline for a reclamation of the Pebble mine under the heading "***Pebble: Designed for Closure***." *Id.* The reclamation block stated that "[m]ost buildings [would be] removed," "[t]errain resculpted," and "[n]ative plants resown," after 5 years. *Id*. After 20 years, "[v]egetation well-established in reclaimed areas," "[p]it continues to fill with water." *Id.* After 30 years, "[p]it lake has formed," "[w]ater is pumped from pit for treatment and discharge." *Id.* In other words, Defendants pitched the Pebble Project as a one-time 20-year mine designed for closure and a return to pre-Pebble life.

*Id.*

On October 23, 2019, Defendant Collier doubled-down on this commitment in testimony before the United States House of Representatives. *Id.* ¶ 38. Collier stated that Northern Dynasty "ha[s] taken several steps to de-risk [its] mining plans." *Id.* Specifically, Collier represented that Northern Dynasty "***has planned a smaller, smarter mine***," of "***just 5.2 square miles***" and has "reduced the mine size" to alleviate concerns about environmental impacts. *Id.* Collier emphasized that Northern Dynasty's ***mine closure plan*** was a "***significant factor***" in reducing impacts from the mine because it eliminated waste rock storage by filling the open pit. *Id.*

Collier categorically rejected concerns about the possibility of expanded mining of the Pebble deposit. *Id.* ¶ 39. Collier mocked those concerns as imaginary, saying they were nothing more than the "desperation" of those opposed to the mine. *Id.* In no uncertain terms, Collier unequivocally represented that Pebble "***has no current plans, in this application or in any other way, for expansion***":

> I would like to talk about what the Pebble Partnership has done to improve its plans and dispel some of the myths associated with the Corps' work to date. Pebble has planned a smaller, smarter mine. ***In response to concerns voiced by various stakeholders, we have reduced the mine size to a footprint that even EPA's rigid Proposed Determination would nearly have allowed to proceed through the NEPA permitting process*** . . .
>
> One of my fellow panelists today, former EPA Regional Administrator Dennis McLerran, has called Pebble's permit application the "camel's nose under the tent," which I suppose means that he believes that Pebble plans on shoehorning in a larger project despite the fact that we have scaled back the footprint in the mine currently before the Corps of Engineers. I have several responses:
>
> First, I believe it shows the level of desperation that the Pebble opposition has reached. Think about it: to oppose this permit application, they are forced to argue that it must in fact be far different than what is actually proposed. In other words, they are struggling to find problems with what is currently pending before the Corps.
>
> ***Pebble has no current plans, in this application or in any other way, for expansion.***

*Id.* ¶ 39.

On July 24, 2020, the Army Corps released a positive Final Environmental Impact Statement ("FEIS") for the Pebble Project, noting that the Pebble Project would have no measurable impact on Bristol Bay's fisheries. *Id.* ¶ 40. The FEIS is not a permit decision and does not authorize operation of the mine. *Id.* The FEIS contained an analysis of Pebble's preferred alternative along with alternatives to that project. *Id.* The analysis in the FEIS was to be used, along with other factors, to determine if Pebble's preferred alternative was permissible under section 404 of the Clean Water Act. *Id.*

Collier hailed the FEIS as a significant milestone for the Pebble Project, claiming that the Alaskan residents had been deceived by a "misinformation campaign" that the fishing industry would be harmed by the mine:

> Alaskans, especially the residents of Bristol Bay, have never received the real Pebble story and after a lengthy misinformation campaign many were led to believe a mine at Pebble would harm the fishery. Today's report from the USACE turns that lie on its head – returning salmon won't be harmed, subsistence fishing won't be harmed, and the commercial fishing industry won't be harmed. The final EIS for Pebble unequivocally shows it can be developed without harming salmon populations. It clearly states that no long term measurable impacts to returning salmon are to be expected and there will be no long term changes to the health of the Bristol Bay commercial fishery.

*Id.* ¶ 41.

Eventually, as described herein following revelations—caught on tape—about Defendants' actual plan to mine in perpetuity, in November 2020, the Army Corps denied the permit, finding that the plan "does not comply with Clean Water Act guidelines" and concluding that "the proposed project is contrary to the public interest." *Id.* ¶ 43.

### C.  In Truth, Defendants Planned a Massive and Long-Lasting Project

Contrary to their public representations, including in filings with the SEC and before Congress, Defendants had other plans for the Pebble Project.  Compl.¶ 44. In truth, Defendants

schemed to secure a permit for the Pebble Project by pretending to have significantly downsized the project and its duration. *Id.* But unbeknownst to the market, Defendants planned all along to develop one of the largest mines in the world. *Id.*

On September 21, 2020, the Environmental Investigation Agency ("EIA"), a Washington DC-based non-profit, released a series of conversations recorded between August and September 2020 that took place among undercover EIA investigators expressing an interest in investment opportunities related to the Pebble Project, and Defendants Thiessen and Collier. *Id.* ¶ 45. The recordings, dubbed "The Pebble Tapes," revealed Defendants' actual plans to build a much larger and long-lived mine than publicly described. *Id.* The Pebble Tapes contain repeated admissions by Thiessen and Collier that confirm Defendants' true plans for the Pebble project. *Id.*

In these tapes, Thiessen repeatedly stressed that the 20-year project described publicly was, in fact, merely ***the first stage*** in Northern Dynasty's planned, expansive development of the Pebble deposit. *Id.* ¶ 46. Thiessen is heard saying that once it secures the permit for Pebble, Northern Dynasty is "gonna make the application to continue for another 20" years:

> [Thiessen]: The original footprint was about 16 to 18 square miles. How do we bring that down and make people comfortable? . . .
> [W]e said 'Ok, let's see if we can reduce the size of the project overall and still have a reasonable economic. [sic]
> So we reduced the size of the processing plant to 160,000 metric tons per day. And then we said 'Let's just have a 20-year mine life . . . So we said 'Let's only have a 20-year mine life' and so that's how we kept the footprint down to five-and-a-half square miles. Is slightly smaller throughput and a 20-year mine life. ***But during that 20 years, you're gonna make the application to continue for another 20. So we do have all the studies that go through all of this***, and to increase the size of the mill from 160,000 metric tons per day we can go to 220, we can go to 320.

*Id.*, Ex. B, Pebble Tape 1.

Thiessen made clear that the Pebble Project's processing capacity had been designed to expand far past the milling rates disclosed publicly: "we can go to 320." Compl. ¶ 47, Ex. B, Pebble Tape 1. Thiessen unequivocally admitted that "***all the key elements of the expansion are already***

*contained in the current project*." *Id.* Thiessen emphasized that **expansion of the mine "is the plan**." *Id.* Thiessen summed up its actual plan: "**See this project ultimately will look a lot like the Mongolian project Oyu Tolgoi**," an open pit and underground mine that is one of the largest in the world. *Id.*

When asked by the investigators if growth of the mine past the scale currently applied for would be "unstoppable," Thiessen offered a categorical "Yes." Compl. ¶ 48, Ex. B, Pebble Tape 1. Thiessen explained further: "Well who's gonna stop a mine that has 180– at a 160,000 metric tons per day, the first deposit that we've discovered at Pebble – **and there will be more – but the first one lasts 180 years**." *Id.* Thiessen added: "Once you have something like this in production why would you want to stop? And even, at the end of the day its footprint is so tiny." *Id.* "If we mined the whole valley it's 25 square miles." *Id.*

Collier backed up Thiessen's admission that the 20-year plan was a fiction designed to extract the initial permit. *Id.* ¶ 49. In response to a question from the investigators about the mine's expansion after the first 20 years, Collier said that Northern Dynasty plans for "**constant expansions**" once it secures the permit. *Id.*, Ex. B, Pebble Tape 1. When asked whether "the likelihood [of expansion] is pretty much 100 percent almost," Collier responded with a resounding "Yes." *Id.* Thiessen added that "[w]ell I'm just saying that based on a 180,000 short tons a day of processing capacity, and we have 10 billion tons, that's 180-year mine life. And we know that there's more ore there **so it's probably gonna be more than 200 years**." *Id.* When asked how locked Northern Dynasty was "into thinking or planning to go beyond 20 years, 180 years or so?," Thiessen responded "**Well it's absolutely because the ore is there. We've drilled it. We've engineered it. All the work's been done for it**." *Id.*

In a separate conversation with the investigators, Thiessen emphasized: "**remember this**

*mine is not gonna be finished for 180, 200 years*." *Id.*, Ex. B, Pebble Tape 9. When asked "***and***

***it's important to not make [the extension plan] public now I understand,***" Thiessen offered a

resounding ***"Yes."*** *Id.*, Ex. B, Pebble Tape 12. Collier added other admissions on tape, noting that

when he "came in [his] assignment from Ron was to kind of reconsider the project and design

something we thought could get through the permitting process without as much controversy as

the original project had engendered. So we did lots of things to the project. We made it smaller .

. . ." *Id.* ¶ 50, Ex. B, Pebble Tape 5. Collier further explained how the "northern corridor route"

was already planned to facilitate the expansion: "And so now we are going to be building a

northern corridor. We'll have a slurry pipeline as part of it so the concentrate will go down to the

coast by pipeline. And it makes a lot of things easier for us. ***It makes expansion much easier***."

*Id.* In response to the investigators' question "when you say it is easier for the expansion you

mean post–20 years or ….?," Collier responded: "***Yes post–20 years***." *Id.*

Thiessen also enthusiastically embraced the hidden plan for the northern infrastructure

corridor because it was designed to facilitate expansion of the mine: "The northern corridor

infrastructure part will handle the expansion":

> [Thiessen]: The northern corridor infrastructure part will handle the expansion.
> When that expansion comes on, you know because the PEA talks about effectively
> a 220,000 ton per day concentrator and ***what we're building in the first stage is a***
> ***180,000 ton per day concentrator***.
> [Investigator]: So all is already contained, all the expansion, all the key elements of
> the expansion are already contained in the current project.
> [Thiessen]: ***Yes.***
> [Investigator]: And that's the plan? That's really the objective?
> [Thiessen]: ***That is the plan*** . . .

*Id.*, Ex. B, Pebble Tape 1.

Thiessen also emphasized Northern Dynasty's interest in developing ***additional mines*** in

the Pebble Valley, saying "Pebble itself has . . . 425 square miles of mineral claims, and so there

could be more mines on the Pebble lands over time." Compl. ¶ 51, Ex. B, Pebble Tape 12. "***We***

*have other sites that we've drilled into and we have ore-grade mineralization in other areas in that 425 square miles but we don't talk about it too much because right now we want people to focus on only Pebble . . ." Id.*

Thiessen also disclosed to the investigators Northern Dynasty's plan of using the infrastructure that will be put in place as part of the Pebble Project to facilitate activation of ***another*** nearby mine. Compl. ¶ 52. According to Thiessen, the nearby Donlin mine was economically unviable unless it could use the roads and pipelines that will be built by Pebble to export its ore. *Id.* Thiessen explained: "there is another project that's 175 miles north of Pebble. It's called the Donlin Project . . . there is a lot of logic to us joining forces to make a single corridor." *Id.*, Ex. B, Pebble Tape 2. Collier also weighed in, stating, "***if you flip the Pebble switch on, it's likely that you may be also flipping on the Donlin switch***." *Id.*

Thiessen described Defendants' plan to have multiple mines in that region for centuries, underscoring that it was important to keep the plan hidden from the market:

> [Thiessen]: Well you know there, ***so I mean listen the first mine is 180 years long***, Pebble. There's no rush for the other ones but I think ultimately, it's like you can say like Escondida, like Los [unclear], like Chuquicamata, you could see, you know, three to four mines in the area. But that might be over a century.
>
> [Investigator]: Yea, that's exactly what I was about to say. So that would be, say, three, four – ***in reality what's at stake here is three, four mines for a century in the region?***
>
> [Thiessen]: ***Yes***
>
> [Investigator]: Have you shared your plan or what the plan is about of having several other mines in pebble with the Army Corps? What have they said about that?
>
> [Thiessen]: So… Yes, we have. More about the extension of the original mine to subsequent years. They took a look at downstream, the kinds of things that would need to be considered and they did take some of that into account but because we are only applying for a 20-year mine life most of this will be addressed sometime in the next 20 years.

[Investigator]: Mhmm. And it's important to not make it public now I understand.

[Thiessen]: *Yes.* So we've, with respect to other mines, typically we share that information under the NDA [Non-Disclosure Agreement] with the other potential partners, the mining operating partners. *[Y]ou can see it, there's a picture in our presentation and it's induced polarization. It's a picture of the 425 square miles and it's got a bunch of dots on it. Each one of those little dots represents potentially another mine site.*

[Investigator]: And so the army corp when they made their decision, they took into account that. *Its not Public* but

[Thiessen]: **Yes**

[Investigator]: -- ah. I understand. So they are already thinking along your side guys on the big development expansion and are planning in this way?

[Thiessen]: Yes. Yes. We've told them that there are two ways we would expand. The most obvious one is to extend the mine life, the mining license by 20 to 40 years, once we know the next methodology, block caving, open pit, or a combination of the two. And then the other expansion potential is to expand the mill from 180,000 tons a day to say 320,000 tons a day.

*Id.* ¶ 53, Ex. B, Pebble Tape 12.

While seeking to exert political influence over some members of the Army Corps with whom Defendants shared their hidden plan, in Northern Dynasty's public filings with the SEC, on the Company's website, and in Congressional testimony Defendants peddled lies. Compl. ¶ 5, 58–111. Far from the "substantially smaller" 5.9 square miles mine of 20-year duration touted to the market, the Pebble Tapes revealed Northern Dynasty's true intent to develop a mine as large as 25 square miles, that is "not gonna be finished for 180, 200 years." *Id.* ¶ 54. At bottom, the market was told that the Pebble mine is a 20-year project, while the Pebble Tapes reveal that the mining operations will be expanded for centuries. *Id.* While the market was told that the mine is "just 5.2 square miles," the Pebble Tapes revealed that the mining operations could spread over the entire Pebble Valley and pave the way for other mines, hundreds of miles away. *Id.* While the market was told that only 160,000 – 180,000 tons per day will be mined, the Pebble Tapes revealed that

the planned mining rate was at least 220,000 – 320,000 tons per day for the first mine alone.  *Id.*

**D.    Throughout the Class Period, Defendants Repeatedly Made False and Misleading Statements About the Size, Scope and Duration of the Pebble Project**

During the Class Period, Defendants repeatedly misled investors by misrepresenting the size, scope and duration of the Pebble Project. Compl. ¶ 58.  For example, Defendants claimed that the Pebble Project "design we're taking into permitting includes a substantially reduced development footprint and meaningful new environmental safeguards that respond directly to the priorities and concerns we've heard from stakeholders in Alaska." *Id.* ¶ 60.  Defendants declared that "[n]ot only are we confident that Pebble as currently envisaged will secure development permits from federal, state and local regulatory agencies, we are confident it will co-exist with the world class fisheries of Bristol Bay and earn the support of the people of the region and the state." *Id.* This was so because "[t]he footprint of Pebble's major mine facilities (pit, tailings storage facility) will be substantially smaller than previous planning iterations, at approximately 5.9 square miles," "less than half the size previously envisaged." *Id.* ¶¶ 61, 68.  Defendants represented that "[f]ollowing four years of construction activity, the proposed Pebble mine will operate for a period of 20 years." *Id.* ¶ 68.

Defendants also insisted that the Pebble mine has been "designed for closure," and detailed a "Reclamation and Closure" plan they had in place. *Id.* ¶ 72.  With this closure plan, stakeholders had no need to worry because at the end of the 20-year period the facilities were going to be "removed and land reclaimed in such a way that it can be returned to a stable and productive state." *Id.*

These and other similar falsehoods kept the price of Northern Dynasty's securities artificially inflated throughout the Class Period. *Id.* ¶ 112.

E.    **When the Truth Was Eventually Revealed Through a Series of Materializations of Risks and Corrective Disclosures, the Price of Northern Dynasty's Securities Went Into a Tailspin**

When the truth about the size, scope, and/or the duration of Defendants' mining plans emerged and the risk that the Pebble Project will not receive a permit materialized, the price of Northern Dynasty's securities plunged as the prior artificial inflation came out of the price over time. Compl. ¶¶ 112–28. As a result of their purchases of Northern Dynasty securities during the Class Period, Plaintiffs and other members of the Class suffered significant damages as the Company lost millions of dollars in market capitalization. *Id*. ¶ 6.

On August 24, 2020, the month the Individual Defendants were recorded bragging about their true plans for the Pebble project, the Army Corps publicly released a statement concerning the project, stating that it would result in "significant degradation of the environment and would likely result in significant adverse effects on the aquatic system or human environment." *Id.* ¶ 113. The Army Corps further found that "the project, as currently proposed, cannot be permitted under section 404 of the Clean Water Act." *Id.* The Army Corps requested a mitigation plan. *Id.* On this news, Northern Dynasty's common share price fell $0.55 per share, or 37.9%, to close at $0.9 per share on August 24, 2020, damaging investors. *Id.* ¶ 114.

Picking up and expanding on this news, the next day *POLITICO* published an article "Pebble Problems Stack Up." *Id.* ¶ 115. *POLITICO* reported in part that "[t]he mitigation projects required may be difficult for the mine developers to meet given that the pristine wilderness near the Bristol Bay project has few areas in need of restoration . . ." *Id.* On this news, Northern Dynasty's common share price fell $0.29 per share, or 32.22%, to close at $0.61 per share on August 25, 2020, damaging investors. *Id.* ¶ 116.

On September 21, 2020, the Environmental Investigation Agency publicly released the Pebble Tapes, reporting that Collier and Thiessen were recorded directly contradicting "previous

public statements by company executives as well as assertions in official company materials that Pebble is intended to be only a small 20-year mine, as described in the Clean Water Act permit application for the project." *Id.* ¶ 117.  The next day, on September 22, 2020, the *Washington Post* published an article "In Secret Tapes, Mine Executives Detail their Sway over Leaders from Juneau to White House." *Id.* ¶ 118.  The *Washington Post* reported that Northern Dynasty "had deliberately downplayed the project's impact." *Id.* On the same day, the *New York Times* published an article "Tape Casts Doubt on Alaska Mine Plan." *Id.* The *New York Times* reported that "in private" Thiessen and Collier explained that "their plans for massive expansion will be unstoppable" and that "the operation could run nine times longer than outlined in their permit filings." *Id.*  On this news, Northern Dynasty's common share price fell another $0.10 per share, or 9.01%, to close at $1.01 per share on September 23, 2020, damaging investors. *Id.* ¶ 119.

On October 28, 2020, the *Outside* published an article "What the Hell Is Going on with the Pebble Mine?" *Id.* ¶ 120.  The article quoted several authoritative figures, stating that "[t]he [Pebble] tapes were damning," that "[i]t's a testament to the flaws in our permitting system that it takes a videotape to force people to come to terms with that basic fraud," that "the flawed permitting process and alleged political influence taint the process beyond repair," and that "[a]t this point, a permit denial is clearly needed." *Id.*  On this news, Northern Dynasty's common share price fell another $0.08 per share, or 8.16%, to close at $0.9 per share on October 28, 2020, damaging investors. *Id.* ¶ 121.

On October 29, 2020, the EIA released additional tapes and emails revealing the extent to which Northern Dynasty CEO Thiessen played a hands-on role in every aspect of Pebble Project's development, and made statements to EIA's investigators that were as offensive as those made by Collier. *Id.* ¶ 122. The new tapes included Thiessen discussing his influence over Alaska's senators

including Senator Lisa Murkowski and the pro-Pebble governor, and an assertion that Thiessen believes that the state of Alaska would contribute roughly $1.5 billion of taxpayer money to assist in building infrastructure for the mine. *Id.* The EIA's press release stated that "[t]he recordings underscore both Thiessen's importance as a driving force behind the Pebble project and the financial windfall that he anticipates Pebble to deliver to his companies located in British Columbia, including an estimated $1.5 billion subsidy *from Alaskans*." *Id.* On this news, Northern Dynasty's common share price fell yet another $0.06 per share, or 6.32%, to close at $0.89 per share on October 30, 2020, damaging investors. *Id.* ¶ 123.

On November 18, 2020, the office of Alaska Senator Lisa Murkowski issued a damning condemnation of Defendants' "fabrications and truly a dishonest appraisal of their own project":

> *given everything that has come to light during this considerable review process [of the Pebble Project], I have reached the same conclusion that Ted Stevens did many years ago: that this is the wrong mine in the wrong place . . .* Where I have come down is that Pebble cannot be permitted, according to now multiple administrations. *And I think that the Army Corps should deny its permit application* within the scope of its normal process, rather than setting the stage for an EPA veto that would set a dangerous precedent for the state . . . *But I have to tell you. I'll just be very honest with you. What we saw, what we all saw play out in those awful Pebble tapes was something that none of us should feel good or comfortable about. If you have those who are attempting to sell a project through I believe not only fabrications and truly a dishonest appraisal of their own project, I think we all should be concerned. I don't think that does anybody else's development project in the state any help at all.*

*Id.* ¶ 124.

On this news, Northern Dynasty's common share price fell an additional $0.05 per share, or 5.62%, to close at $0.84 per share on November 18, 2020, damaging investors. *Id.* ¶ 125.

On November 25, 2020, it was announced that the Army Corps has denied the permit for the Pebble Project. *Id.* ¶ 126. The Corps said in a statement that it has determined that the plan "does not comply with Clean Water Act guidelines" and it has concluded that "the proposed project is contrary to the public interest." *Id.* On this news, Northern Dynasty's common share price fell

yet another $0.40 per share, or 50%, to close at $0.40 per share on November 25, 2020, damaging investors. *Id.* ¶ 127.

As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses. *Id.* ¶ 128.

## III.   ARGUMENT

In evaluating a Rule 12(b)(6) motion to dismiss, the Court must accept the truth of the facts alleged and draw all reasonable inferences in Plaintiffs' favor. *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006). Plaintiffs need only allege "enough facts to state a claim for relief that is plausible on its face[,]" meaning that "[P]laintiff[s] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.   Defendants Made Materially False and Misleading Statements About the Pebble Project

"The [securities] laws are founded on the principle that full and fair disclosure of all material facts must be made to investors so that they may have the benefit of the facts in making their investment decisions." *Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247, 249 (2d Cir. 1973). Rule 10b-5(b) makes it unlawful for a person, under certain circumstances, "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b). The "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective [investors]." *Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013) (citations omitted). "Recognizing that the materiality of an omission is a mixed question of law and fact, courts often

will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission." *Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352, 356–57 (2d Cir. 2002).

Under Rule 10b-5, "[w]hen a corporation [] make[s] a disclosure - whether it be voluntary or required - there is a duty to make it complete and accurate." *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992); *see also In re Par Pharms, Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990) ("even though no duty to make a statement on a particular matter has arisen, once corporate officers undertake to make [such] statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading"). "Upon choosing to speak, one must speak truthfully about material issues." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("Once [a company] chose to discuss its hedging strategy, it had a duty to be both accurate and complete."). An "alleged deception, in itself, [gives] rise to the duty to disclose." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 454 (S.D.N.Y. 2005).

Throughout the Class Period, Defendants deceived investors into believing they had drastically transformed the Pebble Project into a "substantially smaller" footprint with a 20-year lifetime that was all but assured to secure a permit from the Army Corps. Compl. ¶¶ 61, 68, 79, 85, 88, 93. For example, in filings with the SEC and on the Company's official website, Defendants repeatedly represented that "[i]n response to stakeholder concerns, the footprint of the proposed development in the updated Project Description is substantially smaller than previously envisaged." *Id.* ¶ 85. Defendant Collier repeated that refrain in sworn testimony before the House of Representatives, insisting that "Pebble has planned a smaller, smarter mine. In response to concerns voiced by various stakeholders, we have reduced the mine size to a footprint that even

EPA's rigid Proposed Determination would nearly have allowed to proceed through the NEPA permitting process." *Id.* ¶ 98. Collier also stressed publicly that the redesigned Pebble Project would get a permit, giving its significantly reduced design: "[Opponents] are right when they say Pebble believes it is likely to get a permit, but not because the [political] fix is in – rather, because our smaller, environmentally enhanced mine plan meets the high environmental standards and permitting requirement enforced in the US and Alaska, and should receive a permit." *Id.* ¶ 96.

Defendants repeatedly emphasized the significantly reduced Pebble Project, claiming that "[f]ollowing four years of construction activity, the proposed Pebble mine would operate for a period of 20 years as a conventional drill-blast-shovel operation." *Id.* ¶¶ 85, 88. According to Defendants, "[t]he mining rate [for this substantially smaller Pebble project] will average 70 million tons per year, with 66 million tons of mineralized material going through the mill each year (180,000 tons per day), for a low life-of-mine waste to ore ratio of 0.12:1." *Id.* ¶ 88.

These and other similar representations were false and misleading because, in reality, Defendants were planning to extend the mining operations at least for 180–200 years for the first mine alone, and to increase its daily production rates to between 220,000 and 320,000 tons per day. *Id.* ¶ 89 In reality, Defendants were planning to drill at least 425 square miles and to activate the Donlin mine, another project 175 miles north of Pebble. *Id.* Defendants purposefully advanced a smaller plan in hopes of securing a permit, but their actual plan was for constant expansion. *Id.* ¶ 91.

As a preliminary matter, ignoring the serious misrepresentations asserted in the Complaint, Defendants attack a straw man: that their "statements about the *potential* to seek further permits to expand the mine are plainly consistent with their statements about the initial smaller mine for

which a permit was sought." [2] Defs.' Br. at 17. But the Complaint attacks no such statements. Compl. ¶¶ 90–91. Instead, as explained above, it challenges an entirely different category of misstatements not about the "potential" to seek future permits, but about Defendants' actual plans for the Pebble Project. *Id.* ¶ 93. By choosing to discuss their plan for the Pebble Project, Defendants were legally required to tell the whole truth. *Id.* Defendants lied about their plan to operate the Pebble mine for only 20 years. *Id.* In truth, their plan for the Pebble mine was expansive, with the first mine alone slated to operate for at least 180–200 years. *Id.* ¶ 95. Accordingly, Defendants' statements are actionable as a matter of law. *Id.* ¶ 97.

Defendants argue that they had no duty to disclose any future expansion because it was supposedly a mere "possibility." Defs.' Br. at 29–31. But that is not what the Complaint alleges. Compl. ¶¶ 59–111. Far from a hypothetical or mere possibility, the Complaint alleges that Defendants had already devised a plan for expansion. *Id.* ¶¶ 3, 47, 49–50, 53. Controlling precedent mandates that when a proposal is "under active and serious consideration," it must be disclosed. *In re Time Warner Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993); *accord Kronfeld v. Transworld Airlines, Inc.*, 832 F.2d 726, 735 (2d Cir. 1987) ("contingencies inextricably bound up with a company's fortunes need not be certainties to qualify as material"). In *Time Warner*, the plaintiffs alleged that the company's public statements about raising capital by forming "strategic partnerships" were materially false and misleading because, undisclosed to investors, the company was also considering a new stock offering. 9 F.3d at 262. The Second Circuit held, in a summary judgment context, that Time Warner's statements about partnerships created a duty to disclose its consideration of the stock offering: "[W]e hold that when a corporation is pursuing a specific

---

[2] As explained below, even statements about "potential" expansion are false and misleading under controlling authority because they warn about an event that had *already occurred:* Defendants **already had a plan** for a significant expansion. Compl. ¶ 95.

23

business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration."  *Id*. at 268.

Similarly, in *Kronfeld*, the defendant, TWA's parent corporation, failed to disclose in the prospectus for a new issue of TWA stock that it was contemplating termination of its relationship with TWA.  832 F.2d at 730.  Because the prospectus discussed "in some detail the relationship between TWA" and the parent, *id*. at 735, the Second Circuit held that a fact question was presented as to whether it was materially misleading not to disclose the ***"substantial possibility"*** of termination, *id*. at 736–37 (emphasis added).  The alternative, if disclosed, would have suggested to investors that the various guarantees extended from the parent to TWA might be meaningless.[3]

The case on which Defendants rely, *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 809–10 (2d Cir. 1996) is not to the contrary. Defs.' Br. at 30–31.  There, unlike here, the supposedly undisclosed marketing strategy to change the price of cigarettes was not alleged to have been under active and serious consideration.  Instead, "[t]he only statement [the Court] deem[ed] pertinent to plaintiffs' claim that defendants had committed to increasing the price of Marlboro in order to sustain profits [was] the assertion contained in [a] January 13 *Wall Street Journal* article that [unidentified] 'tobacco executives' had stated that the main focus in 1993 would be on profits and not on market share."  *San Leandro*

---

[3] *See also State of New Jersey & its Div. of Inv. v. Sprint Corp.*, 2004 WL 1960130, at *7 (D. Kan. Sept. 3, 2004) ("Assuming that the 'active and serious consideration' standard is the appropriate standard by which to measure defendants' conduct, the question of what defendants were considering in March 2001 and March 2002, and to what extent they were considering any particular subjects, is not one that can be resolved on a motion to dismiss.").

*Emergency Med. Grp. Profit Sharing Plan*, 75 F.3d at 810. The court found that this unattributed statement was simply "[a] single, vague" one that "cannot have led any reasonable investor to conclude that Phillip Morris had committed itself to a particular marketing strategy and had foreclosed all alternatives." *Id*. Moreover, *San Leandro* involved allegations of sensitive pricing information, and the Court was "concerned . . . about interpreting the securities laws to force companies to give their competitors advance notice of sensitive pricing information." *Id*. at 809.[4] No such policy concerns exist here.

Here, there can be little doubt that the Individual Defendants were not only giving active and serious consideration to an expansion of the mine; they ***had already hatched the plan for its expansion***. Compl. ¶¶ 3, 47, 49–50, 53. This damning evidence comes straight from the horse's mouth. Thiessen admitted on the Pebble Tapes that ***expansion of the mine "is the plan"*** and that "***all the key elements of the expansion are already contained in the current project***." *Id*. ¶ 47, Ex. B, Pebble Tape 1. Thiessen discussed Northern Dynasty's plan that "***during the 20 years, you're gonna make the application to continue for another 20***," saying "***we do have all the studies that go through all of this***." *Id*. ¶ 46, Ex. B, Pebble Tape 1. He underscored that the plan is for the first mine alone to last at least 180 years ("and there will be more—but the first one lasts 180 years"), with additional mines in the 425 square miles radius ("We have other sites that we've drilled into and we have ore-grade mineralization in other areas in that 425 square miles but we don't talk about it too much because right now we want people to focus on only Pebble."). Compl. ¶¶ 48–51.

Likewise, Collier admitted to the investigators that Northern Dynasty was planning for "***constant expansion***," ***with that likelihood being "100 percent almost***." *Id*. ¶ 49. Collier and

---

[4] Still, the Court "decline[d] to hold that marketing plans are *per se* immaterial." *Id*. at 810

Thiessen each detailed how the current expansion plan worked—by building the "northern corridor route":

> And so now we are going to be building a northern corridor. We'll have a slurry pipeline as part of it so the concentrate will go down to the coast by pipeline. And it makes a lot of things easier for us. It makes expansion much easier.

> *Id.* ¶ 50, Ex. B, Pebble Tape 5.

Thiessen acknowledged that "***[a]ll the work's been done for [the expansion]***," but remarked that it was "***important to not make [the expansion plan] public***." Compl. ¶ 49.

Accordingly, having chosen to speak about the size, scope and duration of the Pebble Project, Defendants had a duty to tell the whole truth, including revealing their plan for significant expansion that was at least under active and serious consideration. *Id.* ¶¶ 3, 47, 49–50, 53.

## B. Defendants' Safe-Harbor Defense Fails

Defendants advance a meritless safe-harbor/bespeaks caution defense. Defs.' Br. at 16–22. "Under the bespeaks caution doctrine, a misstatement or omission will be considered immaterial if cautionary language is sufficiently specific to render reliance on the false or omitted statement unreasonable." *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 755 (S.D.N.Y. 2001) *abrogated on other grounds by In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003); *P. Stolz Family P'ship L.P v. Daum*, 355 F. 3d 92, 96–97 (2d Cir. 2004) (same).[5]

Defendants assert that the challenged statements are not actionable because Defendants "disclose[d] the ***potential*** for future phases of development," rendering any other statements inactionable. Defs.' Br. at 18. Specifically, Defendants argue that Northern Dynasty's SEC filings

---

[5] The PSLRA safe harbor is a codification of the bespeaks caution doctrine. As such, they are parallel provisions and courts have routinely ruled that statements that were unprotected by one are unprotected by the other. *In re Oxford Health Plans Inc.*, 187 F.R.D. 133, 145 (S.D.N.Y. 1999); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1213 n.23 (1st Cir. 1996).

mentioned that the "proposed project uses a portion of the currently estimated Pebble mineral resources" and "[t]his does not preclude development of additional resources in other phases of the project in the future, although any subsequent phases of development would require extensive regulatory and permitting review by federal, state and local regulatory agencies, including a comprehensive EIS review process under NEPA." *Id*. at 18–19. Defendants also point to language in the EIS that "*if* Pebble Project expansion occurs, it is assumed to begin in year 20 of the proposed project operation," which again they claim exculpates them from liability. *Id.* at 19 n.34.

But these generalized risk disclosures were wholly inadequate given that, at the time they were made, Defendants *were already planning* a vast expansion of the Pebble Project. Compl. ¶ 95. "By superficially warning of possible risks while failing to disclose [already existing] critical facts, [Northern Dynasty] was akin 'to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'" *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013), *quoting In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996). A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability. *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014). "One cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors." *Id*. "[T]he failure to disclose [problems] would cause a reasonable investor to make an overly optimistic assessment of the risk." *Id. See also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 193 (S.D.N.Y. 2010) (disclosures concerning potential risks do not insulate defendants from liability when the risk has already occurred or is ongoing); *Sharette v.*

*Credit Suisse Int'l*, 127 F. Supp. 3d 60, 88 (S.D.N.Y. 2015) ("if the Credit Suisse Defendants knew that the Offerings would certainly cause a massive drop in the price of ECD stock, but merely warned investors that the Offerings 'might' cause the price to drop, such warnings would still constitute misstatements or omissions").[6]

Here, in order for the market to have accurately assessed the risks of investing in Northern Dynasty, Defendants were required to disclose their existing plan for constant and endless expansions. Compl. ¶ 62. This plan, if disclosed, would have changed an investor's assessment of the risks attendant in investing in Northern Dynasty because, if exposed, these undisclosed facts would have made it highly unlikely for Northern Dynasty to obtain a permit even for the substantially smaller mine they touted publicly (which, in reality, was no small mine at all). *Id.* Instead, investors were deceived when Defendants misleadingly claimed that, in addressing stakeholders' concerns, Northern Dynasty devised a "substantially smaller" and responsible mine with a 20-year lifespan. *Id.* ¶¶ 61, 68, 79, 85, 88, 93. Even more misleading, to dupe the market (and Congress), Defendants presented them with a Reclamation and Closure Plan to demonstrate their supposed intent to stop mining and "return [the land] to a stable and productive state." *Id.* ¶ 72. Indeed, in public filings Defendants underscored that the Pebble mine was "designed for closure," and Collier emphasized that Northern Dynasty's mine closure plan was a "significant factor" in reducing impacts from the mine because it eliminates waste rock storage by filling the open pit. *See*, *e.g.*, *id.* ¶¶ 38, 72, 98. Defendants' vague, boilerplate language regarding

---

[6] *See also Dolphin & Bradbury, Inc. v. S.E.C.*, 512 F.3d 634, 640 (D.C. Cir. 2008) ("substantial evidence supports the Commission's conclusion that Bradbury's cautionary statements were so deficient he must have known investors would be misled by the offering documents. The Commission noted the critical distinction between disclosing the risk a future event might occur and disclosing actual knowledge the event *will* occur. Bradbury's cautionary language only disclosed a risk that tenants might leave Forum Place—not his knowledge that PennDOT *actually planned* to do so in the near future.").

"potential" "future" plans to further develop the Pebble Project did not provide a blanket license for them to lie to investors regarding the *current* scope of the Project.

Even if Defendants' misrepresentations were accompanied by meaningful cautionary language (they were not), Defendants *knew* their statements were false when made. *Id.* ¶¶ 3, 47, 49–50, 53. "[C]autionary language does not protect material misrepresentations or omissions when defendants knew they were false when made." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y. 1996); *see also Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) ("a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading") (emphasis in original). Here, Plaintiffs allege that Defendants ***knew*** they had a plan for a significant expansion—indeed, they devised it themselves. Compl. ¶ 71.

Moreover, the "safe harbor" and "bespeak caution" doctrines "apply to forward-looking statements only, and not to material omissions" or to statements of present facts. *See, e.g.*, *Iowa Pub. Emps.' Ret. Syst. v. MF Glob., Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F.Supp.2d 314, 340 (S.D.N.Y. 2001). When a false statement "has both a forward-looking aspect and an aspect that encompasses a representation of present fact," the bespeaks caution doctrine does not apply. *Shaw*, 82 F.3d at 1213; *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("inventory situation was 'in good shape' or 'under control,' are actionable misstatements of historical fact"); *see also EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 876 (3rd Cir. 2000) (fact issue existed as to whether alleged misrepresentations concerning "imminent" new contracts were present statements of fact).

Here, many of the challenged statements include statements of fact. *See, e.g.*, Compl. ¶ 60

(the "design we're taking into permitting includes a substantially reduced development footprint and meaningful new environmental safeguards that respond directly to the priorities and concerns we've heard from stakeholders in Alaska"); (the Pebble Project "has been 'designed for closure'"). *Id.* ¶ 72. Indeed, the "significantly smaller" Pebble Project was developed "[i]n the latter part of 2017,"[7] so Defendants' statements were based on existing facts. *Id.* ¶¶ 82, 85, 93, 105. Accordingly, Defendants' misleading representations and omissions are not rendered inactionable by Defendants' inept disclosures to which they refer in their brief. Defs.' Br. at 1, 2, 23–29. "Historical or present fact—knowledge within the grasp of the offeror—is a different matter. Such facts exist and are known; they are not unforeseen or contingent. It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language." *P. Stolz Family P'ship L.P.*, 355 F.3d at 97. Defendants' cautionary statements were, if anything, misleading in light of the fact that they bespoke caution concerning an event already certain to occur. *See id.* Here, as Defendant Collier admitted on the Pebble Tapes, the likelihood that Defendants were going to significantly expand the Pebble Project was virtually 100%. Compl. ¶ 49.

Defendants also advance factual arguments that are improper at the motion to dismiss stage, asserting that Defendants didn't say what they actually said. Defs.' Br. at 19. In addition to being premature, Defendants' factual arguments are also plain wrong. For example, Defendants quibble that, as they see it, the Pebble Tapes show only that Thiessen and Collier may "potentially" seek to expand the project at some unspecified point potentially in the future. *Id.* at 19. But the Pebble Tapes reveal not a mere "potential," but an already hatched plan for long-lasting expansion, with the first phase alone scheduled to last at least 180 years. Compl. ¶ 48.

---

[7] Compl. ¶ 82.

Defendants also urge their own interpretation of facts regarding their hidden plan to use the infrastructure of the Pebble mine to open up expansive swathes of additional land through the activation of the Donlin mine. Defs.' Br. at 22. In the Pebble Tapes, Defendants can be heard confirming their interest in using the Pebble Project infrastructure to activate the Donlin mine, another project 175 miles north of Pebble: "if you flip the Pebble switch on, it's likely that you may be also flipping on the Donlin switch," and "there is a lot of logic to us joining forces to make a single corridor." Compl. ¶ 52, Ex. B, Pebble Tape 2. Defendants' argument that "such plans would not be inconsistent with the prior statements about the scope and duration of the project proposed in the permit application" is directly contradicted by the record. Defs.' Br. at 22. As explained above, Defendants repeatedly represented to the public that "the Pebble Project design we're taking into permitting includes a substantially reduced development footprint and meaningful new environmental safeguards that respond directly to the priorities and concerns we've heard from stakeholders in Alaska"—a mine that "will operate for a period of 20 years" that is "designed for closure." Compl. ¶¶ 60, 68, 72. Defendants repeatedly affirmed that the Pebble Project "has been 'designed for closure,' in order that facilities can be removed and land reclaimed in such a way that it can be returned to a stable and productive state." *Id*. ¶ 72.

### C. Defendants' Truth-on-the-Market Defense Fails

Defendants argue that the alleged omissions were in fact publicly disclosed, rendering the alleged misrepresentations immaterial as a matter of law. Defs.' Br. at 23–29, 33. Not true. A misrepresentation or omission is material if there is a "substantial likelihood" that the disclosure of omitted facts "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011). "Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for

the trier of fact." *EP Medsystems, Inc.*, 235 F.3d at 875. "A complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (citations omitted). Here, the Pebble Project was Northern Dynasty's principal mineral property, so a reasonable investor would have considered the undisclosed information material to her investment decision. Compl. ¶ 19.

Defendants' affirmative "truth-on-the-market" defense fails in all respects. As an initial matter, Defendants have a very high burden to meet. Under the "truth on the market" theory, "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Ganino*, 228 F.3d at 167. Such information must be communicated "'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." *Id.* (quoting *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)).

"[T]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino*, 228 F.3d at 167; *see also Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) ("[D]efendants' burden [of establishing truth-on-the-market defense is] extremely difficult, perhaps impossible, to meet"—even "at the summary judgment stage.").

This is not the rare, if not impossible, situation in which "truth on the market" is so irrefutable that this very difficult and limited defense can be decided by the Court on a motion to dismiss or even motion for summary judgment. Defs.' Br. at 32. A trial will be necessary to prove up the elements of the defense. *Id.* The Complaint's allegations establish that Defendants

misrepresented to the public their plan for the Pebble Project. Compl. ¶¶ 59–111. As explained above, Defendants pretended that they took the stakeholders' concerns about Northern Dynasty's prior plans to mine large swaths of land for a long duration into account and, in response, specifically re-designed a "substantially reduced development footprint" that was "designed for closure" after a limited 20-year timespan. *See*, *e.g.*, *id.* ¶¶ 60, 68, 72.

Moreover, Defendants' public denials to the market's concerns that they were secretly planning to expand the Pebble mining operations (*see supra* at 9) further demolish their truth-on-the-market defense. *See Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 562 (S.D.N.Y. 2017) (truth-on-the-market defense failed where defendants denied credibility of media reports); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 288 (S.D.N.Y. 2006) (negative publicity predating alleged corrective disclosures was "counteracted by authoritative statements from defendants."); *Lapin v. Goldman Sachs Group*, Inc., 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (same); *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 663 (E.D. Va. 2021) ("Defendants explicitly denied the allegations that they now claim relieved them of their obligation to make full disclosures. Because Defendants chose to speak about their marketing practices, denying that they targeted youth, it had a duty to tell the entire truth about its marketing practices . . . ").

Defendants assert that the Company disclosed to the investing public the full scope of the Pebble Project in a Form 6-K filed in November 16, ***2011***." Defs.' Br. at 23. But that was the Company's ***initial mine proposal***, whose fate was all but doomed, and was rejected by the EPA. *See supra* at pp. 5–8. It was precisely because this proposal was met with an outpour of concerns and barriers that Defendants proclaimed to have changed course, advancing instead a substantially smaller plan. Compl. ¶¶ 61, 63, 68, 79, 82, 85, 88, 93, 98, 105, 109. Equally unavailing is Defendants' argument that in a presentation given in September 2017 at a private gathering

designed to capture private gold companies into pouring their money in the Pebble Project, Defendants discussed the long-term nature of the mine. Defs.' Br. at 23. *First*, the presentation was given **before** the Class Period and any indication that Defendants may have planned to stay for centuries was directly contradicted by the public statements Defendants repeatedly made **during** the Class Period in SEC filings and on the Company's official website, where Defendants vouched that the Pebble Project was significantly chopped. Compl. ¶¶ 60, 68, 72.

*Second*, it cannot be seriously disputed that the statements made to the small group of gold companies spoke to the general public with "a degree of intensity and credibility" that effectively counterbalanced the misrepresentations Defendants made in SEC filings, on the Company's official website, and before Congress during the Class Period. *See Ganino*, 228 F.3d at 167; *see also New Jersey Carpenters Health Fund v. The Royal Bank of Scotland Grp., Plc*, 709 F.3d 109, 126–28 (2d Cir. 2013) (*New York Times* and *Forbes* articles did not establish truth on the market); *In re Comverse Tech., Inc. Sec. Litig.*, 543 F.Supp.2d 134, 150 (E.D.N.Y. 2008) (press release insufficient to establish truth on the market); *In re eSpeed, Inc. Sec. Litig.*, 457 F.Supp.2d 266, 288 (S.D.N.Y.2006) (a "collection of news articles" and "bad publicity" fail to establish truth on the market). Indeed, "[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a proxy statement or prospectus on the basis that the information is public knowledge and otherwise available to them." *Kronfeld*, 832 F.2d at 736.

Moreover, as explained *supra* at pp. 26-30, Defendants' generalized language that the Pebble Project "does not preclude [unspecified] development of additional resources in other [unspecified] phases of the project in the [unspecified] future" does not excuse Defendants for failing to disclose their existing plan to mine the first mine alone for at least 180 years and to

exponentially increase mining in the 425 square miles for centuries (admitting that in reality what's at stake here is three, four mines for a century in the region). Defs.' Br. at 18, Compl. ¶ 111. Indeed, ***Defendants admitted on tape that such information was hidden from the public***. *See supra* at pp. 13-14, 26.

Defendants again point to the Final EIS issued on July 24, 2020 by the Army Corps as evidence that Defendants disclosed the whole truth to the market, but that document simply addressed the three scenarios Northern Dynasty initially advanced ***a decade earlier***: a 25-year open pit mine; a 45-year open pit mine; and a 78-year open pit mine. Defendants also rely on an extraneous document (Exhibit 35 to the Decl. of Ashwin J. Ram, at p. 1) that is outside the four corners of the Complaint and cannot be considered by the Court. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) (as a rule, "a district court must confine itself to the four corners of the complaint when deciding a motion to dismiss under Rule 12(b)(6).").[8] But even that document does not help Defendants. Exhibit 35 shows that "[t]he USACE has decided to evaluate the cumulative effects of the 78 year resource case that was presented in the Wardrop 2011 Preliminary Assessment of the Pebble Project Southwest Alaska, prepared for Northern Dynasty Minerals Ltd." *Id*. The Final EIS is clear that it analyzed only hypotheticals: "The concept is merely one of several expanded development scenarios that ***could potentially*** be proposed and permitted in the future." *Id*. at 3. These hypotheticals hardly informed the public of Defendants' hidden expansion plan that was already in existence. To the contrary, Chapter 4 references "***Potential*** Reasonably Foreseeable Future Actions" and states that "expansion is ***not*** part of a current NEPA compliance or Best Interest Finding effort, and ***is not described as reasonably foreseeable in a government planning document***." Ex. 34 to the Decl. of Ashwin J. Ram, Table

---

[8] Defendants' Exhibits 4 and 5 and also improperly before the Court.

4.1-1 at p. 4.1-9. Even these hypothetical scenarios limit the longest open-pit mine to 78 years. *Id.* at Table 4.1-2. None even mentions Northern Dynasty's actual plan to explore the first Pebble mine alone *for at least 180-200 years*, let alone the other mines contemplated by Defendants.

Defendants' claim that the market knew the truth is also rebutted by the market's explicit surprise at the end of the Class Period. When the truth gradually emerged through a series of partial disclosures and materializations of risk that the Pebble Project will not receive a permit, Northern Dynasty's stock price crumbled. Compl. ¶¶ 126–27; *see, e.g., United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) (movement of stock price relevant to materiality); *New Orleans Emps.' Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011) (materiality pled by, inter alia, "precipitous decrease in share price that occurred after [defendant] disclosed the true state of its inventory"); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) (finding "the materiality of the alleged misrepresentations [was] self-evident when we look at the market's negative reaction" when the truth was disclosed); *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[M]ateriality of disclosed information may be measured post hoc by looking to the [stock price] movement").[9]

### D. Defendants' Fraud Caused Plaintiffs' Losses

Loss causation requires only "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346–47 (2005). The

---

[9] *See also In re MBIA, Inc., Sec. Litig.*, 700 F.Supp.2d 566, 582 (S.D.N.Y. 2010) ("Considering . . . the market reaction . . . the Court concludes that there are sufficient facts pled to question whether Defendants provided the 'truth-on-the-market' with the 'degree of intensity and credibility' sufficient to counter-balance the allegedly misleading statements."); *Lapin*, 506 F. Supp. 2d at 236 (crediting "a sizable drop in [stock price] when the [disclosures] were announced to the investing public"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F.Supp.2d 158, 182 (S.D.N.Y. 2003) ("[D]efendants' claim that the market knew or should have known . . . is belied by the precipitous drop in . . . securities prices that followed immediately after . . . information of [the] actual financial condition started to emerge.").

Complaint's loss causation allegations are evaluated under Rule 8's notice pleading standard. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 183 (2d Cir. 2015) ("[T]he vast majority of courts in this [Circuit] have required that [pleading] loss causation only meet the notice requirements of Rule 8.") (quotations omitted); *see also Dura Pharms., Inc.*, 544 U.S. at 346 (assuming that ordinary notice pleading applies). To plead loss causation, a plaintiff must allege that the ***subject*** of the fraudulent statement or omission was the cause of the actual loss suffered. *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 96 (2d Cir. 2001) (emphasis added).

In that vein, loss causation is "often compared [] to the tort law concept of proximate cause, meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). Thus, in addition to a corrective disclosure, loss causation can be established under a "materialization of the risk" theory. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (S.D.N.Y. Sept. 27, 2016); *see also In re Am. Int'l. Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010) (loss causation may be adequately pleaded by alleging either "the materialization of a concealed risk that causes a stock price decline" or "a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price."). Loss causation is sufficiently pled "where some or all of the risk is concealed by the defendant's misrepresentation or omission." *Nathel v. Siegal*, 592 F.Supp.2d 452, 467 (S.D.N.Y. 2008). The disclosure "need not take the form of a single announcement, but rather, can occur through a series of [corrective] events." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008).

It is well settled that loss causation is a matter of proof at trial and not to be decided on a

Rule 12(b)(6) motion. *Emergent Cap. Inv. Mgmt., LLC*, 343 F.3d at 197; *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 217 (2d Cir. 2000) ("A foreseeability determination in and of itself is also a question of fact for resolution by the finder of fact."). Despite this, Defendants devote a large discussion of the Complaint's loss causation allegations to premature factual arguments disputing Plaintiffs' allegations. Defs.' Br. at 33–37. Contrary to Defendants' contentions, Plaintiffs sufficiently plead loss causation under both theories. Compl. ¶¶ 112–128.

### *Materialization of Risk Theory*

Under the materialization of risk theory, a misrepresentation "is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions[.]" *In re Bear Stearns Companies, Inc. Sec., Deriv., and ERISA Litig.*, 763 F. Supp. 2d 423, 505 (S.D.N.Y. 2011), *on reconsideration*, 2011 WL 4072027 (S.D.N.Y. Sept. 13, 2011), *and on reconsideration*, 2011 WL 4357166 (S.D.N.Y. Sept. 13, 2011). "The zone of risk is determined by the purposes of the securities laws, *i.e.*, to make sure that buyers of securities get what they think they are getting." *DoubleLine Cap. LP v. Odebrecht Fin.*, 323 F. Supp. 3d 393, 456 (S.D.N.Y. 2018) (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010)). For example, in *In re Barrick Gold Sec. Litig.*, the court found sufficient under a materialization of risk theory allegations that the defendants' misstatements concealed risks related to environmental compliance, which risks ultimately materialized when a Chilean court issued an order halting Barrick Gold's construction work at a gold mine and fining the Company as a result of the compliance issues. 2015 WL 1514597, at *12–13 (S.D.N.Y. Apr. 1, 2015). The court rejected the defendants' argument that they warned of these risks, finding that "[a]lthough Barrick did warn of the risk of the specific litigation that resulted in the [] injunction and the possible consequences of that litigation, defendants' alleged misstatements regarding environmental

compliance meant that investors could not accurately weigh that risk." *Id*. at *13.

Here, as in *Barrick Gold*, Defendants' misrepresentations and omissions regarding the Pebble Project concealed risks that prevented investors from accurately weighing the risk that Defendants' permit application was likely to be denied. Compl. ¶ 126. Northern Dynasty's securities prices declined over a two-day period as these risks first began to materialize when, on August 24, 2020, the Army Corps released a statement that the Pebble Project would cause harm to the area and news commentators remarked that it would be difficult for the Company to provide any adequate mitigation plans. *Id*. ¶¶ 113–16.

Defendants claim that they disclosed the risk that the Pebble Project may not receive a permit, pointing to hypothetical language such as risks that "***could***" cause actual results to differ materially include "an inability to ultimately obtain permitting for a mine at the Pebble Project." Defs.' Br. at 35. As explained above, this disclosure was hopelessly vague and failed to warn of actual facts on the ground that significantly altered an investor's ability to accurately assess the risks of investing in Northern Dynasty. Unbeknownst to the public, Defendants already had a plan to build one of the largest mines in the world, with the first mine alone spanning for at least 180 years. Compl. ¶¶ 4, 44.

Defendants also argue that "the Complaint does not allege that Defendants made materially false or misleading statements about mitigation, the likelihood of the permit being denied, or other environmental factors," but that level of precision is not legally required. Defs.' Br. at 35; *see Suez Equity Invs. L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 96 (2d Cir. 2001) ("subject" of the fraudulent statement or omission was the cause of the actual loss suffered). In effect, Defendants advance the theory that the false and misleading statements must exactly match the revelations of the fraud. That is not the law. *See Suez Equity Invs.*, 250 F.3d at 96; *see also Freudenberg*, 712

F. Supp. 2d at 202 (there is no "mirror image" requirement); *accord Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at \*17 (N.D. Ill. Aug. 11, 2021) ("Defendants argue that Plaintiffs fail to plead loss causation because they do not explain exactly which alleged misstatements the 'corrective disclosures' corrected. But Defendants cite no authority for that purported requirement, and courts around the country have found that plaintiffs may satisfy the loss causation pleading requirement 'without identifying a corresponding, mirror-image prior representation for every disclosure that precedes a share price decline.'") (collecting cases). The "subject" of the fraudulent statement or omission related to the parameters of the envisioned Pebble Project. Compl. ¶ 57. Defendants grossly misrepresented its scope, size, and duration. *Id.* ¶¶ 59–111. Investors were deceived by Defendants statements, which gave the false impression that the redesigned project was more likely to be approved because it supposedly addressed the stakeholders' concerns. *Id.* ¶¶ 60, 63, 98.

The risk that Northern Dynasty was unlikely to secure the permit materialized several times in a number of ways, including when the Army Corps issued a statement that the project "cannot be permitted under section 404 of the Clean Water Act." *Id.* ¶ 113. Importantly, the Army Corps released this statement on August 24, 2020, the month the investigators secured confessions on tape of the Individual Defendants bragging about their real plan for constant expansion. *Id.* ¶¶ 45, 113. On the tapes, Defendants were also heard trumpeting their connections with individuals at the Army Corps, who were privy to the real plan concealed from the public:

> Q: Have you shared your plan or what the plan is about of having several other mines in pebble with the Army Corps? What have they said about that?
> A: So . . . Yes, we have . . .
> Q: Mhmm. And it's important to not make it public now I understand.
> A: Yes. . . .

*Id.* ¶ 53.

Defendants' contention that the Army Corps denied the Pebble permit for reasons wholly unrelated to any of the alleged misstatements (Defs.' Br. at 36) finds no support in the record. Based upon the record and the four corners of the Complaint, the only reasonable inference for the Army Corp's adverse statement regarding the Pebble Project is that it had learned of Defendants' secret plans. It is beyond peradventure that a significantly larger project posed exponentially larger environmental hazards. Compl. ¶¶ 53, 126. Defendants made false and misleading statements about the Pebble Project (*e.g.*, having a limited duration of 20 years, being designed for closure to address the stakeholders' concerns) and, in so doing mislead investors about the likelihood of obtaining a permit. *Id.* ¶¶ 59–111. Defendants' factual argument is also premature at the motion to dismiss stage.

In sum, Defendants peddled a significantly smaller project to secure a permit they were unable to obtain for a larger project. Compl. ¶ 3. The loss to investors, from the risk that materialized when Defendants' revised proposal was blocked, was a foreseeable consequence of Defendants' misrepresentations of a significantly smaller mine designed for closure, and of their omissions about their true plan to develop one of the largest mines in the world. *Id.* ¶¶ 113–27. Plaintiffs have adequately alleged loss causation. *See*, *e.g.*, *Emergent Cap. Inv. Mgmt., LLC*, 343 F.3d at 197 (causal connection between plaintiff's economic loss and defendants' statements adequately alleged where loss was foreseeable consequence of misrepresentations and omissions); *Barrick Gold*, 2015 WL 1514597 at *12–13; *In re Daou Systems, Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005) (risk associated with accounting fraud materialized when the fraud ceased and the Company was forced to report sharply lower earnings from the previous (fraudulently inflated) periods).

Eventually, on November 25, 2020, the Army Corps denied the permit for the Pebble

Project, noting that it was "contrary to the public interest." Compl. ¶ 126. This announcement was a further materialization of the risk and drove another huge decline in Northern Dynasty's stock price. *Id.* ¶ 127.

### Corrective Disclosure Theory

A corrective disclosure does not have to be a "mirror image" of the false statement that is tantamount to a confession of fraud. *See Freudenberg*, 712 F. Supp. 2d at 202. Rather, a complaint need allege only that the "relevant truth" about the company's underlying condition was revealed. *Id.*; *see also Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 477 (S.D.N.Y. 2013) (corrective disclosures need "not explicitly disclose [the truth] in flashing neon lights"). There is no "requirement that the disclosure take a particular form or be of a particular quality." *In re Initial Pub. Offering Sec. Litig. ("In re IPO")*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) (citations omitted). While not required, here, the corrective disclosures disclosed the truth "in flashing neon lights." *Van Dongen*, 951 F. Supp. 2d at 477. Defendants' scheme was caught on tape. Compl. ¶¶ 117–19. In response to the revelations on the Pebble Tapes, Northern Dynasty's share price fell precipitously. *Id.* ¶ 119.

Defendants rehash their improper truth-on-the-market argument, claiming that the hidden plan was actually publicly disclosed, and that the Individual Defendants did not make any false statements because they disclosed that they intended to operate the Pebble Project for the first 20 years. Defs.' Br. at 32–33. As explained above, this argument is meritless.[10]

---

[10] Defendants' cases are inapposite because the allegedly concealed information was in fact ***fully disclosed*** to the market or the alleged corrective disclosure ***did not reveal any "relevant truth"*** to the market, which is not the case here. *See Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 559–60 (S.D.N.Y. 2021) (allegedly corrective report "contained an analysis of publicly available information" and Defendants' own disclosures "referred investors to that same data"); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d at 512–13 ("undisputed fact" that the information allegedly concealed was already known to the market one year before the alleged corrective

The harm from the Pebble Tapes continued its heavy toll on the price of Northern Dynasty's securities when the Western Director and Senior Attorney for the Natural Resources Defense Council and the Executive Director of United Tribes of Bristol Bay pushed for a clear denial of the permit in light of the "basic fraud" uncovered. Compl. ¶¶ 120–21. New information about the severity of Defendants' involvement was revealed on October 29, when additional tapes showed the extent to which Defendants played a hands-on role in the scheme. *Id*. ¶ 122. Thiessen is heard bragging about his influence over Alaska's senators and the state's governor, and the financial windfall to Thiessen's companies in the British Columbia on the back of Alaska's taxpayers. *Id.* On this news, Northern Dynasty's stock suffered another significant decline. *Id.* ¶ 123.

Then, on November 18, 2020, Alaska Senator Lisa Murdowski issued a strong statement condemning the "fabrications and truly a dishonest appraisal of [Northern Dynasty's] own project," and calling for "the Army Corps [to] deny [Northern Dynasty's] permit application . . . " *Id.* ¶ 124. On this news, Northern Dynasty's stock suffered another significant plunge. *Id.* ¶ 125.[11]

Taken as true, as required at the pleading stage, the Complaint's allegations plausibly allege loss causation. *See*, *e.g.*, *Christine Asia Co. v. Ma*, 718 F. App'x 20, 22 (2d Cir. 2017) (citing to "market reaction" to show "the importance of this information to investors"); *In re MBIA, Inc. Sec.*

---

disclosure; decision reached on summary judgment after full merits and expert discovery); *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) (no loss causation where allegedly corrective disclosure did not reveal any "relevant truth").

[11] Contrary to Defendants' assertions (Defs.' Br. at 34 n.55), the "bad press" following new disclosures in the Pebble Tapes provided additional information to the market, which resulted in further drops *(see, e.g.,* discussing senior figures pushing for the denial of the Pebble permit, followed by significant drops in the Company's stock price).

*Litig.*, 700 F. Supp. 2d at 595 ("allegations of significant price drops in response to disclosures of the alleged omissions or misstatements can establish loss causation"); *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 396 (S.D.N.Y. 2007) (same).

<u>Defendants' Remaining Arguments Fail</u>

Defendants assert without any legal support that because Lead Plaintiff sold all of his shares on August 24, 2020, only the August 24, 2020 disclosure can be used to establish loss causation for the proposed class. Defs.' Br. at 36. Defendants are wrong. *First*, Defendants ignore the fact that Named Plaintiff Charles Hymowitz held shares though the last corrective disclosure date of November 25, 2020 (ECF No. 1 at *23–24, Case No. 1:20-cv-6126, attached hereto as Exhibit A), so ***all*** disclosure dates ought to be considered.[12] *See, e.g., In re Third Ave. Mgmt. LLC Sec. Litig.*, 2016 WL 2986235, at *3–4 (S.D.N.Y. May 13, 2016) ("concern with standing can be protected in other ways . . . [a] lead plaintiff may, consistent with the PSLRA, add 'named plaintiffs to aid the lead plaintiff in representing a class'") (quoting *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 83 (2d Cir. 2004) (citing cases)).

*Second*, the law is settled in the Second Circuit and around the country that a plaintiff has standing to bring securities fraud claims on behalf of purchasers of other securities of the same issuer or at other times during the class period based on the same course of misrepresentations. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (plaintiffs have standing where they have personally suffered an injury as a result of the illegal conduct and such conduct implicated "the same set of concerns" as the conduct alleged to have caused injury to other members of the putative class by the same defendants; "in the context

---

[12] Case Nos. 20-cv-5917 and 20-cv-6126 were consolidated on March 17, 2021. ECF No. 11, Case No. 20-cv-6126. Hymowitz never dismissed his action and is properly named as a Plaintiff herein.

of claims alleging injury based on misrepresentations, the misconduct alleged will almost always be the same: the making of a false or misleading statement"); *Hevesi*, 366 F.3d at 82 ("Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action . . . [indeed], "it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim."); *Elstein v. Net1 UEPS Techs. Inc.*, 2014 WL 3687277, at *2, *6 (S.D.N.Y. July 23, 2014) (finding plaintiff who sold all shares in December 2012 adequate and typical to represent class for period from August 2009 to November 2013); *Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 WL 4006661, at *8–10 (S.D. Fla. Mar. 16, 2016) (certifying class where plaintiffs sold all shares before second of two corrective disclosures).

Lastly, Defendants incomprehensibly argue that withholding the hidden plan to operate one of the largest mines in the world was tantamount to withholding "favorable information" that, in fact, artificially depressed the stock price. Defs.' Br. at 36. This contention makes little sense. Defendants' prior efforts to build a large mining operation had been doomed since the Company originally advanced such a project a decade earlier. *See supra* at pp. 5–8. Those failed efforts catapulted into Defendants' scheme to peddle a supposedly smaller plan complete with closures and reclamations. Compl. ¶¶ 35–37, 72. When the truth about Defendants' scheme was revealed through a serious of materializations of risks and corrective disclosures, the price of Northern Dynasty's securities went into a tailspin.[13]

---

[13] *Collier v. Aksys Ltd.*, 2005 WL 1949868, at *12 (D. Conn. Aug. 15, 2005) (cited in Defs.' Br. at 37) doesn't help Defendants because there, unlike here, the price *moved in the wrong expected direction* in response to the corrective disclosure. Defendants also cite *Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 753 (S.D.N.Y. 2011) for the point that withholding favorable information artificially depressed the stock price. Defs.' Br. at 36. Here, Defendants' scheming is hardly favorable information. Compl. ¶ 3. Here, the stock reacted as expected to the revelation of the scheme: it dropped precipitously. *Id.* ¶¶ 112–28.

### E. The Scienter Allegations Are Compelling

In the Second Circuit, a plaintiff may satisfy scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud or (b) by alleging facts that constitute . . . evidence of conscious misbehavior or recklessness." *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 141 (E.D.N.Y. 2008) (quoting *Ganino*, 228 F.3d at 168–169). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information [that] contradicted their public statements." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). The key question is whether "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id*. While "smoking gun" evidence of scienter is not required, *see Tellabs*, *Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007) the Complaint pleads precisely this kind of evidence.

#### 1. The Complaint Pleads Defendants' Conscious Misbehavior or Recklessness

Defendants cannot seriously contend that Thiessen or Collier did not have actual knowledge of their undisclosed plan. Compl. ¶¶ 3, 47, 49. As discussed above, Defendants' openly admitted this fact on tape. *See id*.¶¶ 46–57.[14] The fact that the Defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter. *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) (collecting cases from various circuit courts). Defendants' own involvement in the scheme conclusively established scienter. *Id*. ¶¶ 46–57, 146. Further cementing an inference of scienter is Defendants' own admissions that it was important to keep their secret plan hidden from

---

[14] Defendants' trickery—to commit to a significantly smaller mining operation only until a permit was secured—had been in the works for some time, and at least as early as the beginning of the Class Period. Compl. ¶¶ 55–57.

the public. *Id.* ¶¶ 49, 53.

Although not required, other allegations cement an inference of scienter. For example, Defendant Collier's resignation on the heels of the Pebble Tapes' publication further supports an inference of scienter. *Id.* ¶ 7, *In re Salix Pharms., Inc.*, 2016 WL 1629341, a *15 (S.D.N.Y. Apr. 22, 2016) (collecting cases).

Further supporting the inference of scienter is the fact that the U.S. Attorney's office for the District of Alaska commenced a grand jury investigation into the matter. Compl. ¶ 7; *see*, *e.g.*, *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) (government investigations add to inference of scienter).

The "core operations" doctrine also supports scienter. Courts have held that "[t]o fulfill the scienter pleading requirement, a plaintiff may rely on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013). The core operations doctrine can "provide supplemental support for allegations of scienter, even if [it] cannot establish scienter independently." *New Orleans Emps. Ret. Sys.*, 455 F. App'x at 14 n.3 (2d Cir. 2011) (summary order). The Pebble Project is Northern Dynasty's principal mineral property, and the Company has tried to secure a federal permit for the Project since 2011. Compl. ¶¶ 19, 20.

### 2. *The Complaint Pleads Defendants' Motive and Opportunity to Commit Fraud*

Motive allegations are not required to allege scienter in light of the facts discussed above, which demonstrate Defendants' knowledge. *See Tellabs*, 551 U.S. at 325. Nevertheless, the Complaint's particularized allegations concerning the Individual Defendants' motives to misrepresent and conceal material facts regarding the Pebble Project support a strong inference of

47

scienter. Compl. ¶¶ 45–57, 146. Here, Defendants were motivated to conceal their real plan for expansion so that they could secure a permit to start mining. *Id.* ¶ 96. Once that permit was secured, Defendants planned to exponentially expand their mining operations. *Id.* ¶¶ 45–57. As the top executives responsible for the Pebble Project, which failed to secure a permit for roughly a decade, Defendants had the motive and opportunity to scheme in order to advance their cause. *Id.* ¶¶ 15–16, 20–33, 45–57. Indeed, Collier is a veteran D.C. lobbyist who was hired at an annual salary of around $1.5 million, but with an additional whopping bonus of $12.5 million directly conditioned on his ability to secure a permit. *Id.* ¶ 16. [15]

Defendants argue that the desire to keep stock prices high to increase officer compensation are insufficient to plead scienter (Defs.' Br. at 37–38), but the Second Circuit has never categorically rejected an inference of scienter from compensation plans. *ECA, Local 134IBEW Joint Pension Tr. of Chicago v. JPMorgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) (acknowledging possibility of scienter from a "direct link between the compensation package and the fraudulent statements because of the magnitude of the compensation and the defendants' motive to sweep problems under the rug"). Courts routinely credit compensation structures, which are, as here, uniquely tethered to the fraud. *See*, *e.g.*, *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 557–58 (S.D.N.Y. 2010) (possibility of windfall payout); *Darquea v. Jarden Corp.*, 2007 WL 1610146, at *10 (S.D.N.Y. May 31, 2007) *adhered to on reconsideration*, 2007 WL 2584744 (S.D.N.Y. Sept. 5, 2007) (incentive payments tied to stock performance). Indeed, allegations that "the executives' careers and the very survival of the company were on the line" are the types of corporate goals that satisfy the pleading requirement for scienter. *In re Cabletron Sys. Inc.*, 311

---

[15] Defendants' assertion that Plaintiffs do not allege motive (Defs.' Br. at 37) is directly contradicted by the Complaint's allegations.

F.3d 11, 39 (1st Cir. 2002); *accord Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (citing *Fla. State Bd. of Admin.*, 270 F.3d at 661) ("When financial incentives to exaggerate earnings go far beyond the usual arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter").[16]

Considered holistically with the Complaint's other allegations, these facts support a strong inference of Defendants' scienter. *See, e.g.*, *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 112–13 (2d Cir. 2009) (considering potential motives simultaneously with allegations of recklessness).[17]

### F.     The Complaint Adequately Alleges Section 20(a) Claims

The Complaint alleges primary violations and that each Individual Defendant had actual control over the Company's statements. *See, e.g.*, Compl. ¶¶ 15–16, 142–151, 152–57. While courts disagree whether "culpable participation" need be pled at all, *e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 416 (S.D.N.Y. 2003), the Complaint's scienter allegations as to each Individual Defendant suffice.

## IV.     CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion in its entirety. Should the Court grant Defendants' motion, Plaintiffs respectfully request leave to amend.

Dated:  November 15, 2021

---

[16] The court explained that "[w]hat makes this case different are the inferences that corporate officers understood . . . that the success of the new products, and of taking the old line company into a new world, was important to their own survival and that of the company. Indeed, the complaint alleges that Russell said, 'If I can't turn the company around in one year, I won't be here.'" *Id*.

[17] The Individual Defendants' scienter is imputed to Northern Dynasty. *Gordon v. Vanda Pharms. Inc.*, 2021 WL 911755, at *2 (E.D.N.Y. Mar. 10, 2021) (citing *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).

Respectfully submitted,

POMERANTZ LLP

*/s/ Emma Gilmore*
Jeremy A. Lieberman
Emma Gilmore
Dolgora Dorzhieva
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
egilmore@pomlaw.com
ddorzhieva@pomlaw.com

*Lead Counsel for Plaintiffs and for the
Proposed Class*

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Named Plaintiff and
for the Proposed Class*