## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

IN RE NORTHERN DYNASTY
MINERALS LTD. SECURITIES
LITIGATION

Case No. 1:20-cv-05917-ENV-RLM

Date of Service: December 15, 2021

**Oral Argument Requested**

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................................ 1

PRELIMINARY STATEMENT ..................................................................................... 3

ARGUMENT .................................................................................................................... 6

I.     Plaintiffs' Complaint Is Built Upon A Series Of Faulty Assumptions, Logical Fallacies, And Arguments That Are Directly Contradicted By The Statements Upon Which Plaintiffs Rely ...................................................................................................... 6

    A.    Plaintiffs' Argument That Defendants Were Engaged In An Elaborate Scheme To Defraud Investors And Secretly Build A Massive Mine, Is Premised On Three False Assumptions ........................................................... 7

        1.    Faulty Assumption #1: Plaintiffs Incorrectly Assume That Attempting to Obtain A Permit By Submitting A Small Mine Plan Is Deceptive ......... 8

        2.    Faulty Assumption #2:  Plaintiffs Incorrectly Assume That An Initial Permit Provides Carte Blanche To Operate A Different Mining Operation Without Additional Evaluation Or Permits ............................... 9

        3.    Faulty Assumption #3:  Plaintiffs Incorrectly Assume That The Company Can Pursue The Pebble Permitting Project Or A Larger Project Through Future Expansion, But Not Both .................................... 11

    B.    Plaintiffs' Opposition is Rife with Conclusory Allegations That Misrepresent The Record And Is Not Supported By Any Adequately Pleaded Facts ............... 14

        1.    Plaintiffs' Allegation That The Pebble Tapes Contradict The Company's Public Statements Is Conclusory And Contradicts The Public Filings Upon Which Their Claims Are Based ............................... 14

        2.    Plaintiffs' Allegation That Defendants Lied To The Market About Limiting The Size Of The Pebble Project Is Conclusory And Contradicted By Plaintiffs' Own Factual Support ................................... 16

        3.    Plaintiffs' Allegation That the Pebble Tapes Revealed A Secret Expansion Plan Is Conclusory And Contradicted By Plaintiffs' Own Factual Support ........................................................................................ 19

        4.    Plaintiffs' Allegation That Defendants Filed A Closure and Reclamation Plan in Order to Deceive Investors Is Conclusory And Contradicted By Plaintiffs' Own Factual Support ................................... 25

        5.    Plaintiffs' Allegation That Defendants Had A Secret Plan To Operate The Donlin Mine Is Conclusory And Contradicted By Plaintiffs' Own Factual Support ........................................................................................ 27

    C.    Plaintiffs Misrepresent the Overwhelming and Relevant Evidence That The USACE Concluded That Expansion Of The Pebble Project Was Reasonably Foreseeable ..................................................................................................... 28

        1.    Plaintiffs Misstate Defendants' Argument .............................................. 28

2. Plaintiffs Misstate The Facts Concerning The USACE's Analysis of Future Pebble Project Expansion ................................................................ 29

3. Plaintiffs Falsely Claim That the USACE Did Not Consider the Company's Plan to Explore Other Mines ................................................. 34

D. Plaintiffs' New Conspiracy Theory Does Not Save Their Complaint................. 35

E. Defendants Had No Duty to Disclose Plans For Future Expansion ..................... 39

II. Plaintiffs Even Misleadingly Characterize the Company's Defense and Offer a Strawman on the Purported "Risk" Of Future Expansion ................................................. 42

III. Plaintiffs Have Failed To Overcome Defendants' Truth-On-The-Market Defense ........ 44

A. Plaintiffs' Fraud-On-The-Market Theory Is Based On A False Premise ............. 45

B. Plaintiffs' Reliance On Inapplicable Prior Court Decisions Is Misplaced .......... 46

C. Plaintiffs' Attempt At Disavowing Their Own Complaint Reveals The Unavoidable Problem With Their Fraud Theory ..................................................... 47

IV. Plaintiffs Have Failed To Adequately Plead Loss Causation ............................................ 50

A. Plaintiffs' Misstate The Applicable Legal Standard For Loss Causation............. 50

B. Plaintiffs' Corrective Disclosure Theory Is Baseless ........................................... 51

C. Plaintiffs' Materialization of Risk Argument Is Completely Contrived............... 54

1. The Possibility of Future Expansion Was Not A Risk, Let Alone a Risk Related to Obtaining a Permit ............................................................ 56

2. Plaintiffs' Claim That The USACE Denied The Pebble Project Permit Because Of "Hidden Plans" Revealed By The Pebble Tapes Is Demonstrably False ................................................................................... 56

V. Plaintiffs Have Not Adequately Plead Scienter ................................................................ 59

VI. Plaintiffs Have Not Plead a Section 20A Claim ............................................................... 63

CONCLUSION.......................................................................................................................... 63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)..............................................................................14, 62

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014)......................12

*In re Barrick Gold Securities Litigation*,
  No. 13 Civ. 3851 (SAS), 2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015)....................................54

*Bratusov v. Comscore, Inc.*,
  No. 19-cv-3210, 2020 WL 3447989 (S.D.N.Y. June 24, 2020) ............................................40

*Citibank, N.A. v. K-H Corp.*,
  968 F.2d 1489 (2d Cir. 1992).........................................................................................51

*In re Cosi, Inc. Sec. Litig.*,
  379 F. Supp. 2d 580 (S.D.N.Y. 2005)............................................................................42

*Das v. Rio Tinto PLC*,
  332 F. Supp. 3d 786 (S.D.N.Y. 2018)......................................................................45, 59

*Dura Pharms, Inc. v. Broudo*,
  544 U.S. 336 (2005).....................................................................................................50

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ..........................................................................................61

*In re Forcefield Energy Inc. Sec. Lit.*,
  15 Civ. 3020 (NRB), 2017 WL 1319802 (Mar. 29, 2017) ....................................................36

*Gagnon v. Alkermes PLC*,
  368 F. Supp. 3d 750 (S.D.N.Y. 2019)...........................................................................61

*In re Gentiva Securities Litigation*,
  932 F. Supp. 2d. 352 (E.D.N.Y 2013) ......................................................................60, 61

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)............................................................................59

*In re Grand Jury Subpoena Dated July 6, 2005*,
  510 F.3d 180 (2d. Cir. 2007)........................................................................................60

*Kronfeld v. Transworld Airlines, Inc.*,
    832 F.2d 726 (2d Cir. 1987)................................................................ *passim*

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007).......................................................................50

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005).............................................................50, 51, 54

*In re Liberty Tax, Inc. Sec. Litig.*,
    435 F. Supp. 3d 457 (E.D.N.Y. 2020) ......................................................54

*In re Merrill Lynch & Co., Inc.*,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003).......................................................50

*New Jersey Carpenters Health Fund v. The Royal Bank of Scotland Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013) .................................................................45, 46

*Oklahoma Law Enf't Ret. Sys. v. Telefonaktiebolaget LM Ericsson*,
    No. 18 Civ. 3021, 2020 WL127546 (S.D.N.Y. Jan. 10, 2020)................60

*In re Omnicom Group, Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008) (*aff'd* 597 F.3d 501 (2d Cir. 2010)) ..........................52

*In re Omnicom Group, Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)) .....................................................................52

*Pehlivanian v. China Gerui Adv. Materials Grp., Ltd.*,
    153 F. Supp. 3d (S.D.N.Y. 2015) .............................................................40

*Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*,
    No. 15 Civ. 5999, 2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017)..........42

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).......................................................................14

*Ruotolo v. Fannie Mae*,
    933 F. Supp. 2d 512 (S.D.N.Y. 2013)........................................................35

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co.,Inc.*,
    75 F.3d 801 (2d Cir. 1996)...................................................................39, 42

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank KM*,
    250 F.3d 87 (2d. Cir. 2001)........................................................................50

*In re Time Warner Securities Litigation*,
    9 F.3d 259 (2d Cir. 1993) .....................................................................39, 40

*U.S. v. Sells Eng'g, Inc.*,
    463 U.S. 418 (1983)................................................................................60

*In re Vivendi Universal, S.A., Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)..............................................................54

*White v. H&R Block, Inc.*,
    No. 02-cv-8965, 2004 WL 1698628 (S.D.N.Y. July 28, 2004).............46

**Statutes**

National Environmental Policy Act (NEPA)..............................................9, 17, 30, 43

**Other Authorities**

Fed. R. Civ. P. Rule 12(b)(6)..........................................................................50

# EXECUTIVE SUMMARY

This Court should dismiss the Complaint with prejudice for the following reasons:

➢ *None* of the statements cited in the Complaint were, or are, false or misleading. This is self-evident from an objective reading of the full documents referenced and incorporated in the Complaint. Plaintiffs' attempt to conflate statements about the *initial project* made in the permit application with statements about the *possibility of future expansion* after initial mining operations were underway does not withstand basic scrutiny.

➢ There was *no "secret" expansion plan*. As confirmed by the Pebble Tapes themselves, the Company did not have, and could not have developed, specific or concrete plans for a future expansion scenario prior to commencing operations under an initial permit. Moreover, all of the information about possible future expansion discussed on the Pebble Tapes, including that the initial permit project did not preclude future phases/expansion to develop the remaining resources, which would be subject to future permitting, had already been disclosed publicly in the Company's SEC filings, presentations available on its website, and permit-related documents provided to and published by the USACE.

➢ Even if not previously disclosed, Defendants' *statements about possible future expansion projects on the Pebble Tapes did not render the Company's permit application false or misleading*. The initial permit application project and possible future expansion scenarios are necessarily separate projects subject to separate permitting. Therefore, obtaining a permit for the initial project would not allow the Company to develop any of the future expansion options discussed on the Pebble Tapes. In fact, had Defendants' actually represented in its public disclosures that the limited project for which it was seeking a permit included future expansion phases – which Plaintiffs claim was the "secret plan" Defendants intentionally hid from the

investing public – that disclosure *would have been* false.  Plaintiffs' "heads I win, tails you lose" gambit is transparent.

> Plaintiffs' underlying claim that Defendants failed to fully disclose the "risk" that the Company would pursue future expansion of the Pebble Project is contrived and illogical.  *There was no "risk" of future expansion to disclose* to the investing public any more so than there is a "risk" that the Company will recover gold, silver, and other valuable minerals during the course of mining operations.  Because future expansion to develop additional resources at the Pebble Deposit was indisputably a *benefit*, the Company consistently disclosed the entirety of the Pebble deposit's estimated resources and related mineral rights beyond the initial project submitted for a permit.

> Plaintiffs cannot adequately plead loss causation because *there was no misstatement or omission that could have negatively impacted the Company's stock price*.  Without a "revelation of truth," any negative publicity or impact the Pebble Tapes had on the Company's stock price was *necessarily unrelated* to any previously undisclosed information about the possibility of future expansion beyond the initial project submitted for a permit.

> Plaintiffs cannot adequately plead scienter because there was nothing fraudulent about the Company's permitting strategy focusing on a smaller initial project.  This strategy was openly shared with the public to such a degree that even the USACE responded to public comments noting that the Company's permitting approach was "similar to what has happened with other Alaska[n] mines"[1] that received permit approvals.

---

[1] *See* Mot. Ex. 34, Final Environmental Impact Statement (FEIS) at 4.1-9.

## PRELIMINARY STATEMENT

Plaintiffs continue to maintain the unsustainable allegation that "Defendants lied about their plan to operate the Pebble mine for only 20 years."  Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Opp") at 23.  The allegation is so succinct that one would have expected Plaintiffs' Opposition to Defendants' Motion to Dismiss to be filled with numerous examples of Defendants informing investors of "their plan" to operate the Pebble mine for just 20 years before closing the mine for good.  And yet, there are *none*.  Instead, Plaintiffs' Opposition amalgamates logical fallacies, conspiracy theories, and conclusory statements that are directly contradicted by the record of public statements upon which the claims are based.  In reality, Defendants' statements about the size, duration, and scope of the Pebble Project for which the Company is seeking a permit were, and remain to this day, true.[2]

The Pebble Project, as a whole, includes 2,402 mineral claims and covers an area of approximately 417 square miles.  Compl. ¶ 19.  As shown in the map below, taken from the Company's 2017 Annual Report cited in the Complaint,[3] the Pebble Deposit that is the subject of the Company's permit application exists within a small portion of that area of mineral claims.

---

[2] Defendants' counsel fully appreciate the Court's Individual Motion Practice and Rule III.C, which requires counsel to exercise their professional judgment as to the length of their memorandum, and would not typically consider it appropriate, or constructive, to submit a Reply that is approximately 14 pages longer than the underlying Opposition memorandum.  Here, however, rather than focusing on Defendants' arguments, Plaintiffs devoted the first 20 pages of their Opposition memorandum exclusively to restating and amplifying the same false and misleading factual allegations contained in the Complaint.  A complete reading of the records referenced and incorporated in the Complaint require dismissal as a matter of law.  Therefore, after careful consideration, counsel has determined that it is necessary to provide a comprehensive response to Plaintiffs' lengthy and counterfactual narrative.

[3] *See* Reply Ex. 1, NDM Form 40-F, Ex. 99.7 Annual Information Form to 2017 Annual Report (filed Mar. 30, 2018), at 15; *see also* Compl. ¶ 78 (citing NDM's 2017 Annual Report).



Throughout the period of the Complaint, the Company repeatedly and consistently disclosed in in its SEC filings and other public documents cited by Plaintiffs that the Pebble mineral resources included approximately 11 billion tons of measured, indicated, and inferred copper, gold, silver, and molybdenum.[4]  On December 22, 2017, PLP submitted for the first time a permit application to the Army Corps for a specific project to mine a total of 1.1 billion tons of mineralized material—or roughly 10% of the estimated resources—over a "project operating life of 20 years."[5]  Compl. ¶ 35.

The Complaint provides no factual basis to accept as true Plaintiffs' conclusory assertions that the Company mislead investors into believing that the Pebble Project as described in the permit application (the "Pebble Permitting Project")[6] was the *only* project the Company would

---

[4] See, e.g., Mot. Exs. 3-14, MD&A sections to NDM's quarterly and annual filings (disclosing the current estimate of the Pebble mineral resources, including Measured and Inferred).

[5] *See* Mot. Ex. 32, The Pebble Project, Dep't of Army Application for Permit (POA-2017-271), Attachment D—Project Description (Dec. 2017), at 1, 14, 28, 30, 34.

[6] The Pebble Permitting Project refers to the Pebble Project contained in the initial December 22, 2017 permit application and its amendments.

ever pursue at the Pebble Deposit. Such an allegation makes no logical sense. Plaintiffs fail to cite a single instance in which the Company told investors that, by filing an application to mine a fraction of the available resources at the Pebble Deposit, it was somehow abandoning not just the remaining estimated resources at the Pebble Deposit but all other mineral claims within the larger 417-square mile area. Nor have Plaintiffs identified a *single* fact discussed on the Pebble Tapes that was omitted from the Defendants' disclosures about the Pebble Permitting Project.

In fact, a review of the same documents on which the Complaint is based makes clear that the Company repeatedly and consistently disclosed to investors: (1) the complete description of the Pebble Permitting Project, and even provided investors a link to the USACE's website where *each of the permit application documents were available to the public*; (2) the *full scope* of the estimated mineral resources at the Pebble Deposit; (3) that the Pebble Permitting Project related to a single project defined by the "Project Description in the permit application" that only "uses a portion of the currently estimated Pebble mineral resources"; and (4) that filing a permit application to mine a portion of the estimated Pebble resources did "not preclude development of additional resources in other phases of the project in the future." Indeed, the Company repeatedly and consistently cautioned investors that these future projects were not part of the current permit application and would therefore be subject to separate permitting and regulatory review.

In sum, the Complaint fails to plead any actionable factual allegations supporting a claim that the statements contained in the Pebble Tapes revealed any material, nonpublic information that rendered the Company's prior statements false or misleading.

**ARGUMENT**

## I. Plaintiffs' Complaint Is Built Upon A Series Of Faulty Assumptions, Logical Fallacies, And Arguments That Are Directly Contradicted By The Statements Upon Which Plaintiffs Rely

Plaintiffs' Complaint alleges that Defendants' public statements about the size, scope, and duration of the Pebble Permitting Project were false and misleading based on subsequent statements contained in the Pebble Tapes. These allegations are demonstrably untrue. Not only were the substance of statements in the Pebble Tapes already public, but, glaringly, Plaintiffs have failed to cite a *single* statement that actually contradicts any of the Company's prior public statements.[7] Like the Complaint, Plaintiffs' Opposition fails to identify any statements from the Pebble Tapes that render the Company's prior public statements materially false or misleading. Instead, Plaintiffs rely on a series of logical fallacies and misleading excerpts from the Company's public documents. And in a final, desperate attempt at salvaging the Complaint, Plaintiffs' Opposition includes a demonstrably false conspiracy theory implicating government officials.

Before addressing the specifics underlying Plaintiffs' failed effort at pleading fraud, the unavoidable irony of Plaintiffs' fraud theory itself illustrates the insurmountable hurdle that Plaintiffs' face as a matter of law. *If* Defendants had "corrected" or replaced the Company's public statements about the Pebble Permitting Project with statements used to separately describe the potential for future expansion, *Defendants would have been providing false and misleading statements* in connection with the Pebble Permitting Project. To illustrate this point, the MD&A section of the Company's 2017 Annual Report includes a "Project Description" section, which states that the project proposed in the permit application "will operate for a period of 20 years"

---

[7] *See, e.g.*, Mot. at 1.

and have a mining rate of "160,000 tons per day."[8]  According to the Complaint, the statements "describing the Pebble mine operating only for a period of 20 years, with a mining rate of 160,000 tons per day were materially false and misleading when made because Defendants failed to disclose that they were planning to extend the mining operations at least for 180–200 years for the first mine and to increase its daily production rates to between 220,000 and 320,000 tons per day." Compl. ¶ 80.  The irony is that *if* the Company's 2017 Annual Report had actually stated that the project proposed in the permit application will operate for at least 180-200 years for the first mine with a mining rate between 220,000 and 320,000 tons per day, which Plaintiffs claim would have corrected the statements, then the Company *would have actually and materially misled investors* into believing that the initial permit would allow the Company to operate for over 160 years longer with a much higher mining rate than what the permit would actually allow.

The fact that the alleged "corrective disclosures" upon which Plaintiffs' fraud allegations are based would actually render otherwise accurate statements false and misleading demonstrates why Plaintiffs' allegations fail as a matter of law and why none of Plaintiffs' illogical and misleading arguments, discussed below, can overcome this fundamental problem with Plaintiffs' fraud theory.

A.      **Plaintiffs' Argument That Defendants Were Engaged In An Elaborate Scheme To Defraud Investors And Secretly Build A Massive Mine, Is Premised On Three False Assumptions**

In December 2017, the Company filed a permit application with the USACE to build and operate a mine that would extract roughly 1.1 billion tons of minerals over the course of 20 years.  Compl. ¶ 35.  According to Plaintiffs, the Pebble Project permit application was mere "trickery," because Defendants were actually engaged in a "scheme" whereby they would

---

[8] *See* Mot. Ex. 2 at 10.

"commit to a significantly smaller mining operation only until a permit was secured." Opp. at 46 (citing Compl. ¶¶ 55–57). Plaintiffs further allege that "Defendants concocted a plan to devise a significantly smaller mine of shorter duration in an effort to extract a federal construction permit." Compl. ¶ 2. Plaintiffs' conclusory allegation that Defendants "schemed" to submit and commit to a significantly smaller project only until they somehow extracted a permit from the USACE is based on three false assumptions about mining permitting and operations, and is contradicted by the Pebble Tapes.

1. **Faulty Assumption #1: Plaintiffs Incorrectly Assume That Attempting to Obtain A Permit By Submitting A Small Mine Plan Is Deceptive**

The only support for this assumption is Plaintiffs' conclusory allegations that because of the Company's "contentious history with the EPA" concerning the Pebble Project,[9] "Defendants designed [a] scheme," "concocted a plan" and "deliberately crafted" a smaller, shorter mine "in an effort to extract a federal construction permit." Although these "allegations" are largely unremarkable (*i.e.*, proposing a strategic plan to operate a mine that complies with regulatory requirements and coexists with the environment is laudable), the Company was clear about its "contentious history with the EPA" prior to submitting its permit application. Indeed, the Company repeatedly disclosed this fact in its public filings, which included a detailed chronology of events.[10] The Company's decision to respond to the EPA's prior, public resistance by submitting a permit application for a smaller, shorter project in order to increase its chances of government approval was a transparent and perfectly reasonable business decision.

---

[9] *See* Opp. at 3-7 (citing Compl. ¶¶ 24-34).

[10] *See* Reply Ex. 2, NDM Form 40-F, Ex. 99.6 MD&A to 2017 Annual Report (filed Mar. 30, 2018), at 15-20; *See also* Compl. ¶ 78 (citing NDM's 2017 Annual Report).

### 2. Faulty Assumption #2: Plaintiffs Incorrectly Assume That An Initial Permit Provides Carte Blanche To Operate A Different Mining Operation Without Additional Evaluation Or Permits

Similarly, Plaintiffs incorrectly assume that the Company can "extract" from the government a permit for a limited project and then decide to operate a much larger project as soon as it obtains the narrower authorization. In reality, the Company has only ever sought a permit from the USACE for a 20-year open-pit project to mine approximately 1.1 billion tons of minerals. Compl. ¶ 35. If the government ever grants that permit, that is *the only project* that the Company can legally operate unless and until it files, and the government approves, a subsequent permit. The USACE has made this point clear, explaining "[i]f a permit for the proposed activities under USACE authority is issued to PLP, only the action as described in the ROD [permit] would be allowed, subject to all conditions of approval contained in the ROD" and any modifications or expansion "would require a subsequent NEPA review and permit evaluation." [11] Tom Collier also explained why project opponents' argument that the Company was planning on "shoehorning in a larger project" into the initial permit made no sense given the actual regulatory requirements:

> If expansion did become feasible, new permits would be required. The permit applicant would have to go through the same rigorous procedure that Pebble is now going through. Any concerns with scope or environmental risk can be addressed in that new permitting process. ***If the Corps grants Pebble's current permit application, nothing in that permit suggests a carte blanche to expand.*** Any future mining projects in the area would therefore be evaluated on their own merits based on then-existing conditions when and if future applications are submitted to the relevant permitting agencies.[12]

---

[11] *See* Reply Ex. 3, FEIS Appendix D at D-41-42 (emphasis added).

[12] Mot. Ex. 33 at 20 (27 of pdf) (emphasis added).

In other words, the Company cannot avoid addressing the environmental risks or scope associated with a large project by seeking a permit for a smaller project. Any concerns about the large project would ultimately have to be reviewed if and when a permit application to expand the mine were proposed.

Furthermore, Plaintiffs' conclusory allegation is also contradicted by the Pebble Tapes, which demonstrate that Defendants were, in fact, committed to the Pebble Permitting Project. For example, Thiessen confirmed that there would be open pit mining for the first 20 years, during which time the Company would make a decision about expansion and submit a new application:

> So we reduced the size of the processing plant to 160,000 metric tons per day. And then we said 'Let's just have a 20-year mine life. And one of the reasons was, I mean this entire deposit, 10 billion tons, it can be mined by open pit, but it might at some point be more reasonable to do what's called a high-volume large-scale underground mining block caving, or panel caving, *but for sure the first 20 years is gonna be open pit*, and during that 20 years you'll make a decision on how you will go forward…. But during that 20 years, you're gonna make the application to continue for another 20.[13]

Likewise, Collier explained that one of the key purposes of obtaining a permit for a smaller mine was to actually *build and operate it* in order to gain local support for any potential future expansion:

> This is a well-worn path that we're following to build something that allows us to show the community and the state that we can do it, we can do it well, that it's not dangerous and then we'll come in at some point in the future and request an extension of the time and

---

[13] Compl., Ex. B at 3 (emphasis added). *See also id*. at 4 (Thiessen stating: "Now we could start Pebble at say 35,000 tons and grow over a 30, 40-year period. *No, we are going to start it at 160,000 tons per day. And maybe it grows to either 260 or 320 over the next 20 to 30 years*.") (emphasis added).

probably an expansion of how much we are producing on a daily basis.[14]

Thus, contrary to Plaintiffs' allegation, Defendants' statements on the Pebble Tapes confirm that the Company actually intended to build and operate the mine according to the description contained in its permit application.

### 3. Faulty Assumption #3: Plaintiffs Incorrectly Assume That The Company Can Pursue The Pebble Permitting Project <u>Or</u> A Larger Project Through Future Expansion, But Not Both

Plaintiffs assume that the Company can pursue either the Pebble Permitting Project *or* a larger project that includes additional permits for future expansion, but not both. This argument is based on the classic "either/or" logical fallacy and contradicts the actual record. Instead, Plaintiffs' Opposition confirms there is no evidence that the Company's statements about size, scope, and duration of the project contained in the *permit application* were untrue. Plaintiffs' attempt at pleading fraud improperly conflates the Company's public statements about the size, scope, and duration of the *Pebble Permitting Project* with statements on the Pebble Tapes in which Defendants discuss the size, scope, and duration of *potential expansion projects*.[15]

The specific project plan described in the permit application submitted to the USACE in December 2017 refers to a 20-year project that would develop roughly 10% of the Pebble Deposit. The option to expand the project in the future is *necessarily separate* from this permit

---

[14] *Id.* at 15 (emphasis added).

[15] For example, Plaintiffs allege that "Defendants repeatedly represented to the market" in public filings and elsewhere that the Pebble Project would "operate for a period of 20 years with a development footprint less than half the size previously envisaged that is designed for closure after 20 years," but then the "Pebble Tapes reveal a different version of Defendants' plan" that included filing additional permits during the first 20 years to expand the project. *See* Compl. ¶¶ 2, 4 (internal quotations omitted). Based on the false assumption that only one of those "plans" can be true, Plaintiffs allege that the statements on the Pebble Tapes constitute evidence of fraud.

application, as evidenced by the fact that an expanded project could only be built if the Company submitted and the USACE approved a subsequent permit application. In other words, the USACE has to approve *two* separate plans for an expanded project to be built. It is not, as Plaintiffs' argument assumes, an "either/or" proposition: the Company *can* design, submit, and operate, if approved, the Pebble Permitting Project *and also* design, submit, and operate, if approved, some hypothetical project expansion option contained in a future permit application. Thus, statements on the Pebble Tapes that discuss the possibility of future expansion do not, as Plaintiffs allege, reveal a secret plan that contradicts the project described in the permit application. They simply reflect the unremarkable fact that Defendants are discussing potential expansion options that would build upon the first permit.

Contrary to Plaintiffs' assertions, *see, e.g.*, Opp. at 2 (citing Compl. ¶ 3), planning to submit additional permit applications after obtaining an initial permit does not make statements about the size, scope, and duration of the project submitted in the first permit application false or misleading. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 582 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) (finding that defendant's truthful disclosures regarding pending litigation were not rendered incomplete or inaccurate by their failure to make disclosures about threated litigation, particularly because defendant was careful to note that some litigation did not preclude additional legal action"). Indeed, the USACE *explicitly rejected* the suggestion that it combine the current and future projects for the purpose of the EIS review, and anticipated that if it approved the Pebble Permitting Project, the Company would submit future permit applications to expand the project.

First, the USACE determined that "Pebble Project expansion" was reasonably foreseeable after concluding that the Company would initiate the expansion process during the timeframe of the Pebble Permitting Project, which it was currently reviewing:

> ***The Pebble Project expansion is considered an RFFA*** in this EIS. Actions are considered reasonably foreseeable if they would occur or have potential impacts in the area analyzed for direct and indirect effects on a specific resource. In addition, the likelihood that a specific RFFA would occur must also be assessed. ***This is not based on speculation, but must be anticipated, to enter the permitting process based on project documentation***, identified in public or private planning documents as scheduled for development, have identified indicated resources/reserves sufficient to develop a project, or have advanced exploration activities under way ***in the timeframe being used for assessment***.[16]

Second, the USACE explicitly rejected Plaintiffs' "either/or" logic by explaining in the Final EIS that future expansion is *not an alternative* to the proposed 20-year project:

> Some commenters were confused by the expanded mine development scenario and suggested it should be referred to as Alternative 4.
>
> The Applicant has proposed a 20-year mine. They have not proposed to expand and continue mining after the 20-year period; however, USACE has determined expansion is an RFFA [reasonably foreseeable future action], and has analyzed it accordingly in cumulative effects. ***It would not be appropriate to describe future expansion as Alternative 4, because it is not an alternative to the Applicant's 20-year project***.[17]

Plaintiffs' arguments rely on this same "confusion" that the USACE explicitly debunked in the Final EIS. The USACE did not consider the Company's Pebble Permitting Project and

---

[16] Mot. Ex. 34 (EIS Chapter 4 at 4.1-5) (emphasis added); *see also id*. at 4.1-9 (based on the Company's response to RFI 062, the USACE determined that "Project expansion would begin in the timeframe of the proposed Pebble Project, in year 20 of proposed project operations.").

[17] *See* Reply Ex. 3, FEIS Appendix D at D-158 (emphasis added); *see also* Reply Ex. 5, FEIS Appendix B at B-14 ("Future expansion of the mine has been determined reasonably foreseeable by the USACE, and an expansion scenario developed and analyzed as a cumulative effect in the EIS. The USACE cannot legally analyze mining the entire resource as the proposed project, nor can they analyze the expansion scenario as an additional alternative.").

plans for future permit applications to be mutually exclusive, nor did it consider a Company's

intent to expand a project after obtaining an initial permit to be unusual: "If the Pebble Project

was permitted, Pebble expansion could use and expand on the project mine site and

transportation infrastructure that would be in place, *similar to what has happened with other*

*Alaska mines where adjacent reserves are commonly owned*."[18]  Again, this illustrates the fallacy

of Plaintiffs' argument that the Pebble Tapes' discussion about expanding the Pebble Project in

the future somehow made Defendants' prior statements about a specific project contained in the

permit application false and misleading.

**B.      Plaintiffs' Opposition is Rife with Conclusory Allegations That Misrepresent The Record And Is Not Supported By Any Adequately Pleaded Facts**

**1.      Plaintiffs' Allegation That The Pebble Tapes Contradict The Company's Public Statements Is Conclusory And Contradicts The Public Filings Upon Which Their Claims Are Based**

The Complaint is replete with conclusory allegations that statements excerpted from the

Company's SEC filings—in which the Company discusses the size, scope, and duration of the

project contained in the December 22, 2017 permit application submitted to the USACE—were

rendered false and misleading by Defendants' statements excerpted from the Pebble Tapes.[19]

*See, e.g.*, Opp. at 7.  These allegations arise from Plaintiffs' selective and misleading citations to

documents incorporated or referenced in the Complaint.  The statements in the Pebble Tapes

reference options for potential *future expansion* and do not contradict statements from the public

filings focusing on the more limited Pebble Permitting Project.

---

[18] *See* Mot. Ex. 34, FEIS at 4.1-9.

[19] *See ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (to survive a
motion to dismiss a securities fraud complaint, "[a]llegations that are conclusory or unsupported
by factual assertions are insufficient."); *see also Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir.
2004) (Plaintiffs "must do more than say that the statements. . . were false and misleading; they
must demonstrate with specificity why and how that is so.").

For example, the Complaint alleges that the "description of the proposed Pebble Mine" contained in the Company's January 5, 2018 press release, filed as an SEC Form 6-K, and which discussed the proposed 20-year project, was false and misleading because the Company failed to disclose Defendants' "plans" (allegedly discussed over two years later on the Pebble Tapes) to extend the period of mining operations and daily production rates. Compl. ¶¶ 67-69. But none of the Pebble Tapes' statements about future expansion of the project include facts that the Company omitted from its description of the project discussed in its January 5, 2018 press release, which included a link to the USACE's website where investors could obtain each of the Company's permit application documents.[20]

Likewise, Plaintiffs allege that Defendants' statements on the Pebble Tapes render "representations concerning the size, the scope, and the duration of the Pebble mine" in the Company's MD&A section of its 2017 Annual Report false and misleading. Compl. ¶¶ 78-80. This conclusory allegation falsely assumes that the statements in the 2017 Annual Report and the Pebble Tapes both relate to a single plan for the "Pebble mine." In actuality, Plaintiffs excerpted the purported "representations concerning the size, the scope, and the duration of the Pebble mine" from the section entitled "Project Description," which described the project proposed in the *permit application* and is explicitly distinguished from future projects that would be the subject of additional permits.[21] Read in full with the sections Plaintiffs omit, the excerpt cited in

---

[20] *See* Reply Ex. 4, NDM Form 6-K, Ex. 99.1 *Northern Dynasty: US Army Corps of Engineers confirms Pebble permit application complete* (dated January 5, 2018) ("Pebble's permit application documents, including a 'Project Description' that comprehensively sets out the project the Pebble Partnership proposes to develop, is available at http://www.poa.usace.army.mil/Missions/Regulatory/Public-Notices-Section-Homepage/. The Project Description is also available on the Northern Dynasty website under Pebble Project/Project Status.").

[21] *Compare* Compl. ¶ 68 (Plaintiffs' excerpt) *with* Mot. Ex. 2 at 10-11 (complete Project Description section).

the Complaint is a description of the limited project contained in the permit application and does *not* relate to potential future expansion to further develop the Pebble Deposit's remaining resources. The Complaint repeats this same baseless argument using selective, misleading excerpts from each of the Company's public filings throughout the relevant period.[22] No amount of repetition can turn this conclusory allegation into a viable factual pleading. Plaintiffs still have not cited a single material fact about the proposed project that was omitted from the Company's description of the project contained in the permit application.

> **2.    Plaintiffs' Allegation That Defendants Lied To The Market About Limiting The Size Of The Pebble Project Is Conclusory And Contradicted By Plaintiffs' Own Factual Support**

According to Plaintiffs' theory: "Defendants schemed to secure a permit for the Pebble Project by pretending to have significantly downsized the project and its duration. *But unbeknownst to the market*, Defendants planned all along to develop one of the largest mines in the world." Opp. at 10-11 (emphasis added).

Plaintiffs' alleged scheme relies on a demonstrably false narrative that when the Company submitted the scaled-back project in the permit application to mine 1.1 billion tons of the minerals believed to be at the Pebble Deposit, it had somehow (and without informing investors) abandoned its previous long-term goal to further develop the remaining minerals. According to Plaintiffs' theory, the Pebble Tapes revealed that, "unbeknownst to the market," Defendants continued to secretly "develop one of the largest mines in the world." *Id*. at 11. This theory is contradicted by the public record and simply not viable.

First, Plaintiffs falsely claim that in February 2011, the Company formally submitted to the SEC "plans for the development of the Pebble Project" and that the "originally proposed

---

[22] *See* Compl. ¶¶ 59-111.

mine *was expected* to be one of the largest open pit mines in the world." Opp. at 3-4 (emphasis added). In truth, the Company disclosed the results of a Preliminary Assessment of the Pebble Project (years before the Company proposed its permitting project), which "describes and assigns potential economic value for three successive development cases," including an "***an initial 25-year open pit mine life*** upon which a decision to initiate mine permitting, construction and operations may be based."[23] The Company specifically stated that:

- "***any project which is ultimately put forward*** by the Pebble Partnership for permitting under the National Environmental Policy Act (NEPA) may differ from those mine models presented in the Preliminary Assessment" and that "[p]hases of mine development beyond 25 years would require ***separate permitting*** and development decisions to be made in the future, based on prevailing conditions at the time and the accumulated experience gained from developing and operating the ***initial phase*** of the Pebble Project.";

- Only the initial 25-year case included comprehensive engineering that "[o]ngoing investigations undertaken ***during the first 25 years of mining***, including construction of an early access shaft, would ***determine the optimal mining method and plan for subsequent phases of development***.";

- The "initial [25-year] phase of mining processes about two billion tons of material or less than 20% of the total Pebble mineral resource. As such, ***it is not considered to be ideal for assessing the potential long-term economic value of the Pebble Project.***"; and

- the 78-year case was presented "to demonstrate the ***longer-term value of the Pebble Project***" which could involve the processing of "some 6.5 billion tons of material, primarily in Measured and Indicated categories."[24]

So, according to Plaintiffs' own evidence upon which their scheme theory is based, ***since at least 2011***, the Company has discussed a mining process that would be initiated by proposing a short-term project to mine a portion of the Pebble Deposit, which would be thereafter followed by longer-term projects that the Company would investigate and develop during the course of the initial project and that would be subject to separate permitting. Although the Company

---

[23] *See* Mot. Ex. 1 at 1-2 (emphasis added).

[24] *See id.* at 1, 2, 4 (emphasis added).

ultimately decided, in 2017, on an initial permitting project that was smaller than the 25-year initial phase discussed in 2011, it remains true to this day that any subsequent long-term projects will be developed upon further investigation during the initial project and subject to additional permitting.

Second, the Plaintiffs repeatedly present aspects of the overall Pebble Project in the past tense to support the false narrative that the Company had "changed course" to develop ***only*** the resources described in the Pebble Permitting Project.  A review of these statements shows how this is misleading.  For example, Plaintiffs describe the overall Pebble Project as the Company's "plan to develop what Defendants ***deemed*** 'one of the world's most important mineral resources'" and that the Company "***had been planning a mine size***" up to 6.5 billion tons.  *See* Opp. at 1 (emphasis added).  Plaintiffs then immediately present the smaller Pebble Permitting Project as though Defendants had abandoned the possibility of mining additional resources by filing the initial permit application.  *See id*.  But the same SEC filings from 2017 through 2020 that Plaintiffs cite in the Complaint not only discuss the size, scope, and duration of the Pebble Permitting Project, they also disclose the same broader prospects discussed back in 2011:

> ***The Pebble Project is an initiative to develop one of the world's most important mineral resources***. The current estimate of these mineral resources at a 0.30% copper equivalent cut-off grade comprise:
>
> - ***6.5 billion tonnes in the combined Measured and Indicated categories*** …; and
> - 4.5 billion tonnes in the Inferred category ….[25]

Thus, even after filing the permit application for the initial, smaller mine, the Company continued to discuss the overall project in the same manner as it did prior to filing the permit

---

[25] *See, e.g.*, Mot. Ex. 3 at 6.

application, including by disclosing to investors the latest resource estimates for the entire Pebble deposit. None of this was "unbeknownst to the market."

3. **Plaintiffs' Allegation That the Pebble Tapes Revealed A Secret Expansion Plan Is Conclusory And Contradicted By Plaintiffs' Own Factual Support**

As discussed above, even assuming that such a plan exists (it does not), it would not contradict statements about the project contained in the permit application and described in its public filings. But more importantly, Defendants' statements on the Pebble Tapes actually *confirm* that the Company does not have, and is currently unable to develop, specific plans for expansion. Specifically, Plaintiffs rely on misleading excerpts from the Pebble Tapes that omit portions of the recordings in which Thiessen repeatedly states that the Company has not developed specific plans for expansion.

First, Plaintiffs include an excerpt from the Pebble Tapes for the assertion that "Thiessen repeatedly stressed that the 20-year project described publicly was, in fact, merely the first stage in Northern Dynasty's planned, expansive development of the Pebble deposit" and that "Thiessen is heard saying that once it secures the permit for Pebble, Northern Dynasty is 'gonna make the application to continue for another 20' years." Opp. at 11. The "20-year project described publicly" was, in fact, the project described in the permit application, which is not inconsistent with Thiessen stating that the Company would file a subsequent permit application. Furthermore, Plaintiffs omit the portions of Thiessen's statement in which he explains that the decision on how the project will move forward and the type of mining that will be used has not yet been made. Below is Thiessen's complete statement, with the omitted portion in italics:

> We then said "OK, let's see if we can reduce the size of the project overall and still have a reasonable economic." So we reduce the size of the processing plant to 160,000 metric tons per day. And then we said "let's just have a 20 year mine life." *And one of the reasons was, I mean this entire deposit, 10 billion tons, it can be*

19

*mined by open pit, but it might at some point be more reasonable to do what's called, you know, a high-volume large scale underground mining, block caving, or panel caving, but for sure, the first 20 years is going to be open pit, and during that 20 years you'll make a decision on how you will go forward. Will it be open pit only? Block cave only? Or a combination of the two? It'll be a combination of the two, I'm pretty sure.* So we said "let's only have a 20 year mine life" and so that's how we kept the footprint down to 5½ square miles. It's slightly smaller throughput and a 20 year mine life. But during that 20 years, you're gonna make the application to continue for another 20. And so, we do have all the studies that go through all of this, and to increase the size of the mill from 160,000 metric tons per day - we can go to 220, we can go to 320.[26]

Thiessen's statement does not reveal an actual plan beyond the first 20 years, which he unequivocally states will be consistent with the Pebble Permitting Plan.

Plaintiffs also falsely claim that Thiessen's statement "we can go to 320" shows that "the Pebble Project's processing capacity had been designed to *expand far past the milling rates disclosed publicly*." *Id*. (emphasis added). Thiessen's statement that "we can go to 320" ***was publicly disclosed***. The Final EIS states that the option of a mine throughput of 320,000 tons per day "was evaluated by PLP when developing the project design," and this throughput analysis was provided to the USACE in response to a formal request for information.[27]

Next, Plaintiffs claim that "Thiessen unequivocally admitted that 'all the key elements of the expansion are already contained in the current project'" and that "Thiessen emphasized that expansion of the mine 'is the plan.'" Opp. at 11-12. These statements once again do not refer to a specific expansion plan, nor do they contradict the prior statements about the project contained in the permit application. Moreover, Thiessen makes clear in the complete dialogue between

---

[26] Compl., Ex. B at 3 (emphasis added).

[27] *See* Reply Ex. 5, FEIS Appendix B at B-25.

Thiessen and the actor (whose voice was added to the Pebble Tapes) that he is referring to the additional capacity discussed in the publicly-filed Preliminary Economic Assessment from 2011:

> Actor:     So, all is already contained, all the expansion, all the key elements of the expansion, are already contained in the current project?
>
> Thiessen:  Yes.
>
> Actor:     And that's the plan? That's really the objective?
>
> Thiessen:  That is the plan, and that's because the northern corridor plan that was submitted as part of the Pebble permitting process really came out of, effectively, the work that was done to accommodate the PEA, so it already has that capacity in it.[28]

Similarly, Plaintiffs also use a snippet of a statement for the assertion that on the Pebble Tapes, "Thiessen summed up its *actual plan*: 'See this project ultimately will look a lot like the Mongolian project Oyu Tolgoi,' an open pit and underground mine that is one of the largest in the world." Opp. at 12 (emphasis added). This snippet does not reveal an "actual plan," much less one that contradicts statements about the project contained in the permit application. Furthermore, the same Pebble Tapes on which Plaintiffs rely reveal that not only is there no current expansion plan, but one of the reasons the Company decided to begin with a limited, 20-year project is that it will take another 12-15 years after the initial project begins and $200 to $300 million in additional exploration work before the Company has enough information to develop actual expansion plans. Thiessen states:

> Well, it's absolutely because the ore is there. We've drilled it. We've engineered it. All the works been done for it. ***The only thing that we have to do additionally is determine will there be more open pit exclusively or will we also do some underground mining like bulk underground mining, block caving, in which case we need to sink a shaft and do some underground work. That itself will probably be two to $300 million, but that will be***

---

[28] Compl., Ex. B at 6.

*carried out through that 20-year period* and then we'll make application for another 20 or maybe 40 years of mine life. It's not unusual that mines, you know in fact you're better off asking for a permit for 20 years than asking for a permit for 60 years because we don't know what kind of mine operation we will have after 20 years. We don't know that yet. So when they ask us what the environmental footprint is of that expansion, we can't tell them today. We will only be able to tell them in say year 12 or year 15. See this project ultimately will look a lot like the Mongolian project Oyu Tolgoi, where there's an open pit and there's underground.[29]

Despite Plaintiffs' selective and misleading citations, Thiessen does not contradict the prior statements that the Company intends to perform open pit mining pursuant to the permit application for the first 20 years. Thiessen *confirms* those prior statements. Thiessen's explanation mirrors not only what the Company had already told the USACE during the EIS review, that "[a]n underground mine scenario would require development of a 3,500-foot-deep, 24-foot-diameter shaft, 2,200 feet of lateral development, and significant underground work to first determine if underground mining is feasible; and if so, confirm the mining plan/design,"[30] but also what the Company disclosed in 2011, when the initial mining phase was expected to be 25 years, which is that "[o]ngoing investigations undertaken during the first 25 years of mining, *including construction of an early access shaft, would determine the optimal mining method and plan for subsequent phases of development*."[31]

Plaintiffs also falsely assert that "Collier backed up Thiessen's admission that the 20-year plan was a fiction designed to extract the initial permit," Opp. at 12, based on another snippet of the Pebble Tapes in which Collier refers to "constant expansions." There is no such admission,

---

[29] Compl., Ex. B at 6-7 (emphasis added).

[30] Reply Ex. 5, FEIS Appendix B at B-9.

[31] *See* Mot. Ex. 1 at 2 (emphasis added).

and Collier does not discuss any actual plans or suggest that the permit project was a "fiction." As the full statement shows, Collier was merely predicting that the "constant expansions" that have occurred at *other* mining projects would happen at the Pebble Project *after* the Company uses the 20-year project to prove to stakeholders that the Pebble mine can be operated safely and *after* the Company submits an additional permit application "at some point in the future":

> No. In America there's not a single major mine, and there certainly isn't a major oil field, that didn't start out small, smaller than it has grown. And there have been constant expansions that have been suggested and approved. And that's what would happen here. ***This is a well-worn path that we are following to build something that allows us to show the community and the state that we can do it, we can do it well, that it's not dangerous and then we'll come in, at some point in the future, and request an extension of the time and probably an expansion of how much we are producing on a daily basis***.[32]

Collier confirms that the 20-year project was not a "fiction," but rather real and designed to establish a track record upon which to base future requests to expand the project.[33]

Plaintiffs also repeatedly reference discussion on the Pebble Tapes about the mine lasting 180-200 years as the basis for claiming that the 20-year Pebble Permitting Project "was a

---

[32] Compl., Ex. B at 4 (emphasis added).

[33] Plaintiffs' allegation that "Collier categorically rejected concerns about the possibility of expanded mining of the Pebble deposit" when he testified before Congress that "Pebble has no current plans, in this application or in any other way, for expansion" is also baseless and misrepresents the record. Opp. at 9. First, as the Pebble Tapes reveal, the Company had not developed any actual mining plans that could be used for an expansion phase, which the Company could only develop after future investigation of the Pebble Deposit. Second, Collier did not reject the possibility of expanding the Pebble Project. At the time of Collier's October 2019 Congressional testimony, the USACE had already determined that future expansion was reasonably foreseeable based on information that the Company provided. *See* Reply Ex. 6, Draft EIS (dated February 2019) Chapter 4 at 4.1-8-4.1-11. What Collier actually stated in his testimony, consistent with what he said on the Pebble Tapes, was that "[i]f expansion did become feasible, new permits would be required" and that "future mining projects in the area would therefore be evaluated on their own merits based on then-existing conditions *when and if future applications are submitted* to the relevant permitting agencies." Mot. Ex. 33 at 27 (emphasis added).

fiction." *See*, *e.g.*, Opp. at 12-13.   These statements do not refer to a specific plan, nor do they contradict the specific project submitted in the permit application.   As Thiessen explains in the statement Plaintiffs cite, this is a simple, rough calculation, based on public information that the Company reports to investors, of the time it would take to mine all of the minerals identified (with various levels of accuracy) at the Pebble Deposit.   And as noted in the USACE's Scoping Report, which Plaintiffs cite in their Opposition, the Company publicly disclosed Pebble's 200-year mine life on its website more than two years before the Pebble Tapes: "the applicant's website notes that the mine can operate for 200 years and could have 11 billion tons of ore."[34]

Plaintiffs also make the conclusory allegation that "Thiessen also enthusiastically embraced the hidden plan for the northern infrastructure corridor because it was designed to facilitate expansion of the mine."   Opp. at 13.   This is untrue for two reasons.

First, the allegation that Defendants designed the northern infrastructure corridor as part of a "hidden plan" is incorrect and contradicted by the Pebble Tapes underlying the Complaint; the government, *not Defendants*, chose that alternative at the last minute.   As Thiessen explains:

> So as it turned out we had three different infrastructure corridors and *we thought that the ferry route would be most acceptable because it was the least environmentally impactful*. It had the smallest what's called wetlands footprint but it and the western route had the least amount of engineering on them, both of them scoping level, whereas the norther route had pre-feasibility level engineering and *at the 11th hour the federal agencies asked us to change from the ferry route to the northern corridor*. They preferred a larger wetlands footprint and no ferry on the lake.[35]

Similarly, Collier noted that "while this was not something we sought, this was forced on us by the Corps of Engineers, it actually worked out to our benefit," because "it makes a lot of things

---

[34] *See* Reply Ex. 7, Pebble Project EIS, Scoping Report at 28.

[35] Compl., Ex. B at 13.

easier for us," including expansion,[36] debunking Plaintiffs' contention that "Collier further explained [on the Pebble Tapes] how the northern corridor route was already planned to facilitate the expansion."[37] Opp. at 13.

Second, Thiessen does not discuss a "hidden plan for the northern infrastructure corridor" or state that it was designed to facilitate expansion of the mine. Rather, he states that the northern corridor would handle the additional capacity, and then speculates about what "in all likelihood" that expansion would involve:

> The northern corridor infrastructure part will handle the expansion. When that expansion comes on, you know because the PEA talks about effectively a 220,000 ton per day concentrator and what we are building in the first stage is a 180,000 ton per day concentrator. In all likelihood the expansion mainly involves just increasing the crushing and grinding capacity, probably one secondary, one additional line of secondary mills - not sure that we would even need a new line of SAG mills, probably just increase motor size on existing SAG mills, but the northern corridor will handle the expansion of Pebble.[38]

### 4. Plaintiffs' Allegation That Defendants Filed A Closure and Reclamation Plan in Order to Deceive Investors Is Conclusory And Contradicted By Plaintiffs' Own Factual Support

Plaintiffs' allegation that "Defendants went so far as to include a ***closure and reclamation plan*** for the mine in order to demonstrate their commitment to leave after 20 years," attempts to spin an unremarkable *legal requirement* into a conspiracy. Opp. at 8 (citing Compl. ¶ 36) (emphasis in original). The Company did submit a Reclamation and Closure Plan, but it was not in furtherance of some scheme. It was to comply with government permitting regulations

---

[36] *Id*.

[37] *See also id.* at 18 (Collier stating that the USACE's request to use the northern corridor "was a surprise.").

[38] Compl., Ex. B at 6.

and a formal Request for Information from the USACE.  As the USACE explained in its Final

EIS, mining companies operating in Alaska are required to have an approved reclamation and

closure plan *prior* to commencing construction of a project, regardless of the duration of the

proposed mining.[39]  And Contrary to the Plaintiffs' conspiracy theory, the USACE explained that

the Company submitted its Reclamation and Closure Plan during the EIS review in response to a

formal RFI.  As the USACE wrote in the Final EIS:

> PLP has provided a reasonably detailed Reclamation and Closure
> Plan *to help inform the impact analysis for the* FEIS (PLP 2019-
> RFI 115)*. The purpose of PLP's Reclamation and Closure Plan is
> to provide guidelines for implementing stabilization and
> reclamation procedures for the various facilities associated with
> the project*. These guidelines are based on the best available
> reclamation technologies and on state regulations for mine
> reclamation. PLP's Reclamation and Closure Plan has been
> summarized in Chapter 2, Alternatives, and incorporated into
> impact analyses in Chapter 4 of the FEIS where appropriate.[40]

Plaintiffs also emphasize that the Pebble Project permit application stated that "[t]otal

TSF [Tailings Storage Facility] capacity will be sufficient to store the 20-year mine life tailings

volume" and suggest that the closure plan "commit[s] Northern Dynasty to a 20-year mining

plan."  Opp. at 7-8.  Not so.  The Final EIS cited by Plaintiffs makes clear that submitting TSF

---

[39] *See also* Reply Ex. 3, FEIS Appendix D at D-17 ("The State of Alaska's Large Mine
Permitting Team (LMPT) provisions are designed to account for reclamation and closure
objectives, including long-term environmental management (ADNR 2018g). *See* Chapter 5,
Mitigation, for a summary of the LMPT permitting process. State mining regulations (11 AAC
97.300—97.350) require an approved reclamation plan prior to commencing construction, and
the reclamation plan does not become effective until bonding is in place (11 AAC 97.400)."); *see
also* Mot. Ex. 33 at 24 (Collier's written testimony stating that "PLP has provided for the Corps a
draft Reclamation and Closure Plan that meets State of Alaska formatting requirements in
support of the FEIS.").

[40] *See* Reply Ex. 3, FEIS Appendix D at D-181 (emphasis added); *see also id*. at D-142
("Additional details associated with some of the plans listed in this SOC have been provided
through [Requests for Information], and have been addressed in the appropriate sections of the
FEIS. These include: … RFI 115—Reclamation and Closure Plan.").

and closure plans with its permit application does ***not*** "commit" the Company to cease all Pebble mining activity at the end of the initial permit.  In response to comments from outside groups that closing the mine and backfilling the pit at the end of the 20-year permit period would be "***contrary to standard mining practices*** and would foreclose future mining of 88 percent of the remaining deposit," the USACE explained that if the Company was allowed to extend the life of the Pebble Project, tailings and waste rock "***would not be returned to the open pit at the end of the 20-year mine***" and that "TSF would be maintained ***until the end of the expanded mine development period, and then returned to the open pit***."[41]  The Company's compliance with these standard government requirements cannot constitute some nefarious scheme of deception, no matter how Plaintiffs attempt to spin it.

> ### 5.  Plaintiffs' Allegation That Defendants Had A Secret Plan To Operate The Donlin Mine Is Conclusory And Contradicted By Plaintiffs' Own Factual Support

In their Opposition, Plaintiffs continue to advance their baseless allegation that "[i]n the Pebble Tapes, Defendants can be heard confirming their interest in using the Pebble Project infrastructure to activate the Donlin mine, another project 175 miles north of Pebble: 'if you flip the Pebble switch on, it's likely that you may be also flipping on the Donlin switch,' and 'there is a lot of logic to us joining forces to make a single corridor.'"  Opp. at 31.  As Defendants explained in their Motion to Dismiss, Thiessen stated explicitly on the Pebble Tapes that the Company does not own the Donlin project, and therefore, Defendants do not have the ability— potential synergies aside—to "activate" it.[42]  Mot. at 21-22.

---

[41] *See* Reply Ex. 3, FEIS Appendix D at D-245.

[42] Because the Donlin project had already received its federal permitting, the USACE concluded that development of the Donlin project was reasonably foreseeable and included its environmental impact in the cumulative effects analysis of the Pebble Project.  *See* Mot. Ex. 34, FEIS at 4.1-14 and Reply Ex. 3, FEIS Appendix D at D-36.

Plaintiffs fail to address these incontrovertible facts, which are contained in the Pebble Tapes upon which the Complaint is based. Plaintiffs merely argue that a plan to activate the Donlin project (again, factually impossible) would be inconsistent with Defendants' purported prior representations that the mine would operate only 20 years. *See, e.g.*, Opp. at 31. Even accepting Plaintiffs' impossible facts to be true, Plaintiffs do not and cannot explain how somehow using the infrastructure from the Pebble Project to "activate the Donlin mine" (whatever that means) contradicts any representations about "the Pebble Project design" that Defendants proposed in the permit application.

**C.  Plaintiffs Misrepresent the Overwhelming and Relevant Evidence That The USACE Concluded That Expansion Of The Pebble Project Was Reasonably Foreseeable**

In response to the overwhelming evidence that the USACE concluded that future expansion of the Pebble Project and additional mines were both reasonably foreseeable, Plaintiffs offer profoundly misleading arguments that nevertheless still fail to explain how Defendants could have discussed expansion of the Pebble Permitting Project with the USACE *and* been engaged in a scheme to deceive the public into believing that the Pebble Permitting Project would never go beyond 20 years.

**1.  Plaintiffs Misstate Defendants' Argument**

Plaintiffs argue that because the USACE only analyzed "hypothetical scenarios" that would expand open-pit mining to 78 years, the market did not know the entire truth about the Company's expansion plans. Opp. at 35-36. The gravamen of Plaintiffs' allegations is that Defendants submitted a fictitious project plan in its permit application as part of a scheme to deceive the public that the mine would operate for only 20 years, despite Defendants having a "plan" to expand the mine. *See* Opp. at 1-2. Defendants' response is simple:  the fact that the Company provided the USACE information upon which the USACE determined that expansion

beyond 20 years was reasonably foreseeable *completely refutes* Plaintiffs' conclusory assertion.

Plaintiffs' focus on whether or not the USACE based its conclusion that future expansion was

reasonably foreseeable on potential options lasting up to 78 years or 200 years is entirely

misplaced.  The bottom line is that the Company told the USACE *and the USACE concluded* that

there was no intention to limit the Pebble Project to 20 years.  This eliminates the entire

foundation of Plaintiffs' baseless claims.

> **2.**     **Plaintiffs Misstate The Facts Concerning The USACE's Analysis of Future Pebble Project Expansion**

Plaintiffs misleadingly attempt to undermine the significance of the USACE's analysis of

the likelihood of future expansion by implying that the USACE's conclusion was merely

"hypothetical" and not based on actual evidence that the Company intended to expand.  *See, e.g.*,

Opp. at 35-36.  Plaintiffs are demonstrably wrong, for a number of reasons.

First, Plaintiffs' assertion that Chapter 4 of the Final EIS only concerns "Potential"

Reasonably Foreseeable Future Actions ("RFFA") is based on an incorrect reading of a table

heading in Chapter 4 of the Final EIS.  That table contains a list in the first column reflecting the

known projects at or near the proposed Pebble Project that the USACE identified for analysis to

determine whether each of these projects should be considered an RFFA—*i.e.*, it is a list of

potential RFFAs—followed in the second column by a summary of the USACE's RFFA analysis

and conclusions as to whether each project was, *in fact*, an RFFA.[43]  According to the USACE:

"RFFAs are existing plans, permit applications, or fiscal appropriations that are likely (or

---

[43] *See* Mot. Ex. 34, FEIS at 4.1-9.

reasonably certain) to occur. ***The Pebble Project expansion is considered an RFFA***,"[44] Plaintiffs' misleading suggestion notwithstanding.

Second, Plaintiffs' assertion that Chapter 4 of the Final EIS states that "expansion is not part of a current NEPA compliance or Best Interest Finding effort, and is not described as reasonably foreseeable in a government planning document,"[45] wrongly attempts to suggest that the USACE did not actually conclude that the Pebble Project expansion was an RFFA. As explained in the Final EIS, the USACE applied six parameters to identify and evaluate specific RFFAs associated with the Pebble Project.[46] The excerpt cited by Plaintiffs in their opposition relates to the *third* parameter, which considers whether projects are sufficiently advanced in the permitting process to be "considered reasonably foreseeable for *development*" during the life of the project being reviewed, in this case 20 years.[47] But its determination under the third parameter is ultimately irrelevant, because the USACE determined that future expansion of the Pebble Project to develop "55% of delineated resources" at the Pebble Deposit during the 20-year project under review was reasonably foreseeable under the ***first*** parameter.[48]

Third, although Plaintiffs correctly note that the Pebble Project expansion scenario that the USACE analyzed was "merely one of several expanded development scenarios that could potentially be proposed and permitted in the future," Plaintiffs then falsely claim these

---

[44] *Id.* at 4.1-5; *see also id.* ("The Pebble Project expansion is considered an RFFA in this EIS…. This is not based on speculation, but must be anticipated, to enter the permitting process based on project documentation, identified in public or private planning documents as scheduled for development, have identified indicated resources/reserves sufficient to develop a project, or have advanced exploration activities under way in the timeframe being used for assessment.").

[45] *Id.* at 4.1-9.

[46] *See* Mot. Ex. 34 at 4.1-7.

[47] *Id.*

[48] *See id.* at 4.1-9.

"hypotheticals hardly informed the public of Defendants' hidden expansion plan that was already in existence." Opp. at 35. Plaintiffs have not cited any statements on the Pebble Tapes that support their conclusory allegation that Defendants had developed a "hidden expansion plan." What the Company told the USACE, and what the USACE concluded, is no different than what was discussed on the Pebble Tapes: future expansion of the Pebble Project is reasonably foreseeable; the Company is expected to submit additional permits during the 20-year life of the initial project; and there are currently no developed plans but expansion will likely include extending the life of the project, increasing throughput, and involve either surface mining, underground mining, or a combination of the two. The table below shows the consistency between what Defendants said about future expansion on the Pebble Tapes and the USACE's understanding of future expansion reflected in the Final EIS.

| Future Expansion Issue: Pebble will propose to expand the Pebble Project during the first 20 years of the original permit. *See, e.g.*, Opp. at 2, 11, 25. | |
| --- | --- |
| **Pebble Tapes** | **USACE Final EIS** |
| "It's slightly smaller throughput and a 20-year mine life. But during that 20 years, you're gonna make the application to continue for another 20." Compl., Ex. B at 3. | "As presented in the response to RFI 062 (PLP 2018-RFI 062), if Pebble Project expansion occurs, it is assumed to begin in year 20 of the proposed project operations." Mot. Ex. 34, FEIS at 4.1-7. |
| "[T]hat will be carried out through that 20-year period and then we'll make application for another 20 or maybe 40 years of mine life." *Id.* at 6. | "Project expansion would begin in the timeframe of the proposed Pebble Project, in year 20 of proposed project operations." *Id.* at 4.1-9. |
| Future Expansion Issue: The Company will consider using underground mining during the expansion phase. *See* Opp. at 15. | |
| **Pebble Tapes** | **USACE Final EIS** |
| "And one of the reasons was, I mean this entire deposit, 10 billion tons, it can be mined by open pit, but it might at some point be more reasonable to do what's called, you know, a high-volume large-scale underground | "***USACE determined that future expansion of the Pebble Mine to develop Pebble East was a reasonably foreseeable future action*** for analysis of potential cumulative impacts. A mine expansion scenario was prepared, |

| | |
|---|---|
| mining, block caving, or panel caving…Will it be open pit only? Block cave only? Or a combination of the two? It'll be a combination of the two, I'm pretty sure." Compl., Ex. B at 3.<br><br>"We've told [the USACE] that there are two ways we would expand. The most obvious one is to extend the mine life, the mining license by 20 to 40 years, *once we know the next methodology*, block caving, open pit, or a combination of the two." *Id.* at 29 (emphasis added). | and includes open pit mining of Pebble East (see PLP 2018-RFI 062). It is reasonable to expect that if expansion occurs in the future, ***underground mining methods would be considered to determine feasibility*** and potential for reducing environmental impacts (***as acknowledged in RFI 062***)." Reply Ex. 3, FEIS Appendix D at D-46. |

**Future Expansion Issue:**  During the initial 20-year project, the Company will need to sink a shaft and perform significant underground work ***before*** it can develop actual expansion plans.  (Omitted from Opposition and Complaint).

| Pebble Tapes | USACE Final EIS |
|---|---|
| "The only thing that we have to do additionally is determine will there be more open pit exclusively or will we also do some underground mining like bulk underground mining, block caving, in which case we need to sink a shaft and do some underground work. That itself will probably be two to $300 million, but that will be carried out through that 20-year period." *Id.* at 6.<br><br>"It's not unusual that mines, you know in fact you're better off asking for a permit for 20 years than asking for a permit for 60 years because we don't know what kind of mine operation we will have after 20 years. We don't know that yet. So when they ask us what the environmental footprint is of that expansion, we can't tell them today. We will only be able to tell them in say year 12 or year 15." *Id.* at 6-7. | "USACE determined that future expansion of the Pebble Mine to develop ***Pebble East was a reasonably foreseeable*** future action for analysis of potential cumulative impacts." Reply Ex. 3, FEIS Appendix D at D-46. (emphasis added).<br><br>"PLP completed *an evaluation of mining Pebble East* in response to Request for Information (RFI) 094 (PLP 2018-RFI 094). An open pit mine scenario would require stripping 2,000 feet of waste to access the ore. *An underground mine scenario would require development of a 3,500-foot-deep, 24-foot-diameter shaft,* 2,200 feet of lateral development, *and significant underground work to first determine if underground mining is feasible*; *and if so, confirm the mining plan/design*." Reply Ex. 5, FEIS Appendix B at B-9 (emphasis added). |

| **Future Expansion Issue:** Pebble could use the infrastructure approved in the original permit application for future expansion projects. Opp. at 13, 26. |  |
| --- | --- |
| **Pebble Tapes** | **USACE Final EIS** |
| "The northern corridor infrastructure part will handle the expansion." Compl., Ex. B at 6.<br><br>"We'll have a slurry pipeline as part of it so the concentrate will go down to the coast by pipeline. And it makes a lot of things easier for us. It makes expansion much easier." *Id.* at 14, 15. | "If the Pebble Project was permitted, ***Pebble expansion could use and expand on the project mine site and transportation infrastructure that would be in place***, similar to what has happened with other Alaska mines where adjacent reserves are commonly owned." Mot. Ex. 34, FEIS at 4.1-9 (emphasis added). |

| **Future Expansion Issue:** The Company has already performed extensive work that will support future expansion. Opp. at 11, 12, 25. |  |
| --- | --- |
| **Pebble Tapes** | **USACE Final EIS** |
| "Well, it's absolutely because the ore is there. We've drilled it. We've engineered it. All the works been done for it." Compl., Ex. B at 6.<br><br>"So we do have all the studies that go through all of this." *Id.* at 3. | "PLP has conducted ***extensive exploratory drilling and analysis*** to compile a 43-101 feasibility assessment level of information on mineral reserves in terms of measured, indicated, and inferred resources, along with characterization of the grades of component ore in the deposit and estimated costs ***of development of mine expansion***." Mot. Ex. 34, FEIS at 4.1-9 (emphasis added). |
|  | "Estimates of permanent footprint acreage, direct wetlands impact acreage, miles of direct stream impacts, and number of stream crossings ***associated with expansion of the Pebble mine have been developed using GIS*** and are included in specific resource sections." *Id.* at 4.1-7 (emphasis added). |

| **Future Expansion Issue:** Throughput will likely increase during future expansion project. Opp. at 11. |  |
| --- | --- |
| **Pebble Tapes** | **USACE Final EIS** |
| "We've told them that there are two ways we would expand….And then ***the other expansion potential is to expand the mill*** from 180,000 tons a day to say 320,000 tons a day." Compl., Ex. B at 29 (emphasis added). | The current proposed project proceeds as outlined by EIS alternative for the first 20 years.<br><br>After 20 years, mining continues for 58 years and mill throughput is expanded from |

| | 180,000 tons per day to 250,000 tons per day. This represents a 39% expansion in throughput compared to the proposed action.  Mot. Ex. 34, FEIS at 4.1-22. |
|---|---|
| **Future Expansion Issue:**  The Pebble Mine can last up to 180-200 years.  Opp. at 22 | |
| **Pebble Tapes** | **USACE Scoping Report** |
| "Well I'm just saying that based on 180,000 short tons a day of processing capacity, and we have 10 billion tons, that's 180-year mine life. And we know that there's more ore there so it's probably gonna be more than 200 years."  Compl., Ex. B at 5. | "[t]he the applicant's website notes that the mine can operate for 200 years and could have 11 billion tons of ore."  Reply Ex.7, Pebble Project EIS Scoping Report at 28. |

### 3. Plaintiffs Falsely Claim That the USACE Did Not Consider the Company's Plan to Explore Other Mines

Plaintiffs continue to argue that Defendants' statements about the Pebble Permitting Project were false and misleading because the Pebble Tapes contained statements about the fact that "Pebble itself has . . . 425 square miles of mineral claims, and so there could be more mines on the Pebble lands over time."  Compl. ¶ 4.  These statements do not contradict statements about the Pebble Project contained in the permit application.  Moreover, in response to the overwhelming evidence that the USACE knew that the Company planned to continue exploring additional mines in the area, Plaintiffs argue that none of the expansion scenarios that USACE examined "even mentions Northern Dynasty's actual plan to explore the first Pebble mine alone for at least 180-200 years, let alone the other mines contemplated by Defendants."  Opp. at 36. This argument fails for two reasons.

First, the USACE based its determination that Pebble Project expansion of the Pebble Deposit was an RFFA, in part, on the fact that the Company has "existing permits for resource

exploration" and had already assessed the mineral resources of the *entire* Pebble Deposit.[49]  The Final EIS notes that "PLP has conducted extensive exploratory drilling and analysis to compile a 43-101 feasibility assessment level of information on mineral reserves in terms of measured, indicated, and inferred resources, along with characterization of the grades of component ore in the deposit and estimated costs of development of mine expansion."[50]  Moreover, in response to a request that the USACE consider an alternative project that would "maximize the potential economic benefits of developing the deposit, such as a larger and longer-lived mine," the USACE included this option as an RFFA (but not an alternative to the current project) based, in part, on the fact that "Northern Dynasty Minerals Ltd. has communicated to shareholders that expanded development is possible."[51]

Second, the USACE concluded that it was reasonably foreseeable that the Company would continue to explore additional sites located outside the Pebble Deposit during the 20-year timeframe of the proposed Pebble Project, including at Pebble South, Big Chunk South, and Big Chunk North.[52]

### D.      Plaintiffs' New Conspiracy Theory Does Not Save Their Complaint

To survive Defendants' motion to dismiss, Plaintiffs claim for the first time that Defendants "shared their hidden plan" with the USACE as part of some plan to "exert political influence over some members of the Army Corps."  Opp. at 15.  Plaintiffs' bizarre new conspiracy claims appear nowhere in the Complaint, and Plaintiffs may not use their Opposition to assert unpled theories or facts.  *See, e.g.*, *Ruotolo v. Fannie Mae*, 933 F. Supp. 2d 512, 515 n.1

---

[49] Mot. Ex. 34, FEIS at 4.1-9.

[50] *Id.*

[51] Reply Ex. 5, FEIS Appendix B at B-13-14.

[52] Mot. Ex. 34, FEIS at 4.1-9-11.

(S.D.N.Y. 2013) ("When determining a motion to dismiss for failure to state a claim, a court is confined to the facts as pleaded in the complaint and any permissible attachments, and a court should not consider new facts alleged in moving papers.") But perhaps more importantly, this "conspiracy theory" is contradicted by Plaintiffs' own evidence.

First, the Complaint's central allegation is that the Pebble Tapes "revealed Defendants' actual plans to build a much larger and long-lived mine than publicly described." Opp. at 11. Plaintiffs repeatedly argue in their Opposition that Defendants kept "their secret plan hidden from the public" and "hidden from the market." *See, e.g.*, Opp. at 13, 14. But according to Plaintiffs' new conspiracy theory, "Defendants shared their hidden plan" with "some members of the Army Corps" in order to "exert political influence" over them. Opp. at 15. Nonsense. If Defendants possessed a "hidden plan" different than the plan for which the Company was seeking a permit, it defies logic that Defendants would share that hidden plan with the USACE, the very government agency responsible for reviewing the permit application. Plaintiffs allege that it was to "exert political influence over some members of the Army Corps," but fail to explain how members of the USACE would be politically influenced by being told of a hidden plan that was allegedly different than the plan that the USACE itself was currently reviewing. There is no explanation, because it never happened. In fact, Plaintiffs argue elsewhere that the "only reasonable inference" for why the USACE denied the permit for the Pebble Project is because the USACE "learned of Defendants' secret plans." Opp. at 41. These two arguments are inherently inconsistent.[53]

---

[53] To the extent that Plaintiffs' attempt to allege a conspiracy as a part of their claim, there can be no conspiracy liability in a private securities action premised on a Section 10(b) claim. *See In re Forcefield Energy Inc. Sec. Lit.*, 15 Civ. 3020 (NRB), 2017 WL 1319802, at *8 (Mar. 29, 2017). Plaintiffs have also failed to adequately allege any details of such a conspiracy under even Rule

Second, the Pebble Tapes and the documents upon which Plaintiffs' Complaint rely leave no doubt that this "hidden plan" was actually just the information about future expansion the USACE requested, the Company provided, and that ultimately was published in the Final EIS (a public document). According to the excerpts contained on Pebble Tape 12, Defendants shared with the USACE two things: (1) the possibility that there could be three or four additional mines; and (2) that there are two ways to expand the Pebble Permitting Project: "The most obvious one is to extend the mine life, the mining license by 20 to 40 years, *once we know the next methodology*, block caving, open pit, or a combination of the two. And then the other expansion potential is to expand the mill from 180,000 tons a day to say 320,000 tons a day."[54] Opp. at 14-15 (emphasis added).

There can be no doubt that Thiessen is referring here to public information shared with and published by the USACE. The USACE concluded that it was reasonably foreseeable for the Company to continue to explore at least three potential mines outside the Pebble Deposit during the 20-year life of the proposed project: Pebble South, Big Chunk South, and Big Chunk North.[55] And with respect to what Thiessen told the USACE about extending the current project, the USACE determined that it was reasonably foreseeable that the Company would seek to extend the project during the 20-year life of the permit, that the expansion would might include open pit mining and possibly underground mining if, the Company performed "significant underground

---

8's pleading standard, stating only that USACE had "learned of Defendants' secret plans." Opp. at 41.

[54] The Pebble Tape recordings, including Pebble Tape 12, are available at https://eia-global.org/reports/20200921-the-pebble-tapes. As stated on these recordings, EIA concedes that excerpts from different conversations were cobbled together by topic and were re-recorded using an actor in lieu of the investigator who was on the actual calls posing as a potential project partner.

[55] *See* Mot. Ex. 34, FEIS at 4.1-9-11.

work to first determine that under underground mining is feasible," and that the throughput would expand at a minimum from 180,000 to 250,000 tons per day.[56]

Third, the verbatim statements on the tapes, even accepted as true, do not reveal an actual plan, let alone one that the Company secretly shared with some members of the USACE. But they also do not contradict the proposed project contained in the permit application. Thiessen states explicitly that "extension of the original mine to subsequent years … will be addressed sometime in the next 20 years" and that a future permit to extend the mine life was the "most obvious" option, though they still needed to determine "the next methodology" to be used, "block caving, open pit, or a combination of the two."[57] It is objectively impossible for Defendants to have developed a hidden plan when the Company had not even determined the basic mining methodology upon which such a plan would be based.

Finally, the *entire* discussion that Plaintiffs allege amounts to a hidden plan concerns *additional* projects *after* the USACE approves the project plan contained in the permit application. Plaintiffs do not allege, nor could they, that the "hidden plan" that the Company allegedly shared with certain unknown members of the USACE was meant to be *in lieu* of the project plan that the USACE was reviewing.

Plaintiffs' resort to a conspiracy theory – not alleged in the Complaint – implicating members of the USACE demonstrates only that Plaintiffs fully understand that they have failed to adequately plead a claim against Defendants.

---

[56] *See supra* Table at pg. 35.

[57] Compl. Ex. B at 28, 29.

### E. Defendants Had No Duty to Disclose Plans For Future Expansion

Plaintiffs contend that Defendants had a duty to disclose a "plan" to expand the Pebble

Project:[58]

> By choosing to discuss their plan for the Pebble Project,
> Defendants were legally required to tell the whole truth.
> Defendants lied about their plan to operate the Pebble mine for
> only 20 years. In truth, their plan for the Pebble mine was
> expansive, with the first mine alone slated to operate for at least
> 180–200 years. Accordingly, Defendants' statements are
> actionable as a matter of law.

Opp. at 23 (internal citations omitted). Momentarily putting aside the fact that there was no

"secret" expansion plan to disclose, there is also no legal support for Plaintiffs' duty to disclose

theory, which is based on the same series of logical fallacies and misrepresented facts discussed

in detail above.

Plaintiffs rely heavily on two pre-PSLRA cases, *In re Time Warner Securities Litigation*,

9 F.3d 259 (2d Cir. 1993) and *Kronfeld v. Transworld Airlines, Inc.*, 832 F.2d 726 (2d Cir. 1987)

to argue that Defendants had a duty to disclose plans for expansion of the Pebble Project. But

neither *Time Warner* nor *Kronfeld* stand for this broad proposition. As Plaintiffs' acknowledge,

the Second Circuit in *Time Warner* held that "when a corporation is pursuing a specific business

goal and announces that goal as well as an intended approach for reaching it, it *may* come under

an obligation to disclose other approaches to reaching the goal when those approaches are under

active and serious consideration." 9 F.3d at 268 (emphasis added). The Second Circuit later

---

[58] With respect to the Pebble Permitting Project, the Company *did* continue to update investors as amendments to the *actual plan* were made. *See* Reply Ex. 8, NDM Form 6-K, Ex. 99.2 Management's Discussion & Analysis to Q2 2018 Report, filed with the SEC on August 15, 2018, at 9 ("As a result of ongoing engineering work, the Company updated the mine plan being reviewed in the EIS permitting process. The currently proposed plan is for the Pebble deposit to be developed as a 180,000-ton per day open pit mine with associated on and off-site infrastructure ….").

clarified that *Time Warner*'s duty to disclose applied only in situations where "(i) the company induced investors to believe that alternative business plans were excluded from consideration; and (ii) the company promised to maintain its business plan in the future, but nevertheless changed direction." *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co., Inc.*, 75 F.3d 801, 810 (2d Cir. 1996) ("*Philip Morris*"); *see also Bratusov v. Comscore, Inc.*, No. 19-cv-3210, 2020 WL 3447989, at *10 (S.D.N.Y. June 24, 2020).

Plaintiffs have alleged neither of those circumstances here. To the contrary, in the same periodic annual and quarterly report from which Plaintiffs' derive the alleged misstatements regarding the 20-year project, Defendants explicitly disclosed that the "proposed project uses a portion of the currently estimated Pebble mineral resources. This ***does not preclude development of additional resources in other phases of the project in the future.***" Mot. at 6-7; Exs. 3-14; App'x A; *see e.g.*, Compl. at ¶ 59-111.

Discussions of further expansion were also *not* considered an "alternative to the Applicant's 20-year project," as acknowledged by the USACE in the FEIS.[59] Further, as discussed below *infra*, potential expansion is not "'false' because [a] company had already made the decision, or was actively considering adopting a plan' to implement a different strategy." *See Pehlivanian v. China Gerui Adv. Materials Grp.*, Ltd., 153 F. Supp. 3d 628,646 (S.D.N.Y. 2015) (quoting *Philip Morris*, 75 F.3d at 812)).

The Complaint fails to allege any facts to support that the Company has abandoned or altered the project submitted for permitting. Nor can it. The Company is *still today* seeking a permit for the 20-year project. As such, Plaintiffs have failed to show that the Company had a duty to disclose any alleged "plans" under *Time Warner*.

---

[59] *See* Reply Ex. 3, FEIS at D-158; *see also supra* at pgs. 16-17.

Plaintiffs' argument fares no better under *Kronfeld*. As Plaintiffs' own summary of that case reveals, *Kronfeld* is inapplicable to the present case for two obvious reasons.

First, as Plaintiffs concede, *Kronfeld* concerned the materiality standard to be applied to prospective events in cases in which the company omitted information from a registration statement that may affect the probable future of the company. *See* Opp. at 23 (citing *Kronfeld* for the proposition that "contingencies inextricably bound up with a company's fortunes need not be certainties to qualify as material."). Here, there are no allegations that the Company withheld any information related to prospective events that might affect its probable future as an ongoing business.

Second, as Plaintiffs summarize in their opposition, the factual issue in *Kronfeld* was that a company filed a prospectus that included a discussion of the relationship with its subsidiary, but did not disclose that it had also begun considering as an alternative *terminating* that relationship entirely. *See* Opp. at 24. As Plaintiffs explain, "the Second Circuit held that a fact question was presented as to whether it was materially misleading not to disclose the 'substantial possibility' of termination," which Plaintiffs recognize was an "alternative" to the corporate relationship between the company and subsidiary that was discussed in the prospectus. *See id.* In the present case, the Complaint does not offer any coherent factual allegations demonstrating that the Defendants were considering, much less had developed, an *alternative* plan to the Pebble Permitting Project that would render prior statements about the size, scope, and duration of the Pebble Permitting Project false or misleading.[60] Instead, Plaintiffs offer statements about

---

[60] As discussed above, one of the Plaintiffs' faulty assumptions underlying the Complaint is that the Company could only pursue *either* the Pebble Permitting Project *or* a larger project that includes additional permits for future expansion, which is demonstrably false. *See supra* at § I.A.3.

(previously disclosed) future expansion options that do not raise any trial facts, because the future expansion options were never presented as, or even alleged to be, alternatives to the initial permitting project, which is the subject of the allegedly false and misleading statements. Accordingly, the Complaint fails to adequately allege a material omission related to the alleged failure to disclose alternatives to the Pebble Permitting Project. *Kronfeld* does nothing to save the Complaint from this fatal deficiency.

In any event, the Complaint does not adequately allege a concrete plan to expand the project beyond the initial permit. Rather than provide any facts to support the Company's alleged "scheme," Plaintiffs point to cherry-picked statements from the Pebble Tapes in an attempt to show a "plan" sufficient to require a duty to disclose. *See supra* at § I.B.3. But Plaintiffs' allegations at best reflect *potential*, highly speculative, plans for which the Second Circuit does not recognize a duty to disclose. *See Philip Morris*, 75 F.3d at 810-811; *Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*, No. 15 Civ. 5999, 2017 WL 4403314, at *16 (S.D.N.Y. Sept. 30, 2017); *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 587 (S.D.N.Y. 2005). At bottom, the Pebble Tapes confirm that the Company had *not* developed any specific expansion plans and could not do so until *after* beginning operations pursuant to the initial permit and *after* performing significant additional work. *See supra* at pgs. 20-24.

## II. Plaintiffs Even Misleadingly Characterize the Company's Defense and Offer a Strawman on the Purported "Risk" Of Future Expansion

Plaintiffs devote five pages of their Opposition to challenging a "a meritless safe-harbor/bespeaks caution defense" that Defendants did not raise. Opp. at 26-31. Plaintiffs have misstated Defendants' actual argument in three key respects.

First, nowhere do Defendants argue that any alleged misstatements or omissions were "immaterial" because the Company provided specific cautionary language to render reliance on

the false or omitted statements unreasonable. *See, e.g.*, Opp. at 26-27. Defendants' argument is actually that *none* of the statements cited in the Complaint were false or misleading, and that the Complaint and documents referenced therein, read as a whole, actually confirms this point. *See, e.g.*, Mot. at 22.

Second, Defendants are *not* arguing that the Company disclosed the purported "risk" that it would seek a permit to expand the project in the future, because the affirmative potential for future expansion was never a "risk," and the Company *never* indicated otherwise. Future expansion to develop resources at the Pebble Deposit was indisputably a benefit, which is why the Company has consistently, including throughout the purported class period, disclosed the entirety of the Pebble deposit and related mineral rights well beyond the specific project that it submitted for permitting.[61] Thus, in each of the public filings containing the Project Description, which discussed the details of the limited project submitted for permitting that was designed to develop only 1.1 billion tons of the more than 10 billion tons of minerals, it explained to investors that the project submitted in the permit application uses only "a portion of the currently estimated Pebble mineral resources" and that "[t]his does not preclude development of additional resources in other phases of the project in the future."[62] This was not a "risk disclosure" any more so than there was a "risk" of recovering gold, silver, and other valuable minerals during the course of mining operations. The relevant cautionary language related to this disclosure was not the "risk" that the Company would develop additional resources in other phases of the project in the future, it was the risk that the Company's ability to develop those resources was dependent upon its ability to obtain additional permits from the government. Specifically, the Company

---

[61] *See supra* at pgs. 19-20.

[62] *See, e.g.*, Mot. Exs. 2-14.

cautioned that "any subsequent phases of development would require extensive regulatory and permitting review by federal, state and local regulatory agencies, including a comprehensive EIS review process under NEPA."[63]  In other words, the Company was cautioning investors that future expansion, which would make the overall project more valuable, was not guaranteed because each iteration of the project is subject to its own government review and approval.

Third, Defendants' actual argument was that *the Complaint* is false and misleading because it is based on statements from the Company's public filings and the Pebble Tapes that Plaintiffs have misrepresented by omitting key portions that demonstrate that the Company's disclosures were, in fact, reasonable and accurate.  *See, e.g.*, Mot. at 26.  In other words, Defendants could not have deceived investors into believing that the *entire* development and operational goal for the massive Pebble Deposit was forever limited to the 20-year project contained in the permit application, because the Company fully disclosed that the 20-year project (a) only used a portion of the Pebble Deposit resources and (b) did not preclude future phases of the project.

Finally, Plaintiffs' misleading attempt at reframing Defendants' argument into an argument about "risk disclosure" is based on the illogical claim that the prospect of future expansion was a "risk" and that investors were harmed when that "risk" was revealed.  Plaintiffs' contrived argument has no support in the record.

## III.    Plaintiffs Have Failed To Overcome Defendants' Truth-On-The-Market Defense

Plaintiffs argue that Defendants' disclosures regarding expansion of the mine do not rise to the level of "intensity and credibility" to effectively counter-balance any alleged

---

[63] *See id.*

misstatements, and thereby preclude a truth-on-the-market defense.  Opp. at 32.  Plaintiffs'

argument fails on multiple grounds.

### A.    Plaintiffs' Fraud-On-The-Market Theory Is Based On A False Premise

Plaintiffs' defense of the Complaint's reliance on the fraud-on-the-market doctrine is

grounded upon arguments that improperly conflate the Company's statements about the Pebble

Permitting Project and statements on the Pebble Tapes about possible future expansion.

According to Plaintiffs:

> This is not the rare, if not impossible, situation in which "truth on
> the market" is so irrefutable that this very difficult and limited
> defense can be decided by the Court on a motion to dismiss or
> even motion for summary judgment. A trial will be necessary to
> prove up the elements of the defense. The Complaint's allegations
> establish that Defendants misrepresented to the public their plan
> for the Pebble Project.  As explained above, Defendants pretended
> that they took the stakeholders' concerns about Northern Dynasty's
> prior plans to mine large swaths of land for a long duration into
> account and, in response, specifically re-designed a "substantially
> reduced development footprint" that was "designed for closure"
> after a limited 20-year timespan.

Opp. at 32-33.  However, as discussed above, *see supra* at § I.B.3, none of the statements on the

Pebble Tapes about potential future expansion—*e.g.*, extending the duration of the project,

increasing throughput, using the northern corridor infrastructure—reveals *any* material

information to support Plaintiffs' argument that "Defendants misrepresented to the public their

plan for the Pebble [Permitting] Project" itself.  Rather, the Company repeatedly explained that

the Pebble Permitting Project did not restrict potential future phases of development, which, *all

things equal*, would be the ultimate goal or objective of almost any major mining project.

Plaintiffs' claims seek to eviscerate this distinction and must fail as a matter of law.

## B.    Plaintiffs' Reliance On Inapplicable Prior Court Decisions Is Misplaced

Plaintiffs rely exclusively on cases in which a defendant corporation asserted that the truth was known to the market through third party-news coverage, rather than by the defendant's own affirmative statements.  For example, in *New Jersey Carpenters Health Fund v. The Royal Bank of Scotland Grp., PLC*, the Second Circuit declined to consider two news articles that had reported about the company's "loose" underwriting standards, because these "sporadic news reports" alone did not clarify alleged omissions in the company's prospectus.  709 F.3d 109, 126-27 (2d Cir. 2013).  This and related cases are inapposite here because *the Company itself* unequivocally disclosed accurate information about the Pebble Permitting Project and the potential for future expansion in its SEC filings, in Congressional testimony, as well as to investors and the USACE as part of the permitting process.  *See* Mot. at 6-10.  There are no "limitations on a [NDM]'s ability to charge its stockholders with knowledge of information"[64] because all relevant information regarding (1) the details of the Pebble Permitting Project and (2) the fact that the Pebble Permitting Project did *not forever* limit the overall development of the Pebble Deposit to 20 years was readily accessible to the public by virtue of the fact that the information was presented in the *same section of every single periodic and annual report* filed with the SEC during the class period (and cited in the Complaint).  It was *also* available in the Company's permitting documents, including the USACE's Final EIS, which, as the Company advised investors, were publicly available on the USACE's website dedicated to the Pebble Project.  *See* Mot. at 24-25.  As such, these alleged omissions are immaterial as a matter of law because the market price of the stock has already reflected the truth of the allegedly omitted

---

[64] *See Kronfeld*, 832 F.2d at 736.

46

information.  *See White v. H&R Block, Inc.*, No. 02-cv-8965, 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004).

### C. Plaintiffs' Attempt At Disavowing Their Own Complaint Reveals The Unavoidable Problem With Their Fraud Theory

According to the Complaint, Plaintiffs claim that a September 26, 2017 presentation during which Thiessen discussed the "long-term nature of the mine" and the smaller project that the Company was advancing into permitting is evidence that "Defendants' trickery—to commit to a significantly smaller mining operation only until a permit was secured—had been in the works for some time, and at least as early as the beginning of the Class Period."  Compl. ¶55.  As Defendants explained in their Motion to Dismiss, the September 26, 2017 presentation actually represents Plaintiffs' own admission that ahead of submitting its first Pebble Project permit application, the Company publicly discussed the fact that the decision to seek a permit for a portion of the Pebble Deposit was part of a long-term, "generational opportunity" to develop the full extent of the Pebble resources.  Mot. at 23 (citing Mot. Ex. 31).  Realizing that Thiessen's presentation reveals the invalidity of their entire fraud theory, Plaintiffs now attempt to refute the significance of the statements cited in their own Complaint:

> Equally unavailing is Defendants' argument that in a presentation given in September 2017 at a private gathering designed to capture private gold companies into pouring their money in the Pebble Project, Defendants discussed the long-term nature of the mine. Defs.' Br. at 23. First, the presentation was given ***before*** the Class Period and any indication that Defendants may have planned to stay for centuries was directly contradicted by the public statements Defendants repeatedly made ***during*** the Class Period in SEC filings and on the Company's official website, where Defendants vouched that the Pebble Project was significantly chopped.

Opp. at 34 (emphasis in original).  Plaintiffs' attempt at saving face fails on multiple grounds.

First, Plaintiffs' attempt to contrast Thiessen's presentation "at a private gathering" with "the public statements" contained "in SEC filings and on the Company's official website" ignores reality. To publicly disseminate the information in the September 26, 2017 presentation, the Company issued a September 25, 2017 press release, which it also filed with the SEC on a Form 6-K, in which it announced that Thiessen "will present to attendees on Tuesday afternoon, September 26, 2017," provided a link where a recording of Thiessen's presentation would be replayed, and advised that it had posted a copy of the slide presentation on its homepage and in the Investor Relations section of its website.[65] Moreover, one of the comments in the USACE's August 2018 Scoping Report, which Plaintiffs cite in their Opposition, specifically refers to Thiessen's September 2017 presentation:

> The USACE needs to acknowledge that the current permit application could be the initial phase in a much broader mine development plan. ***Pebble Limited Partnership has repeatedly said, as recently as September 2017, their project is, "a multigenerational opportunity.*** Its size and scale will lead to a very, very long life mine." Based on statements such as this, and ***official records indicating they plan to mine up to 11 billion tons*** of ore, it is reasonably foreseeable that ***Pebble intends to expand its mine far beyond what is currently proposed.***[66]

Plaintiffs' allegation that the public was unaware of Thiessen's September 2017 presentation or that the Company viewed the Pebble Project as a "multigenerational opportunity" is belied by the fact that they were both discussed publicly (in a document prepared by the USACE) more than two years before the Pebble Tapes were released. Far from being discussed

---

[65] Reply Ex. 9, NDM Form 6-K, Ex. 99.1 *Northern Dynasty Minerals Ltd. to Present at Denver Gold Forum, President & CEO Ron Thiessen to provide update on permitting, mine planning and partnering process* (dated Sept. 25, 2017).

[66] *See* Reply Ex. 7, Pebble Project EIS Scoping Report at 31.

at a "private gathering," the Company disseminated Thiessen's statements in the September 2017 presentation every bit as widely as its SEC filings.

Second, although the Complaint alleges that Thiessen's September 26, 2017 presentation occurred at the "beginning of the Class Period," *see* Compl. ¶ 55, Plaintiffs now attempt to distance themselves from Thiessen's presentation by arguing that "the presentation was given ***before*** the Class Period." Opp. at 34 (emphasis in original). Plaintiffs' walk-back is unpersuasive and completely misses the relevance of Thiessen's presentation, which informed current and future investors about the Pebble Deposit's long-term prospects *and* provided a description of the smaller project that the Company had decided to take into permitting, which would be consistently repeated in public disclosures throughout the alleged Class Period. For example, the presentation includes slides describing the full extent of the Pebble Deposit,[67] a slide with the "induced polarization" map of additional exploration sites that Thiessen references on the Pebble Tapes,[68] a slide comparing Pebble to the Oyu Tolgoi project Thiessen discussed on the Pebble Tapes,[69] a separate section of slides on the permitting project,[70] and a separate section entitled, "A Generational Opportunity."[71] Contrary to Plaintiffs claim here, this information could not have been revealed for the first time in the Pebble Tapes.

In sum, Plaintiffs' real problem with the September 26, 2017 presentation cited in the Complaint is that it is incontrovertible evidence that Defendants publicly discussed both the smaller project that it was preparing to submit in its initial permit application *and* the long-term

---

[67] *See* Mot. Ex. 31 at Slides 5-6.

[68] *See id.* at Slide 7.

[69] *See id.* at Slide 9.

[70] *See id.* at Slides 10-13.

[71] *See id.* at Slide 21.

generational opportunities that the complete Pebble Deposit provides.  These statements are entirely consistent with all of the Company's subsequent disclosures in its SEC filings and other public documents, as well as statements on the Pebble Tapes.  Most significantly, these statements completely undermine Plaintiffs' theory that Defendants submitted a smaller project in the December 2017 permit application *in lieu* of pursuing other long-term opportunities.

## IV.    Plaintiffs Have Failed To Adequately Plead Loss Causation

As demonstrated in the Motion to Dismiss, the Complaint fails to adequately plead loss causation under either a "corrective disclosure" or materialization of risk theory.  Mot. at 33-37.[72]

### A.    Plaintiffs' Misstate The Applicable Legal Standard For Loss Causation

Plaintiffs' assert that effectively *any* alleged misleading statement or omission may be causally connected to their economic loss, so long as the fraudulent statement is related to the Pebble Project's "parameters." Opp. at 40.  As the securities laws are not intended to serve as investor insurance for stock drops, that is not the operative legal standard for loss causation.

Under the Second Circuit's "sufficient connection" pleading standard for loss causation, a plaintiff must allege facts that show a close nexus between the alleged omission or misstatement

---

[72] Plaintiffs represent that "it is well settled that loss causation is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion." Opp. at 37-36. To the contrary, allegations of loss causation are subject to attack during the motion to dismiss stage of a securities case. In the foundational case, *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005), the Supreme Court noted in the context of a motion to dismiss that "[a]llowing a plaintiff to forgo giving any indication of the economic loss and proximate cause would bring about the very sort of harm the securities statutes seek to avoid, namely, the abusive practice of filing lawsuits with only a faint hope that discovery might lead to some plausible cause of action." (reversing denial of motion to dismiss and remanding to district court).  Plaintiffs here even cite to cases where courts have ruled on loss causation on a motion to dismiss. *See, e.g.*, *Suez Equity Investors, L.P. v. Toronto-Dominion Bank KM*, 250 F.3d 87 (2d. Cir. 2001); *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157-58 (2d Cir. 2007).

and the economic loss. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) ("[I]f the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie."); *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 364 (S.D.N.Y. 2003) ("The loss causation inquiry must examine '*how* directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was *a foreseeable outcome* of the fraudulent statement.'" (citing *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)) (emphasis added)). In other words, a plaintiff must adequately allege that the misstatements were "the reason the transaction turned out to be a losing one." *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992).

As discussed below, Plaintiffs fail to adequately connect alleged misstatements to their economic loss, and therefore, fall short of meeting the requisite standard for pleading loss causation.

**B.      Plaintiffs' Corrective Disclosure Theory Is Baseless**

Plaintiffs cite to disparaging press releases following the release of the Pebble Tapes, Opp. at 43, as contemporaneous "corrective disclosures" that reveal Defendant's "scheme" to operate a larger mine than submitted for permitting.

First, Plaintiffs concede that to be considered a "corrective disclosure," the Complaint must properly allege that the pertinent disclosure revealed the "relevant truth." Opp. at 42. This is because allegations that unfavorable news caused a stock's price to drop without actually revealing a previously hidden lie or material omission – that formerly served to artificially inflate the stock's price – does not constitute a "corrective disclosure" for purposes of loss causation. *Lentell*, 396 F.3d at 173 (requiring that "the underlying truth concealed by the misrepresentations [caused] the stock value correction."). Thus, Plaintiffs' "corrective disclosure" theory—that

"Defendants' scheme was caught on tape"—fails because the Pebble Tapes were neither "corrective" or a "disclosure" for purposes of establishing loss causation. Specifically, as discussed above, the tapes did not reveal new, material, nonpublic information about the size, scope, or duration of Pebble Permitting Project. Nor did the tapes contradict Defendants' prior public disclosures about the same. Plaintiffs' "corrective disclosure" theory merely repackages the Complaint's distortions about Defendant's prior public statements and continues to conflate statements about the Pebble Permitting Project with conceptually distinct statements about the possibility of future expansion beyond an initial permit.

In the same vein, Plaintiffs' "corrective disclosure" theory is not supported by their citation to articles in which mining project opponents negatively characterize already-public information about the Pebble Permitting Project (including articles that quote the head of the organization that (i) covertly recorded Defendants while posing as potential business partners, (ii) replaced actual participants with actors, and (iii) released spliced-together clips of those recordings). *See In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (*aff'd* 597 F.3d 501 (2d Cir. 2010)). "[C]onclusory suspicions… add[ed] nothing to the public's knowledge" that Defendants allegedly formulated an undisclosed plan to expand the mine. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d at 512 (negative characterization of previously known information cannot form the basis of a corrective disclosure).

Second, Plaintiffs' own Opposition underscores the fatal problems with their "corrective disclosure" argument. For example, Plaintiffs cite an October 28, 2020 article in *The Outside* as a corrective disclosure. In the article, one of the Pebble Project's biggest opponents argued that the Company's permit should be denied "in light of the 'basic fraud' uncovered [on the Pebble Tapes]." Opp. at 43. But as shown in the full quote contained in the Complaint, the project

opponent was specifically disparaging the USACE permitting system – relying on the same false assumptions Plaintiffs advance here – stating that the USACE was unaware of the possibility of future expansion until the release of the Pebble Tapes: "It's a testament to the flaws in our permitting system that it takes a videotape to force people to come to terms with that basic fraud." Compl. ¶ 120. The negative (and false) characterization of previously public information cannot amount to a corrective disclosure.

Equally flawed is Plaintiffs' reliance on the October 29, 2020 release of additional Pebble Tapes and Senator Murkowski's negative reaction on November 18, 2020 to the Pebble Tapes. Opp. at 43. For example, Plaintiffs argue that the Company's stock price dropped after "Thiessen is heard bragging about his influence over Alaska's senators and the state's governor, and the financial windfall to Thiessen's companies in the British Columbia on the back of Alaska's taxpayers." *Id.* However, even if true, Thiessen's alleged statements do not reveal any "relevant truth" about the size, scope, and duration of the Pebble Permitting Project. Not only does this allegation not support loss causation, it is persuasive evidence that it does not exist, *i.e.*, any negative impact the Pebble Tapes had on the Company's stock price was *unrelated* to any nonpublic information revealed about the size, scope, or duration of the Pebble Permitting Project. Likewise, Plaintiffs' reliance on Senator Murkowski's negative reaction to the Pebble Tapes two months after they were released and one week before the USACE released the Record of Decision ("ROD") does not sufficiently allege loss causation. Senator Murkowski did not release any new or previously undisclosed facts, and therefore, any impact her statements had on the stock price is not actionable.

In short, any stock decline caused by the negative publicity associated with the Pebble Tapes themselves, including potentially embarrassing statements about politics and money, does not satisfy the stringent requirements for pleading loss causation in this District.

### C. Plaintiffs' Materialization of Risk Argument Is Completely Contrived

Unable to show a causal connection between any decline in stock price and the actual revelation of previously nonpublic and material misstatements or omissions about the size, scope, or duration of the Pebble Permitting Project, Plaintiffs' Opposition shifts their loss causation theory to assert that the allegedly undisclosed plans for expansion caused their economic loss by concealing the "risk" that the project would not receive a permit.[73] But the Second Circuit has emphasized that "past holdings do not suggest that 'corrective disclosure' and 'materialization of risk' create fundamentally different pathways for proving loss causation," and that they "are not wholly distinct theories of loss causation." *In re Vivendi Universal, S.A., Sec. Litig.*, 838 F.3d 223, 261-62 (2d Cir. 2016). In other words, the central inquiry under either a theory of materialization of the risk or corrective disclosure is the same: whether a misstatement

---

[73] Plaintiffs' reliance on *In re Barrick Gold Securities Litigation*, No. 13 Civ. 3851 (SAS), 2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) is misplaced. *See* Opp. at 38-39. The defendants in *Barrick* made direct representations that they were complying with all Chilean environmental commitments despite knowledge to the contrary and a demonstrably poor record with environmental compliance. *Id.* at *11. The *Barrick* court found that misstatements concerning environmental compliance precluded an investor from accurately weighting the risk that the Project would be suspended for noncompliance. *Id.* In other words, the Court found a *clear connection* between Defendants' alleged misstatements and a decline in stock price following news that a mining project was suspended for regulatory noncompliance. *Barrick* is simply not applicable to the facts as alleged in the Complaint. Here, Plaintiffs allege that statements about the size of a project submitted for permitting are similarly connected to the denial of a permit as in *Barrick* where statements concerning environmental compliance were casually related to a stock decline when that noncompliance came to light. Plaintiffs in *Barrick* adequately alleged a *connection* between the statements made and the claimed economic loss. Here, Plaintiffs failed to show that "the underlying truth concealed by the misrepresentations [caused] the stock value correction." *Lentell*, 396 F.3d at 173.

or omission concealed *something* from the market that negatively affected the value of the stock price when disclosed. *Id.* (citing *Lentell*, 396 F.3d at 173). "Loss causation rest[s] on the revelation of truth." *Id.; see also In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 471 (E.D.N.Y. 2020) (finding that defendant's resignation cannot constructively disclose defendants' fraud because plaintiffs did not allege that defendants made any misstatements or omissions *concealing the risk* of defendant's resignation).

Even assuming that the "materialization of risk" theory affords Plaintiffs with a wholly different means of demonstrating loss causation, the factual allegations in the Complaint do not adequately plead loss causation. Plaintiffs' "materialization of risk" argument states that "Defendants' misrepresentations and omissions regarding the Pebble Project concealed risks that prevented investors from accurately weighing the risk that Defendants' permit application was likely to be denied." Opp. at 39. This theory rests on three key premises:

- The Company's disclosure of the risk of not getting permits for the Pebble Project was "hopelessly vague and failed to warn of actual facts on the ground that significantly altered an investor's ability to accurately assess the risks of investing in Northern Dynasty." *Id.*

- The "actual facts on the ground" that impacted investors' risk assessment that Defendants failed to disclose was that they allegedly "already had a plan to build one of the largest mines in the world, with the first mine alone spanning for at least 180 years." *Id.*

- The risk that the Company would not obtain a permit for the Pebble Project materialized because the USACE denied the permit because "it learned [from the Pebble Tapes] of Defendants' secret plans" not to limit the duration of developing the Pebble Deposit to 20 years. *Id.* at 41.

These key components of Plaintiffs' theory are contradicted by the record Plaintiffs rely on, and the materialization of risk argument therefore fails as set forth below.

### 1. The Possibility of Future Expansion Was Not A Risk, Let Alone a Risk Related to Obtaining a Permit

Plaintiffs' argument that Defendants' disclosure of the risk of obtaining a permit was "hopelessly vague" is based on a fallacy: that when the Company explained (in every periodic filing during the class period) that the Pebble Permitting Project "uses a portion of the currently estimated Pebble mineral resources" and "does not preclude development of additional resources in other phases of the project in the future," it was somehow disclosing a *risk* that the Company would not obtain a permit. Opp. at 26-27. As explained in detail above, *supra* at § II, pgs. 43-45, the Company *never* considered or disclosed the possibility of future expansion as a *risk*, let alone a risk related to obtaining a permit.[74]

### 2. Plaintiffs' Claim That The USACE Denied The Pebble Project Permit Because Of "Hidden Plans" Revealed By The Pebble Tapes Is Demonstrably False

As noted in Defendants' Motion to Dismiss, among the reasons the Court should dismiss the Complaint is that the Complaint does not actually allege that the USACE denied the Pebble Project permit because of any allegedly false or misleading statements of Defendants. But rather than concede this point, Plaintiffs attempt in vain to forge the requisite causal link between a stock drop and an alleged false statement to maintain their loss theory by alleging that the USACE in fact denied a permit for the Pebble Project after learning of Defendants' alleged plans to expand the mine after obtaining the initial permit. They offer no support for this claim other than Plaintiffs' observation that this is "the only reasonable inference." Opp. at 41. Plaintiffs'

---

[74] The first (or second during the pandemic) risk factor listed in the Company's periodic filings is the risk that the "Company may ultimately be unable to secure the necessary permits under United States Federal and Alaskan State laws to build and operate a mine at the Pebble Project." *See, e.g.*, Mot. Exs. 2-14.

argument makes no sense and contradicts the well-established record related to the USACE's permit decision, *i.e.*, ROD.

First, Plaintiffs' materialization of risk theory is based on the fantastical notion that up until the release of the Pebble Tapes, the USACE and investors believed that the Company was *only* going to mine the Pebble Deposit for 20 years and then close the mine. According to Plaintiffs:

> Defendants made false and misleading statements about the Pebble Project (e.g., having a limited duration of 20 years, being designed for closure to address the stakeholders' concerns) and, in so doing mislead investors about the likelihood of obtaining a permit…. Here, in order for the market to have accurately assessed the risks of investing in Northern Dynasty, Defendants were required to disclose their existing plan for constant and endless expansions. Compl. ¶ 62. This plan, if disclosed, would have changed an investor's assessment of the risks attendant in investing in Northern Dynasty because, if exposed, these undisclosed facts would have made it highly unlikely for Northern Dynasty to obtain a permit even for the substantially smaller mine they touted publicly (which, in reality, was no small mine at all). *Id.*

Opp. at 28, 41. Even assuming, *arguendo*, that the factual predicates contained in Plaintiffs' theory are true (they are not), Plaintiffs do not explain how the "corrective disclosures" on the Pebble Tapes (when released) could have affected the USACE's ultimate decision on the Pebble Permitting Project when the USACE *already knew* of these "undisclosed facts" well before the Pebble Tapes were released.

As discussed in detail above, the USACE's Final EIS, released in July 2020, provides incontrovertible proof that the USACE did *not* believe that the Pebble Project was forever limited to the 20-year initial project, including the USACE's determination that expansion of the Pebble Permitting Project and exploration of additional mines in the vicinity of the Pebble

Deposit were both reasonably foreseeable.  *See supra* at §§ I.C.2-3.[75]  Given this overwhelming

evidence, Plaintiffs' materialization of risk theory is factually impossible.

Second, Plaintiffs' claim directly contradicts the USACE's actual ROD.  In their

Opposition, Plaintiffs respond by arguing:

> Defendants' contention that the Army Corps denied the Pebble
> permit for reasons wholly unrelated to any of the alleged
> misstatements (Defs.' Br. at 36) finds no support in the record.
> Based upon the record and the four corners of the Complaint, the
> only reasonable inference for the Army Corp's adverse statement
> regarding the Pebble Permitting Project is that it had learned of
> Defendants' secret plans.

Opp. at 41.  Plaintiffs' argument is demonstrably false and would eviscerate the loss causation

requirement.

As specified in Defendants' Motion to Dismiss, the Complaint itself states: "On

November 25, 2020, it was announced that the Army Corps has denied the permit for the Pebble

Permitting Project.  The Corps said in a statement that it has determined that the plan 'does not

comply with Clean Water Act guidelines' and it has concluded that 'the proposed project is

contrary to the public interest.'"  Compl. ¶ 126.  Thus, Plaintiffs' claim that there is no support in

the record for "Defendants' contention that the Army Corps denied the Pebble permit for reasons

wholly unrelated to any of the alleged misstatements" is belied by their own Complaint.

---

[75] The Complaint also refers to evidence of USACE's understanding of the Company's future expansion goals that predate the Final EIS.  For example, Plaintiffs also claim that the Company's statement that "The Draft EIS envisages the project developed as an open pit mine and processing facility with ... a significantly smaller development footprint than previously envisaged" was false and misleading.  *See* Compl. ¶¶ 92-95.  However, future expansion of the Pebble Permitting Project and additional mines were identified as Reasonably Foreseeable Future Actions in the Draft EIS, released in February 2019.  *See* Reply Ex. 6, Draft EIS Chapter 4 at 4.1-8-4.1-11.

Moreover, Plaintiffs' argument that "the only reasonable inference for the Army Corp's adverse statement regarding the Pebble Project is that it had learned of Defendants' secret plans" is baseless.  Setting aside the fact that, as discussed above, Plaintiffs have failed to adequately allege that Defendants had "secret plans," Plaintiffs ignore the USACE's ROD, which is well within the four corners of the Complaint.  They ignore the ROD because it is fatal to their argument.  The ROD's Summary of Decision states: "USACE evaluated the application as documented in this ROD and determined that the proposed discharge does not comply with the 404(b)(1) Guidelines.  In addition, the proposed project is contrary to the public interest."[76]   In other words, notwithstanding Plaintiffs' unsupported inference, there is no actual dispute that the basis of the USACE's decision to reject the Pebble Project permit was its evaluation of the project proposed in the Company's permit application.  There is no basis anywhere in the record for Plaintiffs' conclusory assertion that the USACE's decision was based on any alleged secret plans.

Accordingly, Plaintiffs' cannot adequately plead loss causation.

**V.  Plaintiffs Have Not Adequately Plead Scienter**

Plaintiffs argue that the recordings on the Pebble Tapes are conclusive "evidence of conscious misbehavior or recklessness."  *See* Opp. at 46.  Under a theory of recklessness, a plaintiff must show that "specific contradictory information was available to the defendants at the *same time* they made the misleading statements."  *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 813 (S.D.N.Y. 2018) (emphasis added).  As discussed at length above, discussions on the Pebble Tapes are *entirely consistent* with public disclosures regarding future expansion, and do not

---

[76] Mot. Ex. 36, Record of Decision for Application Submitted by Pebble Limited Partnership to: The U.S. Army Corps of Engineers (Dep't of Army Permit # POA-2017-00271) (Nov. 20, 2020), at 2-1.

render false any past statements about the project submitted for permitting. If anything, the Pebble Tapes affirmatively confirm that Defendants did *not* have a developed or concrete plan with respect to a specific expansion scenario as late as September 2020. *See supra* at pgs. 20-24. Nor do Plaintiffs plead any additional facts showing any specific plans were or even could have been devised *after* the Pebble Tapes were made in the final days of the alleged Class Period. In short, Plaintiffs fail to adequately allege any facts showing that Defendants knowingly or recklessly made any statements – contemporaneously or otherwise – that contradicted any previous public statements about the size, scope, or duration of the Pebble Permitting Project.

Grasping at straws, Plaintiffs now allege two additional "inferences" of scienter. Opp. at 47. First, Plaintiffs argue that Tom Collier's resignation following the release of the Pebble Tapes further supports an inference of scienter. The law in this Circuit is clear: Resignation alone is not indicative of any wrongdoing. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) ("[R]esignations, without some indicia of highly unusual or suspicious circumstances, are insufficient to support the required strong circumstantial evidence of scienter."). Plaintiffs rely on *In re Salix Pharm* for this argument, but the facts are readily distinguishable because there, the defendants' resignations coincided with the company's exercise of a compensation claw back provision in their resignation agreement, based on a Board determination "that the Individual Defendants '*intentionally engaged in wrongdoing*.'" *Id.* at *15, 16 (emphasis added). Plaintiffs offer no comparable indicia of wrongdoing surrounding Tom Collier's resignation and cannot claim that this supports a finding of scienter.

Second, Plaintiffs suggest that a pending grand jury investigation by the United States Attorney's Office for the District of Alaska can also serve as an inference of scienter. Opp. at 47. Plaintiffs cite *In re Gentiva Securities Litigation*, 932 F. Supp. 2d. 352, 380 (E.D.N.Y 2013)

to support this improper proposition. But *In re Gentiva Securities Litigation* did not even

consider whether a grand jury investigation created an inference of scienter. Indeed, the case

referenced only a Senate Finance Committee ("SFC") and Securities Exchange Commission

("SEC") investigation.

SFC and SEC investigations serve a fundamentally different function and purpose than a

grand jury investigation. A grand jury serves the "dual function of determining if there is

probable cause to believe that a crime has been committed and of protecting citizens against

unfounded criminal prosecutions." *U.S. v. Sells Eng'g, Inc.*, 463 U.S. 418, 423 (1983) (internal

citations omitted); *see also In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 186

(2d. Cir. 2007) (citing *Sells Eng'g, Inc.*, 463 U.S. at 424) ("Without thorough and effective

investigation, the grand jury would be unable either to ferret out crimes deserving of prosecution,

or to *screen out charges not warranting prosecution*.")(emphasis added).[77] Given the dual role

of a federal grand jury, the existence of a grand jury proceeding does not support an inference of

scienter because any grand jury investigation is equally likely to be clearing Defendants of any

wrongdoing.

To be sure, the *Gentiva* court acknowledged the defense argument that "the mere

commencement and pendency of [the Senate Finance and SEC] investigations cannot support a

strong inference of scienter, because 'the fact that a regulator is fulfilling this role cannot be

---

[77] Plaintiffs also seek to show scienter through the "core operations" doctrine, Opp. at 47, but
"[t]here is considerable doubt whether the core operations doctrine survived enactment of the
PSLRA, and many courts have held that it is no longer valid." *Oklahoma Law Enf't Ret. Sys. v.
Telefonaktiebolaget LM Ericsson*, No. 18 Civ. 3021, 2020 WL127546, at *7 (S.D.N.Y. Jan. 10,
2020). Regardless, courts have consistently held that "core operations" allegations alone are
insufficient to plead a strong inference of scienter. *See Gagnon v. Alkermes PLC*, 368 F. Supp.
3d 750, 775 (S.D.N.Y. 2019). Here, Plaintiffs fail to allege any facts demonstrating that
Defendants had knowledge of information contradicting the alleged misstatements.

sufficient to allege scienter.'" *In re Gentiva Securities Litigation*, 932 F. Supp. 2d. at 380*. (citing In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 102 (S.D.N.Y. 2011)). Prior to dismissing the operative complaint, the *Gentiva* court agreed that the "existence of [the Senate Finance Committee and SEC] investigation alone is *not* sufficient to give rise to a requisite cogent and compelling inference of scienter, [but] it may be considered by the Court as part of its analysis." *Id.* at 380.

Next, consistent with the overarching conspiracy alleged in the Complaint, Plaintiffs argue in the Opposition that Defendants concealed their "real plans" for expansion so that they could "advance their cause" and receive compensation for securing the permit. Opp. at 48. Plaintiffs' own case law refutes their position, [*see* Opp. at 48], as *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.* confirms that the Second Circuit has rejected compensation as motive. 553 F.3d 187, 201 (2d Cir. 2009) ("[T]he allegation that [defendants] had the requisite motive because they received bonuses based on corporate earnings and higher stock prices *does not strengthen the inference of fraudulent intent*.") (emphasis added); *id.* ("If scienter could be pleaded solely on the basis that defendants were motivated because…corporate performance would increase their compensation, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."(internal citations omitted)).

Because the Pebble Tapes and the Company's public disclosures regarding the Pebble Permitting Project and potential future expansion beyond an initial permit are entirely consistent, such statements cannot create an inference of scienter. Piling on late assertions outside of the complaint about a resignation, a grand jury investigation, and the existence of bonus

compensation – all three of which have equally innocent explanations – does not change the calculus. Accordingly, Plaintiffs have failed to adequately plead scienter.

## VI. Plaintiffs Have Not Plead a Section 20A Claim

For the reasons detailed above, and those discussed in the Motion, Plaintiffs have failed to plead a predicate Section 10(b) violation, precluding recovery under Section 20(a) as well. *See ATSI*, 493 F.3d at 108.

## CONCLUSION

For the foregoing reasons and those set forth in the Defendants' Motion to Dismiss, the Court should dismiss the Complaint in its entirety, with prejudice.

Dated: December 15, 2021                 Respectfully Submitted,

/s/ Ashwin J. Ram
Ashwin J. Ram
Steptoe & Johnson LLP
633 W. 5th Street, Ste. 1900
Los Angeles, CA 90071
Telephone: 213-439-9443
aram@steptoe.com

David Matthew Fragale
Steptoe & Johnson LLP
1330 Connecticut Ave NW
Washington, DC 20036
Telephone: 202-429-8195
dfragale@steptoe.com

*Counsel for Defendants Northern Dynasty Minerals, Ltd., Ronald W. Thiessen, and Tom Collier*