**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE NORTHERN DYNASTY MINERALS LTD. SECURITIES LITIGATION | Case No. 1:20-cv-05917-ENV-RLM<br><br>Date of Service: November 22, 2022<br><br>**Oral Argument Requested** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO STRIKE OR IN THE ALTERNATIVE**
**FOR LEAVE TO ENTER A MORE FULSOME RESPONSE IN**
**REPLY TO PLAINTIFFS' IMPROPER PLEADING**

**I.      THE COURT SHOULD STRIKE PLAINTIFFS' LETTER AS IMPROPER**

On November 15, 2022, Plaintiffs' filed a letter on the docket of this case (Plaintiffs' Letter), with Defendants' Motion to Dismiss fully briefed and ripe for decision, supplying what it represents to be a "Report" from a U.S. House of Representative committee. (ECF No. 43.) But the document is *not* an actual Report of a Committee of the U.S. House. Plaintiffs' Letter is an attempt to inject new allegations into the fully briefed motion and effectively amend, without leave, both the Amended Complaint and its Opposition to the Defendants' Motion to Dismiss.

The true intentions of Plaintiffs' are laid bare by the last sentence of their letter: "In the event that the Court is inclined to dismiss the complaint, Plaintiffs respectfully request leave to amend" the Amended Complaint. (*Id.*) But Plaintiffs cannot simply file a letter with the Court in place of a properly noticed motion for some relief, such as leave to amend the Amended Complaint. Furthermore, a properly noticed motion for leave to amend the operative pleading must be accompanied by a proposed amended pleading so that the Court can assess whether such amendment would be futile. *See La Barbera v. Ferran Enters., Inc.*, No. 05-cv-2678, 2009 WL 367611, at *3 (E.D.N.Y. Feb. 10, 2009) (holding that the "[d]enial of the motion to amend [was] warranted by Plaintiffs' unexplained failure to submit a proposed pleading"). Plaintiffs satisfy none of these basic procedural hurdles.

In order to prevail on a motion to strike under Rule 12(f), the movant must show that: "(1) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the relevant issues; and (3) permitting the allegations to stand would result in prejudice to the movant." *See Lynch v. Southampton Animal Shelter Found. Inc.*, 278 F.R.D. 55, 63 (E.D.N.Y.2011). Defendants can satisfy all three of these elements, and importantly, discussion of these elements show why a more robust response is necessary to correct the prejudice to Defendants should the Court choose to not strike the improper pleading.

1

*First*, Plaintiffs' improper pleading discusses a purported U.S. House Transportation & Infrastructure Committee ("T&I Committee") report regarding the Pebble project underlying this litigation (the "DeFazio Report").  But Plaintiffs greatly overstate the import of the document they cite to.  Rather than being a final T&I Committee report,[1] the DeFazio Report is merely an interim Staff Report that two representatives, members of the T&I Committee, who have announced on the Committee's website that they have a vendetta against defendants, prepared in anticipation of their loss of control of the T&I Committee, an event which, indeed, is set to take effect on January 3, 2023.  The two members are the soon-to-be former Chair of the T&I Committee Peter A. DeFazio (D-OR) and soon-to-be former Chair of the T&I Subcommittee on Water Resources and Environment Grace F. Napolitano (D-CA).

Should there be any doubt that the conduct surrounding the T&I Committee's "investigation" of Pebble is not the full committee, but rather, just these two Representatives, one needs to look no further than the T&I Committee's own website.  There, in describing the timeline of activity the "committee" took against Pebble, it clearly provides that "Chairs DeFazio and Napolitano issued," "forwarded," and "sent" material related to their long-standing opposition to Pebble.[2]

The release is not a final report of the T&I Committee and would not pass scrutiny under the rules of admissibility. DeFazio and Napolitano's interest in the Pebble project is more akin to a vendetta against Defendants than it is to a fair and thorough investigation.  The Company *voluntarily* produced documents to the T&I Committee based on the assumption that the T&I

---

[1] For an example of a final report of the T&I committee, *see* https://transportation.house.gov/imo/media/doc/2020.09.15%20FINAL%20737%20MAX%20Report%20for%20Public%20Release.pdf.
[2] https://transportation.house.gov/news/press-releases/news-chairs-defazio-and-napolitano-release-committee-report-on-pebble-mineask-the-ag-to-investigate-false-statements-to-congress.

Committee was performing an actual, legitimate investigation related to Collier's testimony. That never happened. Instead, the *Majority Staff* of the T&I Committee prepared a report without conducting any hearings, requesting interviews of the individuals who authored documents, posing any questions to the Company about the meaning or purpose of any of the thousands of documents and communications that it produced, or even allowing the Company an opportunity to respond to the Staff's conclusions before publishing the DeFazio Report. As a result, the DeFazio Report is riddled with basic errors, ignores publicly-available documents that refute its allegations, and misrepresents both Collier's testimony and the cherry-picked documents upon which the DeFazio Report purportedly relies. Nor is the DeFazio Report subject to any kind of evidentiary threshold for purported "findings," such as a basic preponderance of the evidence standard.

*Second*, for all these reasons and as highlighted in greater detail below, (2) the allegations are inherently unreliable, and therefore, have no bearing on relevant issues, and (3) permitting the allegations to stand would result in prejudice to the defendants.

## II.    THE DEFAZIO REPORT IS DEMONSTRABLY UNRELIABLE AND IRRELEVANT

There are so many errors and misrepresentations in the DeFazio Report that it would be inappropriate to cover each of them in this motion to strike. Thus, should the Court determine that the DeFazio Report is relevant to Defendants' Motion to Dismiss, we respectfully request the opportunity to submit a more fulsome response. However, for purposes of this motion, Defendants provide the following handful of examples.

### A.    The DeFazio Report Misrepresents Collier's Congressional Testimony

None of the actual documents appended to the DeFazio Report contradicts Collier's testimony or supports Plaintiffs' allegations. Rather, the DeFazio Report simply replicates

3

Plaintiffs' strawman argument in which they, first, claim that during his testimony Collier "categorically rejected" the possibility of future expansion and was adamant that the Permitting Project would be the "only" mine ever built at Pebble,[3] and second, curiously claim Collier lied by pointing to documents in which Collier discusses various future expansion options.

The problem with both the Amended Complaint and the DeFazio Report is that Collier did *not* categorically reject the "possibility" of future expansion, nor did he testify that the "only" project Pebble would ever build was the Permitting Project. Indeed, at the time of Collier's Congressional testimony, Pebble had already provided information to the Army Corps about its potential expansion options and the Army Corps had already determined that future expansion of the Pebble project was reasonably foreseeable.[4] Rather, Collier's *prepared written testimony* included a response to a specific allegation being promulgated by project opponents that Pebble's actual plan was to use the permit for the 20-year Permitting Project to build and operate a massive, long-term mine without obtaining any additional permits:

> One of my fellow panelists today, former EPA Regional Administrator Dennis McLerran, has called Pebble's permit application the "camel's nose under the tent," *which I suppose means that he believes that Pebble plans on shoehorning in a larger project despite the fact that we have scaled back the footprint in the mine plan currently before the Corps of Engineers*. I have several responses….
>
> Pebble has no current plans, in this application or in any other way, for expansion**.** *If expansion did become feasible, new permits would be required. The permit applicant would have to go through the*

---

[3] *See* Plaintiffs' Consolidated Amended Complaint at ¶ 39 (claiming "[i]n response to concerns about the possibility of expanded mining of the Pebble deposit, Collier categorically rejected those concerns"); and DeFazio Report at 2 (claiming "Collier was adamant in his testimony that Pebble LP intended to only build a scaled-back version of the mine"). *See also* Reply at 23 n.33 (explaining that "Plaintiffs' allegation that 'Collier categorically rejected concerns about the possibility of expanded mining of the Pebble deposit' when he testified before Congress that 'Pebble has no current plans, in this application or in any other way, for expansion' is also baseless and misrepresents the record.").

[4] *See* Motion to Dismiss ("Mot.") Ex. 35, the Pebble Partnership Response to RFI 062 re "Scenario for Expanded Development of Pebble Mine" (Sept. 5, 2018); Reply Ex. 6, Draft EIS (dated February 2019) Chapter 4 at 4.1-8-4.1-11.

> *same rigorous procedure that Pebble is now going through. Any concerns with scope or environmental risk can be addressed in that new permitting process. If the Corps grants Pebble's current permit application, nothing in that permit suggests a carte blanche to expand.*
>
> *Any future mining projects in the area would therefore be evaluated on their own merits based on then-existing conditions when and if future applications are submitted to the relevant permitting agencies.*"[5]

There is no doubt from the actual text of Collier's prepared written testimony that Collier was: (a) responding to the specific allegation that "Pebble plans on shoehorning in a larger project" with the 20-year permit; (b) confirming that Pebble was not planning to (and would not) expand beyond the Permitting Project without seeking additional permits and undergoing a future environmental review; and (c) explaining that any environmental concerns about a larger project would be fully considered if and when permits to develop a larger mine were sought. Thus, documents showing that Collier was aware of future expansion options do not contradict his testimony and are irrelevant to Plaintiffs' claim that they were defrauded.

> **B.      The DeFazio Report Is Not Evidence That Pebble Misled Regulators To Avoid A More Robust Environmental And Public Review Process**

Previously, Plaintiffs advanced a conspiracy theory that the Defendants "shared their hidden plan" with "members of the Army Corps." Opp. at 15. Now Plaintiffs argue that the DeFazio Report shows that Pebble "deliberately sought to mislead regulators regarding the mine's planned scope in order to avoid more robust environmental and public review processes" and that it is the "internal emails authored or received by Mr. Collier and Mr. Thiessen that prove most damaging and provide deeply concerning insight into the true intentions of those wanting to

---

[5] Mot. Ex. 33, *The Pebble Mine Project: Process and Potential Impacts, Hearing Before Subcomm. on Water Resources and the Environment, Comm. on Transportation and Infrastructure*, 116 Cong. 39 (Oct. 23, 2019) (Testimony of Tom Collier, CEO of Pebble Partnership), at 20. (emphasis added).

develop the Pebble Mine." Plaintiffs' Letter at 2. Like the Plaintiffs' conspiracy theory, their new claims that the DeFazio Report demonstrates that Pebble misled regulators are patently absurd and unfounded.

First, the Army Corps does not review a "mine's planned scope," whatever that means. As the Army Corps has repeatedly explained, it is required to review the specific project being proposed, not the projects that may be proposed in the future.[6]

Second, the Army Corps knew that the overall scope of the Pebble Project was larger than the initial 20-year Permitting Plan. As covered in great detail in the memoranda supporting Defendants' Motion to Dismiss, the Army Corps had already concluded, based on documents furnished by Pebble, that future expansion beyond the 20-year project was reasonably foreseeable.[7] For example, Pebble provided the Army Corps a Technical Memorandum, dated September 5, 2018, in which it provided details of an expansion scenario that would add 5.2 billion tons of material to the project and extend the life of the mine to 98-118 years, further explaining that "[t]he concept is *merely one of several expanded development scenarios* that could potentially be proposed and permitted in the future."[8]

Third, the Army Corps has already refuted—in the publicly-available Final EIS Report—the DeFazio Report's accusation that Pebble's permit application was a "sham" that unlawfully segmented the project and prevented the Army Corps from fulfilling its regulatory duty to consider "all connected, cumulative, and similar actions." For example, the Army Corps reviewed the

---

[6] *See* Reply Ex. 5, Final Environmental Impact Statement (FEIS), App. B at B-13-14 ("The USACE is required to evaluate the Applicant's project, as proposed in the Department of Army permit application. … The USACE cannot legally analyze mining the entire resource as the proposed project.") (emphasis added).

[7] *See, e.g.*, Reply at 28-34.

[8] Mot. Ex. 35, Pebble response to Request for Information 62 re "Scenario for Expanded Development of Pebble Mine" (submitted September 6, 2018). Unlike the technical information that Pebble provided to the Army Corps about the 118-year expansion option, the alternatives that the DeFazio Report considers "plans" were *smaller* and consisted of general bullet points. *Compare* Mot. Ex. 35 *with* DeFazio Report at 87.

following Statement of Concern: "An expanded Pebble Mine is more than a cumulative impact of the proposed action; it is its logical endpoint. In such cases, *NEPA prohibits agencies from breaking a project into smaller component parts to minimize significant environmental impacts of the project*."[9]    The Army Corps' response explains why the Statement of Concern—and the DeFazio Report's accusation—was wrong:

> The USACE is required to review the proposed action as described in an Applicant's permit application. NEPA requires direct, indirect, and cumulative impacts of the action alternative and other alternatives to be assessed in the EIS. Direct and indirect impacts are assessed on the description of the action and other alternatives carried forward in the EIS. Cumulative effects are interactive, synergistic, or additive effects that would result from the incremental impact of the action when added to other past, present, and RFFAs.
>
> *The USACE has determined that expansion of the Pebble Mine*, as originally described in the Wardrop 2011 Preliminary Assessment Technical Report and refined in the response to RFI 062 (PLP 2018-RFI 062), *is an RFFA to be analyzed under the cumulative effects analysis*. The expansion scenario is described in response to RFI 062 (PLP 2018-RFI 062), and detailed assumptions are summarized in Table 4.1-2 of the DEIS.
>
> Evaluation of the cumulative impacts of the expansion scenario is provided in the EIS. The assessment of the cumulative impacts of Pebble Mine expansion can be found in Section 4 under each of the resource categories, including spills. *The level of detail in the cumulative impact assessment is appropriate for a potential expansion scenario, and references information presented under direct and indirect effects where expansion would use elements of specific alternatives*.
>
> If a permit for the proposed activities under USACE authority is issued to PLP, only the action as described in the ROD would be allowed, subject to all conditions of approval contained in the ROD. *Any modifications to the activities authorized by USACE, including any expansion of the authorized discharges of dredged or fill into WOUS, or additional work and structures in navigable WOUS,*

---

[9] Reply Ex. 3, FEIS Appendix D at D-45 (emphasis added).

*would require a subsequent NEPA review and permit evaluation.*
No change was made to the EIS.[10]

Finally, the DeFazio Report's theory that Pebble's permit application for a 20-year mining project was an attempt to avoid more robust environmental review of some secret larger mining project is refuted by the actual documents appended to the DeFazio Report.  For example, the DeFazio Report cites to a September 27, 2019 email as evidence of "Mr. Collier's direct involvement in developing the alternative mine plans."[11]  However, in the actual September 27, 2019 email, not only was Collier told that simply extending the duration of the mining operations would require additional infrastructure and revised plans that had not yet been developed, he was also provided a list of additional permitting required to extend the project, including permits required by Section 404 of the Clean Water Act:[12]

- Waste dumps and stockpiles *will require 404 permits* prior to development
- Site R tailings *will require 404 permits* by year 20
- The water management plan *will require major revisions*, which *will trigger the requirement for a new APDES permit*; and
- The increased mine operation, power increase, waste dumps and Site R *will trigger a PSD revision*.

Of course, the authors of the DeFazio Report did not need these internal documents to know that any future expansion plans would require new permits and would be assessed on their own merits, which is exactly what Collier conveyed in his Congressional testimony.

### C.    Pebble and NDM Officials Did Not "Pitch" Investors On A Different Mine Plan

Most of Plaintiffs' Letter is devoted to the DeFazio Report's discussion of confidential slide presentations that included references to development alternatives beyond the 20-year

---

[10] *Id*. (Emphasis added).
[11] DeFazio Report at 18.
[12] DeFazio Report at 113 (emphasis added).

Permitting Project, which were purportedly shared with "investors" in October 2019.[13]  According to Plaintiffs and the DeFazio Report, sharing these presentations with investors the same week of Collier's Congressional testimony is a "glaring example" of evidence that Pebble had "current plans" to expand.  They are wrong.  The DeFazio Report, and therefore Plaintiffs, mispresents what these documents actually show.

First, the DeFazio Report claims that Collier and Thiessen were using the slide presentations discussing development alternatives in "pitches" to "investors," suggesting that Collier and Thiessen were secretly providing confidential information about the Pebble Project to "investors" of *Northern Dynasty*, which is the publicly-traded company that currently owns both 50% shares of the Pebble Partnership, a private company that owns the Pebble Project.  That would not make sense and is not what the documents show.  Instead, Thiessen and Collier were engaged in confidential discussions with international *mining companies[14]* about purchasing an ownership interest in the Pebble Partnership, which owns rights to the *entire* Pebble deposit, and not just the 10% to be mined during the Permitting Project.  Although Northern Dynasty was precluded from disclosing details about these discussions—both for legal[15] and business[16] reasons—it repeatedly informed investors that discussions to secure a mining partner to develop the overall Pebble Project was a high priority for the Company.[17]

---

[13] Plaintiffs' Letter at 2.

[14] DeFazio Report at 39 (stating in the email that "Ron, Tom Collier and I are sitting down with [name of international mining company] this afternoon in Melbourne.").

[15] *See* NI 43-101 Standards of Disclosure for Mineral Projects, Form 43-101F1 Technical Report and Related Consequential Amendments (prohibiting the disclosure of economic analysis of mineral resources except under certain conditions, including a technical report prepared by an independent qualified expert).

[16] Northern Dynasty, like all responsible corporations, conducts potential business partnerships with outside companies pursuant to a confidentiality agreement that prohibits the disclosure of confidential business information publicly and prevents the trading of its shares based on nonpublic information.

[17] *See, e.g.*, Mot. Ex. 9, NDM Form 6-K, Ex. 99.2 Management's Discussion & Analysis to Q3 2019 Report, filed with the SEC on November 22, 2019 ("Other key activities include … discussions directed toward securing a partner with which to advance the overall development of the project."); Mot. Ex. 6, NDM Form 40-F, Ex. 99.6 Management's Discussion & Analysis to 2018

Second, the development alternatives discussed in the actual presentation slides shared with potential mining partners are not evidence of "current mine plans." They simply represent future *alternatives*—which, by definition, cannot be current plans—which is why they appear in a section of the presentation entitled "Project *Opportunities*."[18]  It is entirely unsurprising that a potential mining partner would need to know about potential opportunities in addition to the current project before it could consider purchasing an interest in the Pebble Partnership.

Finally, had the authors of the DeFazio Report had a better understanding of the documents, they would have realized that the expansion alternatives are merely modelling hypotheticals that include options that *do not currently exist*—and, therefore, cannot be part of any "current plans." For example, the open pit mining alternatives in the presentation slides include adding a secondary gold plant as part of the expansion.  However, as Thiessen explains in the email that attaches the presentation slides, the option to add a secondary gold plant is wholly dependent upon the future availability of alternative technology that currently *does not exist*.[19]  Likewise, the slide deck also discusses the possibility of using underground mining as an alternative to open pit mining for a potential expansion phase, which would have the benefit of a "[s]ignificantly reduced footprint."[20] However, as discussed in support of Defendants' Motion to Dismiss, the Company has explained in its public filings and to the Army Corps that it will need to sink a 3,500-foot access shaft to perform additional studies during the life of the Permitting Project before it can determine whether the underground mining option is even feasible.[21]

---

Annual Report, filed with the SEC on April 1, 2019 (explaining that that one of NDM's 2019 plans was to "remain focused on efforts to secure a partner for the project.").

[18] *See* DeFazio at 86-87.

[19] *See id*. at 69 (email in which Thiessen explains, "[w]e do believe that there will be alternative luxiviants *in the near future which would allow a secondary gold plant*") (emphasis added).

[20] *Id*. at 93.

[21] *See, e.g.*, Deft. Reply at 22.

**D.**    **The DeFazio Report Actually Confirms That Pebble Does Not Have Current Mine Plans To Expand The Mine**

Plaintiffs' misplaced reliance on the conclusions reached in the flawed DeFazio Report is further undermined by the fact that the actual documents appended to the DeFazio Report *corroborate* Collier's testimony that Pebble does not have any current expansion plans.

For example, the DeFazio Report claims that an email from September 27, 2019 "shows that Mr. Collier knew of the existence of alternative Pebble Mine plans when he testified before the subcommittee in October 2019."[22]  But the email the DeFazio Report cites actually shows that Collier was informed expansion plans had *not* been developed for even the most basic alternatives.[23]  Indeed, Collier is also told that a "feasibility study for the extension would have to be completed during construction [of the Permitting Project]."[24]

The emails authored by Thiessen and cited in the DeFazio Report also confirm that Pebble had not developed any actual mine expansion plans.  For example:

- January 3, 2020 email in which Thiessen explains that the "current [permitting] plan is 160,000MT/180,000ST through put," and that it was *"[m]ore logical to permit production capacity increases in future when the basis for the increase would be known with certainty and not speculative"*;[25]

- September 12, 2019 email from Thiessen in which he writes: "We are currently in the final stages of mine permitting under the US NEPA process.  The project development plan we are in permitting seeks to Mine approximately 10% of the total resources.  That said we have a large property *with multiple*

---

[22] *See* DeFazio at 18.

[23] *See* DeFazio at 112 (email informing Collier that extending the Permitting Project beyond 20 years would require the "commissioning of a new tailings facility (likely Site R) and that "[r]evised plans for Site R have not been developed," "increased mining capacity and gold plant would likely result in the need for additional power generation" the "large increase in mining tonnage would also require expansion of the explosives handling, in increase in workforce with expanded camp facilities, and additional fuel storage," none of which is supported by any plans.).

[24] *Id.*

[25] *Id.* at 114 (emphasis added).

11

*potential targets* and the Pebble deposit itself is open in a couple of directions";[26] and

- March 24, 2020 email from Thiessen in which he writes: "The other alternative is continuing operations beyond 20 years, given the ore is there, but the other facilities mainly TSF are not. *But there could be very different methods of mining or processing beyond 20 years*. In my mind *the mine life extension isn't something which can technically be answered today, in any event*."[27]

*   *   *   *   *

As the foregoing sample highlights demonstrate, neither the DeFazio Report nor the actual documents appended it support the Staff's claims that Collier lied to Congress or that Pebble misled the regulators or anyone else about the Permitting Project. Instead, these materials confirm that Pebble did not have expansion mine plans at the time Collier testified, that such plans will not be, and cannot be, designed and engineered until additional information becomes available in the future, and that the Army Corps was aware of and had considered future expansion of the Pebble Project as part of its EIS review. In short, the DeFazio Report is wholly unreliable and irrelevant to Plaintiffs' claims.

---

[26] *Id*. at 116 (emphasis added).
[27] *Id*. at 155 (emphasis added).

## III.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court strike Plaintiffs' Letter at ECF No. 43, or in the alternative, grant Defendants leave to file a more robust response in reply to the issues raised in Plaintiffs' improper pleading.


Dated: November 22, 2022

Respectfully Submitted,

/s/ Ashwin J. Ram
Ashwin J. Ram
Steptoe & Johnson LLP
633 W. 5th Street, Ste. 1900
Los Angeles, CA 90071
Telephone: 213-439-9443
aram@steptoe.com

David Matthew Fragale
Steptoe & Johnson LLP
1330 Connecticut Ave NW
Washington, DC 20036
Telephone: 202-429-8195
dfragale@steptoe.com

*Counsel for Defendants Northern Dynasty Minerals, Ltd., Ronald W. Thiessen, and Tom Collier*