UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
:
IN RE NORTHERN DYNASTY :
MINERALS LTD. SECURITIES :
LITIGATION : <u>ORDER DENYING MOTION TO DISMISS</u>
:
: 1:20-cv-05917-ENV-RLM
:
:
------------------------------------------------------------ x

VITALIANO, D.J.

      Lead plaintiff Lawrence Keleman and named plaintiff Charles Hymowitz, individually and on behalf of all others similarly situated, filed an amended class action complaint against defendants Northern Dynasty Minerals Ltd. ("Northern Dynasty"), Tom Collier, and Ronald William Thiessen, asserting two counts: first, violation of Securities Exchange Act § 10(b), 15 U.S.C. § 78j(b) ("Section 10(b)"), as well as U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), promulgated thereunder, and second, violation of Securities Exchange Act § 20(a), 15 U.S.C. § 78t(a) ("Section 20(a)"). Dkt. No. 37. Northern Dynasty has moved to dismiss the Amended Complaint. Dkt. No. 39. For the reasons stated below, Northern Dynasty's motion to dismiss is denied.

I.    Background[1]

      Northern Dynasty is a public corporation that explores mineral properties in the United States. Am. Compl. ¶¶ 14, 19. It established the Pebble Limited Partnership in 2007 for the purpose of engineering, permitting, constructing, and operating a mine in the Bristol Bay area of Alaska (the "Pebble Project" or the "Project"), with an aim to extract hundreds of millions to

---

[1] Unless otherwise indicated, the following facts are taken from the Amended Complaint and are presumed to be true for the purposes of deciding this motion.

1

billions of tons of ore over a timeframe of several decades. *Id.* ¶¶ 15, 19–22, 25–26. In 2011, Northern Dynasty publicly submitted plans for the Project in a mandatory SEC filing. *Id.* ¶ 22. In the filing, Northern Dynasty stated the Project would operate for at least 25 years, and perhaps as long as 78 years or longer. *Id.* ¶ 30. The Environmental Protection Agency ("EPA") began its review of the Project shortly thereafter. *See id.* ¶ 24. In 2014, EPA published a highly critical Proposed Determination report in which the agency concluded that the Project as designed would entail extraction of a massive 2.0 to 6.5 billion tons of ore, and so proposed strict limits on the Project to reduce environmental harm to the Bristol Bay watershed. *Id.* ¶¶ 28–32.

To mitigate these concerns, in December 2017, Northern Dynasty submitted a new, scaled-down proposal for the Pebble Project that would operate for only 20 years and extract only 1.1 billion tons of ore. *Id.* ¶¶ 34–35. Northern Dynasty also included a closure plan that would "preclud[e] mining at the mine site [beyond the] 20-year" period in the plan. *Id.* ¶ 36. In August 2018, the U.S. Army Corps of Engineers ("USACE") released its scoping report of the revised project,[2] which based its conclusions on this 20-year timeline. *Id.* ¶ 37. In October 2019, Tom Collier, then-CEO of the Pebble Limited Partnership, testified before the U.S. House of Representatives that there were "no current plans, in this application *or in any other way*, for expansion" of the Project, seemingly confirming USACE's reliance on this 20-year timeframe. *Id.* ¶ 39. In July 2020, USACE issued its Final Environmental Impact Statement ("FEIS"), which indicated the Project would have no measurable impact on Bristol Bay's fisheries; however,

---

[2] Section 404 of the Clean Water Act provides that proposed mining operations in the navigable waters of the United States require a permit. 33 U.S.C. § 1344(a). Such permits are issued by USACE, and can also be denied by EPA if the project would have an "unacceptable adverse effect" on the aquatic environment. *Id.* at § 1344(a), (c), (d).

USACE then requested that Northern Dynasty submit a mitigation plan for the Project after finding the Project "cannot be permitted" under the Clean Water Act. *Id.* ¶¶ 40, 43, 113.

In September 2020, a non-profit organization called the Environmental Investigation Agency ("EIA") released secretly recorded tapes in which Ronald William Thiessen, then Northern Dynasty's CEO and President, admitted that Northern Dynasty had plans to extend the Pebble Project far beyond the timeframe and size it indicated in its 2017 filing, and that Northern Dynasty was intentionally keeping those plans private. *Id.* ¶¶ 45–49, 53. Following the release of these tapes, several media outlets, including the *New York Times* and the *Washington Post*, cast doubt on the Project's likelihood of approval. *Id.* ¶ 118. On November 18, 2020, Senator Lisa Murkowski of Alaska publicly stated that she thought USACE "should deny [the Project's] permit application." *Id.* ¶ 124. A week later, USACE denied the permit. *Id.* ¶ 126.

Plaintiffs commenced this action on December 4, 2020, alleging that public filings by Northern Dynasty and public statements by Collier and Thiessen were materially misleading. In lieu of filing an answer, defendants filed a motion to dismiss, which is now before the Court.

## II. Legal Standard

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "must accept as true all [factual statements alleged] in the complaint and draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008) (quoting *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 591–92 (2d Cir. 2007)). To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)).

Moreover, securities fraud claims brought under Section 10(b) and Rule 10b-5 must satisfy two additional provisions: Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") and the Private Securities Litigation Reform Act ("PSLRA"). Rule 9(b) requires that plaintiffs "state with particularity the circumstances" of any fraud claim. Fed. R. Civ. P. 9(b). PSLRA mandates that plaintiffs state with particularity both the facts constituting the alleged violation and the other elements of the Section 10(b) cause of action, such as state of mind. 15 U.S.C. § 78u-4(b).

### III. Discussion

Section 10(b) makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). In short, Section 10(b) prohibits manipulation, whether in the form of false statements or market manipulation. *United States v. Royer*, 549 F.3d 886, 900 (2d Cir. 2008). Rule 10b-5, promulgated thereunder, makes it "unlawful for any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim for relief under Section 10(b) and Rule 10b-5, plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021) (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015)).

Defendants contend that the Amended Complaint fails to cite any false or misleading statements or omissions of material fact. The yardstick used to take the measure of a claim challenged by such defense is well worn. To allege securities fraud, Rule 9(b) specifically requires that a plaintiff "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (quoting *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012)).

Plaintiffs are off to a fast start in satisfying their burden. They have pleaded with particularity about Collier's October 23, 2019, testimony before the Subcommittee on Water Resources and the Environment, a subcommittee of the Committee on Transportation and Infrastructure of the U.S. House of Representatives. Am. Compl. ¶ 98. This satisfies the first, second, and third prongs of the statutory framework.

Additionally, the fourth prong, explaining why the statements were fraudulent, is satisfied because of defendants' material omission. "Even though Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, [that party] has a 'duty to be both accurate and complete.'" *Plumbers' Union Loc. No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 180 (S.D.N.Y. 2010) (quoting *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002)). An omission becomes actionable "only when the [defendant] is subject to a duty to disclose omitted facts," including once a proposal is "under active and serious consideration." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267–68 (2d Cir. 1993).

Collier testified in October 2019 that "Pebble has no current plans, in this application *or in any other way*, for expansion," Am. Compl. ¶ 100 (emphasis added), and Northern Dynasty's January 2018 6-K described the Project as "designed for closure" following its 20-year lifespan,

5

*id.* ¶ 72. But the Pebble Tapes, interpreted in the light most favorable to plaintiffs, revealed a definite (and secret) plan to extend the Project. *See id.* ¶¶ 47 ("[A]ll the key elements of the expansion are already contained in the current project. . . . [Expansion] is the plan."), 49 (agreeing that "the likelihood [of expansion] is pretty much 100 percent almost" and that "it's important to not make [the plan] public") (first alteration to ¶ 49 original). Defendants therefore had a duty to publicly disclose this expanded plan that was "under active and serious consideration." But between the time of Collier's testimony and the release of the tapes, defendants did not do so. Plaintiffs have plausibly pleaded that defendants did not satisfy their duty.

Defendants strive to shore up their position by citing to some cases decided after the passage of PSLRA, including *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co., Inc.*, 75 F.3d 801 (2d Cir. 1996), to argue that plaintiffs failed to meet PSLRA's heightened pleading standard. Reply Mem., Dkt. No. 41, at 45–46.[3] *San Leandro* held in relevant part that the duty to disclose applies only when "(i) the company induced investors to believe that alternative business plans were excluded from consideration; and (ii) the company promised to maintain its business plan in the future, but nevertheless changed direction." *Bratusov v. Comscore, Inc.*, No. 19 Civ. 3210 (KPF), 2020 WL 3447989, at *10 (S.D.N.Y. June 24, 2020) (citing *San Leandro*, 75 F.3d at 810–11). Plaintiffs, again, have successfully pleaded such circumstances. Collier's testimony and defendants' filings with the SEC induced investors to believe that the Project would not be expanded beyond the scope specified in the 2017 permit application. Collier's testimony that defendants had no plans for expansion was a promise to

---

[3] Page citations to the parties' memoranda are with reference to ECF pagination rather than internal pagination.

continue this plan. And the Pebble Tapes reveal a change in direction, with both Collier and Thiessen indicating the real plan was for expansion. Am. Compl. ¶ 47, 49.

Defendants then raise two defenses to materiality, both of which fail.[4] First, defendants argue that the market already knew of the possibility for expansion. This "truth-on-the-market" defense is mistaken. Rule 10b-5 mandates that once speakers choose to speak about a topic, their statements must be "truthful, accurate, and complete." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 159–60 (S.D.N.Y. 2008). Because silence about expansion of the Project could reasonably lead investors to believe that Northern Dynasty still planned, as they stated in their congressional testimony, not to expand the Project, Northern Dynasty had a duty to disclose contrary information to investors once they decided to expand. *See Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) (Rule 10b-5 imposes a "duty to disclose only when silence would make other statements misleading or false.") (quoting *Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 243–44 (4th Cir. 1988)). The *possibility* of expansion that defendants allegedly expressed in September 2017 (before the revised proposal was submitted) and October 2019 is not the same as a *definite plan* of expansion thereafter, which is what plaintiffs allege. *Compare* Defs.' Mem., Dkt. No. 39-39, at 11 (claiming Thiessen gave a presentation contrasting "the smaller mine project" with "the long-term nature of the mine"), 15 (quoting language from Collier's congressional testimony regarding possible changes "[i]f expansion did become feasible"), 29 (section entitled "The *Possibility* of Future Expansion Was Publicly Disclosed") (emphasis added), *with* Am. Compl. ¶ 47 ("[E]xpansion of the mine 'is *the plan*.'"). Nor does the fact that the July

---

[4] To the extent that defendants also raise a defense under the bespeaks caution doctrine, *see* Opp'n Mem., Dkt. No. 40, at 34–39, Reply Mem. at 48–50, it too fails, as that doctrine applies to "forward-looking statements *only*, and not to material omissions." *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001); *see also Iowa Pub. Emps. Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010).

2020 FEIS determined expansion was reasonably foreseeable, *see* Defs.' Mem. at 31–32, Reply Mem. at 35–40, shield defendants from liability. While defendants may have disclosed extension plans to USACE in confidence, plaintiffs adequately allege that Thiessen's statement that "it's important to not make [the extension plan] public," Am. Compl. ¶ 49 (alteration original), shows that defendants did not disclose this plan to the market. In light of Collier's Congressional testimony that Northern Dynasty "has no current plans, in this application *or in any other way*, for expansion," *id.* ¶ 39, defendants had an obligation to inform investors in addition to USACE.

Second, defendants assert that, because there was no definitive plan to extend the Project, failing to disclose the possibility of expansion was immaterial. But information is material if there is "a substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)) (internal quotation marks omitted). Plaintiffs sufficiently allege that defendants definitively planned to expand the Project, and disclosure of this plan would have significantly altered the total mix of information made available to investors. Because Collier's Congressional testimony was an effort to increase the likelihood of permit approval, a reasonable investor would consider facts cutting against his testimony, and therefore equivalently against permit approval, significant. Plaintiffs have, certainly, plausibly tendered such a pleading.

There is yet another box to check off on the plausible pleading checklist. PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The scienter requirement for Rule 10b–5 is "an intent to deceive, manipulate or defraud." *Setzer v. Omega Healthcare Invs., Inc.*,

8

968 F.3d 204, 212 (2d Cir. 2020) (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000)). A plaintiff adequately pleads such an intent by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)). Plaintiffs successfully allege both.

A complaint sufficiently pleads motive and opportunity to commit fraud when it pleads facts showing defendants "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000). Opportunity is generally presumed when a defendant is either a corporation or officer. *In re AstraZeneca Sec. Lit.*, 559 F. Supp. 2d 453, 468 (S.D.N.Y. 2008); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993). Plaintiffs adequately plead that defendants had a motive to hide their expansion plans, specifically, that they were motivated to do so in order to get the Project approved. *See* Opp'n Mem. at 49. By mixing in motive with opportunity, the cocktail is complete; the desire to get the Project approved provides the mix.

While the Second Circuit has held that motive cannot be inferred from a bonus based on corporate earnings or higher stock prices alone, motive can be inferred from compensation more directly tied to the alleged fraud. *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) (noting that courts have found motive based on the "magnitude of the compensation and the defendants' motive to sweep problems under the rug given one defendant's expiring contract"). Plaintiffs allege that Collier would receive a $12.5 million bonus if he secured approval of the permit. Am. Compl. ¶ 16. Therefore, plaintiffs adequately plead that Collier had the motive to commit fraud by misrepresenting the size of the

9

Project in order to obtain the permit for the Project, and correspondingly, to obtain a bonus for himself.

Even if plaintiffs had failed to allege scienter through motive and opportunity, they sufficiently allege scienter through strong circumstantial evidence of conscious misbehavior. A complaint adequately pleads scienter when it alleges defendants had "knowledge of facts or access to information contradicting their public statements." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Novak*, 216 F.3d at 308). The Pebble Tapes demonstrate conscious misbehavior, since they show defendants discussing plans for expansion of the Project while also discussing the importance of keeping this information nonpublic. Am. Compl. ¶ 47, 49.

There is still more to the pleading requirement. An allegation of securities fraud under Section 10(b) and Rule 10b-5 requires a plaintiff to establish that they reasonably relied on the defendants' alleged misrepresentation or omission, and that the fraud caused the plaintiff's loss. *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195–97 (2d Cir. 2003). The fraud-on-the-market theory establishes a presumption of reliance if the securities were traded in an efficient market, *Basic*, 485 U.S. at 241–42, as they were here. The "theory is based on the hypothesis that," in an efficient market, "available material information regarding the company and its business" determines "the price of a company's stock." *Id.* at 241 (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160 (3d Cir. 1986)). Misleading statements consequently defraud even those purchasers who "do not directly rely on the misstatements," and "[t]he causal connection between the defendants' fraud and the plaintiffs' purchase of stock . . . is no less significant than in a case of direct reliance on misrepresentations." *Id.* at 241–42 (quoting *Peil*, 806 F.2d at 1160–61). As noted in the discussion of defendants' "truth-on-the-market" argument above, plaintiffs adequately

10

alleged that defendants' fraudulent statements were not disclosed. Accordingly, reliance is presumed under the fraud-on-the-market theory.

Next, under Rule 10b-5, a plaintiff must show "loss causation," *i.e.*, that there is a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *Emergent Cap.*, 343 F.3d at 197).[5] Defendants contend that plaintiffs failed to adequately plead loss causation because plaintiffs failed to connect the alleged misstatements to their economic loss. Plaintiffs can show loss causation either through the corrective disclosure theory, *i.e.*, "the reaction of the market to a corrective disclosure which reveals a prior misleading statement," or through the materialization of risk theory, "whereby a concealed risk . . . comes to light in a series of revealing events that negatively affect stock price over time." *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 474 (S.D.N.Y. 2014) (quoting *Solow v. Citigroup, Inc.*, 827 F. Supp. 2d 280, 292 (S.D.N.Y. 2011)) (alteration original). Under either theory, plaintiffs' required showing is essentially the same: that a "misstatement or omission concealed *something* from the market that, *when disclosed*, negatively affected the value of the [asset]." *In re Vivendi Universal, S.A., Sec. Litig.*, 838 F.3d 223, 261–62 (2d Cir. 2016) (quoting *Lentell*, 396 F.3d at 173).

Plaintiffs sufficiently allege facts showing that the Pebble Tapes' corrective disclosure about defendants' intended size and scope of the Project caused the stock price to drop. Defendants once again argue that the tapes revealed no new, material, nonpublic information about the size, scope, or duration of the Project. But as discussed above, concrete plans for expansion were

---

[5] A plaintiff must also show "transaction causation," *i.e.*, that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Lentell*, 396 F.3d at 172 (quoting *Emergent Cap.*, 343 F.3d at 197). Defendants make no allegations that plaintiffs failed to make such a showing here, *see generally* Defs.' Mem. at 39–43, Reply Mem. at 56–65, and the Court therefore does not consider the issue.

11

different from what Collier stated in his testimony. Moreover, as also discussed above, the revelation through the Pebble Tapes that defendants were planning to pursue further expansion beyond what they had publicly stated led to a flurry of negative press attention and opposition from local political figures, which ultimately led to the Project's cancellation. Plaintiffs adequately alleged that the tapes' revelation of the true plans constituted a corrective disclosure; thus, plaintiffs adequately pleaded loss causation.

The materialization of risk theory, though, requires that plaintiffs claim that a risk previously concealed or a subsequent revealing event led to the decline in stock price, not only that the false statement itself led to the decline. *Salvani*, 50 F. Supp. 3d at 476 (S.D.N.Y. 2014). Defendants contend that there was no risk but that instead the possible extension of the Project was a benefit to Northern Dynasty shareholders and was seen as such by defendants. But even if defendants' view is accepted as reasonable, it is not the only reasonable view to which the circumstances would admit. Because EPA had previously determined the more extensive plan would have "unacceptable adverse effects" on the fishery habitats in the region, Am. Compl. ¶ 32, such a plan for extension could reasonably be seen as a risk, not a benefit.

Defendants claim that neither Senator Murkowski's statements nor news articles concerning the Pebble Tapes are actionable. But loss causation is "often compared . . . to the tort law concept of proximate cause, 'meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission.'" *Emergent Cap.*, 343 F.3d at 197 (quoting *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001), *abrogated on other grounds by Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 18 N.Y.3d 341, 939 N.Y.S.2d 274, 962 N.E.2d 765 (2011)). Intervening events such as Senator Murkowski's comments or articles criticizing the Project occurred after the release of the Pebble Tapes, and

proximateness is a matter of proof not to be decided at this stage. Any drops in stock price following these events are credibly alleged, at this stage, to have been caused by defendants' misrepresentation and the Pebble Tapes' corrective disclosure.

Finally, Section 20(a) provides liability for persons who control entities that violated Section 10(b), even if the person themselves did not directly violate Section 10(b). *See* 15 U.S.C. § 78t. Such a claim requires that a complainant show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns*, 493 F.3d at 108). Defendants' only clearly stated ground for dismissing plaintiffs' Section 20(a) claim is that there was no primary violation of Section 10(b). *See* Defs.' Mem. at 9, 21, 45. Because the Court concludes for the reasons explained above that plaintiffs did adequately allege a Section 10(b) claim, the Court also finds no reason to dismiss plaintiffs' Section 20(a) claim.

IV. Conclusion

In line with the foregoing, defendants' motion to dismiss the Amended Complaint is denied.

The parties are directed to contact the assigned United States Magistrate Judge for further pretrial management of the case.

So Ordered.

Dated: Brooklyn, New York
       December 18, 2022

/s/ Eric N. Vitaliano
ERIC N. VITALIANO
United States District Judge