UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK (BROOKLYN)

NEIL DARISH, et al,

               Plaintiffs,

v.

NORTHERN DYNASTY MINERALS
LTD., et al,

               Defendants.

Case No. 1:20-cv-05917-ENV-TAM

Brooklyn, New York
July 24, 2023
9:43 a.m.

TRANSCRIPT OF TELEPHONIC FAIRNESS HEARING
BEFORE THE HONORABLE TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: (Charles Hymowitz and Movant Lawrence Kelemen) | Jeremy Lieberman, Esq. Emma Gilmore, Esq. Villi Shteyn, Esq. Pomerantz, LLP 600 Third Avenue New York, NY 1001 |
| For the Defendants: (Northern Dynasty Minerals, Ltd., Mark C. Peters, Marchand Snyman, and Tom Collier) | Evan Goldstick, Esq. Steptoe & Johnson, LLP 1114 Avenue of the Americas New York, NY 10019 |
| Clerk: | J.F. |
| Court Recorder: | Electronic Sound Recording |
| Transcription Service: | Chris Hwang Abba Reporting PO Box 223282 Chantilly, Virginia  20153 (518) 302-6772 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**INDEX**

Page

Court's Ruling                                      30

(Call to order at 9:43 a.m.)

THE COURT:  Good morning.

Ms. Chan, whenever you're ready to start the recording, please.

THE CLERK:  Sure, Judge.  It's recording's on.  This is civil cause for a fairness hearing, docket 20-cv-5917, Darish v. Northern Dynasty Minerals, Ltd., et al.

Before asking the parties to state their appearance, I would like to note the following.

Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and re-broadcasting of court proceedings.

Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court.

Will the parties please state their appearances for the record, starting with the Plaintiff?

MR. LIEBERMAN:  Hi, good morning, Jeremy Lieberman, Pomerantz, LLP on behalf of lead Plaintiffs.  With me is my partner, Emma Gilmore and Villi Shteyn.

MS. GILMORE:  Good morning, Your Honor.

MR. SHTEYN:  Good morning.

THE COURT:  Good morning.

For the Defendant?

MR. GOLDSTICK:  And on behalf of Defendants, this is Evan Goldstick of Steptoe & Johnson, LLP.

THE COURT:  Good morning.

MR. GOLDSTICK:  Good morning.

THE COURT:  So we're here today, as you all know, for a fairness hearing as to the proposed class action settlement in this case.  So thank you all for being here.

And I'd like to just start off with an a little bit of procedural history.  As you must recall, this case was originally consolidated back in March 2021 after a memorandum and order was issued by Magistrate Judge Mann on referral by Judge Eric Vitaliano.

Plaintiffs thereafter filed an amended complaint in June 2021.  And the Defendant subsequently moved to dismiss with a fully briefed motion filed on December 15th, 2021.

On January 25th, 2023, Judge Vitaliano denied the motion and directed the parties to contact me for further pre-trial management of the case.

And on January 27th, just a short time thereafter, the parties requested that I stay discovery in -- so that the parties could have an attempt to resolve the case through mediation, which I granted.

So I learned from the motion papers that your mediation took place on March 27, 2023 before the retained mediator Robert Myer (phonetic).

And after the mediation was unsuccessful, the parties continued to negotiate and later notified the Court on April 17th, 2023 that you had reached a settlement in principle.

Is that procedural history correct, Mr. Lieberman?

MR. LIEBERMAN:  That's correct, Your Honor.

THE COURT:  All right, Mr. Goldstick, do you agree with that?

MR. GOLDSTICK:  Yes, I do, Your Honor.  Thank you.

THE COURT:  Thank you.

The Plaintiffs then filed their motion for a hearing on May 9th.  And that's docketed at ECF Number 55.  That's the motion that brings us here today because on May 15th, Judge Vitaliano referred the motion to me to hold a fairness hearing and to rule on any subsequent motion arising from the conference.

On June 7th, 2023, the Plaintiffs filed a motion for preliminary settlement approval, along with a proposed settlement agreement at ECF 56, which we have carefully reviewed and we then scheduled today's hearing.

So thank you for appearing today.  The motion papers have obviously been very informative and they address nearly all of my concerns.

There are a few areas where we'd like a little bit more information from the parties.  And I also would like to develop a record to some extent as to the negotiation process

that led to the proposed settlement agreement.

So, as you all know, at the preliminary approval stage, a court must make an initial evaluation of fairness prior to notifying the class.

Preliminary approval is of course guided by a likelihood standard.  In other words, whether the parties have shown that the Court will likely be able to grant final approval and certify the class.

The standard is of course not (indiscernible) and the judicial role in reviewing a proposed settlement is demanding.

Additionally, the Advisory Committee notes to Rule 23 stress that preliminary approval is an important event, I quote from the Advisory Committee Rules, and should be based on a solid record.

That said, I am also of course mindful of the strong judicial policy in favor of settlement, particularly in the class action context, and that, you know, mindfulness is derived in no small part from the in Payment -- In re:  Payment Card litigation language at 330 F.R.D. 11 at page 27.

So if the Court determines the notice to class members is justified by the parties showing as to the likelihood of final approval and class certification, it must then direct notice in a reasonable manner to all class members who will be bound by the proposal.

So, with all of that in mind, I'd like to begin with

the likelihood of final approval and then turn to the likelihood of class certification.

And after that, we can discuss the parties' proposed manner and form of notice.

So the parties, of course, are very familiar with the various procedural factors that weigh into the Court's determination of the likelihood of final settlement approval, one of course, being adequate representation.

So I'd like you to give me a little bit of an overview, Mr. Lieberman, about the parties' discovery efforts prior to mediation and settlement.

I know formal discovery did not commence, but how did you ensure that you had adequate information to negotiate and reach a settlement on behalf of the class?

MR. LIEBERMAN:  Your Honor, thank you.  The investigation taken to date as Your Honor noted, was not formal.  We have yet to -- Defense had yet to answer the complaint and we have yet to engage in formal discovery.

And the -- so therefore, any discovery is limited to informal discovery based upon our -- in our amended complaint, we had interviewed confidential informants, who had given us color as to the merits of the claims, as well as there's a relatively extensive record via Congressional testimony and also other government investigations into Defendants, which gave us a very solid basis to weigh the merits of this action.

Ultimately, our conclusion was, it's the role of the litigation to date, was this was a very meritorious case, but with a -- against an issuer and against Defendants with limited resources.

And so, we basically achieved the settlements.  With our action, there's a parallel committee and proceeding, which you know, essentially exhausted the available insurance proceeds.

And looking at the company's market capitalization cash on hand right now that we see they have about somewhere between $7- to $9 million cash at hand.

Their market capitalization has declined significantly I believe over 90 percent since this -- since the -- since its high during the class period, more than 90 percent, Your Honor.

And so, all those factors show us a company that was in significant distress that may not be able to pay for a judgment down the road and that insurance proceeds at that point might be exhausted.

And so, while we on the one hand really believe very much in the merits of the action, and that this is a case that would pass through all the procedural hoops of a class action and ultimately return a favorable verdict for Plaintiffs, we, you know, realistically looked at the company and its financial wherewithal and said that a resolution now, something for the

class, is better than fighting, you know, inaction through judgment when there's nothing at the end of the day for the class.

THE COURT: All right, so in terms of the efforts to investigate, you described a number of avenues including discussions with confidential informants, Congressional testimony, other governmental investigations. And I assume that includes the undercover recordings that you detailed in the complaint?

MR. LIEBERMAN: That's correct, Your Honor.

THE COURT: And of course, the public filings and the various statements, press releases, things of that nature?

MR. LIEBERMAN: Yes, that's correct, Your Honor.

THE COURT: And you also touched upon one of my later questions, which is the ability to withstand greater judgment. So if you could just expand a little bit on your financial review. You indicated that you had determined that they only have about 7- to 9 million cash on hand. Where did you derive that number?

MR. LIEBERMAN: That's just from publicly available sources. The -- you know, the company still files relevant filings with the Securities and Exchange Commission and they make, you know, quarterly statements to investors.

And so, based upon that, we were able to glean that information. Currently, the stock is trading at 25 cents per

share, which is, you know, well below where it was trading.  It was trading at about -- at a high of $13 per share, or excuse me, of $18 per share during the class period.

So we see that's, you know, well -- actually 90 percent -- it's more like 99.9 percent or so.  The company's really, you know, struggled a lot since this whole scandal erupted 2 to 3 years ago.  And so, that's really (indiscernible) our view, you know, with respect to settlement.

THE COURT:  You also mentioned the parallel Canadian proceeding and the concerns that the insurance in the case or the insurance that the Defendants carried had somewhat been exhausted.  Can you expand a little bit on how you learned that?

MR. LIEBERMAN:  Well, through the -- I would say that they had not been exhausted, but that they might be exhausted through the various litigation and Defense costs as our case went through discovery.

We learned -- I'll decline -- I'll leave it to Defendants as to what more color they want to give as far as available insurance, because it's not in the public record, but I would say that we learned a lot about the available insurance during the mediation sessions.

And that guide -- that led us to the conclusion that we should take what we can now as opposed to continue to waste and erode further policy proceeds.

THE COURT:  All right, that's a good and specific segue.

Mr. Goldstick, is there anything you'd like to add with regard to the discovery process that led to the settlement and/or the company's ability to withstand greater judgment?  I know this is obviously a sticky area for you as Defense representative.

MR. GOLDSTICK:  Yes, thank you, Your Honor.  I won't add too much.  As Mr. Lieberman alluded to, a lot of this would still remain, you know, out of the public eye.  And we intend to keep it that way.

I will just, you know, put in some standard, you know, we obviously disagree with Plaintiffs as to the strength of their case and the future success of the merits.

Despite the outcome of the motion to dismiss, you know, the Defense view is this was a, you know, heavily pled complaint and discovery.  And the merits and the truth coming out would have, you know, really, really left the Plaintiffs with a shell of a case to the allegation.

And in terms of the, you know, timing of settlement and discovery, as Mr. Lieberman alluded to, there was no formal discovery.  After the motion to dismiss, the parties went straight into a mediation relatively quickly.  Although that was unsuccessful, not much was exchanged beyond that before ultimately reaching agreement.

And we believe the agreement is fair and just for the shareholders and achieves the right balance of equities on both sides.

THE COURT: Okay, well, thank you for that. So, in terms of the procedural factors, we had started with adequate representation. I'd also like to discuss the arm's length negotiation just a little bit.

As I noted earlier, you did work your mediation through Mr. Myer at JAMS. Obviously, he's very well regarded in the field.

And I noted that you did not reach a conclusion with -- through the mediation itself, but can you tell me a little bit about how the mediation helped to lead to the ultimate settlement if that is the case, Mr. Lieberman?

MR. LIEBERMAN: Sure. A key issue was is, you know, our strong belief in the merits of the action. And you know, we did believe that a settlement of 6.375 million, you know, didn't reflect properly the merits of the case.

But as we had time to learn about the strains of the company, about the, you know, eroding policies, it took us time to, you know, to come to believe that this was something that even though, you know, we felt that it was a relatively low percentage of recovery, our view as compared to the merits, you know, Mr. Myer had convinced us through the process of discussions with Defendants, which I had a number even after

failed -- we had discussions with Defense counsel before the mediation and even after the mediation, as well as a number of discussions with Mr. Myer.

And it led us to conclude that really, you know, we should take the available policies now.  There are a number of constraints on the policies including the Canadian action, including governmental proceedings.

And so, it was just -- from our view, we didn't have many options left as far as trying to secure some recovery for the investors in this case.

So, it's to say, to sum it up, Your Honor, we went -- came to the mediation session in late March.  And we're dissatisfied with what was being offered.

And as time went on and we had further discussions and did further due diligence, we came to believe that this was really the best option for the class.  It wasn't a whole lot more or potentially there'd be a lot less available, you know, a year or two down the road.

THE COURT:  And that brings us right next then to the first substantive factor that I wanted to discuss, which is the cross risks and delay of a trial.

Can I assume your analysis as to the fairness of the proposed settlement was driven by those questions that you just went through?

MR. LIEBERMAN:  Yeah.  The timing certainly was -- is

a factor.  And timing and all the complexities of a case like this.  Defense counsel doesn't come cheap.  And they were going to certainly erode large swaths of the available insurance.  And so, we felt, given the complexity and given the time, this was the best option for the class.

THE COURT:  Okay.  I also note that in the papers, you know, was this question of causation of what seemed to be a sort of flashpoint in the discussion.  Did you take the challenges of proving causation into consideration?

MR. LIEBERMAN:  Your Honor, we did.  I -- you know, Defendants certainly raised, you know, causation and issues, you know, whether there was loss causation compared to the statements.

In our view, we would have successfully surmounted any challenge as far as loss causation goes, but there were in the motion to dismiss briefing that was, you know, a lot of issued were raised.

There were a lot of issues raised as well.  You know, there was -- we had, you know, sought damages well after the Pebble case had come to light.  And if so, the truth was already known to the market.  So, therefore, there could not be any recovery for those subsequent declines.

We had arguments that there were further materialization of risk.  And when the government authorities did not allow for further -- denied the permits, that was also

a materialization of the risk that was not disclosed to investors.

And so, I think it's fair to say that there would be -- has been a hotly contested issues regarding loss causation in this case that would have been battled by experts in this litigation. So we can concede that.

We don't concede -- you know, we do believe that -- so a challenge would have been mounted. We think we would have surmounted them, but again, that would have been all at significant cost.

THE COURT: Right, yes. So the next criterion that I have to look at under Federal Rule of Civil Procedure 23(e)(2)(C) is of course the effectiveness of the proposed method for distributing relief to the class.

The claim form, which you submitted, it's ECF Number 57, page 19 to 20, and the way that the opt-outs are treated all seemed fairly straightforward.

Is there anything you'd like to amplify with regard to your effective methodology and claims processor? I understand Epiq has done a lot of these cases, but is there anything you'd like to put on the record with regard to that factor?

MR. LIEBERMAN: Only, you know, Epiq is a seasoned claims administrator. As far as the process for distributing claims, it goes by fairly plain vanilla claims administration

process where a plan of allocation is set forth in a notice and that determines based upon the allegations of the complaint as to when the truth was revealed to the market on a pro rata basis based upon if you held your -- purchased your shares during the class period and held them through the various disclosures, you would get, you know, your pro rata portion of the recovery.

All of that subject to the PSLRA is 90-day bounceback, which says that you're limited in your recovery to the 90-day average of the stock after the class period. Whether you sell your shares during the 90 days, then you're limited to a date of sale.

There's a senior purchase price in the 90-day average or if you hold your shares through that 90-day period, then you're just limited by your purchase price to the 90-day average.

And so, there's just basically a fairly standard formula for distributing these class monies. And we followed that with consultation of our experts and we came up with a plan of allocation accordingly.

THE COURT: And the table that you've included in the notice, the price per share that was based upon discussions with your expert -- the discount per share based on the different dates of disclosure, those were reached how with discussions with your expert, evaluation of the overall stock

price changes?  How did you reach that chart?

MR. LIEBERMAN:  Both, Your Honor.  We asked our expert to craft a plan of allocation based upon the allegations of the complaint.

And so, the -- basically the -- and looking at page 9 of the notice, which is Table 1, what occurs is that if you purchase your shares during the class period, you held through all of the dates, you have a per share price inflation of 146 because that's just the sum total of all of the -- sum total of all the corrected disclosures that were alleged in the complaint.

And if you purchased and held only for some of them, then you get a lower amount based upon the stock price decline on a date that you held.  And so, that's how we formulated the plan of allocation.  And that's reflected on page 9.

And that would -- so we basically told the expert, you know, draft a plan of allocation pursuant to the allegations with the complaint.  And this is what they came up with.

THE COURT:  Thank you.

So I wanted to next turn to the third factor under 23(e)(2)(C), which is of course attorneys' fees.  And I note that lead counsel anticipates seeking an award of attorneys' fees of no more than one-third of the settlement amount, which is fairly routine given the overall size of the settlement in

this case.

I would of course advise counsel, however, to submit your time and billing records and to make sure that everything is well documented, including the costs when time comes for final settlement approval.

I did have a question, however, about the costs.  In paragraph 3.4 of the Settlement Agreement and in the Preliminary Approval Order, you talk about $500,000 of potential costs before the effective date for administration costs, but then you talk about 200,000 after the effective date.

So for a total of it seemed to me 700,000 as possible, but in all of the notices to the class, it seems to indicate that there was a cap or an anticipated cap of $500,000 on for costs.

So I wanted to really understand two things.  One, why are the costs as high as they are?

And two, what -- which numbers are accurate and are the notices accurate based upon the Preliminary Approval Order, the Preliminary Approval Order need to be changed?

Can you please expand on that, Mr. Lieberman?

MR. LIEBERMAN:  Sure, Your Honor, when we are speaking about the costs in the notice, which would be about the litigation costs, the costs incurred by counsel in this action, and those are going to be no more than $500,000.

What Your Honor's referring to is the claims administration costs.  We don't anticipate -- and so the -- we're suggesting that the order would allow for payment of costs up to $500,000 until the effective date.  And then, there's -- and this is all the work for the claims administrator.

And then potentially, an additional 200,000 in costs that would come afterwards.  And it's really just to allow the flexibility for us to pay the claims administrator as the administration work occurs through the various procedures and various points of the settlements.

And we anticipate that that number will come in lower than $700,000, but we wanted to provide that, you know, that room if necessary in order for the claims administrator to do work without having to repeatedly go back to the Court for permission to pay its bills.

THE COURT:  Understood, but I'm a little bit uncomfortable then with the language in the notices because the notices seem to suggest pretty sternly that $500,000 is the cap.  And if that's not the cap, I don't think you're being completely transparent with the cap.

MR. LIEBERMAN:  Okay, so Your Honor --

THE COURT:  Any response on that?

MR. LIEBERMAN:  Your Honor, I understand Your Honor's point and it's a good one.  So we can go back and submit a

proposed notice that includes the anticipated costs for claims administration.

THE COURT:  I mean, looking at Exhibit A-1, which is the long form notice and by far the most detailed --

MR. LIEBERMAN:  Yeah.

THE COURT:  -- it indicates on page 2 that lead counsel will apply for reimbursement of litigation expenses paid or incurred in connection with the institution, prosecution, and resolution of the claims against the Defendants in an amount not to exceed $500,000.

And it doesn't suggest that there's going to be an extra $200,000 for costs for Epiq if that's what the extra $200,000 is referring to.

I mean, it's, you know, the class is being led to believe that only $500,000 is going to be taken out in addition to the third for counsel.

I mean, when you're talking about $700,000 in costs in a -- plus a third for counsel in a fund of this size, you're talking almost half the fund for litigation fees and costs. It's a lot.

MR. LIEBERMAN:  No, we understand, Your Honor.  So let us -- we'll go back and get a hard -- a harder estimate from claim administrator as to the anticipated costs.  And then, we'll revise the notice accordingly and submit it to the Court.

THE COURT:  Okay, thank you.  And that issue of course is propagated throughout the notices, the short form notice, the postcard notice --

MR. LIEBERMAN:  Yes.

THE COURT:  -- all of them contain that same number of 500-.  And if you expect your litigation costs to be less than 500-, and you have a firmer estimate of the administration costs, maybe it is the $500,000 is the right number.  And that would seem to me still high to be counted based on other cases that I've presided over, but at least it would be clearer to the parties.

And so, if you need to make a change to the preliminary approval order as well as the notices, you know, you should just apprise us of where all the changes need to be made and submit revised forms.

MR. LIEBERMAN:  Okay, we'll do so, Your Honor.

THE COURT:  Okay, thank you.  I note that and the parties also have another agreement in the case, which is pretty standard, but I did want to review that in camera.  So when could the parties submit that to the Court for a review?  That's the fourth factor under (e)(2)(C) of Rule 23.

MR. LIEBERMAN:  As far as Plaintiffs are concerned, we could just submit that along with the revised notice, which we anticipate submitting within the next day or so, if that's okay with Defense counsel.

THE COURT:  Any concern about this, Mr. Goldstick?

MR. GOLDSTICK:  Yeah, I'd just like to confer with my client before we submit it, but I don't anticipate that being an issue.

THE COURT:  Okay, I mean, I did note in the agreement that it was set forth that it would be provided in the event the Court would ask for it.

And I'm asking for it because I do think I just need to take a look.  I've seen them in other cases.  They're usually fine, but just need to know that there's nothing unusual in that agreement before we -- I can recommend that it be approved to Judge Vitaliano.

MR. GOLDSTICK:  Of course, Your Honor.  And we'll work with Mr. Lieberman and counsel as far as that.

THE COURT:  All right, thank you.

All right, now turning to the question of equitable treatment, obviously, the parties addressed the equitable treatment factor pretty extensively in putting forth the plan of allocation and that was very helpful.

I just wanted to understand perhaps a little bit regarding the anticipated fee award for the lead Plaintiff.

Mr. Kelemen was potentially up to $20,000.  What role has he played in the litigation that would warrant 20,000 in compensation to him out of the settlement fund as compared to the 5,000 for Mr. Hymowitz?  If you could just expand on that a

little bit, Mr. Lieberman?

MR. LIEBERMAN: Sure. You know, Mr. Kelemen was the lead Plaintiff. He was really the one that we were in touch with and who had been guiding us through the litigation and had taken the role as a lead Plaintiff with the ultimate decision-making authority.

Mr. Hymowitz, you know, filed one of the initial actions in this case. He was the main Plaintiff, but it was certainly more involved and time put in by Mr. Kelemen in his role as lead Plaintiff pursuant to the PSLRA, which we would think warrants extra compensation.

And again, the notice does say, you know, not to exceed. We don't -- we want to first -- we haven't asked Mr. Kelemen for his time records and how much time he's put into this case.

And that would be a key determinant in the ultimate award that we would request, but based on the size of the settlement, based upon our, you know -- based upon the posture of the case at the time of settlement, we thought this was a good upper bound to put on the (indiscernible) award request and that we would ask Mr. Kelemen to submit his -- any time records that he has and his estimates of the time that he's put into the case and then proceed with requests from there.

THE COURT: Fair enough. You know, certainly would encourage you to include any documentation that you have that

helped to you arrive at the number when you do submit the final approval, you know, paperwork.

I don't anticipate that your expected award of up to $20,000 would preclude approval.  I certainly think that's within the realm hood -- realm of likelihood, which is of course, the consideration that we're looking at for the preliminary approval.

Just, you know, I do note that the reasonableness and amount of the incentive award could of course depend upon the average that's ultimately paid to similarly situated individual claimants.

So, as long as it's documented and you have a rationale, I certainly think that this is within the realm of reasonable.

I just wanted to make sure that when you do make your application for final settlement approval, that it's decently documented so that Judge Vitaliano can make a final informed decision.

MR. LIEBERMAN:  We agree, Your Honor.

THE COURT:  Thank you.

All right, so I think in terms of the remaining Grinnell Factors, the stage of proceedings versus the amount of discovery, we've really discussed that.  The ability to withstand greater judgment, we really talked about that in detail when talking about how much work the parties had done to

arrive at the proposed settlement.  And the range of reasonableness was well addressed in the papers and was certainly addressed today.

So looking now to the likelihood of class certification, of course, Rule 23 encompasses the familiar four prerequisites for class certification, numerosity, commonality, typicality, and adequacy of representation.

Being a PSLRA case with similarly situated putative class members, I think that the commonality and numerosity and typicality are well met.

I also think that, you know, your firm is of course very well regarded in the field.  Mr. Lieberman, you have been deemed adequate counsel in many a PSLRA case.

So I think that you are on solid ground for predominance and superiority and the other standard Rule 23(a) factors.

So I really only have a couple of questions.  You talked about the number of potential class members.  Do you have any estimate of that yet?

MR. LIEBERMAN:  No, Your Honor, we're doing that. The best we get is -- that really comes towards the end of the claims process, which we propose is, you know, occurs at the final hearing.

We can -- or the best we could estimate is the amount of damage shares.  And that -- I could go take a look.  I don't

have it on me at the moment, but that's all you'll know is, you know, what we estimated the amount of damage shares to be during the class period and how that's divided up amongst beneficial owners.  We simply won't know until the claims process is complete.

THE COURT:  Understood, but we're talking well over 40 hundred, right?

MR. LIEBERMAN:  Oh, we're talking about thousands, yes.

THE COURT:  That's what I assumed, okay.  All right, so we've already talked a little bit about the notices.  And one issue that I had spotted in reviewing all the notices.

So I have of course reviewed your long notice, the summary notice, and the postcard notice.  And collectively, they provide a substantial amount of notice as required under Rule 23.

One thing I was concerned about though in addition to the number about the amount of the costs was Rule 23 (c)(2)(B)(iv) states that notices must notify class members that they may enter an appearance through an attorney if so, they desire.

And I think that that notice was really only conveyed in the long form notice.  And it was, you know, pretty much in the middle, not front and center.

I'm not saying that the long notice was inadequate or

misleading, but have you ever included that notice in the postcard notice in the short notice, Mr. Lieberman?

MR. LIEBERMAN: We can look at our prior records for the cases. I can't speak definitively right now, but if Your Honor orders it or requests it, we can certainly do so.

THE COURT: Yeah, I think you should. I mean, it's one of the explicit requirements of Rule 23(c) and I think it's important. I think it should be front and center.

We recently required the same in the 3D Systems litigation in the revised forms that the parties submitted on the docket in that case where, you know, it's like half a sentence of additional information, but I do think it better comports with Rule 23 if you'd like it take a look at the notices.

I can't off the top of my head remember at the moment which firm put that together, but it's one of the firms with whom you work all the time. So I'm sure you're familiar with their form.

MR. LIEBERMAN: Yeah.

THE COURT: And I also note that the parties have a detailed schedule that they put forth with regard to the different steps that would be, you know, put into place to notify the class.

For the record, could you just briefly walk me through the parties' proposed plans in order to make sure that

the class is provided with (indiscernible)?

MR. LIEBERMAN:  Sure, just a moment.  When you say the plan, the plans for notice or the plans for the general schedule leading to final approval hearing?

THE COURT:  The general schedule, just the basics.

MR. LIEBERMAN:  Yeah, sure.

THE COURT:  I don't need every detail.  It's set forth in your papers in a detailed chart at page 25 of your memo.  So just want to make a record.

MR. LIEBERMAN:  Okay, yeah, okay.  So that, you know, from 21 days from the entry of preliminary approval, the summary notice should be emailed to anyone whom the brokerages and other parties can identify as a class member.  That in addition will publish the summary notice as well.

And for anyone who we can not identify by email, but that the brokerages and other nominees have information and addresses, those will be sent out by a postcard notice.  So, basically, it should be overwhelming majority of the class members get either an email or a postcard notice.

And that's -- that process really starts immediately after preliminary approval and, you know, continues through the 21 days and it will continue onwards as the process proceeds.

Then, at that stage, there's -- the 28 days before the settlement hearing, I believe Plaintiffs put in their papers for final approval for approval of the settlement, the

plan of allocation, and also additional attorneys' fees and expenses.

And so then, one week thereafter is the deadline for exclusion by class members and also for objections.  And then, the deadline to submit a settlement claim form is one week after the settlement hearing.

And the reply papers in support of the settlement and addressing any objections or any exclusions would occur seven days before the settlement hearing, which is two weeks after any objections are lodged.

And then, that's filed by the actual, you know, final approval hearing, which you know, we request happens at a course early as possible convenience, 100 days, you know, no earlier than 100 days after the final approval is entered.

THE COURT:  All right, well, it certainly seems they're all consistent with the procedures utilized in other similar cases.

So in terms of the necessary next steps, it sounds as though we're going to need the parties to submit their revised notices and/or revised preliminary approval order and stipulation, Mr. Lieberman --

MR. LIEBERMAN:  Uh-huh.

THE COURT:  -- to deal with their question of the costs.

I'd also like the parties to please submit

their -- the agreement that we talked about before with regards to, you know, whether or not there's too many opt-outs.  And I will review that in camera.

Of course, that can be submitted under seal on the docket.  I give you permission preemptively to do that.  You don't have to file a motion to file it under seal.  I'm giving you that permission right now.  And we will note that in the minute entry and order following the conference.

From there, once we receive those documents, you know, just want to walk through procedurally what happens next.

You know, I -- based upon what I've reviewed so far, I do believe that I'm prepared to recommend preliminary approval of the settlement and the settlement class and the notices as revised per our conversation to Judge Vitaliano.

And then from there, you need to enter the proposed order of preliminary approval.  I didn't see a signature block for him on the stipulation.  Do you need him to so order that or is that -- the preliminary approval cover that, Mr. Lieberman?

MR. LIEBERMAN:  The preliminary approval incorporates the terms of the stipulation.  It's not required for the stipulation.

THE COURT:  Okay, that's what I thought.  I just wanted to confirm, so that I can be very clear, you know, in my report and recommendation as to the anticipated procedural next

steps.

And then from there, the parties would be of course directed to issue the notices in accordance with their proposed schedule.

We would appoint Pomerantz as class counsel for purposes of settlement and recommend that Judge Vitaliano set the final settlement hearing for a specific date, time and place, as soon as possible at least 100 days from the preliminary approval order.

Are there any other procedural steps that need to follow my recommendation to Judge Vitaliano, Mr. Lieberman?

MR. LIEBERMAN:  I don't think so, Your Honor.  So it's anticipated that Judge Vitaliano will hold a final fairness hearing?

THE COURT:  You know, I don't know.  That's really up to him.  If you wanted to consent to jurisdiction for my handling it, he does regularly approve consent to jurisdiction of the magistrate judges, but we would leave it up to him of course as to whether or not he chooses to refer that back to us or if he chooses to hold it.

MR. LIEBERMAN:  Okay.

THE COURT:  What we would do in the report and recommendation recommending approval is that's one of the, you know, steps that needs to happen in the packet of approving the proposal.

MR. LIEBERMAN:  Okay, that's fine.

THE COURT:  Okay, so if you guys would like to discuss consenting to my jurisdiction, you're welcome to do so. You can file -- you can consent to jurisdiction at any time. Certainly no pressure and certainly would not -- no adverse consequences if you choose amongst yourself not to consent, but it is an option that's always available and that does, you know, in organized settled cases, it can sometimes speed things up a little bit because there's no need to wait for the approval of the report and recommendation, but totally up to you.

MR. LIEBERMAN:  We'll discuss with Defense counsel and refer it.

THE COURT:  Yeah, okay, whatever you want to do is fine with me.  I have to write on it either way.  It's just a question of timing.

So prepared, as I said, to recommend preliminary approval.  And we'll wait, of course, for your revised filings. We will have to of course issue a report and recommendation following receipt of your supplemental filings, but I am glad that you were able to reach a proposed settlement.

Is there anything else we should do today, Mr. Lieberman?

MR. LIEBERMAN:  No, Your Honor.

THE COURT:  Mr. Goldstick, anything from Defendant's

perspective that we should have covered or need to make a record of?

MR. GOLDSTICK:  Nothing further from Defendants. Thank you, Your Honor.

THE COURT:  All right, well, thank you both for all of the additional info.  Very helpful.  I look forward to getting your revised documents.

And you can expect your report and recommendation or a memorandum and order, whatever format is appropriate depending on what you guys decide to do in a matter of time after we receive those documents.

MR. LIEBERMAN:  Thank you, Your Honor.

THE COURT:  All right, thank you guys.

MR. GOLDSTICK:  Thank you, Your Honor.

THE COURT:  Have a great day.  Take care.

UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

THE COURT:  Thank you, bye bye.

     (Proceedings concluded at 10:25 a.m.)

**CERTIFICATE**

I, Chris Hwang, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____        <u>July 25, 2023</u>
Chris Hwang                        Date
Court Reporter