UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X

IN RE NORTHERN DYNASTY
MINERALS LTD. SECURITIES
LITIGATION

**MEMORANDUM
AND ORDER**
20-CV-5917 (TAM)

----------------------------------------------------------X

**TARYN A. MERKL,** United States Magistrate Judge:

This is a consolidated, putative class action brought against Northern Dynasty

Minerals Ltd.; its Chief Executive Officer, Ronald William Thiessen (who is also the

Director of the Pebble Limited Partnership ("Pebble Partnership"), a wholly owned

subsidiary of Northern Dynasty); and the former Chief Executive Officer of the Pebble

Partnership, Thomas Collier. (*See* Amended Complaint ("Amend. Compl."), ECF No.

37, ¶¶ 14–16.) Plaintiffs Lawrence Keleman and Charles Hymowitz each purchased

Northern Dynasty's common stock between December 21, 2017, and November 24, 2020

(the "Class Period"), and have filed suit on behalf of all similarly situated purchasers,

other than Defendants and other specified groups, as set forth more fully below. (*Id.*

¶¶ 1, 12–13.) Plaintiffs claim monetary harm resulting from Defendants' alleged

violations of Sections 10(b) and 20(a) of the Exchange Act of 1934, 15 U.S.C. §§ 78j(b)

and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. (*Id.* ¶¶ 142–57.)

Currently pending before the Court is Plaintiffs' motion for preliminary settlement approval. For the following reasons, the Court grants Plaintiffs' motion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

### I.  Factual Background

Northern Dynasty is a mining exploration and development company, and "owns 100% of the Pebble Partnership, which was established in mid-2007 to engineer, permit, construct[,] and operate a mine at the Pebble Project." (Amend. Compl., ECF No. 37, ¶ 19.)  During the Class Period, "Northern Dynasty's [proposed] plan [was] to develop what Defendants deemed 'one of the world's most important mineral resources,'" through its mining efforts in the United States, including Alaska.[2] (*Id.* ¶ 2.) Northern Dynasty securities were trading during the Class Period on the New York Stock Exchange under the ticker symbol "NAK." (*Id.* ¶ 14.) Thiessen served as CEO of the company from November 2001 to present, and served as the Director of the Pebble Partnership, established in 2007, to present. (*Id.* ¶ 15.) Collier served as CEO of the Pebble Partnership from February 4, 2014 until September 23, 2020. (*Id.* ¶ 16.)

In order to move forward with their plan, Northern Dynasty needed to obtain a permit under Section 404 of the Clean Water Act, which may be issued by the U.S. Army Corps of Engineers ("Army Corps"). (*Id.* ¶ 23.) "Under [Section] 404(c), however,

---

[1] The Court recites the facts as alleged in the amended complaint. *See Mikhlin v. Oasmia Pharm. AB*, No. 19-CV-4349 (NGG) (RER), 2021 WL 1259559, at *1 (E.D.N.Y. Jan. 6, 2021). Defendants deny these allegations and dispute liability. (*See* Revised Settlement, ECF No. 64-1, at 3–4.)

[2] Plaintiffs' amended complaint alleges as follows: "Although the Pebble Project would have been located on state land, it was still subject to federal permitting requirements." (Amend. Compl., ECF No. 37, ¶ 23.)

the Environmental Protection Agency ('EPA') may prohibit or restrict fill activities if it determines that a project would have an 'unacceptable adverse effect' on the fishery habitats . . . ." (*Id.*) The EPA ultimately concluded that given the original proposals made by Northern Dynasty, it had "reason to believe that mining of the Pebble deposit at any of [the proposed sizes], even the smallest, could result in significant and unacceptable adverse effects on ecologically important streams, wetlands, lakes, and ponds and the fishery areas they support." (*Id.* ¶ 32.) "Northern Dynasty sued the EPA over the regulatory actions that prevented the Pebble Project from advancing to a permit application with the Army Corps," and following the settlement of the lawsuit, "on December 21, 2017, Northern Dynasty announced its intention to apply for a Clean Water Act permit with the Army Corps using a significantly smaller footprint and a closure plan after 20 years." (*Id.* ¶ 33.) "Defendants deliberately crafted a much smaller, limited, 20-year mining proposal and offered a mine closure plan to obfuscate their actual plans for future expansions . . . design[ing] this scheme in hopes of securing a permit from the Army Corps." (*Id.* ¶ 34 (emphasis omitted).)

Plaintiffs allege that in order to obtain the permit, "Northern Dynasty and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market . . . artificially inflat[ing] the prices of Northern Dynasty's securities . . . by misrepresenting the size, scope, and duration of the Pebble Project," leading to the fall of Northern Dynasty's stock price and investor losses, once these misrepresentations surfaced. (*Id.* ¶ 112; *see also id.* ¶¶ 58–128.) More specifically, Plaintiffs claim that Defendants issued press releases on December 21, 2017 and on

January 5, 2018 (which were also filed with the SEC), collectively misrepresenting the planned size, scope, and duration of the Pebble Project. (*Id.* ¶¶ 59–73.) Ultimately, Plaintiffs contend Northern Dynasty made "materially false and misleading" statements on its official website, in SEC filings, and in press releases throughout the entirety of the Class Period. (*See id.* ¶¶ 58–111.)

A series of conversations ("The Pebble Tapes") recorded between undercover investigators belonging to a non-profit organization, i.e., the Environmental Investigation Agency ("EIA"), expressing interest in investment opportunities related to the Pebble Project, and Defendants Thiessen and Collier, "revealed Northern Dynasty's actual plans to build a much larger and long-lived mine than described in Northern Dynasty's permit application with the Army Corps, in public SEC filings, and in Congressional testimony." (*Id.* ¶ 45; *see id.* ¶¶ 46–57.) The tapes revealed that, when pitching to individuals whom they had thought were potential investors, Defendants Thiessen and Collier represented "that the 20-year project described publicly will . . . be merely the first stage in Northern Dynasty's planned, expansive development." (*Id.* ¶ 46 (emphasis omitted).) Unbeknownst to the public, Defendants had hatched this plan, from the very beginning of the Class Period, to scheme and mislead for the purposes of obtaining a permit, while covertly planning to develop one of the largest mines in the world. (*See id.* ¶¶ 57, 44.) "When the truth emerged through a series of corrective disclosures and materializations of risks that the Pebble Project would not receive a permit, Northern Dynasty's stock went into a tailspin, wiping out hundreds of

millions of dollars in market capitalization and injuring hundreds of thousands of investors." (*Id.* ¶ 6.)

On August 24, 2020, the Army Corps released a statement finding that "'the project, as currently proposed, cannot be permitted under [S]ection 404 of the Clean Water Act.'" (*Id.* ¶ 113 (quoting U.S. Army Public Affairs, *Army Finds Pebble Mine Project Cannot Be Permitted as Proposed*, U.S. Army (Aug. 24, 2020), https://www.army.mil/article/238426/).)  With this news, Northern Dynasty's common share price fell 37.9%, to close at $0.9 per share on August 24, 2020, damaging investors who purchased the stock at artificially inflated prices. (*Id.* ¶¶ 114, 144.) For the next several months (leading up until the remainder of the Class Period), news contradictory to Northern Dynasty's publicly filed and shared plans emerged from various sources, including *Politico*, the EIA, the *Washington Post*, *The New York Times*, the *Outside*, the office of Alaska Senator Lisa Murkowski, and finally the Army Corps (again), announcing that it has denied the permit for the Pebble Project. (*See id.* ¶¶ 113–28.[3]) Each of these instances resulted in a falling of Northern Dynasty's common share price, further damaging investors each time. (*See id.*)

_____

[3] On August 25, 2020, *Politico* published an article called "Pebble Problems Stack Up," reporting that "'[t]he mitigation projects required may be difficult for the mine developers to meet . . . push[ing] any final decision on the mine beyond the end of Trump's first term, potentially leaving it up to his challenger, Joe Biden, who opposes the project.'" (Amend. Compl., ECF No. 37, ¶ 115.) On September 21, 2020, the EIA put out a press release containing a transcript of the Pebble Tapes. (*See id.* ¶ 117.)  The next day, on September 22, 2020, both the *Washington Post* and *The New York Times* published articles in reaction to the tapes. (*See id.* ¶ 118.) On October 28, 2020, the *Outside* followed suit, publishing their own article in reaction to the tapes. (*See id.* ¶ 120.) On October 29, 2020, the EIA released additional tapes and emails, "includ[ing] Thiessen discussing his influence over Alaska's senators and pro-Pebble governor" (*Id.* ¶ 122.) On November 18, 2020, Alaska Senator Lisa Murkowski issued the text of her remarks at the Resource Development Council 2020 Alaska Resources Conference, where she

## II. Procedural History

Plaintiffs filed suit in December 2020, alleging causes of action under Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants, and Section 20(a) of the Exchange Act against Thiessen and Collier. (*See id.* ¶¶ 142–57; *see also* Dec. 4, 2020 Compl., ECF No. 1; Dec. 17, 2020 Compl., Case No. 20-CV-6126 (ENV) (TAM), ECF No. 1.) Specifically, investors filed two separate actions, which the Honorable Roanne L. Mann consolidated on March 17, 2021, appointing Lawrence Kelemen as lead plaintiff and Pomerantz LLP as lead counsel.[4] (*See generally* Mem. and Order, ECF No. 32.)

Thereafter, Defendants moved to dismiss the action on December 15, 2021, for failure to state a claim to relief. (*See* Mot. to Dismiss, ECF No. 39; Mem. in Supp. of Mot. to Dismiss, ECF No. 41.) On January 25, 2023, the Honorable Eric N. Vitaliano denied Defendants' motion. (*See* Order Den. Mot. to Dismiss, ECF No. 47.) The undersigned magistrate judge directed Defendants to file an answer or otherwise respond to the complaint by February 16, 2023. (*See* Jan. 26, 2023 ECF Order.) Defendants requested a stay in order to attempt resolution through mediation. (*See* Letter Mot. to Stay, ECF No. 48.) The motion was granted, in part, on consent, in light of the parties' representations

---

stated "that this is the wrong mine in the wrong place" and that she thought "that the Army Corps should deny [Northern Dynasty's] permit application." (*Id.* ¶ 124.)

[4] The later filed action, No. 20-CV-6126, was initiated by Charles Hymowitz, whom the Court notes was named as a plaintiff in the amended complaint filed after case consolidation. (*See* Amend. Compl., ECF No. 37.) Early on in this action, several class members moved to consolidate cases, i.e., the original action (20-CV-5917) and Hymowitz's later filed action (20-CV-6126), as well as to be appointed as lead plaintiff and lead counsel, pursuant to the provisions of the PSLRA. (*See generally* Mots. to Consolidate Cases and Appoint Counsel and Lead Pl., ECF Nos. 5, 8, 10, 13, 14, 19.) On March 17, 2021, Judge Mann granted all motions to consolidate the cases, as well as Lawrence Keleman's motion for appointment as lead plaintiff and his choice of counsel as lead counsel. (*See* Mem. and Order, ECF No. 32.)

that they had a mediation scheduled for March 27, 2023. (*See* Jan. 30, 2023 ECF Order.) The parties were directed to file a joint status report by April 3, 2023, providing an update as to the status of mediation, and, in the event that the parties did not settle at mediation, Defendants were directed to file an answer by April 10, 2023. (*Id.*) The mediation was ultimately unsuccessful, and Defendants filed their Answer on April 10, 2023. (*See* Letter Post-Mediation Update, ECF No. 50; Answer, ECF No. 51.)

On April 17, 2023, Plaintiffs filed a motion to stay proceedings in anticipation of finalizing a motion for preliminary settlement approval after the parties reached an agreement-in-principle to settle on April 11, 2023. (*See* Letter Mot. to Stay Proceedings, ECF No. 52.) The motion was granted, and the parties filed a status report on May 9, 2023, indicating that they had reached a settlement in principle. (*See* Apr. 18, 2023 ECF Order; May 3, 2023 ECF Order; May 9, 2023 Status Report, ECF No. 54.)

Plaintiffs filed their proposed settlement agreement on June 7, 2023, along with a motion for preliminary settlement approval, a proposed order, and proposed notices. (*See* Proposed Settlement Agreement ("Settlement"), ECF No. 58; Mot. for Prelim. Settlement Approval, ECF No. 56; Proposed Order ("Preliminary Approval Order"), ECF No. 58-1; Mem. in Supp. of Mot. for Prelim. Settlement Approval ("Supp. Mem."), ECF No. 57; Long Notice, ECF No. 58-2; Summary Notice, ECF No. 58-4; Postcard Notice, ECF No. 58-5; Proposed Final J., ECF No. 58-6.) Per these submissions, the parties "have agreed to settle this Action for $6,375,000 . . . by the terms stated in the [proposed settlement agreement]." (Supp. Mem., ECF No. 57, at 1.) Plaintiffs represent that the agreement "was achieved only after substantial arm's-length negotiations with

the aid of a highly regarded mediator, Robert Meyer of JAMS."[5] (*Id.*; *see also id.* at 3

(stating that the parties "participated in an all-day private mediation session" on March

27, 2023).) On May 15, 2023, Judge Vitaliano referred Plaintiffs' pending motion to the

undersigned magistrate judge "to schedule a conference and, at her discretion, any

subsequent motions or rulings arising from the conference." (May 15, 2023 ECF Referral

Order.)

The Court subsequently held a fairness hearing on July 24, 2023. (*See* July 24,

2023 ECF Minute Entry and Order; Tr. of July 24, 2023 Fairness Hearing ("Fairness

Hearing"), ECF No. 62.) The Court heard argument regarding Plaintiffs' pending

motion, including the likelihood of final settlement approval and class certification, as

well as the parties' proposed notice procedures. (*See generally* Fairness Hearing, ECF

No. 62.) The Court noted a discrepancy regarding Plaintiffs' projected cost estimates,

i.e., the settlement agreement and preliminary approval order indicated potential

administrative costs exceeding those numbers presented to the class in the proposed

---

[5] JAMS, previously known as the Judicial Arbitration and Mediation Services, Inc., represents itself to be "the world's largest private alternative dispute resolution (ADR) provider." *About Us*, JAMS, https://www.jamsadr.com/about/ (last visited Aug. 23, 2023). It is further represented that Mr. Meyer has been a mediator for more than 12 years, with experience in "complex business litigation pending throughout the United States, including securities and derivative class actions." *Robert A. Meyer, Esq.*, JAMS, https://www.jamsadr.com/meyer/ (last visited Aug. 23, 2023). Courts in this circuit have observed Mr. Meyer to be "an experienced mediator," *In re PPDAI Grp. Inc. Secs. Litig.*, No. 18-CV-6716 (TAM), 2022 WL 198491, at *8, 13 (E.D.N.Y. Jan. 21, 2022); *see also City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent., Inc.*, No. 20-CV-2031 (JSR), 2021 WL 911216, at *11 (S.D.N.Y. Mar. 7, 2021) (referring to Mr. Meyer of JAMS as "a well-respected and experienced mediator").

forms of notice.[6] (*See id.* at 18:6–21, 19:17–21, 20:3–20, 21:5–15.) In addition, in light of Plaintiffs' representation in their motion papers that, along with the proposed settlement agreement, the parties had entered into a "supplemental agreement," the Court directed the parties to submit the supplemental agreement for *in camera* review. (Supp. Mem., ECF No. 57, at 21; *see* Fairness Hearing, ECF No. 62, at 29:25–30:8.) The Court also expressed a concern regarding the parties' proposed notices — specifically, that certain of the notices did not clearly indicate that class members could appear through their own attorney if desired, as required by Federal Rule of Civil Procedure 23(c)(2)(B)(iv). (*See* Fairness Hearing, ECF No. 62, at 26:17–27:14.) Accordingly, the Court directed the parties to submit revised notices and took the pending motion under advisement. (*See* July 24, 2023 ECF Minute Entry and Order.)

On July 26, 2023, Plaintiffs filed the parties' supplemental agreement for *in camera* review. (*See* Supp. Agreement, ECF No. 63.) Plaintiffs also filed revised versions of their proposed settlement agreement and proposed notices, which addressed the concerns raised by the Court at the Fairness Hearing. (*See* Revised Settlement, ECF No. 64-1; Revised Proposed Order ("Revised Preliminary Approval Order"), ECF No. 64-3; Revised Long Notice, ECF No. 64-5; Revised Summary Notice,

---

[6] The settlement agreement and preliminary approval order anticipated administrative costs of up to "$500,000 from the Settlement Fund prior to the Effective Date to pay Administrative Costs . . . [and] additional amounts, up to $200,000 . . . for any necessary additional Administrative Costs without further order of the Court." (Settlement, ECF No. 58, ¶ 3.4; Proposed Order, ECF No. 58-1, ¶ 12; *but see* Long Notice, ECF No. 58-2; Summary Notice, ECF No. 58-4; Postcard Notice, ECF No. 58-5 (making no mention to potential class members that the attorneys anticipated potential administrative costs of up to $200,000, in addition to the administrative costs of up to $500,000).)

ECF No. 64-7; Revised Postcard Notice, ECF No. 64-9.) Also on July 26, 2023, the parties consented to magistrate judge jurisdiction, and the next day, Judge Vitaliano reassigned the case to the undersigned magistrate judge to conduct all proceedings and order the entry of a final judgment. (*See* Consent to Juris., ECF No. 65; Signed Consent to Juris., ECF No. 66.)

## DISCUSSION

Plaintiffs "request that the Court: (1) preliminarily certify the Settlement Class for the purposes of settlement; (2) preliminarily approve the Settlement as set forth in the [agreement; and] (3) approve the [proposed] form and manner of notice and direct that such notice be disseminated to the Settlement Class." (Supp. Mem., ECF No. 57, at 25–26.) Plaintiffs also request an order appointing Lead Counsel as class counsel for purposes of Settlement. (*See* Revised Preliminary Approval Order, ECF No. 64-3, ¶ 5; *see also* Supp. Mem., ECF No. 57, at 9–10.)

Under Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of a certified class — or a class proposed to be certified for purposes of settlement — may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). "At the preliminary approval stage, a court makes an initial evaluation of fairness prior to notifying the class . . . ." *Rosenfeld v. Lenich*, No. 18-CV-6720 (NGG) (PK), 2021 WL 508339, at *3 (E.D.N.Y. Feb. 11, 2021).

Preliminary approval is guided by a "likelihood standard," i.e., "whether the parties have shown that the court will *likely* be able to grant final approval and certify the class." *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,

330 F.R.D. 11, 28 n.21 (E.D.N.Y. 2019); *see also* Fed. R. Civ. P. 23(e)(1)(B)(i)–(ii). "If the

court determines that notice to class members is 'justified by the parties' showing'" as to

the likelihood of final approval and class certification, "it 'must direct notice in a

reasonable manner to all class members who [would] be bound by the proposal.'"

*Rosenfeld*, 2021 WL 508339, at *4 (quoting Fed. R. Civ. P. 23(e)(1)(B)). The court must

also appoint class counsel for purposes of settlement. *Payment Card*, 330 F.R.D. at 58.

The Court begins with an analysis of the likelihood of final settlement approval

and class certification, then assesses the proposed form and manner of notice, and

concludes with appointment of class counsel.

## I.  Likelihood of Final Settlement Approval

### A. Legal Principles

In assessing the likelihood of final approval, courts "look[] to the factors

contained in the text of Rule 23(e)(2)." *Payment Card*, 330 F.R.D. at 28. Under Rule

23(e)(2), courts must consider whether:

> (A) the class representatives and class counsel have adequately
> represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to
>> the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including
>> timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). "[P]aragraphs (A) and (B) are 'procedural' factors that address 'the conduct of the litigation and of the negotiations leading up to the proposed settlement,' whereas . . . paragraphs (C) and (D) are 'substantive' factors that address the 'relief that the settlement is expected to provide to class members.'" *Rosenfeld*, 2021 WL 508339, at *3 (quoting Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment).

The substantive factors are supplemented by the nine *Grinnell* factors, which "courts in this Circuit have traditionally considered" when "evaluating the fairness, reasonableness, and adequacy of the proposed settlement." *Id.* (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)); *Payment Card*, 330 F.R.D. at 29 (noting the "significant overlap" between the *Grinnell* and substantive factors). The *Grinnell* factors include:

> (1) the expense, complexity, and likely duration of the litigation; (2) the class's reaction to the settlement; (3) the stage of the proceedings and amount of discovery completed; (4) the risks of establishing damages; (5) the risks of establishing liability; (6) the risks of maintaining the class throughout the litigation; (7) defendants' ability to withstand greater judgment; (8) the range of reasonableness of the settlement amount considering the best possible recovery; and (9) the range of reasonableness of the settlement amount[,] given the risks of litigation.

*Rosenfeld*, 2021 WL 508339, at *3 (citing *Grinnell*, 495 F.2d at 463).

## B. Procedural Factors

### 1. *Adequate Representation*

"In determining the adequacy of class representatives and counsel, courts consider 'whether (1) plaintiff[s'] interests are antagonistic to the interests of other members of the class and (2) plaintiff[s'] attorneys are qualified, experienced[,] and able to conduct the litigation.'" *Rosenfeld*, 2021 WL 508339, a *4 (quoting *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007)); *see Payment Card*, 330 F.R.D. at 30 n.25 (explaining that "Rule 23(a)(4) case law . . . guide[s]" the Rule 23(e)(2)(A) analysis). Class representatives "'must be part of the class and possess the same interest and suffer the same injury as the [other] class members.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–49 (2011) (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)); *see also Payment Card*, 330 F.R.D. at 31 (explaining that the Due Process Clause requires adequate representation). As for class counsel, "[a] court reviewing a proposed settlement must pay close attention to the negotiating process, to ensure that . . . counsel have possessed the experience and ability, and have engaged in the discovery[] necessary to effective representation of the class's interests." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (quotation marks omitted); *see* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment ("For example, the nature and amount of discovery in this or other cases . . . may indicate whether counsel negotiating on behalf of the class had an adequate information base.").

13

Here, the record illustrates that Plaintiffs' interests are aligned with those of the proposed class. Plaintiffs seek to represent "all persons and entities . . . who purchased or otherwise acquired Northern Dynasty securities from December 21, 2017 through November 24, 2020," with certain exclusions,[7] and Plaintiffs themselves purchased Northern Dynasty securities during the Class Period. (Amend. Compl., ECF No. 37, ¶¶ 1, 12–13.) Plaintiffs also claim financial harm resulting from Defendants' alleged violations of the Exchange Act — harm that the other proposed class members are also alleged to have suffered. (*Id.* ¶¶ 144–50.) Absent any indication that Plaintiffs' interests in this action "are antagonistic to the interest[s] of other members of the class," the record demonstrates that Plaintiffs are well positioned to represent the proposed class. *Cordes*, 502 F.3d at 99.

The Court similarly finds that Plaintiffs are adequately represented by their attorneys, considering Judge Mann's previous observation that Lead Counsel "is experienced, competent, and well-qualified to conduct the class action securities litigation at hand." (Mem. and Order, ECF No. 32, at 13; *see also* Pomerantz Firm Resume, ECF No. 17-6.)  The Court further notes that Lead Counsel has on several

---

[7] Specified groups excluded from the class include: the Individual Defendants, the officers and directors of Northern Dynasty, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Individual Defendants have or had a controlling interest. (*See* Revised Proposed Settlement Agreement ("Revised Settlement"), ECF No. 64-1, ¶ 1.39.) Also excluded from the class is any individual or entity, who or which has: asserted claims against any or all of the Defendants in any cross-border litigation initiated outside of the United States; been deemed by a court to be a member of a class in such litigation, for settlement purposes or otherwise; is entitled to a settlement or other distribution payment in connection with the resolution of the cross-border litigation, regardless of whether such payment is cashed; and those who or which exclude themselves by submitting a request for exclusion from the class that is accepted by the Court. (*Id.*)

occasions been appointed class counsel for the purpose of settlement. *See, e.g., In re Petrobras Secs. Litig.*, 317 F. Supp. 3d 858, 863, 876 (S.D.N.Y. 2018); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 329 (S.D.N.Y. 2016) (appointing Pomerantz LLP as lead counsel). Both the pleadings and motion papers demonstrate a thorough investigation by Lead Counsel into the underlying facts and applicable law. (*See generally* Amend. Compl., ECF No. 37; Pls.' Mem. in Opp'n to Mot. to Dismiss, ECF No. 40.) Lead Counsel also "attended a full-day mediation session," during which "negotiations were at all times hard-fought." (Supp. Mem., ECF No. 57, at 15.)

Plaintiffs acknowledge that "the Parties had not begun formal discovery" prior to the settlement, a fact that could call into question whether Lead Counsel has adequately represented the interests of the proposed class. (*Id.* at 17.) The Court is mindful, however, that Defendants promptly moved to dismiss after Plaintiffs filed the amended complaint, thereby triggering the discovery stay mandated by the Private Securities Litigation Reform Act ("PSLRA"). *See* 15 U.S.C. § 77z-1(b)(1). (*See* Mot. to Dismiss, ECF No. 39.) Given that statutory limitation, and in light of Lead Counsel's extensive pre- and post-filing efforts to investigate and substantiate the alleged violations, the Court finds that Plaintiffs are being represented by "qualified, experienced" legal counsel. *Cordes*, 502 F.3d at 99.

2. *Arm's Length Negotiation*

"A class settlement reached through arm's-length negotiations between experienced, capable counsel knowledgeable in complex class litigation is entitled to a presumption of fairness." *Rosenfeld*, 2021 WL 508339, at *5 (quotation marks omitted).

Likewise, "a court-appointed mediator's involvement in pre-certification settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure." *D'Amato*, 236 F.3d at 85.

As to the parties' selected mediator, Robert Meyer, several courts in this circuit have held that Mr. Meyer's involvement has supported a finding that settlement negotiations were at arm's length. *See In re PPDAI Grp. Inc. Secs. Litig.*, No. 18-CV-6716 (TAM), 2022 WL 198491, at *8–9 (E.D.N.Y. Jan. 21, 2022); *In re Priceline.com, Inc. Secs. Litig.*, No. 00-CV-1884 (AVC), 2007 WL 2115592, at *3 (D. Conn. July 20, 2007). Additionally, as noted above, Plaintiffs represent that the mediation was a "full-day" session and that "negotiations were at all times hard-fought." (Supp. Mem., ECF No. 57, at 15.) Based on the record in this case, the Court perceives no "'evidence or indicia suggesting that the negotiations were collusive.'" *Gordon*, 2022 WL 4296092, at *4 (quoting *Simerlein v. Toyota Motor Corp.*, No. 17-CV-1091 (VAB), 2019 WL 1435055, at *13 (D. Conn. Jan. 14, 2019)). The Court therefore finds that the parties' proposed settlement was the result of arm's length negotiations.

## C. Substantive Factors

### 1. *Adequate Relief*

#### a. Costs, Risks, and Delay of Trial and Appeal

The first factor in assessing whether the proposed settlement provides adequate relief for the putative class is an evaluation of the "costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C)(i). This factor "'subsumes several *Grinnell* factors,' including the complexity, expense and likely duration of litigation, the risks of

establishing liability, the risks of establishing damages, and the risks of maintaining the class through trial" (factors 1, 4, 5, and 6). *Rosenfeld*, 2021 WL 508339, at *5 (quoting *Payment Card*, 330 F.R.D. at 36). Put simply, courts must assess whether the proposed settlement "'results in substantial and tangible present recovery, without the attendant risk and delay of trial.'" *Id.* (quoting *Payment Card*, 330 F.R.D. at 36).

Plaintiffs have submitted the parties' proposed settlement agreement, which indicates that the settlement amount is $6.375 million. (*See* Revised Settlement, ECF No. 64-1, ¶ 1.38.) Plaintiffs acknowledge that this amount "represents a recovery of approximately 2.3%" of the total potential maximum damages award, which Plaintiffs' damages expert estimated at approximately $281 million. (Supp. Mem., ECF No. 57, at 19.) They clarify, however, that the $281 million figure represents Plaintiffs' best-case scenario — "if Plaintiffs fully prevailed at summary judgment and trial, and the Court and jury accepted Plaintiffs' damages theory." (*Id.*) Plaintiffs therefore argue that the $6.375 million settlement amount is reasonable given the costs, risks, and likely duration of the litigation. (*Id.* at 16.) For example, Plaintiffs assert that "[i]f the Settlement were not reached, the Parties would have to incur substantial costs and engage in prolonged litigation through class certification, summary judgment, trial[,] and if applicable, subsequent appeals." (*Id.*; *see* Fairness Hearing, ECF No. 62, at 13:4–15:10.) As to the "substantial risks" of continued litigation, Plaintiffs point to the risk of establishing liability and damages, noting that "[p]roving, not merely alleging, that Defendants' statements and omissions were false or misleading . . . would be a difficult

task," as well as the risks of maintaining the class action through trial. (Supp. Mem., ECF No. 57, at 17–18.)

The Court agrees that the costs, risks, and likely duration of continuing to litigate this matter are significant and that a settlement would result in a tangible present recovery. This factor therefore weighs in favor of preliminary approval of the parties' proposed settlement.

### b. Effectiveness of Proposed Method of Distributing Relief

The Court next evaluates the parties' "proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). "An allocation formula need only have a reasonable, rational basis" and "need not be perfect." *Payment Card*, 330 F.R.D. at 40 (quotation marks omitted). As to claims processing, the proposed method should "'deter or defeat unjustified claims' without imposing an undue demand on class members." *Rosenfeld*, 2021 WL 508339, at *6 (quoting Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment).

The parties have submitted a Proposed Plan of Allocation, indicating that claimants are to receive a "*pro rata* share of the Net Settlement Fund based upon" their respective losses. (Revised Long Notice, ECF No. 64-5, at 7.) As a general matter, shares of the fund will be calculated by evaluating each claimant's estimated loss per share based on when the claimant purchased or otherwise acquired the shares, when the shares were sold, and the inflation of the stock price per share at the time of purchase and sale. (*See id.* at 7–10; Fairness Hearing, ECF No. 62, at 16–17.) No distribution will be made to claimants "who would otherwise receive a distribution of less than $10.00."

18

(Revised Long Notice, ECF No. 64-5, at 12.) Claimants will be required to report their losses by submitting a proof of claim form, which the Claims Administrator will review to determine each claimant's respective *pro rata* share of the settlement amount. (*See id.* at 7.) The process for distributing the claims follows a standard formula that was reviewed by Plaintiff's retained experts. (*See* Fairness Hearing, ECF No. 62, at 16–17.) "This allocation plan appears to be rational and fair, as it treats class members equitably while taking into account variations in the magnitude of their injuries." *Rosenfeld*, 2021 WL 508339, at *6. Likewise, it appears that the claims processing method imposes a minimal burden on claimants and will adequately filter out unjustified claims to settlement funds. The Court therefore finds that the proposed methods of processing claims and distributing relief are rational and fair.

      c.  <u>Proposed Award of Attorneys' Fees</u>

     The third factor in the evaluation of whether the settlement provides adequate relief is an assessment of "the terms of any proposed award of attorneys' fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). "Courts may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (quoting *Goldberger*, 209 F.3d at 50).

     Here, Plaintiffs' counsel intends to "seek an award of attorneys' fees of no more than one third of the Settlement Amount, and reimbursement of litigation expenses in an amount not to exceed $500,000." (Supp. Mem., ECF No. 57, at 20.) "Courts in this Circuit routinely find that requests for attorney's fees totaling one-third of the

settlement fund are well within the range of reasonableness" — particularly "in cases with funds of less than $10 million." *Rosenfeld*, 2021 WL 508339, at *6 (quotation marks omitted). Assuming that Lead Counsel's request for litigation expenses is documented and substantiated, the Court finds that the requested award for attorneys' fees will likely be found to be reasonable.[8]

### d.  Other Agreements

The fourth factor requires courts to consider "any agreement required to be identified under Rule 23(e)(3)," i.e., "any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(2)(C)(iv), (e)(3). Rule 23(e)(3) is aimed at revealing "undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others," namely, the representative plaintiffs or their attorneys. Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment; *see also* David F. Herr, Annotated Manual for Complex Litigation § 21.631 (4th ed. 2022) ("Requiring the parties to file the complete agreement might elicit comments from class members and facilitate judicial review.").

Here, Plaintiffs have entered a "supplemental agreement" with Defendants. (Supp. Mem., ECF No. 57, at 21; *see also* Suppl. Agreement, ECF No. 63.) Having

---

[8] The Court notes that Lead Counsel's requested award is, of course, subject to modification at final settlement approval. *See Rosenfeld*, 2021 WL 508339, at *7. Lead Counsel should be prepared to submit contemporaneous time records to facilitate a cross-check against the lodestar. *See In re PPDAI Grp. Inc. Secs. Litig.*, 2022 WL 198491, at *14–17; *see also Marion S. Mishkin L. Off. v. Lopalo*, 767 F.3d 144, 148–49 (2d Cir. 2014) (discussing the "strict rule" that any request for attorneys' fees must be "accompanied by contemporaneous time records" (quotation marks omitted)).

reviewed the parties' filing, the Court finds that Plaintiffs have accurately described the terms of the supplemental agreement in their motion for preliminary settlement approval. Specifically, the supplemental agreement provides that: "if Settlement Class Members opt out of the Settlement such that the number of Northern Dynasty securities represented by such opt-outs exceeds a certain amount, [Northern Dynasty] shall have the option to terminate the Settlement." (Supp. Mem., ECF No. 57, at 21.) The precise terms of the supplemental agreement are to be kept "confidential to avoid creating incentives for a small group of class members to opt out solely to leverage the threshold to exact an individual settlement." (*Id.*) The Court notes that such agreements are "standard in securities class action settlements." *Christine Asia Co. v. Yun Ma*, No. 15-MD-2631 (CM) (SDA), 2019 WL 5257534, at *15 (S.D.N.Y. Oct. 16, 2019). "Given the specific function of this separate agreement, it does not appear to bear upon the overall fairness of the settlement agreement itself." *In re PPDAI Grp. Inc. Secs. Litig.*, 2022 WL 198491, at *13. The Court therefore finds that the supplemental agreement is unlikely to preclude final settlement approval.

    2.  *Equitable Treatment*

The proposed settlement must "treat[] class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). In making this assessment, "the court may weigh 'whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief.'" *Rosenfeld*, 2021

WL 508339, at *7 (quoting Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment). As explained above, under the Proposed Plan of Allocation, the settlement funds are to be distributed on a *pro rata* basis. "In this way, the agreement appropriately and fairly accounts for . . . point[s] of differentiation among class members' claims." *Id.*

The Court further notes that the proposed settlement agreement contemplates an incentive award to Plaintiffs, paid out of the settlement fund. (*See* Revised Settlement, ECF No. 64-1, ¶ 8.2(c).) Although the exact amount for the potential incentive award is not specified in the agreement, the Long Notice provides that "Lead Counsel may apply for awards to Plaintiffs in connection with their representation of the Settlement Class in an amount not to exceed $25,000, combined." (Revised Long Notice, ECF No. 64-5, at 2; *see also id.* at 15 ("Lead Counsel will file a motion asking the Court . . . to make an award . . . to Plaintiffs collectively not to exceed $25,000 (up to $20,000 for Lead Plaintiff Lawrence Kelemen and $5,000 for Named Plaintiff Charles Hymowitz).").) "Incentive awards are not uncommon in class action cases and are within the discretion of the court." *Torres v. Toback, Bernstein & Reiss LLP*, No. 11-CV-1368 (NGG) (VVP), 2014 WL 1330957, at *3 (E.D.N.Y. Mar. 31, 2014) (quotation marks omitted). At this juncture, given the size of the settlement fund, the Court finds it unlikely that a requested award of up to $25,000 total (split between two Plaintiffs, according to their level of

contribution) will preclude final settlement approval, assuming that Plaintiffs demonstrate "special circumstances" for such an award.[9] *Id.* (quotation marks omitted).

    3.   *Stage of Proceedings and Amount of Discovery Completed (Grinnell Factor 3)*[10]

    "This [*Grinnell*] factor requires the Court to consider whether the parties have adequate information about their claims." *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 198 (S.D.N.Y. 2012). "To approve a proposed settlement," however, "the Court need not find that the parties have engaged in extensive discovery." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000). The Court need only ensure that the parties have sufficiently investigated the facts such that the settlement is fair and reasonable. *See id.*

    As the parties acknowledge, "[they] had not begun formal discovery." (Supp. Mem., ECF No. 57, at 17; *see* Fairness Hearing, ECF No. 62, at 7:9–25, 11:20–25.) Notwithstanding that, Plaintiffs assert that they "conducted a thorough investigation supporting a detailed Consolidated Amended Complaint" and "thoroughly

---

    [9] Special circumstances include "the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise)," as well as "any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and of course, the ultimate recovery." *Torres v. Toback, Bernstein & Reiss LLP*, No. 11-CV-1368 (NGG) (VVP), 2014 WL 1330957, at *3 (E.D.N.Y. Mar. 31, 2014) (quotation marks omitted); *see id.* ("[C]lass actions in . . . securities or antitrust litigation generally do not carry the same risk to named plaintiffs."). The reasonableness and amount of the incentive award may also depend on the average amount ultimately paid to similarly situated individual claimants out of the settlement fund. *Cf. id.* at *4 (reducing proposed incentive award based, in part, on estimated compensation to be paid to other class members). Plaintiffs "are encouraged to be mindful of [these] concerns when" making any future request for an incentive award. *Id.*

    [10] The second *Grinnell* factor, "the class's reaction to the settlement," cannot be assessed at this time. *Rosenfeld*, 2021 WL 508339, at *3; *see id.* at *4 n.2 (declining to assess this factor at the preliminary approval stage).

investigat[ed] the case and exchang[ed] mediation statements with Defendants." (Supp. Mem., ECF No. 57, at 17.) The Court again notes that discovery was stayed under the PSLRA. *See supra*. Under these circumstances, and given that the well-developed allegations of the pleadings substantiate Plaintiffs' representations as to the investigative efforts that have been undertaken in this matter, the Court finds that Plaintiffs were adequately informed about their claims prior to reaching a proposed settlement.

4. *Defendants' Ability to Withstand a Greater Judgment (Grinnell Factor 7)*

"Under the *Grinnell* analysis, the [C]ourt also considers Defendants' ability to withstand a greater judgment than that provided for in the proposed settlement." *Rosenfeld,* 2021 WL 508339, at *7. Plaintiffs claim that to their knowledge, Defendants currently have somewhere between $7 to $9 million cash on hand, which estimate was derived from publicly filed sources, i.e., relevant SEC filings and quarterly statements to investors. (*See* Fairness Hearing, ECF No. 62, at 7:19–8:11, 9:17–25.) Plaintiffs also represent that, to their knowledge, costs attributable to Defendants' various litigation proceedings may eventually exhaust their insurance, leading Plaintiffs to believe that they should "take what [they] can now as opposed to continue to waste and erode further policy proceeds." (*Id.* at 10:14–25.)

The Court notes that a defendant's "ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair." *Pinnacle Grp.,* 874 F. Supp. 2d at 201 (quotation marks omitted). Accordingly, although the proposed $6.375 million settlement may be less than Defendants' theoretical capacity to pay, based on

Plaintiffs' representations regarding the financial outlook of Northern Dynasty going forward, the Court finds that this factor is not likely to preclude settlement approval.

5. *Range of Reasonableness of Settlement Fund (Grinnell Factors 8 and 9)*

The Court next considers "the range of reasonableness of the settlement fund in light of [both] the best possible recovery" and "the attendant risks of litigation." *Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013); *see Payment Card*, 330 F.R.D. at 47–48 (noting that these "two *Grinnell* factors . . . are often combined for the purposes of analysis"). To calculate the best possible recovery, courts "assume complete victory on both liability and damages as to all class members on every claim asserted against each defendant in the [a]ction." *Payment Card*, 330 F.R.D. at 48 (quotation marks omitted). The risks of litigation include "the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Visa U.S.A.*, 396 F.3d at 119 (quotation marks omitted).

Here, Plaintiffs aver that the settlement amount "represents a recovery of approximately 2.3%" of the total maximum potential damages. (Supp. Mem., ECF No. 57, at 19.) That said, "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not . . . mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell*, 495 F.2d at 455. "[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 455 n.2. This is because the "best possible recovery" may not be "a realistic" one. *Cagan v. Anchor Sav. Bank FSB*, No. 88-CV-3024 (CPS), 1990 WL 73423, at *13 (E.D.N.Y.

May 22, 1990). Accordingly, it remains important to evaluate the settlement amount "in light of the strengths and weaknesses of plaintiffs' case." *Rodriguez v. CPI Aerostructures, Inc.*, No. 20-CV-982 (ENV) (CLP), 2023 WL 2184496, at \*16 (E.D.N.Y. Feb. 16, 2023) (quotation marks omitted). Given the risks of litigation described above, the heightened legal standards under the PSLRA, the complexity of the case, and the financial risks Defendants presently face, the Court finds that the parties' settlement amount falls within a reasonable range.[11]

\*     \*     \*     \*     \*

On balance, the Court concludes that both the procedural and substantive factors set forth in Rule 23 and *Grinnell* suggest that the parties' proposed settlement is fair and reasonable.

## II. Likelihood of Class Certification

### A. Legal Principles

"In order to conclude that giving notice to the putative class is justified, the court must also determine that it will likely be able to certify the class for purposes of judgment on the proposal" under Rule 23(a) and (b). *Rosenfeld*, 2021 WL 508339, at \*8. It is the burden of the party seeking class certification to "affirmatively demonstrate"

---

[11] The Court further notes that the approximately 2.3% settlement amount proposed in this case is somewhat higher than the median settlement for cases with similar estimated losses, but not dramatically so. *See* NERA Economic Consulting, *Recent Trends In Securities Class Action Litigation: 2022 Full-Year Review*, at 18, https://www.nera.com/content/dam/nera/publications/2023/PUB_2022_Full_Year_Trends.pdf (last visited Aug. 23, 2023) (estimating a 1.8% median ratio of settlement to investor losses in cases settled in 2022); *see also* Cornerstone Research, *Securities Class Action Settlements: 2022 Review and Analysis*, at 4, https://www.cornerstone.com/wp-content/uploads/2023/03/Securities-Class-Action-Settlements-2022-Review-and-Analysis.pdf (last visited Aug. 23, 2023).

compliance with these rules. *In re Am. Int'l Grp., Inc. Secs. Litig.*, 689 F.3d 229, 237 (2d Cir. 2012) (quotation marks omitted).

Rule 23(a) sets forth the familiar "four prerequisites for class certification": (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *Rosenfeld*, 2021 WL 508339, at *8; *see* Fed. R. Civ. P. 23(a). "In addition to the explicit requirements of Rule 23(a), the class must satisfy the implied requirement of ascertainability." *Payment Card*, 330 F.R.D. at 50 (citing *In re Petrobras Secs.*, 862 F.3d 250, 266 (2d Cir. 2017)).

Rule 23(b) "lays out three alternative 'types' of class actions that may be maintained." *Rosenfeld*, 2021 WL 508339, at *9. Relevant here, Plaintiffs seek certification under Rule 23(b)(3), which "requires both that (1) 'questions of law or fact common to class members predominate over any questions affecting only individual members,' and that (2) 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Payment Card*, 330 F.R.D. at 54 (quoting Fed. R. Civ. P. 23(b)(3)). (*See* Supp. Mem., ECF No. 57, at 10–12.)

## B.  Rule 23(a) Requirements

### 1.  *Numerosity*

"The numerosity requirement mandates that the class be 'so numerous that joinder of all members is impracticable.'" *In re Sadia, S.A. Secs. Litig.*, 269 F.R.D. 298, 304 (S.D.N.Y. 2010) (quoting Fed. R. Civ. P. 23(a)(1)). The "inquiry is not strictly mathematical but must take into account the context of the particular case." *Penn. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014); *see id.*

(listing factors to consider). As a general rule, when a class consists of forty or more members, numerosity is presumed. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

Here, Plaintiffs assert that, "[a]lthough the exact size of the Settlement Class is not yet known . . . there are likely hundreds, if not thousands of potential Settlement Class Members as Northern Dynasty's common stock was actively traded on the New York Stock Exchange with millions of shares traded during the relevant period." (Supp. Mem., ECF No. 57, at 6.) The Court notes that, "[i]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Sadia*, 269 F.R.D. at 304 (quotation marks omitted). Due to the large number of impacted shares and possible class members, numerosity can be presumed in this case. *See id.* at 309; *see also Balestra v. ATBCOIN LLC*, No. 17-CV-10001 (VSB), 2022 WL 950953, at *4 (S.D.N.Y. Mar. 29, 2022) ("[A]n estimate of thousands of class members is sufficient to satisfy the numerosity requirement." (quotation marks omitted)).

2. *Commonality*

"Commonality requires a showing that common issues of fact or law affect all class members." *In re Sadia*, 269 F.R.D. at 304 (citing Fed. R. Civ. P. 23(a)(2)). It "requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" not "merely that they have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 349–50 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). "In other

words, the relevant inquiry is whether a classwide proceeding is capable of 'generat[ing] common *answers* apt to drive the resolution of the litigation.'" *Jacob v. Duane Reade, Inc.*, 602 F. App'x 3, 6 (2d Cir. 2015) (alteration in original) (quoting *Dukes*, 564 U.S. at 350).

"'Common questions of law and fact are present where the alleged fraud involves material misrepresentations and omissions in documents circulated to the investing public, press releases and statements provided to the investment community and the media, and investor conference calls.'" *In re Facebook, Inc., IPO Secs. & Derivative Litig.*, 312 F.R.D. 332, 341 (S.D.N.Y. 2015) (quoting *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 156 (S.D.N.Y. 2012)). Given the nature of the allegations in this case, which center on material misrepresentations and omissions in public filings, the Court concludes that the pleadings establish that the class members have suffered the same injury. As a result, commonality is present.

3. *Typicality*

"[T]he typicality requirement[] is satisfied by a showing that 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" *In re Deutsche Bank AG Secs. Litig.*, 328 F.R.D. 71, 80 (S.D.N.Y. 2018) (quoting *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)). It "is usually met" where "the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented." *Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993). "In securities

29

actions, in particular, typicality is 'not demanding.'" *In re Deutsche Bank,* 328 F.R.D. at

80 (quoting *Tsereteli v. Residential Asset Securitization Tr. 2006-A8,* 283 F.R.D. 199, 208

(S.D.N.Y. 2012)). The Court therefore finds that Plaintiffs have met the typicality

requirement in this case.

4. *Adequacy of Representation*

To satisfy the adequacy requirement, "[p]laintiffs must meet two standards —

that 'class counsel . . . be qualified, experienced[,] and generally able to conduct the

litigation,' and that 'the class members . . . not have interests that are antagonistic to one

another.'" *Balestra,* 2022 WL 950953, at \*4 (quoting *In re Drexel Burnham Lambert Grp.,*

*Inc.,* 960 F.2d 285, 291 (2d Cir. 1992)). Based on the Court's determinations *supra*

regarding the parallel requirements under Rule 23(e)(2), the Court finds that the

proposed class is adequately represented by Plaintiffs and Lead Counsel, and that the

adequacy requirement will likely be found at the time of final settlement approval and

judgment.

5. *Ascertainability*

"[A] class is ascertainable if it is defined using objective criteria that establish a

membership with definite boundaries." *In re Petrobras Secs.,* 862 F.3d at 257. The

Second Circuit has observed that defining a class based on "securities purchases

identified by subject matter, timing, and location" is both a "clearly objective" means of

doing so and "sufficiently definite." *Id.* at 269. Accordingly, given the defined class

period, and the allegations and claims at issue in this case, the proposed class appears to

be sufficiently ascertainable.

## C. Rule 23(b)(3) Requirements

"Rule 23(b)(3) imposes two additional burdens on plaintiffs attempting to proceed by class action, namely, predominance and superiority." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015); *see* Fed. R. Civ. P. 23(b)(3) (requiring "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy"). These inquiries are ordinarily guided by four factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). However, in the settlement context, "'[s]ome inquiries essential to litigation [of] class certification,' including the issue of 'manageability — how the case will or can be tried, and whether there are questions of fact or law that are capable of common proof,'" are no longer relevant. *Rosenfeld*, 2021 WL 508339, at *10 (quoting *In re Am. Int'l Grp.*, 689 F.3d at 239). The other factors, however, "demand undiluted, even heightened, attention." *In re Am. Int'l Grp.*, 689 F.3d at 239 (quotation marks omitted).

1. *Predominance*

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Again, because the prospect of settlement obviates the manageability concerns ordinarily assessed as part of this inquiry, the focus is instead whether "'the legal or factual questions that qualify each class member's case . . . achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Payment Card*, 330 F.R.D. at 55 (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)); *see also Rosenfeld*, 2021 WL 508339, at *10.

Because this action concerns claims of securities fraud, the predominance test is "readily met." *In re Am. Int'l Grp.*, 689 F.3d at 240 (quotation marks omitted). Class members' claims, i.e., that Northern Dynasty made misrepresentations and omissions regarding the company to the public that harmed shareholders, involve similar, if not identical, questions of law and fact. To the extent there are unique issues as to each class member, for instance, the amount of stock held by each class member, the common questions are "more substantial." *Payment Card*, 330 F.R.D. at 55 (quotation marks omitted). Accordingly, the Court finds that common questions of law and fact predominate over individual questions, and the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc.*, 521 U.S. at 623.

2.  *Superiority*

"Rule 23(b)(3)'s superiority requirement may be satisfied when 'the costs of bringing individual actions outweigh the expected recovery,' and when consolidation 'will achieve significant economies of time, effort and expense, and promote uniformity of decision.'" *Rosenfeld*, 2021 WL 508339, at *10 (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013)). "The superiority requirement is designed to avoid repetitious litigation and possibility of inconsistent adjudications." *Payment Card*, 330 F.R.D. at 57 (quotation marks omitted).

Here, given that Plaintiffs assert that "there are likely hundreds, if not thousands of potential Settlement Class Members," the prospect of individual actions would certainly prove less efficient than a class-wide proceeding. (Supp. Mem., ECF No. 57, at 6.) The Court therefore finds it likely that the superiority requirement will be met.

*   *   *   *   *

For the above reasons, the Court finds that Plaintiffs have demonstrated a good likelihood of class certification. Having concluded that Plaintiffs have also demonstrated a likelihood of final settlement approval, the Court grants preliminary settlement approval and finds that notice to "all class members who would be bound by the proposal" is justified. Fed. R. Civ. P. 23(e)(1)(B).

## III. Notice

Under Rule 23, notice may be issued by either "United States mail, electronic means, or other appropriate means." Fed. R. Civ. 23(c)(2)(B). Additionally:

The notice must clearly and concisely state in plain, easily understood language:

(i) the nature of the action;

(ii) the definition of the class certified;

(iii) the class claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

*Id.*

Ultimately, "[t]he standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." *Visa U.S.A.*, 396 F.3d at 113–14. Courts in this Circuit have found that a settlement notice is sufficient "when it describe[s] the terms of the settlement generally, inform[s] the class about the allocation of attorneys' fees, and provide[s] specific information regarding the date, time, and place of the final approval hearing." *Payment Card*, 330 F.R.D. at 58–59 (quotation marks omitted); *see id.* (collecting cases).

Plaintiffs have submitted several notices for the Court's review, including a long form notice, a summary notice, and a postcard notice. (*See* Revised Long Notice, ECF No. 64-5; Revised Summary Notice, ECF No. 64-7; Revised Postcard Notice, ECF No. 64-9.) The long form notice sets forth a more extensive description of the action and claims process, while the summary and postcard notices contain abbreviated versions of the

same information. Having carefully reviewed the parties' filings, the Court finds that the proposed notices contain the information required by Rule 23, set forth "in plain, easily understood language." Fed. R. Civ. P. 23(c)(2)(B).

Plaintiffs have also submitted the following proposed schedule of events:

| Event | Deadline for Compliance |
|---|---|
| Emailing Summary Notice and/or mailing Postcard Notice; Creating website with Stipulation, Long Notice, and Claim Form. | No later than 21 calendar days after the entry of the Preliminary Approval Order. (¶ 11, 16) |
| Publication of the Summary Notice. | No later than 21 calendar days after entry of Preliminary Approval Order. (¶ 17) |
| Date for Plaintiffs to file papers in support of the Settlement, the Plan of Allocation, and for application of attorneys' fees and expenses. | No later than 28 calendar days before the Settlement Hearing. (¶ 27) |
| Submission deadline for requests for exclusion. | No later than 21 calendar days before the Settlement Hearing. (¶ 21) |
| Submission deadline for objections. | No later than 21 calendar days before the Settlement Hearing. (¶ 25) |
| Submission deadline for Claim Forms. | No later than 7 calendar days after the Settlement Hearing. (¶ 19) |
| Date for Plaintiffs to file reply papers in support of the Settlement, the Plan of Allocation, and for application of attorneys' fees and expenses. | No later than 7 calendar days before the Settlement Hearing. (¶ 28) |
| Date for Settlement Hearing. | At the Court's earliest convenience at least 100 calendar days after the entry of the Preliminary Approval Order. |

(Supp. Mem., ECF No. 57, at 25.) The proposed Preliminary Approval Order also mandates that Lead Counsel provide Class Members notice of the Settlement by either: "(a) emailing the Summary Notice to Settlement Class Members for whom the Claims Administrator is able to obtain email addresses, or (b) mailing the Postcard Notice, if an email address cannot be obtained, by first class mail to Settlement Class Members who

35

can be identified with reasonable effort." (*Id.* at 23–24 (footnote omitted).) "After entry of the proposed [Revised] Preliminary Approval Order, the Stipulation and its exhibits, the Preliminary Approval Order, and the Long Notice and Claim Form will be posted on the Claims Administrator's website. Additionally, Summary Notice will be published electronically once on *PR Newswire* and in print once in *Investor's Business Daily*." (*Id.* at 24.)

The Court finds that Plaintiffs' proposed schedule and manner of notice comply with Rule 23 and adequately afford due process. Notice should be ordered as proposed by the parties, including distribution of the long form notice and summary and postcard notices.

## IV. Appointment of Class Counsel

"When a district court certifies a class, it must appoint class counsel." *Payment Card*, 330 F.R.D. at 58. Under Rule 23(g)(1)(A), the Court "must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The Court may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). "The adequacy of counsel requirement is [ordinarily] satisfied where the class attorneys are experienced in the field or have demonstrated professional competence in other ways, such as by the quality of the briefs and the arguments during the early stages of

the case." *Mendez v. MCSS Rest. Corp.*, No. 16-CV-2746 (NGG) (RLM), 2019 WL 2504613, at *13 (E.D.N.Y. June 17, 2019) (quotation marks omitted).

As discussed above, the filings in this case show that Lead Counsel has engaged in significant investigation of the underlying claims, that they are experienced in class action securities litigation and are knowledgeable in the applicable area of law, and that they have the resources necessary to represent the class. The Court therefore appoints Lead Counsel as class counsel for the purposes of settlement.

## CONCLUSION

For the foregoing reasons, the Court (1) grants Plaintiffs' motion for preliminary settlement approval (ECF No. 56); (2) enters the proposed order preliminarily approving the class action settlement (*see* Revised Proposed Order, ECF No. 64-3); (3) directs the parties to issue notice as proposed (*see* Revised Long Notice, ECF No. 64-5; Revised Summary Notice, ECF No. 64-7; Revised Postcard Notice, ECF No. 64-9; Claim Form, ECF No. 58-3); (4) appoints Pomerantz LLP as class counsel for purposes of settlement; and (5) schedules a final settlement hearing for **December 7, 2023 at 10:30 a.m. in Courtroom 324 North**.

**SO ORDERED.**

Dated:    Brooklyn, New York
          August 24, 2023

                              _____
                              *Taryn A. Merkl*
                              TARYN A. MERKL
                              UNITED STATES MAGISTRATE JUDGE

37