UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

IN RE NORTHERN DYNASTY
MINERALS LTD. SECURITIES
LITIGATION

**MEMORANDUM AND ORDER**
20-CV-5917 (TAM)

-----------------------------------------------------------X

**TARYN A. MERKL**, United States Magistrate Judge:

This case concerns a consolidated class action brought under the Private
Securities Litigation Reform Act on behalf of purchasers of Northern Dynasty Minerals
Ltd.'s ("Northern Dynasty") publicly traded securities between December 21, 2017, and
November 24, 2020 (the "Class Period"). On December 7, 2023, the undersigned
Magistrate Judge held a hearing for final settlement approval (referred to herein as the
"Settlement Approval Hearing") of a proposed class-wide settlement. (Dec. 7, 2023 Min.
Entry & Order.) For the reasons set forth below, the Court finds the parties' settlement
agreement and the related relief Plaintiffs seek to be fair, adequate, and reasonable, and
grants Plaintiffs' motions related to final settlement approval.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.  Allegations in the Amended Complaint[1]

Northern Dynasty is a mining exploration and development company, and "owns 100% of the Pebble Partnership, which was established in mid-2007 to engineer, permit, construct[,] and operate a mine at the Pebble Project." (Am. Compl., ECF No. 37, ¶ 19.)  During the Class Period, "Northern Dynasty's [proposed] plan [was] to develop what Defendants deemed 'one of the world's most important mineral resources,'" through its mining efforts in the United States, including Alaska.[2] (*Id.* ¶ 2.) Northern Dynasty securities were trading during the Class Period on the New York Stock Exchange under the ticker symbol "NAK." (*Id.* ¶ 14.) Defendant Ronald William Thiessen has served as CEO of the company from November 2001 to present, and as the Director of the Pebble Partnership, established in 2007, to present. (*Id.* ¶ 15.) Defendant Tom Collier (together with Defendant Thiessen, the "Individual Defendants") served as CEO of the Pebble Partnership from February 4, 2014, until September 23, 2020. (*Id.* ¶ 16.)

In order to move forward with their plan, Northern Dynasty needed to obtain a permit under Section 404 of the Clean Water Act, which may be issued by the U.S. Army Corps of Engineers ("Army Corps"). (*Id.* ¶ 23.) "Under [Section] 404(c), however, the Environmental Protection Agency ('EPA') may prohibit or restrict fill activities if it

---

[1] The Court recites the facts as alleged in the amended complaint. *See Mikhlin v. Oasmia Pharm. AB*, No. 19-CV-4349 (NGG) (RER), 2021 WL 1259559, at *1 (E.D.N.Y. Jan. 6, 2021). Defendants deny these allegations and dispute liability. (*See* Revised Settlement, ECF No. 64-1, at 3–4.)

[2] Plaintiffs' amended complaint alleges that "[a]lthough the Pebble Project would have been located on state land, it was still subject to federal permitting requirements." (Am. Compl., ECF No. 37, ¶ 23.)

determines that a project would have an 'unacceptable adverse effect' on the fishery habitats . . . ." (*Id.*) The EPA ultimately concluded that given the original proposals made by Northern Dynasty, it had "reason to believe that mining of the Pebble deposit at any of [the proposed sizes], even the smallest, could result in significant and unacceptable adverse effects on ecologically important streams, wetlands, lakes, and ponds and the fishery areas they support." (*Id.* ¶ 32.) "Northern Dynasty sued the EPA over the regulatory actions that prevented the Pebble Project from advancing to a permit application with the Army Corps," and following the settlement of the lawsuit, "on December 21, 2017, Northern Dynasty announced its intention to apply for a Clean Water Act permit with the Army Corps using a significantly smaller footprint and a closure plan after 20 years." (*Id.* ¶ 33.) As alleged in the amended complaint, "Defendants deliberately crafted a much smaller, limited, 20-year mining proposal and offered a mine closure plan to obfuscate their actual plans for future expansions . . . design[ing] this scheme in hopes of securing a permit from the Army Corps." (*Id.* ¶ 34 (emphasis omitted).)

Plaintiffs further allege that in order to obtain the permit, "Northern Dynasty and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market . . . artificially inflat[ing] the prices of Northern Dynasty's securities . . . by misrepresenting the size, scope, and duration of the Pebble Project," leading to the fall of Northern Dynasty's stock price and investor losses once these misrepresentations surfaced. (*Id.* ¶ 112; *see also id.* ¶¶ 58–128.) More specifically, Plaintiffs claim that Defendants issued press releases on December 21, 2017, and on January 5, 2018 (which were also filed with the SEC), collectively misrepresenting the planned size, scope, and duration of the Pebble Project. (*Id.* ¶¶ 59–73.) Ultimately, Plaintiffs contend that Northern Dynasty made "materially false and misleading"

statements on its official website, in SEC filings, and in press releases throughout the entirety of the Class Period. (*See id.* ¶¶ 58–111.)

A series of conversations (the "Pebble Tapes") recorded between undercover investigators belonging to a non-profit organization, i.e., the Environmental Investigation Agency ("EIA"), expressing interest in investment opportunities related to the Pebble Project, and Defendants Thiessen and Collier, "revealed Northern Dynasty's actual plans to build a much larger and long-lived mine than described in Northern Dynasty's permit application with the Army Corps, in public SEC filings, and in Congressional testimony." (*Id.* ¶ 45; *see also id.* ¶¶ 46–57.) The tapes revealed that, when pitching to individuals whom they had thought were potential investors, Defendants Thiessen and Collier represented "that the 20-year project described publicly will . . . be merely the first stage in Northern Dynasty's planned, expansive development." (*Id.* ¶ 46 (emphasis omitted).) Unbeknownst to the public, Defendants had hatched this plan, from the very beginning of the Class Period, to scheme and mislead for the purposes of obtaining a permit, while covertly planning to develop one of the largest mines in the world. (*Id.* ¶¶ 57, 44.) "When the truth emerged through a series of corrective disclosures and materializations of risks that the Pebble Project would not receive a permit, Northern Dynasty's stock went into a tailspin, wiping out hundreds of millions of dollars in market capitalization and injuring hundreds of thousands of investors." (*Id.* ¶ 6.)

On August 24, 2020, the Army Corps released a statement finding that "'the project, as currently proposed, cannot be permitted under [S]ection 404 of the Clean Water Act.'" (*Id.* ¶ 113 (quoting U.S. Army Public Affairs, *Army Finds Pebble Mine Project Cannot Be Permitted as Proposed*, U.S. Army (Aug. 24, 2020), https://www.army.mil/article/238426/).) With this news, Northern Dynasty's

common share price fell "37.9%, to close at $0.9 per share on August 24, 2020, damaging investors" who purchased the stock at artificially inflated prices. (*Id.* ¶¶ 114, 144.) For the next several months (through the remainder of the Class Period), news contradictory to Northern Dynasty's publicly filed and shared plans emerged from various sources, including *Politico*, the EIA, the *Washington Post*, *The New York Times*, the *Outside*, the office of Alaska Senator Lisa Murkowski, and finally the Army Corps (again), announcing that it has denied the permit for the Pebble Project. (*See id.* ¶¶ 113–28.[3]) Each of these instances resulted in a falling of Northern Dynasty's common share price, further damaging investors each time. (*See id.*)

## II. Procedural History

Plaintiffs filed suit in December 2020, alleging causes of action under Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants, and Section 20(a) of the Exchange Act against Thiessen and Collier. (*See* Compl., ECF No. 1, at ¶¶ 45–59; Compl., Case No. 20-CV-6126 (ENV) (TAM), ECF No. 1; *see also* Am. Compl., ECF No. 37, ¶¶ 142–57.) Specifically, investors filed two separate actions, which the Honorable Roanne L. Mann consolidated on March 17, 2021, appointing Lawrence Kelemen as lead

---

[3] On August 25, 2020, *Politico* published an article called "Pebble Problems Stack Up," reporting that "'[t]he mitigation projects required may be difficult for the mine developers to meet . . . push[ing] any final decision on the mine beyond the end of Trump's first term, potentially leaving it up to his challenger, Joe Biden, who opposes the project.'" (Am. Compl., ECF No. 37, ¶ 115.) On September 21, 2020, the EIA put out a press release containing a transcript of the Pebble Tapes. (*See id.* ¶ 117.) The next day, on September 22, 2020, both the *Washington Post* and *The New York Times* published articles in reaction to the tapes. (*See id.* ¶ 118.) On October 28, 2020, the *Outside* followed suit, publishing their own article in reaction to the tapes. (*See id.* ¶ 120.) On October 29, 2020, the EIA released additional tapes and emails, "includ[ing] Thiessen discussing his influence over Alaska's senators and pro-Pebble governor." (*Id.* ¶ 122.) On November 18, 2020, Alaska Senator Lisa Murkowski issued the text of her remarks at the Resource Development Council 2020 Alaska Resources Conference, where she stated "that this is the wrong mine in the wrong place" and that she thought "that the Army Corps should deny [Northern Dynasty's] permit application." (*Id.* ¶ 124.)

5

plaintiff and Pomerantz LLP as lead counsel.[4] (*See* Compl., Case No. 20-CV-6126 (ENV) (TAM), ECF No. 1; *see generally* Mem. & Order, ECF No. 32.)

Thereafter, Defendants moved to dismiss the action on December 15, 2021, for failure to state a claim to relief. (*See* Mot. to Dismiss, ECF No. 39; Mem. in Supp. of Mot. to Dismiss, ECF No. 41.) On January 25, 2023, the Honorable Eric N. Vitaliano denied Defendants' motion. (Order Den. Mot. to Dismiss, ECF No. 47.) The undersigned Magistrate Judge directed Defendants to file an answer or otherwise respond to the amended complaint by February 16, 2023. (Jan. 26, 2023 ECF Order.) Defendants requested a stay in order to attempt resolution through mediation. (Letter Mot. to Stay, ECF No. 48.) The motion was granted, in part, on consent, in light of the parties' representations that they had a mediation scheduled for March 27, 2023. (Jan. 30, 2023 ECF Order.) The parties were directed to file a joint status report by April 3, 2023, providing an update as to the status of mediation, and, in the event that the parties did not settle at mediation, Defendants were directed to file an answer by April 10, 2023. (*Id.*) The mediation was ultimately unsuccessful, and Defendants filed their answer on April 10, 2023. (*See* Letter Post-Mediation Update, ECF No. 50; Answer, ECF No. 51.)

On April 17, 2023, Plaintiffs filed a motion to stay proceedings in anticipation of finalizing a motion for preliminary settlement approval after the parties reached an

---

[4] The later filed action, No. 20-CV-6126, was initiated by Charles Hymowitz, whom the Court notes was named as a plaintiff in the amended complaint filed after case consolidation. (*See* Am. Compl., ECF No. 37.) Early on in this action, several class members moved to consolidate cases, i.e., the original action (20-CV-5917) and Hymowitz's later filed action (20-CV-6126), as well as to be appointed as lead plaintiff and lead counsel, pursuant to the provisions of the Private Securities Litigation Reform Act. (*See generally* Mots. to Consolidate Cases & Appoint Counsel & Lead Pl., ECF Nos. 5, 8, 10, 13, 14, 19.) As noted *supra*, on March 17, 2021, Judge Mann granted all motions to consolidate the cases, as well as Lawrence Keleman's motion for appointment as lead plaintiff and his choice of counsel as lead counsel. (*See* Mem. & Order, ECF No. 32.)

agreement in principle to settle on April 11, 2023. (*See* Letter Mot. to Stay Proceedings, ECF No. 52.) The motion was granted, and the parties filed a status report on May 9, 2023, indicating that they had reached a settlement in principle. (*See* Apr. 18, 2023 ECF Order; May 3, 2023 ECF Order; May 9, 2023 Status Report, ECF No. 54.)

Plaintiffs filed their proposed settlement agreement on June 7, 2023, along with a motion for preliminary settlement approval, a proposed order, and proposed notices — which included, among other things, a long form notice ("Long Notice"), a short form notice ("Summary Notice"), and a postcard notice ("Postcard Notice"). (*See* Proposed Settlement Agreement, ECF No. 58 (hereinafter "Settlement"); Mot. for Prelim. Settlement Approval, ECF No. 56; Proposed Order, ECF No. 58-1 (hereinafter "Preliminary Approval Order"); Mem. in Supp. of Mot. for Prelim. Settlement Approval, ECF No. 57 (hereinafter "Mem. in Supp."); Long Notice, ECF No. 58-2; Summary Notice, ECF No. 58-4; Postcard Notice, ECF No. 58-5.) Per these submissions, the parties had "agreed to settle this Action for $6,375,000 . . . by the terms stated in the [proposed settlement agreement]." (Mem. in Supp., ECF No. 57, at 1.) Plaintiffs represented that the agreement "was achieved only after substantial arm's-length negotiations with the aid of a highly regarded mediator, Robert Meyer of JAMS."[5] (*Id.*;

---

[5] JAMS, previously known as the Judicial Arbitration and Mediation Services, Inc., represents itself to be "the world's largest private alternative dispute resolution (ADR) provider." *About Us*, JAMS, https://www.jamsadr.com/about/ (last visited Jan. 26, 2024). It is further represented that Mr. Meyer has been a mediator for more than 12 years, with experience in "complex business litigation pending throughout the United States, including securities and derivative class actions." *Robert A. Meyer, Esq.*, JAMS, https://www.jamsadr.com/meyer/ (last visited Jan. 26, 2024). Courts in this circuit have observed that Mr. Meyer is "an experienced mediator." *In re PPDAI Grp. Inc. Secs. Litig.*, No. 18-CV-6716 (TAM), 2022 WL 198491, at *13, 20 (E.D.N.Y. Jan. 21, 2022); *see also City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent., Inc.*, No. 20-CV-2031 (JSR), 2021 WL 911216, at *11 (S.D.N.Y. Mar. 7, 2021) (referring to Mr. Meyer of JAMS as "a well-respected and experienced mediator").

*see also id.* at 3 (stating that the parties "participated in an all-day private mediation session" on March 27, 2023).) On May 15, 2023, Judge Vitaliano referred Plaintiffs' pending motion to the undersigned Magistrate Judge "to schedule a conference and, at her discretion, any subsequent motions or rulings arising from the conference." (May 15, 2023 ECF Referral Order.)

The Court subsequently held a preliminary fairness hearing on July 24, 2023. (*See* July 24, 2023 ECF Min. Entry & Order; Tr. of July 24, 2023 Fairness Hearing, ECF No. 62 (hereinafter "Fairness Hearing").) The Court heard argument regarding Plaintiffs' pending motion, including the likelihood of final settlement approval and class certification, as well as the parties' proposed notice procedures. (*See generally* Fairness Hearing, ECF No. 62.) The Court noted a discrepancy regarding Plaintiffs' projected cost estimates, i.e., the settlement agreement and preliminary approval order indicated potential administrative costs exceeding those numbers presented to the class in the proposed forms of notice.[6] (*See id.* at 18:6–21, 19:17–21, 20:3–20, 21:5–15.) In addition, in light of Plaintiffs' representation in their motion papers that, along with the proposed settlement agreement, the parties had entered into a "supplemental agreement," the Court directed the parties to submit the supplemental agreement for *in camera* review. (Mem. in Supp., ECF No. 57, at 21; *see* Fairness Hearing, ECF No. 62, at 29:25–30:8.) The

---

[6] The settlement agreement and preliminary approval order anticipated administrative costs of up to "$500,000 from the Settlement Fund prior to the Effective Date to pay Administrative Costs . . . [and] additional amounts, up to $200,000 . . . for any necessary additional Administrative Costs without further order of the Court." (Settlement, ECF No. 58, ¶ 3.4; Proposed Order, ECF No. 58-1, ¶ 12; *but see* Long Notice, ECF No. 58-2; Summary Notice, ECF No. 58-4; Postcard Notice, ECF No. 58-5 (making no mention to potential class members that the attorneys anticipated potential administrative costs of up to $200,000, in addition to the administrative costs of up to $500,000).)

Court also expressed a concern regarding the parties' proposed notices — specifically, that certain of the notices did not clearly indicate that class members could appear through their own attorney if desired, as required by Federal Rule of Civil Procedure 23(c)(2)(B)(iv). (*See* Fairness Hearing, ECF No. 62, at 26:17–27:14.) Accordingly, the Court directed the parties to submit revised notices and took the pending motion under advisement. (*See* July 24, 2023 ECF Min. Entry & Order.)

On July 26, 2023, Plaintiffs filed the parties' supplemental agreement for *in camera* review. (*See* Suppl. Agreement, ECF No. 63.) Plaintiffs also filed revised versions of their proposed settlement agreement and proposed notices, which addressed the concerns raised by the Court at the Fairness Hearing. (*See* Revised Settlement, ECF No. 64-1; Revised Proposed Order, ECF No. 64-3; Revised Long Notice, ECF No. 64-5; Revised Summary Notice, ECF No. 64-7; Revised Postcard Notice, ECF No. 64-9.) Also on July 26, 2023, the parties consented to magistrate judge jurisdiction, and the next day, Judge Vitaliano reassigned the case to the undersigned Magistrate Judge to conduct all proceedings and order the entry of a final judgment. (*See* Consent to Juris., ECF No. 65; Signed Consent to Juris., ECF No. 66.) On August 24, 2023, the Court granted plaintiff's motion for preliminary settlement approval, entered the proposed order preliminarily approving the class action settlement, directed the parties to issue the proposed notices, and appointed Pomerantz LLP as class counsel. (Mem. & Order, ECF No. 67.)

On November 9, 2023, Plaintiffs filed a motion for final approval of the class action settlement and a motion for attorneys' fees and award to Plaintiffs. (*See* Mot. for Final Approval, ECF No. 68; Mot. for Attorneys' Fees, Reimbursement of Expenses, and Awards to Plaintiffs, ECF No. 69 (hereinafter "Pls.' Fees Mem."); *see also* Mem. of Law in Supp. of Pls.' Mot. for Final Approval of Proposed Class Action Settlement, ECF No. 70,

(hereinafter "Pls.' Mem. of Law"); Mem. in Supp. of Mot. for Attorney Fees, ECF No. 71 (hereinafter "Pls.' Fee Mem.").) On December 7, 2023, the undersigned held the final settlement hearing. (Dec. 7, 2023 Min. Entry.)

For the reasons set forth below, the Court grants (1) the motion for final settlement approval and (2) the motion for attorneys' fees and award to Plaintiff.

## DISCUSSION

### I.  Settlement Agreement, Fund Allocation, and Notification to Class

The memorandum of law in support of Plaintiffs' motion for final approval of the proposed class action settlement defined the settlement class as

> all Persons who purchased or otherwise acquired Northern Dynasty securities during the Settlement Class Period, defined as December 21, 2017 through November 24, 2020, both dates inclusive, (i) on any stock exchanges located in the United States, (ii) on any alternative trading systems located in the United States, or (iii) pursuant to other domestic transactions, and who were damaged thereby. Excluded from the Settlement Class are (i) Individual Defendants; (ii) the officers and directors of Northern Dynasty; (iii) members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns; and (iv) any entity in which the Individual Defendants have or had a controlling interest.[7]

(Pls.' Mem. of Law, ECF No. 70, at 4.)

Members of the settlement class will be entitled to a *pro rata* share of the settlement fund of $6,375,000 (the "Settlement Fund"), less "attorneys' fees, costs, administrative expenses, and net of any taxes on interest" (the "Net Settlement Fund"). (Notice of Pendency & Proposed Settlement of Class Action, ECF No. 58-2, at 1, 7.) In

---

[7] Also excluded from the class is any individual or entity, who or which has: asserted claims against any or all of the Defendants in any cross-border litigation initiated outside of the United States; been deemed by a court to be a member of a class in such litigation, for settlement purposes or otherwise; is entitled to a settlement or other distribution payment in connection with the resolution of the cross-border litigation, regardless of whether such payment is cashed; and those who or which exclude themselves by submitting a request for exclusion from the class that is accepted by the Court. (*See* Attached Order & Final J. at ¶¶ 4, 6.)

exchange for their share of the Settlement Fund, members of the settlement class agree

to release

> any and all Claims and Unknown Claims[8] . . . that have been or could
> have been asserted by or on behalf of any of the [class members], in any
> capacity, which arise out of, are based upon, or relate in any way to the
> purchase or acquisition of Northern Dynasty securities during the
> Settlement Class Period, including but not limited to any claims alleged in
> the Action, and any claims related to the allegations, transactions, facts,
> events, matters, occurrences, acts, disclosures, representations, statements,
> omissions, failures to act, or any other matter whatsoever involved, set
> forth, referred to, or otherwise related, directly or indirectly, to the
> allegations in the Action or the disclosures made in connection therewith
> (including the adequacy and completeness of such disclosures).
> Notwithstanding the foregoing, "Released Plaintiffs' Claims" does not
> include (i) claims in any shareholder derivative action on behalf of
> Northern Dynasty; or (ii) claims to enforce the terms of this Stipulation or
> orders or judgments issued by the Court in connection with this
> Settlement.

(Stipulation & Agreement of Settlement, ECF No. 58, at 10.)

According to the claims administrator, Epiq Class Action & Claims Solutions,

Inc. ("Epiq"), the Postcard Notices were mailed to 78,049 potential settlement class

members. (Decl. of Morgan Kimball, ECF No. 72-1, ¶¶ 6–7.) The Summary Notice was

transmitted over the *PR Newswire* and published electronically in the *Investor's Business*

*Daily*. (*Id.* ¶ 8.) Potential settlement class members also had access to a toll-free phone

line with a pre-recorded message offering "a brief summary about the Action and the

option to request a mailed copy of the Notice Packet," in addition to the availability of a

live operator during business hours. (*Id.* ¶ 10.) Finally, Epiq created a website providing

information and downloadable copies of documents including the Notice, Claim Form,

Stipulation and Agreement of Settlement, and the Preliminary Approval Order, as well

---

[8] "'Unknown Claims' means and includes any and all claims that one or more Releasing
Parties does not know or suspect to exist in his, her, or its favor at the time of the release of the
Released Parties." (Stipulation & Agreement of Settlement, ECF No. 58, at 13.)

as hosting an online claim portal. (*Id.* ¶ 12.) The deadline for Settlement Members to object "to the Settlement, Plan of Allocation, or Lead Counsel's request for an award of attorneys' fees and reimbursement of expenses and awards to Plaintiff" was November 16, 2023. (*Id.* Ex. A, at ECF p. 9.) As of November 9, 2023, Epiq had received 1,095 claims, (*id.* ¶ 16), and counsel had received one valid request for exclusion and no objections. (Pls.' Mem. of Law, ECF No. 70, at 2.) By November 16, 2023, Epiq received five total exclusion requests, three of which were valid. (Supplemental Decl. of Morgan Kimball, ECF No. 75-1, ¶¶ 6–8.) Epiq followed up on the two timely, but invalid exclusion requests soliciting necessary information, but the class members did not cure the issues.[9] (*Id.* ¶ 8.) As of December 15, 2023, Epiq had received 8,942 claims. (Supplemental Decl. of Morgan Kimball, ECF No. 78-1, ¶ 4.)

In addition to the payments to the settlement class, Plaintiffs request an award to Plaintiffs' counsel for fees in the amount of $2,125,000 (one-third of the settlement fund) plus $45,102.04 in expenses, as well as a total award of $25,000 divided between lead plaintiff Lawrence Kelemen and named plaintiff Charles Hymowitz, in connection with their representation of the settlement class. (Pls.' Fee Mem., ECF No. 71, at 1–2.)

---

[9] To be deemed valid, an exclusion request must have been made by letter clearly indicating contact information, stating the identity and quantity of Northern Dynasty securities purchased or acquired and sold during the Class Period, identifying the dates and prices of each purchase or acquisition and sale, totaling the number of securities held at the beginning of the Class Period, and stating that the potential claimant "request[s] to be excluded from the Settlement Class in *In re Northern Dynasty Minerals Ltd. Securities Litigation*, Case No. 1:20-cv-05917-ENV-TAM (E.D.N.Y.)." (Long Notice, ECF No. 58-2, at 14.) Additionally, exclusion requests must have been submitted with documentary proof (i) of each purchase/acquisition and, if applicable, sale transaction of Northern Dynasty securities during the Settlement Class Period and (ii) demonstrating your status as a beneficial owner of the Northern Dynasty securities." (*Id.*)

## II. Legal Standard

The Second Circuit has expressed a "strong judicial policy in favor of settlements, particularly in the class action context." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116–17 (2d Cir. 2005) (quotation marks omitted) (noting that "[t]he compromise of complex litigation is encouraged by the courts and favored by public policy" (quotation marks omitted)). Under Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of . . . a class proposed to be certified for purposes of settlement [] may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e); *see also In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 328–30 (E.D.N.Y. 2010). To approve a class settlement under Rule 23(e), "the district court must determine that it is 'fair, adequate, and reasonable, and not a product of collusion.'" *Loc. 1180, Commc'ns Workers of Am., AFL-CIO v. City of New York*, 392 F. Supp. 3d 361, 374 (S.D.N.Y. 2019) (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)). In conducting this inquiry, courts consider the substantive and procedural fairness of a proposed settlement to determine "whether 'the terms of the settlement and the negotiation process leading up to it' are fair." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 408 (S.D.N.Y. 2018) (quoting *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008)), *aff'd sub nom. In re Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020) (summary order); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("The District Court determines a settlement's fairness by examining the negotiating process leading up to the settlement as well as the settlement's substantive terms.").

For an evaluation of substantive fairness, it is well settled in this circuit that courts must consider the nine *Grinnell* factors:

> (1) the complexity, expense and likely duration of the litigation[;] (2) the reaction of the class to the settlement[;] (3) the stage of the proceedings and the amount of discovery completed[;] (4) the risks of establishing liability[;] (5) the risks of establishing damages[;] (6) the risks of maintaining the class action through the trial[;] (7) the ability of the defendants to withstand a greater judgment[;] (8) the range of reasonableness of the settlement fund in light of the best possible recovery[; and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (internal citations omitted), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009). In determining procedural fairness, there is a "presumption of fairness, adequacy, and reasonableness" that attaches when a class settlement is reached following "arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Visa, U.S.A., Inc.*, 396 F.3d at 116; *see also Johnson v. Rausch, Sturm, Israel, Enerson & Hornik, LLP*, 333 F.R.D. 314, 320 (S.D.N.Y. 2019*); Dover v. Brit. Airways, PLC (UK)*, 323 F. Supp. 3d 338, 349 (E.D.N.Y. 2018). Although settlement approval is subject to a district court's discretion, *see, e.g., McReynolds*, 588 F.3d at 800; *Denney v. Deutsche Bank AG*, 443 F.3d 253, 273 (2d Cir. 2006), courts "must eschew rubber stamp approval in favor of an independent evaluation," *Grinnell*, 495 F.2d at 462. However, "at the same time, [a court] must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Id.*

## III. Analysis

### A. Class Certification

"Before approving a class settlement agreement, a district court must first determine whether the requirements for class certification in Rule 23(a) and (b) have been satisfied." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 238 (2d Cir. 2012); *see also Johnson*, 333 F.R.D. at 318. As noted above, on August 24, 2023, the undersigned

preliminarily certified the class for the purposes of settlement under Federal Rules of Civil Procedure 23(a) and 23(b)(3). (Mem. & Order, ECF No. 67, at 33.) The Court now grants final certification for settlement as well.

      1.  *Rule 23(a)*

Rule 23(a) sets forth four threshold requirements for class certification: (1) numerosity ("joinder of all members is impracticable"); (2) commonality ("[common] questions of law or fact"); (3) typicality ("claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy ("representative parties will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a). As the Court has previously found, Plaintiffs have satisfied Rule 23(a)'s requirements. (*See* Mem. & Order, ECF No. 67, at 26–30.) As discussed below, and given that "[n]othing has changed with respect to [the four Rule 23(a)] elements since the Court entered the Preliminary Approval Order," the Court reiterates its previous finding that Plaintiffs have satisfied Rule 23(a)'s requirements. (Pls.' Mem. of Law, ECF No. 70, at 8; Mem. & Order, ECF No. 67, at 33.)

      a.  <u>Numerosity</u>

When a class consists of forty or more members, numerosity is presumed. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *see also Scott v. Quay*, 338 F.R.D. 178, 187 (E.D.N.Y. 2021). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 304 (S.D.N.Y. 2010). As described *supra*, Plaintiffs ultimately distributed notice of the proposed settlement to 78,049 individual settlement class members and, as of December 15, 2023, Epiq had received 8,942 claims. (Decl. of Morgan Kimball, ECF No. 72-1, ¶¶ 6–7; Supplemental

Decl. of Morgan Kimball, ECF No. 78-1, ¶ 4.) Accordingly, Plaintiffs have demonstrated

that the settlement class consists of well over 40 people, and numerosity is satisfied. *See*

*Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D.

205, 211 (S.D.N.Y. 2021).

> b.  Commonality & Typicality

A class may only be certified if "there are questions of law or fact common to the

class," and "the claims or defenses of the representative parties are typical of the claims

or defenses of the class." Fed. R. Civ. P. 23(a)(2), (3). Analysis of the requirements of

commonality and typicality "tend to merge" because "[b]oth serve as guideposts for

determining whether under the particular circumstances maintenance of a class action

is economical and whether the named plaintiff's claim and the class claims are so

interrelated that the interests of the class members will be fairly and adequately

protected in their absence." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.5 (2011);

*see also Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997); *Scott*, 338 F.R.D. at 188.

"The 'commonality requirement is met' where 'the plaintiffs' claims arise from

the same alleged course of conduct and are based on legal theories similar to those of all

the class members.'" *Haw. Structural Ironworkers Pension Tr. Fund, Inc.*, 338 F.R.D. at 211–

12 (quoting *In re Deutsche Telekom Ag Sec. Litig.*, 229 F. Supp. 2d 277, 281 (S.D.N.Y.

2002)). Similarly, typicality is met "when each class member's claim arises from the

same course of events, and each class member makes similar legal arguments to prove

the defendant's liability." *Marisol A.*, 126 F.3d at 376.

In this case, there are common questions of law and fact related to whether

Defendants misrepresented or omitted material facts in several of Northern Dynasty's

public filings issued during the Class Period, and whether that caused members of the

settlement class to suffer compensable losses. (*See generally* Am. Compl., ECF No. 37.)

Moreover, each class member's claim arises out of the same course of events and requires the same legal arguments as to Defendants' liability. (*See* Mem. & Order, ECF No. 67, at 28–30.) Accordingly, Rule 23(a)'s requirements of commonality and typicality are satisfied. *See Haw. Structural Ironworkers Pension Tr. Fund, Inc.*, 338 F.R.D. at 212; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 52–53 (E.D.N.Y. 2019); *see also In re Grana y Montero S.A.A. Sec. Litig.*, No. 17-CV-1105 (LDH) (ST), 2021 WL 4173684, at *9 (E.D.N.Y. Aug. 13, 2021), *report and recommendation adopted*, 2021 WL 4173170 (E.D.N.Y. Sept. 14, 2021).

      c.  <u>Adequacy of Representation</u>

To satisfy Rule 23(a)(4)'s requirement "that all members of the class are adequately represented, district courts must make sure that the members of the class possess the same interests, and that no fundamental conflicts exist among the members." *Charron v. Wiener*, 731 F.3d 241, 249 (2d Cir. 2013); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). In addition, courts must ensure "that 'class counsel is qualified, experienced, and generally able to conduct the litigation.'" *Marisol A.*, 126 F.3d at 378 (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

In this case, the named Plaintiffs' interests align with those of the settlement class because each named Plaintiff purchased Northern Dynasty securities during the Class Period and claim financial harm from Defendants' alleged violations of the Securities Exchange Act. (Am. Compl., ECF No. 37, ¶¶ 1, 12–13, 144–50.) Plaintiffs have also demonstrated a commitment to the litigation by retaining qualified and experienced lead counsel. (*See* Mem. & Order, ECF No. 67, at 14–15.) Plaintiffs' counsel have substantial experience in securities class actions, and have diligently litigated on behalf of the putative class throughout the litigation. (*Id.*) Therefore, Plaintiffs have sufficiently

shown that they are able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *see also Lea v. Tal Education Grp.*, No. 18-CV-5480 (KHP), 2021 WL 5578665, at *6 (S.D.N.Y. Nov. 30, 2021); Fed. R. Civ. P. 23(e)(2)(A).

   2.   *Rule 23(b)(3)*

   "In addition to satisfying the Rule 23(a) requirements, certification must be appropriate under Rule 23(b)." *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *10 (quoting *B & R Supermarket, Inc. v. Mastercard Int'l Inc.*, No. 17-CV-2738 (MKB) (JO), 2021 WL 234550, at *20 (E.D.N.Y. Jan. 19, 2021)); *see also Rosi v. Aclaris Therapeutics, Inc.*, No. 19-CV-7118 (LJL), 2021 WL 5847420, at *2 (S.D.N.Y. Dec. 9, 2021). Rule 23(b)(3) permits a class action to be maintained if the court finds "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

   "The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Wang v. Tesla, Inc.*, 338 F.R.D. 428, 441 (E.D.N.Y. 2021) (quoting *Amchem*, 521 U.S. at 623). Predominance is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Id.* (citing *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)). To establish the superiority prong of this inquiry, "the moving party must show that 'the class action presents economies of time, effort and expense, and promote[s] uniformity of decision.'" *Lea*, 2021 WL 5578665, at *6 (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013)).

In this case, as discussed above, Plaintiffs and the settlement class members suffered the same basic harm due to the same alleged misconduct by Defendants. Therefore, the Court finds that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Wang*, 338 F.R.D. at 441; *see also Amchem*, 521 U.S. at 625 (explaining that the "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws").

In addition, in light of the numerosity of class members and the uniformity of their claims, there is a strong basis for a finding of superiority. *See Public Emps.' Ret. Sys. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 120 (S.D.N.Y. 2011) (finding superiority where "there is no overwhelming interest by class members to proceed individually" and noting that in most securities actions, "[m]ultiple actions by multiple plaintiffs could also significantly reduce the prospects for recovery as it would decrease plaintiffs' bargaining power").

## B.  Settlement Approval

As discussed above, a district court's approval of a class action settlement is contingent on a finding that the settlement is "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2), which is determined by an evaluation of a settlement's procedural and substantive fairness. *See McReynolds*, 588 F.3d at 803–04; *D'Amato*, 236 F.3d at 85; *see also Lea*, 2021 WL 5578665, at *7; *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *11.[10]

---

[10] The Court notes that "Rule 23 also requires the court to consider several criteria — some of which overlap with the *Grinnell* factors — that inform whether the settlement is fair, reasonable, and adequate." *In re Parking Heaters, Antitrust Litig.*, No. 15-MC-940 (DLI) (JO), 2019 WL 8137325, at *4 (E.D.N.Y. Aug. 15, 2019), *report and recommendation adopted*, Sept. 30, 2019 ECF Order; *see also* Fed. R. Civ. P. 23(e)(2)(A)–(D). These factors do not displace the *Grinnell* factors,

1.  *Procedural Fairness*

Plaintiffs represent that the $6,375,000 global settlement was reached after extensive and arm's-length negotiations between experienced counsel and included an all-day mediation with mediator Robert Meyer of JAMS. (Mem. & Order, ECF No. 67, at 7–8, 14.) In addition, as detailed in the pleadings, motion papers, and at the preliminary fairness hearing, Plaintiffs' counsel spent extensive time investigating the facts of this case, evaluated the strengths and weaknesses of the claims, and successfully opposed Defendants' motion to dismiss the amended complaint. (*See* Mem. & Order, ECF No. 67, at 15.)

These facts support the conclusion that the settlement process was procedurally fair. *See Visa, U.S.A., Inc.*, 396 F.3d at 116 (noting the "presumption of fairness, adequacy, and reasonableness" that attaches when a class settlement is reached following "arm's-length negotiations between experienced, capable counsel after meaningful discovery"); *see also Lea*, 2021 WL 5578665, at *8; *D'Amato*, 236 F.3d at 85 (holding that the settlement was procedurally fair because the court "expressly considered whether the negotiations were a result of arm's length negotiations and whether plaintiffs' counsel possessed the experience and ability to represent effectively the class's interests" (quotation marks omitted)).

Accordingly, the Court concludes "that the parties gained sufficient information about the claims through mediation and settlement discussions to allow them to make a

_____

but rather "focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal," given that "[t]he central concern in reviewing a proposed class-action settlement is that it be fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. Accordingly, in light of the significant overlap between the relevant Second Circuit case law and the Rule 23(e)(2) factors, the Court incorporates the Rule 23 factors into its analysis throughout.

reasoned evaluation of the chances of success," and therefore, "finds that there was procedural fairness in reaching the proposed settlement." *Burns v. FalconStor Software, Inc.*, No. 10-CV-4572 (ERK) (CLP), 2014 WL 12917621, at *4 (E.D.N.Y. Apr. 11, 2014), *report and recommendation adopted*, May 8, 2014 ECF Order; *see also* Fed. R. Civ. P. 23(e)(2)(B).

    2.  *Substantive Fairness*

For consideration of whether "the relief provided for the class is adequate," Fed. R. Civ. P. 23(e)(2)(C), the Court now turns to the *Grinnell* factors to evaluate the proposed settlement's substantive fairness.

    a.  <u>Complexity, Expense, & Likely Duration of Litigation</u>

Although difficult to predict, the complexity, expense, and likely duration of the litigation favor the proposed settlement. Securities class actions are "inherently complex." *Burns*, 2014 WL 12917621, at *4 (citing *Velez v. Novartis Pharms. Corp.*, No. 04-CV-9194 (CM), 2010 WL 4877852, at *12 (S.D.N.Y. Nov. 30, 2010)); *see also Mikhlin v. Oasmia Pharm. AB*, No. 19-CV-4349 (NGG) (RER), 2021 WL 1259559, at *5 (E.D.N.Y. Jan. 6, 2021) ("Class action suits have a well-deserved reputation as being most complex . . . ." (quotation marks omitted)); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, No. 12-MD-2389, 2015 WL 6971424, at *3 (S.D.N.Y. Nov. 9, 2015) ("As a general rule, securities class actions are notably difficult and notoriously uncertain to litigate." (quotation marks omitted)), *aff'd sub nom. In re Facebook, Inc.*, 674 F. App'x 37 (2d Cir. 2016) (summary order).

This case has already been pending for over three years. (*See* Compl., ECF No. 1.) Plaintiffs withstood Defendants' motion to dismiss, but to continue the litigation, the parties would need to conduct extensive fact and expert discovery, litigate motions for class certification and summary judgment, and potentially carry out a trial and

subsequent appeals, all before any class members might recover an award. (Mem. & Order, ECF No. 67, at 16–18.) Litigating this action is also made more complex, expensive, and risky because (1) proving damages would involve "[d]isentangling the market's reaction to various pieces of news" and "[o]vercoming Defendants' anticipated negative loss causation defense"; (2) the parties would pit experts against each other; and (3) "Defendants could move to decertify the class at any time." (*Id*. at 14–15.) In short, the record amply establishes that litigating this case will be complex, expensive, and very time consuming. Accordingly, this *Grinnell* factor, in addition to Federal Rule of Civil Procedure 23(e)(2)(C)(i), favors settlement.

> b.  <u>Reaction of the Class to the Settlement</u>

The reaction of the class also favors the proposed settlement. As the Second Circuit has noted, "[i]f only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." *Visa, U.S.A. Inc.*, 396 F.3d at 118; *see also In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 311 (E.D.N.Y. 2006). To date, as mentioned *supra*, 78,049 copies of the Postcard Notice were mailed to potential settlement class members; the Summary Notice was transmitted over the *PR Newswire* and published electronically in the *Investor's Business Daily*; and links to the Notice, Claim Form, Stipulation and Agreement of Settlement, and the Preliminary Approval Order were published on a website. (Decl. of Morgan Kimball, ECF No. 72-1, ¶¶ 6–8; 12–13.) Class members had until November 16, 2023, to object to the settlement or request exclusion from the settlement class, and as of November 30, 2023, there had not been a single objection, and only three valid requests for exclusion. (*Id*. Ex. A, at ECF p. 9 (noting the deadline to object or request exclusion); Reply Mem. of Law in Supp. of Pls.' Mots., ECF No. 74, at 4 (noting the objections and requests for exclusion received by November 30, 2023).)

c.  Stage of the Proceedings & the Amount of Discovery Completed

For this factor to favor settlement, the court must ensure that the parties have conducted a factual investigation sufficient for the court to evaluate the proposed settlement and confirm that pretrial negotiations were adequately adversarial. *See Plummer v. Chem Bank*, 668 F.2d 654, 660 (2d Cir. 1982); *In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001). Although the parties have not engaged in formal discovery, the record demonstrates that Plaintiffs' counsel have thoroughly investigated the strengths and weaknesses of the claims and conducted extensive legal research in opposing the motion to dismiss. (Pls.' Mem. of Law, ECF No. 70, at 12.)

Therefore, because the Court finds that counsel had sufficient information "to appreciate the merits of the case," settlement approval is favored. *Burns*, 2014 WL 12917621, at *5; *see also Lea*, 2021 WL 5578665, at *9.

d.  Risks of Establishing Liability

"In considering this factor, the Court need not adjudicate the disputed issues or decide unsettled questions; rather, 'the Court need only assess the risks of litigation against the uncertainty of recovery under the proposed settlement.'" *In re Grana y Montera S.A.A. Sec. Litig.*, 2021 WL 4173684, at *13 (quoting *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004)). Here, Plaintiffs face substantial risks in establishing liability. Although Defendants' motion to dismiss was denied, Plaintiffs note continued risks of establishing liability and damages. (*See* Pls.' Mem. of Law, ECF No. 70, at 13–15.) While Plaintiffs' complaint included evidence from third-party investigations, congressional testimony, and a congressional committee investigation, Plaintiffs note the risk that "Defendants' internal documents could have borne out Defendants' position that Plaintiffs failed to allege any materially false or misleading

23

statements." (*Id.* at 14.) In addition, Plaintiffs' counsel noted that there is a risk that Plaintiffs would not be able to certify and maintain certification of a class. (*Id.* at 15–16.)

For all of these reasons, the Court finds that the $6,375,000 proposed settlement eliminates a substantial risk of establishing Defendants' liability and favors the motion for final settlement approval. *See In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 177; *see also Massiah v. MetroPlus Health Plan, Inc.*, No. 11-CV-5669 (BMC), 2021 WL 5874655, at *4 (E.D.N.Y. Nov. 20, 2012) (explaining that "[o]ne purpose of a settlement is to avoid the uncertainty of a trial on the merits"); Fed. R. Civ. P. 23(e)(2)(C)(i).

e.   Risks of Establishing Damages

Establishing loss causation in securities cases "is a complicated concept, both factually and legally," and "typically involve[s] conflicting expert opinion[s] about the difference between the purchase price and the stock's true value absent the alleged fraud." *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 459 (quotation marks omitted); *see also Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 365 (S.D.N.Y. 2002) ("The determination of damages, like the determination of liability, is a complicated and uncertain process, typically involving conflicting expert opinions."). In addition, moving forward to a trial naturally introduces an element of risk because a jury may only award a fraction of Plaintiffs' established damages. *See In re Marsh & McLennan Companies, Inc. Sec. Litig.*, No. 04-CV-8144 (CM), 2009 WL 5178546, at *6 (S.D.N.Y. Dec. 23, 2009) ("If there is anything in the world that is uncertain when a [securities] case like this one is taken to trial, it is what the jury will come up with as a number for damages.").

Plaintiffs in this case recognize that "proving damages in a securities case is always difficult and invariably requires intricate expert testimony," and it is impossible

to predict how the jury will find regarding causation. (Pls.' Mem. of Law, ECF No. 70, at 14.) Plaintiffs note that Defendants could identify other causes for stock price decline, requiring Plaintiffs' expert to "demonstrate that other parts of the stock price declines after the corrective disclosures were attributable to the alleged omissions." (*Id.* at 15.)

In light of these risks, the Court finds this factor also favors settlement. *See Mikhlin*, 2021 WL 1259559, at *6 (noting that where "[b]oth parties would present expert testimony on the issue of damages," it is "'virtually impossible to predict' which side's testimony would be found more credible, as well as 'which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions.'" (quoting *Strougo v. Bassini*, 258 F. Supp. 2d 254, 259–60 (S.D.N.Y. 2003))); *see also* Fed. R. Civ. P. 23(e)(2)(C)(i).

### f.   Risks of Maintaining a Class Action Through Trial

"Courts generally acknowledge that a contested motion to certify a class would pose at least some increased risk that class certification might be denied." *Mikhlin*, 2021 WL 1259559, at *6 (citing *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. at 40). Here, where Plaintiffs anticipate that a motion for class certification "would likely be contested by Defendants and would be expensive and time-consuming," (Pls.' Mem. of Law, ECF No. 70, at 15), "[t]he risks attendant to certifying a class and defending any decertification motion supports approval of the settlement," *Lea*, 2021 WL 5578665, at *10; *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *5 ("The risk of maintaining a class throughout this long and protracted litigation weighs in favor of settlement approval.").

### g.   Ability of Defendants to Withstand a Greater Judgment

"This factor stands for the proposition that if a defendant could not withstand a greater judgment than what is provided for in the settlement, then the settlement is

more likely to be reasonable, fair, and adequate." *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *14 (citing *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997)). Plaintiffs note "Northern Dynasty's dire financial condition (reflecting cash and cash equivalents of $3.4 million as of June 30, 2023)." (Pls.' Mem. of Law, ECF No. 70, at 1.) Further, "by the time the Settlement was reached, Defendants' insurance coverage was rapidly depleting." (*Id.* at 19.) These factors indicate that the proposed $6,375,000 settlement amount may be nearing Defendants' theoretical capacity to pay. Accordingly, the Court finds that this factor does not preclude settlement approval.

> h.  <u>Range of Reasonableness of the Settlement Fund in Light of Best Possible Recovery and in Light of All Attendant Risks of Litigation</u>

The final two *Grinnell* factors "are often combined for the purposes of analysis." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. at 48. "In considering the reasonableness of the settlement fund, a court must compare the terms of the compromise with the likely rewards of litigation." *Id.* (quotation marks omitted); *see also* Fed. R. Civ. P. 23(e)(2)(C)(i). "[S]ettlements have been approved as reasonable where the settlement provides a 'meaningful benefit' to the class." *Burns*, 2014 WL 12917621, at *5 (quoting *In re Metlife Demutualization Litig.*, 689 F. Supp. 2d at 340).

Here, the $6,375,000 settlement represents approximately 2.3% of the maximum estimated aggregate damages, $281 million, assuming Plaintiffs can prove all their relevant causation arguments. (Mem. in Supp., ECF No. 57, at 19.) However, Plaintiffs estimated best possible recovery "do[es] not account for Defendants' anticipated loss causation arguments, which could have reduced potential damages to a great degree." (*Id.*)

Based on the substantial litigation risks discussed above, and because the settlement here was reached with the assistance of an experienced mediator, the Court concludes that the settlement amount is within a reasonable range.[11] *See Grinnell*, 495 F.2d at 455 n.2 ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."); *see also In re Bear Sterns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 270 (S.D.N.Y. 2012) ("It is well-settled that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair."); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 178 (W.D.N.Y. 2011) ("[I]t is more important to assess the judgment in light of plaintiffs' claims and the other factors . . . ."); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 468, 483 (S.D.N.Y. 2009) (approving $586 million settlement that represented only 2% of aggregate expected recovery).

3. *Allocation of Settlement Fund*

The method of distributing relief and processing class member claims also supports approving the settlement. *See* Fed. R. Civ. P. 23(e)(2)(C)(ii). Like the settlement agreement itself, the plan of allocation "must also be fair and reasonable." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. at 316; *see also In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 158 (S.D.N.Y. 2013) ("When formulated by competent and experienced counsel, a

---

[11] The Court further notes that the approximately 2.3% settlement amount proposed in this case is somewhat higher than the median settlement for cases with similar estimated losses, but not dramatically so. *See* NERA Economic Consulting, *Recent Trends In Securities Class Action Litigation: 2022 Full-Year Review* at 18 (Jan. 24, 2023), https://www.nera.com/content/dam/nera/publications/2023/PUB_2022_Full_Year_Trends.pdf (estimating a 1.8% median ratio of settlement to investor losses in cases settled in 2022); *see also* Cornerstone Research, *Securities Class Action Settlements: 2022 Review and Analysis* at 4, https://www.cornerstone.com/wp-content/uploads/2023/03/Securities-Class-Action-Settlements-2022-Review-and-Analysis.pdf (last visited Jan. 26, 2024).

plan for allocation of net settlement proceeds need have only a reasonable, rational basis.") Furthermore, a proposed claims processing method "should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. at 40 (citing Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment).

Here, the method for processing settlement class members' claims and distributing the net settlement fund to eligible claimants includes well established, effective procedures, and was developed with the assistance of a damages expert. (*See* Fairness Hearing, ECF No. 62, at 16:21–17:19.) Epiq will process the claims under Plaintiffs' counsel's guidance, allow claimants an opportunity to cure any purported deficiencies or request that the Court review their claim denial and, if approved, determine claimants' *pro rata* share of the net settlement fund. (Stipulation & Agreement of Settlement, ECF No. 58, at 8–9, 20.) This methodology is appropriate and consistent with many other securities class action settlements' plans of allocation, and treats class members equitably relative to each other. *See Lea*, 2201 WL 5578665, at *11; *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. at 317; Fed. R. Civ. P. 23(e)(2)(D).

4. *Identification of Other Agreements*

Federal Rule of Civil Procedure 23(e) requires the Court to take into account "any agreement made in connection with" the proposed settlement. Fed. R. Civ. P. 23(e)(3), (e)(2)(C)(iv). The parties have entered into a supplemental agreement filed under seal establishing conditions under which Defendants may terminate the settlement if a certain threshold of opt-outs is reached (*See* Suppl. Agreement, ECF No. 63.) As Plaintiffs have explained, the terms of the supplemental agreement were kept confidential to "prevent third parties from utilizing it for the improper purpose of obstructing the settlement and obtaining higher payouts." (Mem. in Supp., ECF No. 57,

at 21 (quotation marks omitted).) Given the specific function of this separate agreement, it does not bear upon the overall fairness of the settlement agreement itself. *See Mikhlin*, 2021 WL 1259559, at *8 (finding that "the general contours of the supplemental agreement are not incompatible with class members' receipt of adequate relief" because "in the event that Defendants' termination right is activated, and that Defendants exercise such right, Plaintiffs would be still be in a position to pursue relief through litigation"); *see also Christine Asia Co. v. Yun Ma*, No. 15-MD-2631 (CM) (SDA), 2019 WL 5257534, at *15 (S.D.N.Y. Oct. 16, 2019) ("This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement."). Accordingly, the Court finds that the supplemental agreement does not pose an impediment to final approval of the settlement.

### C. Attorneys' Fees and Costs & Plaintiff Awards

Rule 23(e)(2)(C)(iii) also requires consideration of "the terms of any proposed award of attorney's fees." Fed. R. Civ. P. 23(e)(2)(C)(iii). Plaintiffs' counsel seek an attorneys' fee award of 33.33% of the settlement amount, $45,102.04 in costs, and $25,000 in total as an award for the lead plaintiff and named plaintiff. (Pls.' Fee Mem., ECF No. 71, at 1–2.) Counsel argues that these amounts are warranted based upon the risks involved in the litigation, the quality of counsel, and the fees granted in similar securities class action litigations. (*See generally id.*) Having reviewed the documents submitted by class counsel in support of their requests, including attorney declarations, billing records, and invoice summaries for the claimed costs, the Court finds that fees totaling 33.33% of the settlement amount, $45,102.04 in costs, and a total award of

$25,000 to the lead plaintiff and named plaintiff to be reasonable, and therefore approves the requested fees, costs, and awards.[12]

1. *Attorneys' Fees*

When determining appropriate counsel fees in class actions, courts generally use the lodestar method or award fees based on a percentage of the settlement fund. *In re Parking Heaters, Antitrust Litig.*, 2019 WL 8137325, at *6 (citing *Goldberger*, 209 F.3d at 47), *report and recommendation adopted*, Sept. 30, 2019 ECF Order. The "lodestar method" multiplies a reasonable number of hours spent on the case by a reasonable hourly rate, whereas the "common fund method" calculates the fee amount as a percentage of the total award. *Id.* (citing *McDaniel v. County of Schenectady*, 595 F.3d 411, 417–22 (2d Cir. 2010)). Courts using the percentage of the fund method, which is the "trend in this Circuit," will also "cross-check the percentage fee against counsel's 'lodestar' amount of hourly rate multiplied by hours spent." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *9 (citing *Visa, U.S.A., Inc.*, 396 F.3d at 121; *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011)). Under either method, courts will also consider the following *Goldberger* factors: "(1) the time and labor expended by

---

[12] Federal Rule of Civil Procedure 23(e)(2)(C)(iii) also requires courts to consider the "timing of payment" for "any proposed award of attorney's fees." Fed. R. Civ. P. 23(e)(2)(C)(iii). Here, the parties' settlement agreement calls for "attorneys' fees and expenses awarded by the Court" to be paid from the Settlement Fund to Plaintiffs' counsel "within ten (10) calendar days after the date the Court enters the Final Judgment and an order awarding such fees and expenses." (Stipulation & Agreement of Settlement, ECF No. 58, at 23.) While courts in this circuit have found "quick-pay" provisions like this one to be objectionable in certain cases, *see, e.g., Hart v. BHH, LLC*, 334 F.R.D. 74, 77 (S.D.N.Y. 2020), the Court does not find such an arrangement to be problematic here because (1) the escrow agent is tasked with distributing the fund to approved claimants, not counsel; and (2) the Court will retain jurisdiction over any disputes arising out of the administration of the settlement fund, (Stipulation & Agreement of Settlement, ECF No. 58, at 14–16, 32). Accordingly, while the timing of the award of attorneys' fees does not necessarily "bolster the case for . . . approval, it also does not undercut th[e] case where, as here, the majority of other factors weigh significantly in its favor." *Mikhlin*, 2021 WL 1259559, at *7.

counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *16 (citing *Goldberger*, 209 F.3d at 50); *see also Burns*, 2014 WL 12917621, at *8 (same).

As discussed, counsel seeks one-third of the settlement fund, or $2,125,000. (Pls.' Fee Mem., ECF No. 71, at 1.) This amount constitutes approximately 135% of counsel's aggregate lodestar amount, which is $905,460.25 billed for 1,272.23 hours worked.[13] (Decl. of Emma Gilmore, ECF No. 72-2, ¶ 5.) Analyzing this requested award against the *Goldberger* factors and cross-checking it against the lodestar both favor approval of the requested fees.

a. <u>*Goldberger* Factors</u>

First, the time and labor expended by class counsel in this case is reasonable considering that the litigation has been proceeding for other three years, required litigating a motion to dismiss, and included extensive settlement negotiations with the assistance of a professional mediator. (Pls.' Mem. of Law., ECF No. 70, at 2–4.) Moreover, the claimed time is supported by Plaintiffs' counsel's declaration and corresponding billing records. (Decl. of Emma Gilmore, ECF No. 72-2, ¶ 5; Billing Recs., ECF No. 77-1.)

Second, this case involves complex questions concerning liability and damages that would have required the introduction of difficult to obtain documentary and

---

[13] Plaintiffs' counsel's aggregate lodestar is calculated by multiplying 1,272.23 hours worked by the rates for attorneys and staff who worked on this litigation, which rates range from $875 to $1,250 for partners, $500 to $550 for associates, and $110 to $365 for paralegals. (Decl. of Emma Gilmore, ECF No. 72-2, ¶ 5; Billing Recs., ECF No. 77-1.)

deposition evidence, as well as significant reliance on experts. (*See* Pls.' Mem. of Law, ECF No. 70, at 13–16); *see also In re Parking Heaters, Antitrust Litig.*, 2019 WL 8137325, at *7 (recognizing that "class actions like these are complex, expensive, and lengthy").

Third, the risk of litigation, which is "often cited as the first, and most important *Goldberger* factor," weighs in favor of approving the requested fee, as "[c]lass counsel undertook this litigation on a contingent basis and have received no payment for their work during the roughly [three] years that the case has remained pending." *Lea*, 2021 WL 5578665, at *12 (citing *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d at 361; *Goldberger*, 209 F.3d at 54). Indeed, Plaintiffs' counsel note that "[f]rom the outset, [they] understood they were embarking on a complex, expensive, and likely lengthy litigation with no guarantee of ever being compensated . . . ." (Pls.' Fee Mem., ECF No. 71, at 7.)

Fourth, as noted above, lead counsel possess substantial experience litigating complex securities class action cases and have provided quality representation to Plaintiffs and the putative class by, among other things, successfully negotiating a settlement. (Decl. of Emma Gilmore Ex. A (Pomerantz LLP Firm Resume), ECF No. 72-2; Pls.' Fee Mem., ECF No. 71, at 8–10.)

Fifth, the requested one-third fee in relation to the settlement is unopposed and constitutes a proportion routinely approved as reasonable. *See, e.g., In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 445 (E.D.N.Y. 2014) ("[I]t is very common to see 33% contingency fees in cases with funds of less than $10 million . . . ."); *see also Burns*, 2014 WL 12917621, at *10.

Finally, public policy considerations also favor approval of the requested fee amount. In addition to obtaining relief for investors alleging violations of securities laws, "[c]ourts in this Circuit have recognized the importance of private enforcement actions and the corresponding need to incentivize attorneys to pursue such actions on a

32

contingency fee basis." *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *18

(citing *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515–16 (S.D.N.Y. 2009)).

> b. Lodestar Cross-Check

The requested fees are also reasonable under the lodestar method. Lead Counsel

represents that they have spent 1,272.23 total hours litigating this case as of November

9, 2023, producing an aggregate lodestar amount of $905,460.25 when multiplied by

counsel's hourly billing rates. (Decl. of Emma Gilmore, ECF No. 72-2, ¶ 5; Billing Recs.,

ECF No. 77-1.) This results in a lodestar multiplier of approximately 2.35, which is "a

reasonable multiplier that falls comfortably in line with multipliers approved by courts

in this Circuit and around the country." (Pls.' Fees Mem., ECF No. 71, at 12–13.) *See, e.g.*,

*Visa, U.S.A., Inc.*, 396 F.3d at 123 (upholding a multiplier of 3.5 as reasonable on appeal);

*Burns*, 2014 WL 12917621, at *10 (holding a fee award of 33.3% as reasonable based on

cross-check multiplier of 4.75); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D.

465, 489 (S.D.N.Y. 1988) (finding a multiplier of 3.97 to be reasonable).

The Court notes, however, that Plaintiffs' counsel's billing records reflect hourly

rates that exceed those normally approved in this district for similar services. *See In re*

*KeySpan Corp. Sec. Litig.*, No. 01-CV-5852 (ARR), 2005 WL 3093399, at *14 (E.D.N.Y. Sept.

30, 2005) ("The reasonable hourly rates should be based on the rates 'prevailing in the

community for similar services of lawyers of reasonably comparable skill, experience,

and reputation.'" (quoting *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1159 (2d Cir. 1994)));

*Rosenfeld v. Lenich*, No. 18-CV-6720 (NGG) (PK), 2022 WL 2093028, at *4 (E.D.N.Y. Jan.

19, 2022) (approving hourly rates ranging from $225 to $900 in a large class action

settlement); *In re Converse Tech. Inc. Sec. Litig.*, No. 06-CV-1825 (NGG) (RER), 2010 WL

2653354 (E.D.N.Y. June 24, 2010) (approving rates ranging from $125 to $800 in a

securities class action). However, even applying reduced hourly rates, a reasonable

aggregate lodestar is $607,228.25, which would produce a lodestar multiplier of 3.5 relative to the requested fee amount.[14] Even at this reduced amount, the multiplier "is below what has been deemed reasonable for the common fund settlements in securities class action cases in this circuit." *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *18 (citing *Athale v. Sinotech Energy Ltd.*, No. 11-CV-5831 (AJN), 2013 WL 11310686, at *8 (S.D.N.Y. Sept. 4, 2013); *Carlson v. Xerox Corp.*, 355 F. App'x 523, 526 (2d Cir. 2009) (summary order)). Accordingly, the lodestar cross-check also favors approval of the uncontroverted amount of fees awarded in the settlement.

*     *     *     *     *

For all of these reasons, the Court grants Plaintiffs' motion for attorneys' fees in the amount of one-third of the settlement fund.

2.  *Attorneys' Expenses*

"The Court may award counsel reasonable out-of-pocket expenses that were necessary to successfully litigate and resolve the action." *Burns*, 2014 WL 12917621, at *11 (citing *In re Metlife Demutualization Litig.*, 689 F. Supp. 2d at 363–64; *In re Glob. Crossing Sec. and ERISA Litig.*, 225 F.R.D. at 468). Plaintiffs' counsel request reimbursement for $45,102.04 in expenses incurred while prosecuting this action.[15] (Pls.' Fee Mem., ECF No. 71, at 1.) Counsel state that significant expenses included an "expert

---

[14] The Court calculated this reduced lodestar by multiplying the hours spent on the litigation by hourly rates generally found reasonable in this district, i.e., $900 for partners and $225 for associates.

[15] The $45,102.04 in costs is comprised of: (1) $402 in clerk filing fees; (2) $20 related to a fee incurred in connection with moving for admission of one of Plaintiffs' counsel; (3) $3,298.42 in online computer legal research and document retrieval fees; (4) $16,976.40 in expert fees; (5) $10,335.93 in investigator fees; (6) $5,275 in mediator fees; (7) $622.68 in clerical overtime; (8) $126.91 in postage and overnight mail; (9) $2,296.26 in press release and newswire fees; (10) $3,839.41 in travel, transportation, and meal expenses; and (11) $1,909.03 in photocopying expenses. (Decl. of Emma Gilmore, ECF No. 72-2, ¶ 7; Expense Records, ECF No. 77-2.)

retained to analyze damages, analyze Defendants' loss causation and damages arguments, and help formulate the Plan of Allocation[,] . . . costs of investigation fees[,] . . . [and] costs of hiring an experienced mediator." (*Id.* at 14.)

Having reviewed counsel's expense records, and given that the Notice distributed to potential class members anticipated up to $80,000 in litigation expenses, the Court finds that the claimed costs were, on the whole, reasonably expended and should be reimbursed. (*See* Decl. of Morgan Kimball, Ex. A, Summary Notice, ECF No. 72-1.) Accordingly, the Court approves the request for an award of attorneys' expenses in the amount of $45,102.04.

3. *Plaintiffs' Awards*

"Incentive awards are common in class action cases and are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by plaintiffs." *In re Parking Heaters, Antitrust Litig.*, 2019 WL 8137325, at *8 (quotation marks omitted); *see also Hernandez v. Immortal Rise, Inc.*, 306 F.R.D. 91, 101 (E.D.N.Y. 2015) (same).

Here, Plaintiffs seek an award of $20,000 to lead plaintiff Lawrence Kelemen and $5,000 to named plaintiff Charles Hymowitz, totaling $25,000, in connection with their representation of the settlement class. (*See* Pls.' Fees Mem., ECF No. 71, at 15.) Both of these Plaintiffs submitted declarations detailing their efforts in this action over the past two years. (*See generally* Keleman Decl., ECF No. 72-3; Hymowitz Decl., ECF No. 72-4.) The incentive awards requested in this case are in line with or are more modest than others that have been awarded. *See, e.g., Benzion v. Vivint, Inc.*, No. 12-CV-61826 (WJZ), 2015 WL 11143078, at *3 (S.D. Fla. Feb. 23, 2015) (approving award of $20,000 to the class representative); *Bogosian v. Gulf Oil Corp.*, 621 F. Supp. 27, 32 (E.D. Pa. 1985)

(same). Accordingly, the Court grants the application for an incentive award of $20,000 to lead plaintiff Lawrence Kelemen and $5,000 to named plaintiff Charles Hymowitz.

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motions for final settlement approval (ECF No. 68) and for attorneys' fees, reimbursement of litigation expenses, and award to Plaintiffs (ECF No. 69). The Court therefore enters the attached Order and Final Judgment.

**SO ORDERED.**

Dated: Brooklyn, New York
          January 26, 2024

*Taryn A. Merkl*
_____
TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE